No. 24-60223

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

AT&T INC.,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

Respondents.

_____

On Petition for Review from the Federal Communications
Commission

OPENING BRIEF OF PETITIONER AT&T INC.

Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T Inc.*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60223, *AT&T Inc. v. Federal Communications Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Petitioner**
AT&T Inc.

**Counsel for Petitioner**
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP

**Respondents**
Federal Communications Commission
United States of America

**Counsel for Respondents**
James Michael Carr
P. Michele Ellison
Jacob Matthew Lewis
FEDERAL COMMUNICATIONS COMMISSION

Merrick Garland, U.S. Attorney General
Robert B. Nicholson
U.S. DEPARTMENT OF JUSTICE

*s/ Pratik A. Shah*
Pratik A. Shah

*Counsel for Petitioner AT&T Inc.*

i

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner AT&T Inc. respectfully requests oral argument. The Federal Communications Commission's $57 million forfeiture order against AT&T raises several significant issues—including the constitutionality of the Commission's forfeiture scheme, the scope of the Commission's authority under section 222 of the Communications Act, the reasonableness of the Commission's liability finding, and the extent to which the Commission can bypass statutorily mandated penalty caps. Oral argument will facilitate proper resolution of these important questions. *See* FED. R. APP. P. 34(a)(2).

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT................................................ iii

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................2

INTRODUCTION ................................................................................................3

STATEMENT OF THE CASE................................................................................6

   A.  Legal Framework ..................................................................6

      1.  *Section 222 Of The Communications Act*.........................6

      2.  *The Commission's Forfeiture Scheme* .............................9

   B.  Factual Background ............................................................11

      1.  *AT&T's Location-Based Services Program*....................11

      2.  *The Securus Incident And AT&T's Response*.................14

      3.  *AT&T's Termination Of The Location-Based Services Program*..............................................................17

   C.  The Commission's Forfeiture Order ........................................19

      1.  *The Notice Of Apparent Liability* ..................................19

      2.  *The Final Forfeiture Order*............................................22

SUMMARY OF ARGUMENT................................................................................24

STANDARD OF REVIEW ..................................................................................28

ARGUMENT ......................................................................................................28

  I.  THE COMMISSION'S FORFEITURE SCHEME IS UNCONSTITUTIONAL.........................................................................28

   A.  The Commission's Adjudication Of Common Law Private Rights Violates The Seventh Amendment....................29

      1.  *Only a jury may impose a punitive civil forfeiture.*........29

      2.  *The Commission's attempt to square the Forfeiture Order with the Constitution runs headlong into Jarkesy.* ........................................................................32

B. The Commission's Dual Role As Prosecutor And Adjudicator Violates Article III and Due Process.....................36

C. The Commission's Discretion To Choose Between An NAL Or An ALJ Violates The Nondelegation Doctrine...........39

II. THE COMMISSION LACKED STATUTORY AUTHORITY TO ISSUE THE FORFEITURE ORDER ...........................................41

A. The Location Data In Question Falls Outside The Plain Text Of Section 222 ...................................................................41

B. Lack Of Fair Notice Bars Retroactive Application Of The Commission's Novel Interpretation Of CPNI..........................45

III. THE FORFEITURE ORDER IS ARBITRARY AND CAPRICIOUS BECAUSE AT&T REASONABLY PROTECTED ITS CUSTOMERS' DATA ........................................48

A. AT&T Took Prompt Yet Sensible Protective Action In Light Of The Securus Incident...................................................49

B. The Commission Failed To Weigh The Countervailing Consumer Benefits And Harms From Abrupt Termination Of LBS Services........................................................................52

IV. THE $57 MILLION PENALTY IS UNLAWFUL AND UNFOUNDED ...................................................................................54

CONCLUSION ....................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Connects v. Bonta,*
    24 F.4th 1233 (9th Cir. 2022) ..............................................................7

*AT&T Corp. v. FCC,*
    323 F.3d 1081 (D.C. Cir. 2003) .........................................................10

*Atlas Roofing Co. v. OSHA,*
    430 U.S. 442 (1977)............................................................................32

*Cinderella Career & Finishing Schs., Inc. v. FTC,*
    425 F.2d 583 (D.C. Cir. 1970)............................................................38

*Connally v. General Constr. Co.,*
    269 U.S. 385 (1926)............................................................................45

*Consumers' Rsch. v. FCC,*
    --- F.4th ----, 2024 WL 3517592 (5th Cir. 2024) (en banc) ..............39

*FCC v. Fox Tel. Stations, Inc.,*
    567 U.S. 239 (2012)......................................................................46, 53

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021)............................................................................28

*FTC v. AT&T Mobility, LLC,*
    883 F.3d 848 (9th Cir. 2018) .............................................................44

*International Union, United Auto., Aerospace & Agric. Implement
    Workers of Am., UAW v. OSHA,*
    938 F.2d 1310 (D.C. Cir. 1991).........................................................48

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ........................................................39, 40

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024)..........................................................28, 34, 57

*Luna-Garcia v. Barr*,
   932 F.3d 285 (5th Cir. 2019) ............................................................40

*Memorial Hermann Hosp. v. Sebelius*,
   728 F.3d 400 (5th Cir. 2013) ............................................................28

*Michigan v. EPA*,
   576 U.S. 743 (2015).................................................................49, 51

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
   Co.*,
   463 U.S. 29 (1983).........................................................................52

*In re Murchison*,
   349 U.S. 133 (1955).......................................................................34

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005).........................................................................7

*Ohio Telecom Ass'n v. FCC*,
   No. 24-3449 (6th Cir.) ......................................................................7

*SEC v. Jarkesy*,
   144 S. Ct. 2117 (2024)...............................................................*passim*

*Simmons v. United States*,
   390 U.S. 377 (1968).......................................................................34

*Talk Am., Inc. v. Michigan Bell Tel. Co.*,
   564 U.S. 50 (2011)...........................................................................3

*Tennessee v. Pennington*,
   40 Tenn. (3 Head) 299 (1859) .........................................................31

*United Gas Pipe Line Co. v. FERC*,
   824 F.2d 417 (5th Cir. 1987) ...........................................................31

*United States v. Chromalloy Am. Corp.*,
   158 F.3d 345 (5th Cir. 1998) ...........................................................57

*United States v. Hoffman*,
   901 F.3d 523 (5th Cir. 2018) ...........................................................30

*United States v. Stevens*,
    691 F.3d 620 (5th Cir. 2012) ...................................................*passim*

*University of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ...........................................52

*Wages & White Lion Invs., L.L.C. v. FDA*,
    90 F.4th 357 (5th Cir. 2024) ...........................................46

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..........................................................41

*Williams v. Pennsylvania*,
    579 U.S. 1 (2016)................................................36, 37, 38

**Commission Proceedings**

*Amendment of Section 1.80(b) of the Comm'n's Rules*,
    Order, 34 FCC Rcd. 12824 (2019) .............................9, 54

*Commission's Forfeiture Pol'y Statement & Amend. of Section 1.80 of
    the Rules to Incorporate the Forfeiture Guidelines*, 12 F.C.C. Rcd.
    17087 (1997)...................................................................36

*Implementation of the Telecomms. Act of 1996: Telecomms. Carriers'
    Use of Customer Proprietary Network Info. & Other Customer
    Info.*, Report and Order and Further Notice of Proposed
    Rulemaking, 22 FCC Rcd. 6927 (2007) ..............................8

*Implementation of the Telecomms. Act of 1996; Telecomms. Carriers'
    Use of Customer Proprietary Network Info. & Other Customer
    Info.*, CC Docket No. 96-115, Declaratory Ruling, 28 FCC Rcd
    9609 (2013)......................................................................47

*Joint Application of Securus Inv. Holdings, LLC, et al., for Grant of
    Auth. to Transfer Indirect Ownership & Control of Licensees*,
    Memorandum Opinion and Order, 32 FCC Rcd. 9564 (2017)....................16, 51

*Protecting the Privacy of Customers of Broadband & Other
    Telecomms. Servs.*, Report and Order, 31 FCC Rcd. 13911 (2016)...............9, 47

*Request by Cellular Telecomms. & Internet Ass'n to Commence Rulemaking to Establish Fair Location Info. Practices*, Order, 17 FCC Rcd. 14832 (2002) ....................................................9

*Request by CTIA to Commence Rulemaking to Establish Fair Location Info. Practices*, Order, FCC 02-208 (July 24, 2002) ....................................................46

*Safeguarding & Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket Nos. 23-320 & 17-108, FCC 24-52 (May 7, 2024) ....................................................7, 9, 46, 47

*Securus Technologies, Inc., et al.,* Order re: Consent Decree, 32 FCC Rcd. 9552 (2017) ....................................................16

*T-Mobile USA, Inc.*, FCC 24-43, 2024 WL 1905233 (F.C.C. Apr. 29, 2024) ....................................................39

*TerraCom, Inc. & YourTel Am., Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd. 13325 (2014) ....................................................46

## Statutes

5 U.S.C.
§ 706(2) ....................................................28

28 U.S.C.
§ 2342(1) ....................................................1
§ 2462 ....................................................35

47 U.S.C.

    § 151 *et seq.* ...............................................................................6
    § 153(51) ..................................................................7, 42, 44
    § 222 ...........................................................................................8
    § 222(a) ......................................................................................8
    § 222(c)(1) .................................................................................8
    § 222(h)(1)(A) ...........................................8, 26, 41, 42, 43, 44
    § 402(a) ......................................................................................1
    § 503(b)(1) ...............................................................................30
    § 503(b)(2)(B) ...............................................................9, 27, 54
    § 503(b)(2)(E) ...........................................................................9
    § 503(b)(3)(A) ...............................................................9, 10, 40
    § 503(b)(4) ...............................................................................10
    § 503(b)(6)(B) .........................................................................20
    § 504(a) ..............................................................................11, 33

## Other Authorities

47 C.F.R.

    § 1.276 ......................................................................................10
    §§ 1.311-1.325 .........................................................................10
    § 1.351 ......................................................................................10
    § 1.376 ......................................................................................10
    § 64.2010(a) ....................................................................8, 48, 52

FCC, Wireless Telecomms. Bureau, *Location-Based Services:  An
    Overview of Opportunities and Other Considerations* (May 2012) ............11, 53

Letter from Lee Petro, Counsel for the Wright Pet'rs to Marlene
    Dortch, Secretary, FCC, WC Docket No. 17-126 (Aug. 5, 2017) ...............15, 51

Letter from Jessica Rosenworcel, Chairwoman to John Stankey, Chief
    Executive Officer, AT&T Services, Inc. (July 19, 2022) ...................35

RESTATEMENT (SECOND) OF TORTS § 652B (Am. L. Inst. 1977) ............................32

RESTATEMENT (SECOND) OF TORTS § 652D (Am. L. Inst. 1977) ...........................32

*Solely*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1118 (10th
    ed. 1997) ...................................................................................42

U.S. CONST. art. I, § 1 ...........................................................................39

# JURISDICTIONAL STATEMENT

This Court has jurisdiction to review final orders of the Federal Communications Commission. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). On April 29, 2024, the Commission issued a forfeiture order against AT&T in *In re AT&T, Inc.*, File No. EB-TCD-18-00027704, FCC 24-40. AT&T paid the penalty (under protest) on May 6, 2024, and timely petitioned for review on May 7, 2024.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

**I.**     Whether the Commission's forfeiture regime—under which the Commission issued a massive civil penalty without a jury trial, adjudicated its own enforcement action, and chose the applicable legal process—is unconstitutional.

**II.**     Whether the Commission exceeded its authority under section 222 of the Communications Act, which allows the Commission to regulate only the use of "customer proprietary network information"—*i.e.*, data obtained "solely" by virtue of a carrier's provision of telecommunications (as opposed to information) services—and which the Commission has never before said covers the type of location data in question.

**III.**     Whether the Commission acted arbitrarily and capriciously when it concluded that AT&T acted unreasonably to protect customers' location data and was thus liable under section 222 of the Communications Act.

**IV.**     Whether the Commission acted arbitrarily, capriciously, and otherwise contrary to law in imposing a penalty 28 times greater than the statutory cap for a continuing violation of the Communications Act.

## INTRODUCTION

The Federal Communications Commission in this case exercised exactly the kind of powers the Constitution forbids. The Commission tried (as it has "repeatedly" before) "to expand [the governing] statute beyond its text," *Talk Am., Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 69 (2011) (Scalia, J., concurring), and then sat as "prosecutor, judge, and jury" over its own allegations of wrongdoing, *SEC v. Jarkesy*, 144 S. Ct. 2117, 2139 (2024). The preordained result is as unsurprising as it is unlawful: the Commission, without any hearing or trial, imposed a $57 million penalty affirming its own notice of purported violation of a statute that plainly does not cover the alleged conduct.

For over 10 years, with the Commission's encouragement, AT&T (like other major wireless carriers) ran a program allowing its customers to engage with and benefit from "location-based services"—like Life Alert's emergency-response medical care, AAA's roadside assistance, and major banks' fraud prevention. AT&T allowed only vetted providers for specifically approved uses to access location data and required that those providers obtain consent from the relevant AT&T customer.

Despite those (and many other) safeguards, AT&T learned in 2018 that one provider had been misusing its access to customer location data across wireless carriers. The provider went so far as to submit false records that prevented AT&T and others from detecting its misdeeds. Once that information came to light, AT&T

responded immediately by shutting down that provider's access, launching an investigation, and reviewing its entire location-based services program from the ground up. Put simply, AT&T did what any prudent company would do in that situation: act quickly, but also sensibly, to protect its customers' interests.

Although the Commission learned of the outlier provider's violations nearly a year before AT&T, it kept the information to itself and took no remedial action. Instead, years later, the Commission faulted the major wireless carriers for not doing more or acting faster, and issued forfeiture orders levying penalties totaling nearly $200 million—$57 million for AT&T specifically. But problems abound. As a constitutional matter, the Commission never proved its case to an impartial (or any) judge or jury, as the Seventh Amendment, Article III, and due process demand. Instead, without even affording AT&T a hearing, the Commission decided the validity of its own claims. In addition, in violation of the nondelegation doctrine, Congress did not provide the Commission with any guidance whether it should proceed in that convenient manner when issuing forfeiture orders (which, predictably, it nearly always does). Any one of those constitutional infirmities dooms the forfeiture order against AT&T, for the same reasons that this Court and the Supreme Court explained in *Jarkesy*.

The Constitution aside, the Commission lacked statutory authority to impose a forfeiture here. The Communications Act authorizes the Commission to regulate

certain customer information obtained "*solely* by virtue of" an entity's provision of "telecommunications services," a term of art all agree referred to voice services (as distinct from data services). But the customer location information at issue was not tied "solely" to voice services; AT&T obtained the same information to provide data services. Indeed, location-based services can be used by data-plan customers who do not even have voice services with AT&T, like many tablet or smartwatch customers.

On its own terms, the forfeiture order is illogical. In determining the "reasonableness" of AT&T's actions, the Commission considers only the (overstated) risks that prompted its action, not the countervailing customer benefits. The order is premised on the notion that AT&T should have, within 30 days of learning about *one* bad actor, cut off access to *every* location-based-services provider—no matter the benefits they offered, the harm (life-or-death for some) that abrupt termination could cause, or the complete lack of evidence of *any* wrongdoing on their part. Yet for all the Commission's insistence that haste was paramount, it did *nothing* when it learned of the provider's misconduct nearly one year before AT&T. The order also shrugs off the many reasonable actions AT&T did take to protect customers' location data and the considered manner in which AT&T constricted and then ultimately terminated its location-based-services program. The Commission's one-sided ledger cannot pass muster as reasoned decisionmaking.

If that were not enough, the order's $57 million penalty is unlawful. The amount not only blows past the statutory penalty cap of $2 million, but also is manufactured from inputs (*i.e.*, the number of location-based-service providers) the Commission all but concedes it plucked out of thin air. Alarmingly, the Commission openly suggests that it would have been free to use a different input (say, the number of AT&T customers) to reach an even more exorbitant penalty (up to *hundreds of trillions*)—all without any evidence of harm to a single AT&T customer. That is the definition of arbitrariness.

The Commission's forfeiture order is unconstitutional, inconsistent with the limitations of the Communications Act, and arbitrary and capricious as to both its liability findings and penalty calculation. This Court should grant AT&T's petition for review and vacate the forfeiture order.

## STATEMENT OF THE CASE

### A. Legal Framework

#### 1. *Section 222 Of The Communications Act*

The Communications Act, as amended by the Telecommunications Act of 1996, distinguishes between two categories of services: telecommunications services and information services. *See* 47 U.S.C. § 151 *et seq*. Providers of telecommunications services are subject to "the broad authority of Title II" and thus the "multitude of statutory restrictions and requirements" for "common carriers."

*ACA Connects v. Bonta*, 24 F.4th 1233, 1238 (9th Cir. 2022). Providers of information services, however, are not. The Commission "has \*\*\* only a more limited 'ancillary authority' with respect to Title I information services." *Id.*; *see also National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005) ("The Act regulates telecommunications carriers, but not information-service providers, as common carriers.").

At all times relevant here, "telecommunications services" encompassed telephone (*i.e.*, voice) services, while "information services" encompassed data (*i.e.*, Internet-access) services. Entities "engaged in providing" voice services were subject to Title II with respect to provision of those services only. *See* 47 U.S.C. § 153(51) ("A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services[.]").[1]

This case concerns section 222 of Title II, which sets forth a telecommunications carrier's responsibilities with respect to "customer proprietary

---

[1] The Commission has recently tried to reclassify—on a prospective basis only—Internet-access services as "telecommunications services." *Safeguarding & Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket Nos. 23-320 & 17-108, FCC 24-52 (May 7, 2024) ("Open Internet Order"). Several challenges are pending. *See Ohio Telecom Ass'n v. FCC*, No. 24-3449 (6th Cir.). The resolution of those challenges will not affect the outcome here, however, because the Commission does not contend that data services were "telecommunications services" during the relevant period.

network information" ("CPNI"). 47 U.S.C. § 222. Section 222 requires carriers to "protect the confidentiality of" CPNI "[e]xcept as required by law or with the approval of the customer." *Id.* § 222(a), (c)(1). The section defines CPNI—consistent with Title II's telecommunications-focused purview—as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *Id.* § 222(h)(1)(A). An example is the date and time of a customer's phone calls.

In implementing section 222, the Commission has stated that "[t]elecommunications carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a). Carriers are also required in certain circumstances to obtain "opt-in" consent from a customer before disclosing that customer's CPNI. *See Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd. 6927 ¶¶ 3, 37-49 (2007).

Yet the Commission has neither confirmed the outer contours of what constitutes CPNI nor provided a comprehensive understanding of the term. *See Request by Cellular Telecomms. & Internet Ass'n to Commence Rulemaking to*

*Establish Fair Location Info. Practices*, Order, 17 FCC Rcd. 14832 (2002). One thing the Commission has made clear is that its CPNI rules have "focused on addressing problems in the [Title II] *voice service* context." Open Internet Order ¶ 359 (emphasis added); *see also Protecting the Privacy of Customers of Broadband & Other Telecomms. Servs.*, Report and Order, 31 FCC Rcd. 13911 ¶ 39 (2016) ("Broadband Privacy Rules").

### 2. *The Commission's Forfeiture Scheme*

The Communications Act authorizes the Commission to assess monetary forfeiture penalties for violations of the Act and its implementing rules. 47 U.S.C. § 503(b)(3)(A). The Act requires the Commission, when determining the penalty amount, to "take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." *Id.* § 503(b)(2)(E). The Act then caps the total amount "assessed for any continuing violation [to] *** a total of $1,000,000 for any single act or failure to act"—adjusted for inflation to just over $2 million. *Id.* § 503(b)(2)(B); *see Amendment of Section 1.80(b) of the Comm'n's Rules*, Order, 34 FCC Rcd. 12824, 12828 (2019).

The process by which the Commission adjudicates a violation is left to the Commission's "discretion." 47 U.S.C. § 503(b)(3)(A). As a first option (albeit rarely exercised), the Commission can designate the case for adjudication before an

administrative law judge ("ALJ"). *Id.* That route allows the Commission staff and the target to take discovery, including depositions and interrogatories. *See* 47 C.F.R. §§ 1.311-1.325. The ALJ will then hold an evidentiary hearing with documentary evidence, live testimony, and cross examination. *See id.* §§ 1.376, 1.351. Based on that contested record, the ALJ will prepare an "initial decision," which the parties may appeal to the Commission. *Id.* § 1.276.

In the alternative, the Commission may—and nearly always does (as it did here)—itself investigate a potential violation and then itself issue the charging document called a notice of apparent liability ("NAL"). 47 U.S.C. § 503(b)(4). The subject of the NAL is not afforded a trial or hearing; it has only one chance to defend itself, by filing a written response. *See AT&T Corp. v. FCC*, 323 F.3d 1081, 1083 (D.C. Cir. 2003) ("Under the less formal NAL procedure *** , the Commission issues a notice of apparent liability to the alleged violator, affording it only the opportunity to show, in writing, why no forfeiture penalty should be imposed."). The Commission will then decide whether its own NAL, including the proposed penalty, should be affirmed.

Although the statute suggests that a party need not pay that penalty until the Department of Justice brings and wins a collection action after a trial de novo, 47 U.S.C. § 504(a), this Court has held that the defendant in such a district court action may challenge only the forfeiture order's factual findings, not its "legal validity,"

*United States v. Stevens*, 691 F.3d 620, 622 (5th Cir. 2012). Under that binding precedent, the only route for true review of a legally invalid forfeiture order is for the party to pay the penalty immediately and pursue a direct appeal.

### B.    Factual Background

#### 1.    AT&T's Location-Based Services Program

AT&T is a wireless company that offers voice, text, and data services. AR4:3.[2] At issue here is AT&T's location-based services ("LBS") program. Location-based services are "mobile services that combine information about a user's physical location with online connectivity." FCC, Wireless Telecomms. Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations* 1, 16 (May 2012) ("LBS Report").[3] They "let users access relevant and up-to-date information about their surroundings, inform others of their whereabouts, and get instant access to maps and traffic information for their current location." *Id.* at 1. The Commission had long supported such services as "creat[ing] a more dynamic user experience," "add[ing] value and convenience," and "greatly increas[ing] the likelihood that someone in distress will receive life-saving assistance." *Id.* at 1, 16.

For more than a decade, AT&T (along with other wireless providers) supported the growth of those services by contracting with certain LBS providers

---

[2] The administrative record is cited as AR[number listed in certified index]:[pages].

[3] https://docs.fcc.gov/public/attachments/DOC-314283A1.pdf.

for access to AT&T customers' device-location data.  AR4:2.  Those providers included household names like:  (i) Life Alert, which dispatched first responders to AT&T customers in urgent need of medical care; (ii) AAA, which sent roadside assistance to stranded AT&T customers; and (iii) major banks, which verified AT&T customers' identities to prevent fraud.  *Id.*

Because LBS users subscribed to different wireless companies, LBS providers generally worked with "location aggregators" that in turn contracted with the major wireless companies, thus serving as a single point of contact for location-data requests.  AR4:5.  For example, if AAA needed to send a tow truck to a member's location, AAA would contact its location aggregator, thereby avoiding the need to figure out whether AT&T, Verizon, Sprint, or T-Mobile was the member's carrier.  AT&T worked with two location aggregators—LocationSmart and Zumigo—to service most LBS providers.  *Id.*

Notably, the location information AT&T provided was not *call* location information, *i.e.*, records of "the customer's location while making or receiving a voice call."  AR1:41 (Comm'r Carr, dissenting) (emphasis omitted); *see* AR4:3.  Instead, AT&T used a customer's network-based location information, *i.e.*, real-time location information generated by a device's connection to the AT&T network regardless of the type of service(s) being provided (*e.g.*, voice and/or data).  AR4:3-4.  AT&T's provision of LBS did not occur in connection with any voice

service. Nor was an AT&T customer required to subscribe to voice services to use LBS; data-only customers could do so as well. AR3:9-10.

Given the sensitivity of LBS data, AT&T implemented industry-leading privacy protocols. As a baseline, AT&T followed the best practices set forth by CTIA—the wireless communications industry's trade association—by imposing notice-and-consent requirements and information-security controls on each location aggregator. AR4:5-6. But AT&T went further in requiring aggregators and providers not only to obtain affirmative customer consent "in connection with every location request," but also to provide a record evidencing that consent. AR4:7-8. AT&T reviewed those records "daily." *Id*.

In addition, before AT&T agreed to provide location data to an aggregator, the aggregator had to identify the LBS provider and the service for which location data would be requested. AR4:6-7. That "use case" described how location data would be used, how the LBS provider would give notice to AT&T customers about its location requests, and how the LBS provider would obtain customers' consent to those requests. *Id.* at 6. AT&T would review the proposed use case to ensure compliance with AT&T's requirements for notice and consent, as well as any applicable legal obligations. *Id.* AT&T also conducted regular assessments to monitor and strengthen its controls. *Id.* at 8.

Employing those protocols (and others), AT&T's LBS program proceeded for years without issue.

### 2. The Securus Incident And AT&T's Response

One LBS provider with access to AT&T LBS data was Securus Technologies, a Commission-licensed company that provides telephone services to prison facilities. AR4:8-9; AR12:3. In 2012, AT&T approved a use case wherein aggregator LocationSmart worked with Securus to obtain customer location information from *consenting* AT&T customers who received prisoner calls. AR4:8-9. Based on that information, for security reasons, Securus might block the call if the customer was within a high-risk location (such as the area surrounding the prison). *Id.*

LocationSmart was contractually obligated to abide by AT&T's detailed notice-and-consent protocols, and to impose the same controls on Securus. AR4:9. Specifically, AT&T required that the AT&T customer receiving a call from a prisoner press a number on their keypad indicating consent to collect his or her location data. *Id.* LocationSmart and Securus would also maintain records verifying that customer consent, which AT&T reviewed daily. *Id.* at 7, 9.

Unbeknownst to AT&T, however, in 2014 Securus created a tool that allowed law enforcement to access a suspect's location information, without that suspect's consent, by uploading a judicial warrant or other legal authorization. AR4:10.

14

Securus never sought approval from AT&T or LocationSmart for that use of customer location data. To make matters worse, Securus did not actually review the documents law enforcement uploaded, which allowed Missouri sheriff Cory Hutcheson to use the tool at least eleven times without uploading any court order or other form of legal authorization. *Id.* at 9. Securus also submitted location requests for that *unapproved* program "under the guise of its *approved* use case" concerning prisoner telephone calls, and Securus continued to provide both LocationSmart and AT&T with false records consistent with the latter. AR1:17 (¶ 39) (emphasis added and capitalization omitted); AR16:11-12. In other words, Securus made its unauthorized law-enforcement tool look like the approved use case to AT&T.

The Commission first became aware in 2017 that Securus had misused its access to location data (thereby enabling Hutcheson's crimes) when Securus sought regulatory approval for a change in its ownership and encountered opposition from prisoners' rights groups. AR3:19 & n.17; *see also* Letter from Lee Petro, Counsel for the Wright Pet'rs to Marlene Dortch, Secretary, FCC, WC Docket No. 17-126, at 2 (Aug. 5, 2017) ("Wright Pet'rs Letter") ("Securus was ordered by a Missouri state criminal court to send a Securus employee to provide testimony in a criminal case involving the misuse of Securus' Location Based Service[.]").[4] Yet the Commission punted those groups' claims to an unspecified future "enforcement proceeding,"

---

[4] https://www.fcc.gov/ecfs/document/10805871110099/1.

which it never launched, and granted Securus's change-in-ownership application. AR3:19 & n.17; *Joint Application of Securus Inv. Holdings, LLC, et al., for Grant of Auth. to Transfer Indirect Ownership & Control of Licensees*, Memorandum Opinion and Order, 32 FCC Rcd. 9564 ¶ 10 (2017) ("Securus Transfer Approval"). Although the Commission in 2017 was concerned enough about unrelated misleading statements Securus made in its applications to enter into a $1.7 million consent decree with Securus, the Commission never investigated the data-access violations or alerted wireless providers of the allegations. AR3:19; *Securus Technologies, Inc., et al.,* Order re: Consent Decree, 32 FCC Rcd. 9552 (2017). Thus, AT&T did not learn of Securus's misconduct until two days before the publication of a *New York Times* article about Securus in May 2018.

AT&T immediately launched an investigation and barred LocationSmart from requesting/providing location data for the unapproved program. AR4:9-10. Ultimately, AT&T was able to determine that the number of requests for location data for the unauthorized program represented only 0.2% of Securus's requests for AT&T location data. *Id.* at 10. To support that subset of requests, Securus had provided false records suggesting AT&T customers (*i.e.*, the subjects of warrants) had consented to the use of their location data. *Id.* Those invalid consent records were indistinguishable in appearance from valid consent records. AR1:6 (¶ 11).

Within days of learning about the incident, AT&T had shut off *all* of Securus's access to AT&T customer location data—including for the approved use case. AR4:10-11. But AT&T did not immediately shut off LocationSmart's access for other providers because AT&T had no reason to believe (and the Commission has never suggested) that LocationSmart had violated AT&T's contractual requirements. *Id.* Moreover, AT&T had no evidence (and the Commission has never suggested) that *any* of the other LBS providers and intermediaries LocationSmart supported— reputable companies like AAA, Allstate, and Life Alert—ever abused their access to customer data to provide valuable services to AT&T customers. *Id.*

### 3. AT&T's Termination Of The Location-Based Services Program

Still, in light of concerns over the Securus incident, AT&T announced in June 2018 that it would be scaling down its LBS program "as soon as practical in a way that preserves important, potential lifesaving services like emergency roadside assistance." AR4:11. To that end, AT&T began a comprehensive review of each LBS provider and approved use case. *Id.* AT&T terminated access to 8 providers by July 2018, 29 providers by October 2018, and 33 providers by December 2018. *Id.* at 12-14. The remaining use cases comprised critical services, such as AAA's roadside assistance, Life Alert's emergency-response services, and major banks' fraud-prevention mechanism. *Id.*

At the same time, AT&T worked to develop an additional notice-and-consent mechanism. AR4:15-17. Even before the Securus incident, AT&T had partnered with the other three major wireless companies to develop a new, industry-wide protocol that would enable wireless providers themselves to implement direct verification of customer consent to LBS data-sharing. *Id.* at 15-16. But in September 2018, to minimize delay, AT&T decided to proceed unilaterally. *Id.* at 16-17. By January 2019, after months of work by more than 50 AT&T employees and engineers, AT&T stood ready to deploy an enhanced notice system that would have sent each customer—as well as the account holder and potentially others on a multi-line account—an SMS text (i) notifying an AT&T customer when AT&T received a record of the customer's consent to location-sharing with an LBS provider and (ii) providing a link to the AT&T Consent Management Platform, where customers could change their location-sharing preferences. *Id.* at 17-18.

On January 8, 2019, however, a publication called *Motherboard* reported that a bounty hunter had misused the system of LBS provider Microbilt (serviced by aggregator Zumigo) to obtain location information of a T-Mobile customer. AR4:19. AT&T had approved MicroBilt to use AT&T customer location data to provide fraud-prevention services, and had no evidence that MicroBilt had compromised the location data of AT&T's customers. *Id.* at 20-21. AT&T nevertheless immediately

cut off MicroBilt's access, and decided to end location aggregator services more broadly—"even those with clear consumer benefits." *Id.* at 21.

Recognizing the need to protect AT&T customers, who were relying on the more critical LBS services that had remained in operation since the Securus incident, AT&T set an orderly transition in motion. AR4:21-22. On January 16, 2019, AT&T sent formal termination notices to LocationSmart and Zumigo, stating that AT&T would stop providing them with location information by March 29, 2019. *Id.* at 21. In the interim, AT&T "worked closely and sometimes intensively" with LBS providers to help them find alternatives. *Id.*

By the end of January 2019, AT&T had stopped providing location information to aggregators for all but 21 LBS providers. AR4:22. AT&T stopped providing location information to aggregators for an additional 10 providers in February 2019 and for the remaining 11 in March 2019. *Id.* By March 29, 2019, AT&T no longer provided location information to *any* location aggregator for *any* LBS provider. *Id.*

## C. The Commission's Forfeiture Order

### 1. The Notice Of Apparent Liability

In February 2020, the Commission issued NALs against AT&T and the other major wireless companies, concluding that they "apparently" violated section 222 of the Communications Act by failing to protect their customers' location data. *See*

AR5.  The NAL deemed AT&T responsible for the Securus incident and reasoned that AT&T acted unreasonably by not terminating access to customer location data for *all* LBS providers within 30 days of learning about that incident.  *See id.* at 19-25 (¶¶ 51-70).

Without citing a single instance in which any remaining LBS provider had abused its access to AT&T customer data, the NAL proposed a $40,000 penalty per each of 84 LBS providers or aggregators for the first day on which location data was shared after the 30-day period, and $2,500 per provider or aggregrator for each day thereafter that AT&T allowed continued access to location data.  AR5:26 (¶ 75).  The NAL also proposed an upward adjustment of 25% because, according to the Commission, AT&T was "highly culpable" and posed a "significant risk of harm."  *Id.* at 28 (¶ 79).  The total proposed penalty amounted to $57 million (about 28 times the $2 million statutory penalty cap for any continuing violation).  The Commission did not propose any penalty related to the Securus incident because the statute of limitations had expired.  *See* 47 U.S.C. § 503(b)(6)(B) (imposing one-year statute of limitations); *see also* AR5:28 (¶ 78) ("[T]he statute of limitations on [the Securus] violations ran out in April 2018, one month before the unauthorized disclosures even came to light in the May 2018 New York Times report.").

Several Commissioners attached statements to the NAL, applauding their own enforcement efforts and claiming the Commission had not gone far enough.  AR5:33,

35-42. Meanwhile, Commissioner O'Rielly issued a statement stressing that he had "serious reservations" with the NAL—in which he "would have expected more well-reasoned items than what [was] presented." *Id.* at 34.

In particular, Commissioner O'Rielly pointed out that it was "unclear *** whether the Commission ha[d] a firm grasp of the services that were actually being offered to consumers, when these services were offered and/or terminated, and whether many of the location-based offerings included to justify the substantial proposed fines were involved in any actual violations." AR5:34. Indeed, the Commission chose not to "engage the parties in conversation prior to issuing the NALs, to establish a more solid foundation from which to consider appropriate penalties." *Id.* Commissioner O'Rielly also stressed that he was "not convinced that the location information in question was obtained as the result of a 'call' or as part of a 'telecommunications service,'" which "rais[ed] questions about the application of [the Commission's] section 222 authority." *Id.*

AT&T responded to the NAL in writing, raising the same issues flagged by Commissioner O'Rielly and others—namely, the constitutionality of the Commission's forfeiture regime, the applicability of section 222, the basis for the liability finding, and the legality of the penalty calculations. AR3. AT&T was never afforded a trial or hearing.

## 2. *The Final Forfeiture Order*

The NAL sat dormant at the Commission for four years. It was not until May 2024 that the Commission (by a 3-2 vote) affirmed its own NAL in full and issued the forfeiture order imposing the proposed $57 million penalty. AR1 ("Forfeiture Order"). The Commission dismissed AT&T's constitutional claims based largely on arguments the Supreme Court has since rejected (or that this Court had already rejected) in *Jarkesy*. *See* AR1:30-36 (¶¶ 66-81). The Commission concluded that the LBS data in question falls within the scope of section 222, even though the customer location data was not made available "solely" from AT&T's provision of voice services. *Id.* at 11-14 (¶¶ 25-30). And the Commission doubled down on its conclusion that AT&T should be penalized for its quick yet measured response to the Securus incident. *Id.* at 24 (¶ 53). As for the $57 million penalty, the Commission claimed that the amount imposed was reasonable because the Commission could have imposed an even larger fine but chose not to do so. *Id.* at 26 (¶ 59).

Commissioners Carr and Simington dissented. In Commissioner Carr's view, the Forfeiture Order exceeds the Commission's "limited and circumscribed authority over privacy." AR1:40. The plain text of section 222, Commission Carr explained, does not cover the LBS data in question, which AT&T "could gather *** even if the customer did not have a voice plan." *Id.* at 41. Even if the statute could cover such information, the Commission "has never held" that it does. *Id.* Thus, Commissioner

Carr concluded, the Commission's "eye-popping" Forfeiture Order, at a minimum, "offend[s] basic principles of fair notice." *Id.* at 40; *see id.* ("[R]etroactively announc[ing]" forfeitures based on a "newfound" interpretation of section 222 "that finds no support in the Communications Act or FCC precedent *** [is] inconsistent with the law and basic fairness.").

Meanwhile, Commissioner Simington focused on how the Commission calculated the total forfeiture amount. "There is no valid basis," he explained, for the Commission's "arbitrary and capricious finding *** that a single, systemic failure to follow the Commission's rules *** may constitute however many separate and continuing violations the Commission chooses to find on the basis of the whole-cloth creation of a novel legal ontology." AR1:43. To the contrary, "[i]t is simply not plausible that Congress intended the Commission [to] arrive at forfeitures of any size" by choosing "whatever" inputs it wants "to arrive at whatever forfeiture amount suits a preordained outcome." *Id.* Indeed, the result is a forfeiture order that "exceeds [the Commission's] statutory maximum forfeiture by a factor of *** dozens." *Id.*

## SUMMARY OF ARGUMENT

This Court should grant AT&T's petition for review and vacate the Commission's Forfeiture Order.

**I.** The Forfeiture Order is the product of an administrative enforcement proceeding that is unconstitutional three times over, as the Supreme Court's and this Court's decisions in *Jarkesy* confirm.

*First*, the Commission's in-house adjudication of this case without a jury trial violates the Seventh Amendment. The Supreme Court made clear in *Jarkesy* that an action seeking monetary penalties triggers the Seventh Amendment's jury-trial guarantee. 144 S. Ct. at 2129. That all but decides this case, in which the Commission sought a $57 million forfeiture meant to punish AT&T, not restore any (still unidentified) victim. To be sure, there is an exception to the Seventh Amendment for actions concerning "public rights." But the Commission's failure-to-reasonably-protect claim does not fall into that narrow category, and the claim's many common-law analogs confirm the same. The Commission's proposed solution—that AT&T wait for the Department of Justice to maybe someday bring a collection action in which AT&T cannot challenge the Commission's legal theories, all while the Forfeiture Order hangs over its head—is no solution at all.

*Second*, by allowing the Commission to act as prosecutor, judge, and jury, the NAL process violates Article III and the Fifth Amendment's Due Process Clause.

Together, those provisions ensure that a defendant facing civil penalties can present his case before an independent judge, rather than an agency decisionmaker wearing multiple hats—for the latter leads to conflicting interests and thus an unconstitutional risk of bias. This case proves the point. Without any hearing at all, the Commission chose to issue an NAL finding AT&T "apparently" liable and to review that finding for itself. It should surprise no one that the Commission affirmed its own finding; it almost always does, and statements by individual Commissioners attached to the NAL practically promised that very result. Such a process is the "opposite of the separation of powers that the Constitution demands," and certainly does not comport with time-honored principles of due process. *Jarkesy*, 144 S. Ct. at 2139.

*Third*, the Commission's ability to choose between the ALJ or NAL route, without any statutory guidance, violates the nondelegation doctrine. This Court held in *Jarkesy* that the power to choose a particular adjudicative process "is a power that Congress uniquely possesses." Giving the Commission absolute discretion in exercising that power, as the Communications Act does, thus violates the Constitution's separation of powers.

**II.**     The Commission also lacked statutory authority to seek forfeiture in the first place. The Commission relied on its authority under section 222 of the Communications Act to regulate a telecommunications carrier's use of CPNI.

Section 222, however, defines CPNI to cover only certain information that "is made available to the carrier by the customer *solely* by virtue of the [telecommunications] carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A) (emphasis added). The LBS data in question did not meet that requirement. It was not "made available" to AT&T "*solely* by virtue of" its "[telecommunications] carrier-customer relationship"—*i.e.*, its provision of voice services. All AT&T customers provided that location information through their device's connection to the AT&T network—whether or not they subscribed to, or were actively using, voice services. In fact, data-only customers provided LBS data as well.

At the very least, due process precludes the Commission from unveiling this aggressive and atextual interpretation of section 222 for the first time in an enforcement proceeding imposing a $57 million penalty. As Commissioner Carr noted in his dissent, the Commission had *never* held that section 222 or its implementing rules apply to such data. Applying that interpretation retroactively here is "inconsistent with the law and basic fairness." AR1:40 (Comm'r Carr, dissenting).

**III.** The Commission's liability finding was also arbitrary and capricious. At bottom, the Forfeiture Order rests on the notion that AT&T acted "unreasonably" in failing to cut off access to every other LBS provider within 30 days of learning about the Securus incident. But that conclusion lacks a reasoned basis. As AT&T

explained to the Commission, it had no evidence that other providers were misusing access to customer location information, and those providers offered essential (sometimes life-saving) services to AT&T's customers—material benefits to which the Commission failed to accord due weight. AT&T thus followed the only "reasonable" path. It promptly and carefully reviewed the approved uses of every single provider with access to AT&T customer location data. Within a year, AT&T shut down its entire LBS program, all while ensuring a smooth-as-possible transition for customers that relied on it. Compare that response to the Commission's when it learned of Securus's misconduct: absolutely nothing.

**IV.** Assuming it reaches the issue, this Court should set aside the Commission's drastic $57 million penalty. That number has no basis in the Communications Act. To the contrary, it blows well past the Act's $2 million limit "for any continuing violation." 47 U.S.C. § 503(b)(2)(B). The Commission, for its part, does not argue that the Communications Act requires that amount or even the Commission's method of calculation. Instead, the Commission insists that a penalty more than 28 times the statutory limit is "reasonable" because the Commission could have selected a higher amount if it wanted. But that effectively concedes the arbitrariness of the calculation in the first place.

# STANDARD OF REVIEW

The Administrative Procedure Act instructs courts reviewing agency action to "set aside agency action, findings, and conclusions found to be *** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Legal questions—including questions of statutory interpretation—are reviewed de novo. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."); *Memorial Hermann Hosp. v. Sebelius*, 728 F.3d 400, 405 (5th Cir. 2013). The arbitrary-and-capricious standard requires courts to ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

# ARGUMENT

## I. THE COMMISSION'S FORFEITURE SCHEME IS UNCONSTITUTIONAL

The Forfeiture Order is the product of an administrative enforcement process in which the Commission issued an NAL charging AT&T with a violation of the Communications Act. Without any hearing or trial, the Commission itself then affirmed the NAL in a final order and levied a penalty totaling $57 million.

Subjecting AT&T to that scheme is unconstitutional at least three times over, as the decisions of both this Court and the Supreme Court in *Jarkesy* make clear.

## A. The Commission's Adjudication Of Common Law Private Rights Violates The Seventh Amendment

First and foremost, the Commission's imposition of the Forfeiture Order through an administrative enforcement proceeding—as opposed to a jury trial before an Article III judge—violates the Seventh Amendment. Even the dissent in *Jarkesy* recognized that the Supreme Court's decision compels that conclusion. *See* 144 S. Ct. 2173-2175 (Sotomayor, J., dissenting) (naming "Federal Communications Commission" as one agency whose practice of "impos[ing] civil penalties in administrative proceedings" would be "upend[ed]").

### 1. *Only a jury may impose a punitive civil forfeiture.*

"By its text, the Seventh Amendment guarantees that in '[s]uits at common law, *** the right of trial by jury shall be preserved.'" *Jarkesy*, 144 S. Ct. at 2128 (alteration and ellipsis in original). Whether a suit is one "at common law" depends on "the cause of action and the remedy," although "the remedy [i]s the 'more important' consideration" because "some causes of action sound in both law and equity." *Id.* at 2129. Critically, when the government seeks "civil penalties *** designed to punish," that "effectively decides that th[e] suit implicates the Seventh

Amendment right, and that a defendant [is] entitled to a jury." *Id.* at 2130. After all, "money damages are the prototypical common law remedy." *Id.* at 2129.

Here, the Commission sought a forfeiture, which is undoubtedly "punitive" in nature. *See United States v. Hoffman*, 901 F.3d 523, 560-561 (5th Cir. 2018) ("As opposed to restitution which is remedial, forfeiture is punitive."). The Communications Act conditions the Commission's ability to assess a forfeiture on culpability findings alone, *see* 47 U.S.C. § 503(b)(1), not any need "to restore the victim," *Jarkesy*, 144 S. Ct. at 2129. And the Commission "is not obligated to return any money to victims," *id.* at 2130, of which there are none here in any event (given the lack of evidence that any AT&T customer suffered any harm, *see* pp. 54-55, *infra*). Thus, there can be no argument that the Forfeiture Order is designed to "compensate" rather than "punish." It is therefore "a type of remedy at common law that could only be enforced in courts of law," thereby "implicat[ing] the Seventh Amendment right." *Id.* at 2129.

To be sure, the Supreme Court recognized in *Jarkesy* that there is a Seventh Amendment exception for cases concerning "public rights." 144 S. Ct. at 2131. But "public rights are a narrow class defined and limited by history" to revenue collection, customs enforcement, immigration, relations with Indian tribes, administration of public lands, and the granting of public benefits. *Id.* at 2146 (Gorsuch, J., concurring); *see id.* at 2131-2134. The Commission's claim that AT&T

did not take reasonable steps to protect customers' privacy is far afield of those categories.

Even if the class of public rights could be expanded, the exception still would not apply here because the rights at issue are private. "A hallmark that [the Supreme Court] ha[s] looked to in determining if a suit concerns private rights is whether it is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Jarkesy*, 144 S. Ct. at 2132 (internal quotation marks omitted). As just explained, the punitive remedy alone suggests that the Commission's suit is one "at common law."

Moreover, readily identifiable common-law analogs, which cover "the same basic conduct" as the Commission's Forfeiture Order, confirm that the public-rights exception does not apply. *Jarkesy*, 144 S. Ct. at 2130. Common-law negligence claims, for example, generally concern "the failure to exercise reasonable care." *United Gas Pipe Line Co. v. FERC*, 824 F.2d 417, 428-429 (5th Cir. 1987). Eavesdropping claims punish efforts to learn a person's private information and then share it. *See, e.g.*, *Tennessee v. Pennington*, 40 Tenn. (3 Head) 299, 300 (1859) (noting that Blackstone defined the "common law offense" of "eaves-dropping" as "listen[ing] under walls, or windows, or the eaves of houses, to hearken after discourse, and thereupon to frame slanderous and mischievous tales"). And intrusion upon seclusion similarly covers efforts to "intrude[] physically or

otherwise, upon the solitude or seclusion of another or his private affairs or concerns." RESTATEMENT (SECOND) OF TORTS § 652B (Am. L. Inst. 1977); *see also id.* § 652D ("One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.").

In short, the Commission's action against AT&T "involve[d] a matter of private rather than public right." *Jarkesy*, 144 S. Ct. at 2136 (alterations and internal quotation marks omitted). So "Congress [could] not withdraw it from judicial cognizance." *Id.* (internal quotation marks omitted); *see also id.* at 2134 ("[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts.") (alteration in original).

> ### 2. *The Commission's attempt to square the Forfeiture Order with the Constitution runs headlong into* Jarkesy.

The Commission maintains that "causes of action analogous to common-law claims" do not, "as a general matter, need to be adjudicated in Article III courts with a right to trial by jury." AR1:35 (¶ 79). Rather, according to the Commission, the public-rights exception allows Congress to "create[] new statutory obligations," "provide[] for civil penalties for violations of those obligations," and "entrust to [an agency] the function of deciding whether a violation has in fact occurred." *See* AR1:34 (¶ 77) (citing, *inter alia*, *Atlas Roofing Co. v. OSHA*, 430 U.S. 442, 450

(1977)) .  The Supreme Court in *Jarkesy* rejected those exact arguments.  *See* 144 S. Ct. at 2136 ("Congress cannot conjure away the Seventh Amendment by mandating that traditional legal claims be *** taken to an administrative tribunal.").

The only argument the Commission has left, then, is that its forfeiture scheme preserved AT&T's jury-trial right.    As the Commission sees things, the Communications Act simply presented AT&T with a choice of how to challenge the Forfeiture Order:  (i) pay the $57 million penalty and appeal to this Court; or (ii) refuse to pay and await the filing of a collection proceeding by the Department of Justice in district court.  *See Stevens*, 691 F.3d at 622-623.  Focusing on the latter option, the Commission posits that "AT&T [was] entitled to a trial *de novo* in federal district court before it [could] be required to pay the forfeiture," and *elected* not to exercise its right to a jury trial.  AR1:30 (¶69); *see* 47 U.S.C. § 504(a) ("[A]ny suit for the recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo[.]").

For starters, subjecting AT&T to a four-year, jury-less administrative proceeding—culminating in a not just proposed but affirmed multimillion-dollar penalty—itself violated the Seventh Amendment.  The availability of some form of federal court review at that late juncture cannot remedy the constitutional violation.

That aside, the Commission leaves out a critical caveat:  under binding Fifth Circuit precedent, defending against a collection action in district court would

require AT&T to forgo any challenge to the "legal validity" of the Forfeiture Order. *See Stevens*, 691 F.3d at 622 (holding that district court's jurisdiction under section 504 is "limited to considering the factual basis for the agency action"). That is no fair deal, much less a constitutional one.

In essence, to exercise its Seventh Amendment right here, AT&T would have been forced to abdicate to the Commission itself judicial review of the Commission's legal authority—a question for which the "abdication in favor of the agency is *least* appropriate." *Loper Bright*, 144 S. Ct. at 2266. That is an untenable burden on the Seventh Amendment right. As the Supreme Court underscored in *Jarkesy*, the Seventh Amendment's jury-trial right works hand-in-glove with Article III's guarantee of a neutral adjudicator on questions of law. *See* 144 S. Ct. at 2131. *Both* are required to "vindicate the Constitution's promise of a 'fair trial in a fair tribunal.'" *Id.* at 2140 (Gorusch, J., concurring) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Forcing AT&T to pick just one is thus no answer. *See, e.g.*, *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another.").

In addition, as a practical matter, the Commission fails to acknowledge the serious collateral consequences AT&T would have faced had it declined to pay the forfeiture penalty. Contrary to the Commission's suggestion, AT&T would *not* have been able demand a jury trial and thus exercise its "prized" Seventh Amendment

right. *Jarkesy*, 144 S. Ct. at 2128. Rather, AT&T would have had to wait for the Department of Justice to sue in federal district court, whenever the Department chose to do so, if at all. *See* 28 U.S.C. § 2462 (establishing five-year statute of limitations for collection proceedings). Only if and when the Department sued would AT&T have been able to present its case to a jury—potentially based on stale evidence or faded witness memories.

In the meantime, the Forfeiture Order, adjudging AT&T to be a "willful[] and repeated[]" violator, would hang over its head. AR1:28 (emphasis and capitalization omitted). Letting that final order lie indefinitely, potentially without any judicial review should the Department forgo a collection action (as it sometimes does), would have created serious reputational and practical problems for AT&T. Even the NAL, an "apparent" liability finding, was cited repeatedly by legislators, the press, and the Commission itself as evidence of poor privacy practices. *See, e.g.*, Letter from Jessica Rosenworcel, Chairwoman to John Stankey, Chief Executive Officer, AT&T Services, Inc. 1 (July 19, 2022) (stressing that NAL "held [AT&T] responsible" for not "taking reasonable measures to protect against unauthorized access to [customer location] information").[5] The final Forfeiture Order ratified those inaccurate claims. Indeed, according to the Commission's own ruling, the Commission would have been free to use its (judicially unreviewed) factual findings

---

[5] https://docs.fcc.gov/public/attachments/DOC-385447A1.pdf.

as a basis to enhance future penalties against AT&T. *See Commission's Forfeiture Pol'y Statement & Amend. of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, 12 F.C.C. Rcd. 17087 ¶ 34 (1997). AT&T also would have to disclose those adverse findings in certain contexts, including when seeking government contracts. Those are just some of many burdens that AT&T, as a repeat player whose livelihood is subject to the Commission's regulation, would risk by failing to file a petition for review directly to this Court to obtain meaningful judicial review.

### B. The Commission's Dual Role As Prosecutor And Adjudicator Violates Article III and Due Process

Next, by allowing the Commission to act as both prosecutor and adjudicator, the Commission's NAL process violates Article III and the Fifth Amendment's Due Process Clause. "Article III entitles individuals to an independent judge who will preside over [a jury] trial. And due process promises any trial will be held in accord with time-honored principles." *Jarkesy*, 144 S. Ct. at 2140 (Gorsuch, J., concurring); *see id.* at 2139 (majority op.) ("A defendant facing a [common law] suit has the right to be tried by a jury of his peers before a neutral adjudicator."). That is because "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). Indeed, allowing "Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch *** is the very opposite of the separation of powers that the Constitution demands." *Jarkesy*, 144 S. Ct. at 2139.

Although any case in which the same agency actor sits as both prosecutor and adjudicator raises serious concerns, those concerns are particularly pronounced on the record here. The NAL process was infused with bias at every turn. The Commission first found for itself in the NAL that AT&T "apparently" violated section 222. Then, like a prosecutor reviewing its own indictment, the Commission affirmed its own findings in full in the Forfeiture Order. *See* AR5. In other words, the Commission necessarily prejudged the merits of the Forfeiture Order in its NAL; it was not rendering a conclusion based on a probable-cause or other similar standard.

The Commissioners' individual statements on the NAL remove any doubt. Two Commissioners criticized the Commission for not being punitive enough. *See* AR5:37 (Comm'r Starks, approving in part and dissenting in part) ("I am pleased that the Notices of Apparent Liability we vote on today confirm that misuse of customer location data by AT&T, Verizon, Sprint, and T-Mobile violate the Commission's rules. *** [But] [b]ecause I strongly believe we should have determined the number of customers impacted by the abuses and based our forfeiture calculations on that data—calculations that would have been possible if we had investigated more aggressively—I must dissent in all remaining parts of the item."); *id.* at 36 (Comm'r Rosenworcel, dissenting) ("[T]he FCC engages in some seriously

bureaucratic math to discount the violations of our privacy laws. *** [W]e impose fines that are too small relative to the law and the population put at risk.").

Likewise, the Chairman's statement in support of the NAL had no pretense of neutrality. *See* AR5:33 ("Today, we *** make clear that we will not hesitate to vigorously enforce [our] statutory provisions and regulations. After a thorough investigation, we find that all of our nation's major wireless carriers apparently failed to comply with these vitally important requirements. *** This FCC will not tolerate any telecommunications carrier putting American consumers' privacy at risk. We therefore propose fines against these four carriers totaling more than $200 million."). Indeed, he characterized the NAL itself as a "strong enforcement action." *Id.*

Given those statements, "a disinterested observer [would] conclude" that the Commission had "in some measure adjudged the facts as well as the law of [AT&T's] case in advance of" deciding it. AR1:33 (¶ 76) (quoting *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970)). Indeed, because the Forfeiture Order upholds every material finding in the NAL, a disinterested observer would conclude that the Commission prejudged *all* the facts and law. Tellingly, the Commission has ultimately rescinded or cancelled only a tiny fraction of the *hundreds* of NALs it has issued over the last five years—and, even then,

mostly because of an inability to pay.[6]  None of that meets the basic standards of due process, let alone the promise of an independent Article III adjudicator.

### C.  The Commission's Discretion To Choose Between An NAL Or An ALJ Violates The Nondelegation Doctrine

If that were not enough, Congress violated the nondelegation doctrine when it authorized the Commission to choose freely whether to adjudicate violations of the Communications Act through an NAL *or* before an ALJ.  Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. CONST. art. I, § 1.  That means, as a matter of separation of powers, "Congress cannot delegate *** powers which are strictly and exclusively legislative" to an agency, unless Congress "provides an 'intelligible principle' by which the recipient of the power can exercise it."  *Jarkesy v. SEC*, 34 F.4th 446, 460-461 (5th Cir. 2022) (internal quotation marks omitted).  Congress must "guide [the] agency's discretion"—not allow it to "roam at will."  *Consumers' Rsch. v. FCC*, --- F.4th ----, 2024 WL 3517592, *10-11 (5th Cir. 2024) (en banc).

---

[6] A Westlaw search of administrative decisions shows that the Commission has issued at least 360 NALs since January 2019.  Only nine (less than 3%) of those were cancelled or had their forfeiture amounts reduced based on new information or arguments presented by the target.  In T-Mobile's related forfeiture order, for example, the Commission reduced the NAL's proposed fine only because the Commission had "double-count[ed]" certain providers and used the wrong "termination dates."  *See T-Mobile USA, Inc.*, FCC 24-43, 2024 WL 1905233, at *33 ¶ 95 (F.C.C. Apr. 29, 2024).

That restriction extends to "the power to assign disputes" to a particular method of adjudication—a choice that "is 'peculiarly within the authority of the legislative department.'" *Jarkesy*, 34 F.4th at 461. Under Circuit precedent, allowing an agency to exercise such power without guidance "is impermissible under the Constitution." *Id.* at 462 ("If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution.").[7]

That reasoning applies with full force here. The Communications Act gives the Commission "exclusive authority and absolute discretion" to decide whether to assess a forfeiture via ALJ or NAL. *Jarkesy*, 34 F.4th at 462; *see* 47 U.S.C. § 503(b)(3)(A) ("*At the discretion of the Commission*, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative law judge.") (emphasis added). Such a delegation, unaccompanied by *any* guidance, is unacceptable under the Constitution's separation of powers, and is thus an additional ground on which to vacate the Commission's Forfeiture Order.

---

[7] In reviewing this Court's *Jarkesy* decision, the Supreme Court expressly declined to reach any issue other than the Seventh Amendment claim. *Jarkesy*, 144 S. Ct. at 2139 ("We do not reach the remaining constitutional issues."). Accordingly, this Court's alternative holdings in *Jarkesy*, including on nondelegation, remain binding Circuit precedent. *See Luna-Garcia v. Barr*, 932 F.3d 285, 291 n.4 (5th Cir. 2019) ("In this circuit, 'alternative holdings are binding precedent and not *obiter dicta*.'").

## II. THE COMMISSION LACKED STATUTORY AUTHORITY TO ISSUE THE FORFEITURE ORDER

Beyond the threshold constitutional impediments to issuance of the Forfeiture Order, section 222 of the Communications Act does not authorize the Commission to regulate the LBS data at issue.

### A. The Location Data In Question Falls Outside The Plain Text Of Section 222

"Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Here, the Commission relied exclusively on its section 222 authority over CPNI, defined as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A).

On the face of that definition, information qualifies as CPNI only if it meets two independent conditions. First, it must be of a certain type—specifically, information that "relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service." 47 U.S.C. § 222(h)(1)(A). Second, it must be provided in a specific way—that is, "*solely* by virtue of the [telecommunications] carrier-customer relationship." *Id.* (emphasis

added); *see also* AR1:41 (Comm'r Carr, dissenting) (describing CPNI definition as having independent type and method-of-obtainment requirements).

AT&T's LBS data does not meet the first CPNI prong. As Commissioner Carr's dissenting statement from the Forfeiture Order explains, "[b]y requiring that the location 'relate' to the 'use of a telecommunications service,' the statute covers a particular type of data known as 'call location information'—namely, the customer's location *while making or receiving a voice call*." AR1:41. Here, it is undisputed that AT&T used customers' network-based location information for its LBS program, not call location information. *See* AR4:4 ("In responding to LBS look-up requests, AT&T did not rely on the call location data[.]"); pp. 12-13, *supra*.

More fundamentally, even assuming the Commission could satisfy the first prong, it would still fail the second because the location data was not provided "*solely* by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A) (emphasis added). "Solely" means "to the exclusion of all else" or "without another." *Solely*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1118 (10th ed. 1997). And the "carrier-customer relationship" means AT&T's relationship with customers as a telecommunications carrier—*i.e.*, as a provider of telecommunications services. *See* 47 U.S.C. § 153(51) ("The term 'telecommunications carrier' means any provider of telecommunications

services[.]"). Thus, read together, CPNI must be information provided to AT&T *only* because of AT&T's provision of telecommunications services.

That requirement inescapably excludes the location data at issue here. As explained (pp. 12-13, *supra*), when responding to LBS look-up requests, AT&T relied on a customer's network-based location information unrelated to the subscription to, or use of, any particular service. That information is necessary to provide all AT&T services, including data—not just voice services. AR4:3-4, 13. Indeed, even data-only customers, for whom AT&T did *not* provide telecommunications service, participated in the LBS program. *See* AR3:6, 10. Thus, location data was not made available "*solely*" because AT&T provided telecommunications services. *See* 47 U.S.C. § 222(h)(1)(A) (emphasis added).

The Commission's confused response in the Forfeiture Order confirms as much. Conspicuously, in the same way that the Commission has refused to clarify the scope of CPNI, the Forfeiture Order declines even to set forth an interpretation of the "solely" requirement. *See* AR1:11 (¶ 26) ("The *NAL* did not specify with precision the standard for applying the second prong of the CPNI definition, and *** we likewise need not resolve that question with specificity."). In fact, the Commission at one point reads "solely" out of the statute entirely. *See id.* (¶ 25) ("[T]he NAL reasoned that '[a]lthough AT&T might also provide non-common-carrier services to the same customer,' the customer provided the relevant data 'by

virtue of the carrier-customer relationship.'") (second alteration in original).  That is because the Commission cannot explain how LBS data can be made available "solely" as the result of a telecommunications-carrier relationship when call location data is not even implicated and when AT&T obtains LBS data "by virtue of" its provision of data services as well.

The Commission instead focuses on section 222's reference to a "customer-carrier relationship."  In the Commission's view, AT&T necessarily has such a relationship with customers to whom it provided telecommunications services, even if those customers also subscribed to non-telecommunications services (such as data services), as virtually all do.  *See* AR1:12 (¶ 28).  But that still does not explain how the "solely" requirement is met here.  AT&T's status as a telecommunications carrier or information-services provider is "activity-based"—meaning it can be a telecommunications carrier and/or an information-services provider, depending on the services it is providing.  *FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 862 (9th Cir. 2018); *see also* 47 U.S.C. § 153(51).  Thus, AT&T can have different, simultaneous relationships with its customers depending on the activity in question—a telecommunications relationship for voice services, and an information-services relationship for internet or data services.  Because customers provide network-based location information "by virtue of" both relationships, the telecommunications relationship cannot be the "*sole*[]" reason AT&T has the LBS data.  47 U.S.C.

§ 222(h)(1)(A) (emphasis added).  Again, some customers did not even subscribe to voice services, and thus had no telecommunications relationship by which to provide the data in question.  *See* AR3:6, 10.

The Commission also suggests that it can regulate CPNI unless the location data at issue was "exclusively" from "non-voice customers."  AR1:13-14 (¶ 29).  But that gets the statute backwards.  The relevant question is whether the data was made available "solely" because of a telecommunications service.  Put another way, section 222 does not reach voice customers so long as their location data was also provided by virtue of an information-services relationship.  Because such relationships indisputably exist here, the Commission cannot meet the "solely" requirement for regulating CPNI and lacked statutory authority to issue the Forfeiture Order.

### B. Lack Of Fair Notice Bars Retroactive Application Of The Commission's Novel Interpretation Of CPNI

Even if one could reasonably read the definition of CPNI to cover AT&T customers' location data, that interpretation is hardly evident from the face of the statute.  Indeed, prior to the Forfeiture Order, the Commission had not interpreted CPNI to have such a broad scope.  Doing so retroactively, and for the first time in an adjudication imposing a massive monetary penalty, runs afoul of due process.

Fair notice of what the law "either forbids or requires" is "the first essential of due process of law."  *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

In the administrative law context, that means an agency must "give the public fair notice of their rules before finding a violation of them." *Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 374 (5th Cir. 2024); *see FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). It follows that "an agency cannot at once invent and enforce a legal obligation" and thus cannot hold companies financially liable for "violat[ing] novel legal interpretations and never-adopted rules." *TerraCom, Inc. & YourTel Am., Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd. 13325 (2014) (Comm'r Pai, dissenting); *see also Fox*, 567 U.S. at 253-255 (no "fair notice" when Commission's interpretation in enforcement proceeding was not apparent).

Yet that is exactly what happened here. The text of section 222 does not suggest that the location data in question is CPNI. *See* pp. 41-45, *supra*. Nor did any regulation in place at the time of the alleged violations. Quite the opposite, the Commission itself recently acknowledged that it "has never provided an exhaustive list of what constitutes CPNI." Open Internet Order ¶ 351. The Commission has even resisted industry calls to clarify the privacy requirements applicable to customer location information. *See Request by CTIA to Commence Rulemaking to Establish Fair Location Info. Practices*, Order, FCC 02-208 (July 24, 2002).

To the extent the Commission has spoken on the subject, its CPNI rules have always "focused on addressing problems in the *voice service context*." Open Internet Order ¶ 359 (emphasis added). Such a narrow focus could not (and did not) give AT&T fair notice that the LBS data at issue—for which the provision of voice services specifically was irrelevant—is CPNI and thus covered by section 222. In fact, the Commission's recent reclassification of broadband from a Title I information service to a Title II telecommunications service not only suggests that section 222 (in Title II) did not reach information services, but also that the Commission's implementing rules were not geared to information services. *See* Broadband Privacy Rules ¶ 39 ("When we reclassified [broadband internet access service] as a telecommunications service, we recognized that our existing CPNI rules were not necessarily well suited to the broadband context," and instead "have been focused on *voice services*.") (emphasis added).

The Commission's primary response is to emphasize its refusal to "set out a comprehensive list of data elements that pertain to a telecommunications service and satisfy the definition of CPNI and those data elements that do not.'" AR1:15 (¶ 34) (quoting *Implementation of the Telecomms. Act of 1996; Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, CC Docket No. 96-115, Declaratory Ruling, 28 FCC Rcd 9609, 9617 ¶ 24 n.54 (2013)). But a refusal to provide clarity more than a decade ago can hardly be said to give "fair notice"

today.  If anything, that refusal proves AT&T's point about the Commission's treatment (or lack thereof) of CPNI:  the interpretation on which the Commission's Forfeiture Order is based was not (and to this day is not) apparent in any Commission policy or rule.

Simply put, if the Commission wanted to apply section 222 to LBS data, it should have first issued rules to notify the public of its novel interpretation—not announce that interpretation for the first time in a proceeding imposing a $57 million penalty for past conduct.  The Commission should not be permitted to craft ill-defined regulatory regimes that trap regulated entities after the fact.

## III. THE FORFEITURE ORDER IS ARBITRARY AND CAPRICIOUS BECAUSE AT&T REASONABLY PROTECTED ITS CUSTOMERS' DATA

Even if the Commission could overcome the various constitutional and statutory authority barriers to issuing the Forfeiture Order, its liability finding—predicated on AT&T's failure to abruptly cut off *all* LBS providers *immediately* after the Securus incident—is unfounded.  As the Commission itself recognized, "companies cannot prevent all data breaches."  AR1:16 (¶ 38).  Neither section 222 nor the Commission's rules expects companies to do so.  The question is thus whether AT&T took "*reasonable* measures to discover and protect against attempts to gain unauthorized access to CPNI."  47 C.F.R. § 64.2010(a) (emphasis added).  That inquiry, in turn, requires "a balancing of costs and benefits."  *International*

*Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. OSHA*, 938 F.2d 1310, 1319 (D.C. Cir. 1991) ("The 'reasonable' person of tort fame is one who takes a precaution if the gravity of the injuries averted, adjusted for their probability, exceeds the precaution's burden."); *cf. Michigan v. EPA*, 576 U.S. 743, 752-753 (2015) ("reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions," and "[n]o regulation is 'appropriate' if it does significantly more harm than good"). Here, the balance undoubtedly favors AT&T's approach.

## A. AT&T Took Prompt Yet Sensible Protective Action In Light Of The Securus Incident

AT&T not only followed CTIA's industry-standard guidelines to protect customers' location data; it exceeded them. AR4:5-6. AT&T vetted all who had access to the data, limited LBS providers' access to specifically approved use cases, and imposed encryption requirements for the data's transmission and storage. *See id.* at 6-8. AT&T also required aggregators to obtain evidence of customer consent from LBS providers, and AT&T itself checked those records daily. *Id.* at 7-8. Further still, AT&T conducted audits and assessments to monitor and strengthen its controls. *Id.* at 2, 8.

In the wake of the Securus incident—which, to be clear, is not the basis of the forfeiture, *see* pp. 20-21, *supra*—AT&T reacted quickly yet prudently. AT&T cut off Securus's access immediately and entirely, but not that of other LBS providers

49

because there was no evidence that they were violating AT&T's requirements or otherwise misusing access to the location data. *See* AR4:11. Moreover, the other LBS providers offered important and sometimes life-saving services that AT&T customers relied upon. *Id.* at 11-15. For example, Life Alert relied on location data to send emergency medical assistance to AT&T users. *Id.* at 13. Older AAA members often did not use the AAA mobile app, and so needed AAA to have access to their LBS data in the event they needed roadside assistance. *Id.* at 12. Account holders at major banks likewise needed the banks to have LBS-data access to perform identity checks and prevent fraudsters from opening bank accounts in their names. *Id.* at 13-14.

Still, rather than limit its response to Securus, AT&T systematically reviewed each and every LBS provider and each and every use case. For each, AT&T weighed whether the services offered were "[]sufficiently important to justify continuing [the provider's] access to AT&T customer location data," and whether "alternative arrangements" were available. AR4:12. Within months, AT&T had reduced its LBS program to uses that offered essential benefits like emergency medical care, roadside assistance, and fraud prevention—even though many of the terminated providers objected that "they had done nothing wrong and that they were using data in accordance with AT&T's requirements." *Id.* at 15. Within a year, AT&T had terminated its LBS program entirely.

That process of weighing the costs and benefits for its customers—what the Commission derides as "piecemeal"—necessarily took some time. AR4:21-22. So too did the actual termination of access. For the more critical providers, AT&T could not just cut off access instantaneously without potentially endangering customers; "an orderly transition was necessary." *Id.* at 21. AT&T thus worked "closely and sometimes intensively" with providers to find alternatives, or at least "coordinate with the affected AT&T customers" to ensure those customers had "proper advance notice of the impending shutdown." *Id.* Such a thoughtful approach, which reconciles competing considerations, is reasonable by any measure.

The suggestion that AT&T dragged its feet is particularly rich given that, as noted above, *the Commission itself* learned of the Securus incident almost *one year* before AT&T did in connection with an unrelated 2017 regulatory proceeding. AR3:19 & n.17; *see also* Wright Pet'rs Letter at 2. Despite that knowledge, the Commission did not inform AT&T (or any other wireless provider) about Securus's lapses. The Commission never suggested that AT&T should stop working with Securus. The Commission did not even describe Securus's lapses in its 2017 order; it merely noted unspecified allegations against Securus and punted the issue to a future "enforcement" proceeding that it never commenced. *See* Securus Transfer Approval, 32 FCC Rcd. at 9576 ¶ 28. The Commission's total inaction contrasts vividly with AT&T's diligence once it learned about Securus's lapses in mid-2018.

Having declined to take any remedial action, or even to share its information with AT&T, the Commission can hardly tag AT&T for moving too slowly.

### B. The Commission Failed To Weigh The Countervailing Consumer Benefits And Harms From Abrupt Termination Of LBS Services

The Commission, meanwhile, pays only lip service to any cost-benefit analysis of its own. The Commission penalizes AT&T for each day it gave LBS providers access to customer location data beginning 30 days after the *New York Times* reported on the Securus incident. But in reaching that conclusion, the Commission considers only the privacy risks associated with LBS, dismissing the unarguable benefits of those services and ignoring the concomitant harms to AT&T customers associated with an abrupt termination. *See* A1:21 (¶ 46). Those realities are an indispensable part of the reasonableness inquiry that the Commission is required to conduct. *See* 47 C.F.R. § 64.2010(a). Indeed, hornbook administrative procedure law demands that the Commission consider and weigh all "relevant factors." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see University of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) ("[W]e must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'").

The Commission's failure to do so here is conspicuous. It has long recognized the need to consider the (many) consumer benefits LBS offer despite the privacy

risks. *See* LBS Report at 16 (highlighting that LBS can be used "in conjunction with existing public safety systems to greatly increase the likelihood that someone in distress will receive life-saving assistance"); *id.* at 1 ("LBS let users access relevant and up-to-date information about their surroundings, inform others of their whereabouts, and get instant access to maps and traffic information for their current location"). Had AT&T had taken the Commission's blunderbuss approach and ignored such benefits (or the related harms of discontinuing LBS), it surely would have been faulted for being too hasty. At minimum, AT&T had no fair notice that such an approach was required. *See* pp. 45-46, *supra*; *Fox Tel. Stations*, 567 U.S. at 253 (regulations "must give fair notice of conduct that is forbidden or required").

Beyond its failure to meaningfully weigh the countervailing considerations, the Commission overstates the privacy risks involved. The Commission repeatedly points to AT&T's reliance on the contractual protections it demanded of LBS providers, suggesting that AT&T made no attempt to determine whether LBS providers followed through. *See, e.g.*, AR1:19 (¶¶ 42-43). The record, however, shows that AT&T conducted daily audits of consent records. AR4:2, 7-8. That Securus hid its use of location data for an unapproved program (a contractual breach) through false records does not make AT&T's protocols unreasonable. Nor does the fact a breach occurred notwithstanding those protocols, as the Commission asserts under what amounts to a strict liability standard. *See* AR1:17-18 (¶¶ 39-40), 22-23

(¶¶ 50-51).  In reality, AT&T's track record reflects the quality of its privacy protocols:  the Commission did not identify a single AT&T customer whose data had been misused.

The Commission's conclusion that AT&T did not reasonably protect its customers' LBS data is thus arbitrary and capricious, and for that reason too the Forfeiture Order should be set aside.

## IV.    THE $57 MILLION PENALTY IS UNLAWFUL AND UNFOUNDED

Lastly, the Forfeiture Order's eye-popping $57 million penalty is both legally and factually untenable.

The Communications Act allows the Commission to assess forfeitures up to specific amounts "for each violation or each day of a continuing violation," subject to an overall statutory maximum of "$1,000,000 for any single act or failure to act." 47 U.S.C. § 503(b)(2)(B) ("[T]he amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act[.]").  With adjustments for inflation, that provision caps overall liability for any continuing violation at $2,048,915. *See Amendment of Section 1.80(b) of the Comm'n's Rules*, 34 FCC Rcd. at 12828.

Here, the Forfeiture Order "finds that AT&T failed to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information."  AR1:18 (¶ 41).  Even if true (and it is not, for the

reasons set forth above, pp. 48-54, *supra*), that plainly describes a systemic problem with AT&T's LBS program, AR1:21 (¶ 46) (referencing the supposedly "obvious LBS program issues")—*i.e.*, one continuing "failure to act," not separate "repeated[]" violations. AR1:28 (¶ 65); *see* AR1:43 ("There is no valid basis for the arbitrary and capricious finding *** that a single, systemic failure to follow the Commission's rules *** may constitute however many separate and continuing violations the Commission chooses to find on the basis of the whole-cloth creation of a novel legal ontology.") (Comm'r Simington, dissenting). Thus, the maximum penalty the Commission could impose would be roughly $2 million.

The Commission nevertheless gets to *more than 28 times* that statutory limit based on the fiction that AT&T engaged in 84 separate failures to implement a reasonable data-security regime. *See* AR1:25-26 (¶¶ 56-58). The Commission derives that multiplier not by identifying 84 distinct data-security inadequacies, nor by identifying 84 breaches of AT&T customer data. In fact, the Commission identifies no misuse of AT&T customer data, nor any actual harm to AT&T customers ensuing from any such misuse. Instead, the Commission derives 84 by counting the number of active LBS aggregators and providers with access to customer location data 30 days after a newspaper article was published, and then calculates the ultimate penalty by factoring in the number of days each provider had access to such data. *Id.* at 24-25 (¶ 58).

That approach is problematic multiple times over. For one thing, it assumes that all 84 LBS providers are equal, such that providing access to *any* of one of them warrants punishment. But as explained above, p. 50, *supra*, many of the providers were well-respected, household-name companies that provided critical services for AT&T customers. The "exact level of threat" they posed, and potential benefits they offered, are hardly "beside the point" when evaluating reasonableness, AR1:29 (¶ 67)—especially if access to each is its own separate violation. By factoring in the number of days each provider had access to the data, the largest share of the $57 million penalty flows from the providers AT&T deemed most critical to its customers and least likely to pose any risk—blue-ribbon companies like AAA, Life Alert, and major banks. That makes no sense.

Even setting aside those case-specific concerns, it is "simply not plausible" that Congress meant to allow the Commission to "arrive at forfeitures of any size simply by disaggregating an 'act' into its individual constituent parts, counting the members of whatever class of object may be related to the alleged violation to arrive at whatever forfeiture amount suits a preordained outcome." AR1:43 (Comm'r Simington, dissenting). Such a made-up, free-floating approach is the definition of arbitrariness.

Notably, the Commission does not directly defend the calculation of the penalty based on 84 supposedly separate violations. Instead, the Commission asserts

that it could have chosen an even *more punitive* approach if it wanted, keyed to the number of users or some other combination of metrics. *See* AR1:26 (¶ 59) (describing penalty as "eminently *conservative*"). Essentially, the Commission believes it could have chosen one of any number of methods to arrive at virtually any penalty. *See United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 353 (5th Cir. 1998) ("*Webster's Third New International Dictionary* defines 'arbitrary' as 'based on random or convenient selection or choice rather than on reason or nature.'"). Indeed, under the Commission's logic, it could have fined AT&T up to *$200 trillion* (100 million AT&T users x $2 million cap per "failure").

It is Congress, however, not the Commission, that sets the bounds of the Commission's penalty authority. And it this Court, not the Commission, that decides whether the Commission has exceeded those bounds. *See Loper Bright*, 144 S. Ct. at 2273. The Commission's supposed benevolence does not make its penalty rationale any less arbitrary or untethered from the statutory cap.

## CONCLUSION

For the foregoing reasons, this Court should hold unlawful, vacate, enjoin, and set aside the Commission's Forfeiture Order.

Respectfully submitted,

July 29, 2024

*s/Pratik A. Shah*
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Pratik A. Shah*
Pratik A. Shah

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,827 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*s/Pratik A. Shah*
Pratik A. Shah

July 29, 2024