No. 24-60223

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AT&T INC.,
*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review of a Final Order
of the Federal Communications Commission

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER

Mariel A. Brookins
 *Counsel of Record*
Maria C. Monaghan
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 659-6000
mbrookins@USChamber.com

*Counsel for* Amicus Curiae

August 5, 2024

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60223, *AT&T v. FCC*

The undersigned counsel of record certifies that, in addition to the persons and entities listed in Petitioners' Certificate of Interested Persons, the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal:

Amicus Curiae: The Chamber of Commerce of the United States of America

Counsel for Amicus Curiae: Mariel A. Brookins and Maria C. Monaghan

*Amicus Curiae* U.S. Chamber of Commerce is a nonprofit, tax-exempt organization incorporated in the District of Columbia. It has no parent company, and no publicly held corporation owns 10% or more of its stock.


/s/ Mariel A. Brookins
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Table of Authorities ................................................................................. iii

Interest of *Amicus Curiae* ........................................................................1

Introduction and Summary .........................................................................3

Argument....................................................................................................6

    I.    The Constitution Prohibits The FCC's Process For Imposing Penalties ..............................................................................................6

        A.    The Seventh Amendment Entitled AT&T to A Jury Trial ........7

        B.    Section 504(a) Does Not Save The FCC's Approach to Imposing Forfeitures. ..............................................................12

    II.    The FCC's Interpretation of the Statute to Permit the Imposition of Unpredictable and Massive Civil Penalties Is Plainly Wrong ............19

Conclusion ...............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Corp. v. FCC*,
   323 F.3d 1081 (D.C. Cir. 2003)..................................................15

*Atlas Roofing Co. v. OSHA*,
   430 U.S. 442 (1977)..................................................................10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984)............................................................19, 23

*Connally v. General Constr. Co.*,
   269 U.S. 385 (1926)..................................................................25

*FCC v. Fox Television Stations*,
   567 U.S. 239 (2012)............................................................17, 18

*Gen. Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995)..................................................25

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998)....................................................................15

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024)..............................................2, 13, 23, 25

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ..................................................13

*Satellite Broad. Co., Inc. v. FCC*,
   824 F.2d 1 (D.C. Cir. 1987).....................................................25

*SEC v. Jarkesy*,
   144 S. Ct. 2117 (2024)......................................................*passim*

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017)................................................25

*United States v. Hoffman*,
   901 F.3d 523 (5th Cir. 2018) .....................................................8

*United States v. Olenick*,
   No. 18-CV-675-LY, 2019 WL 2565280 (W.D. Tex. Apr. 2, 2019) .................12

*United States v. Stevens*,
   691 F.3d 620 (5th Cir. 2012) ...............................................................12

*United States v. Sutton*,
   No. 2:23-CV-02100-SOH-MEF, 2024 WL 2926594 (W.D. Ark.
   Mar. 27, 2024)..................................................................................12

*United States v. WIYN Radio, Inc.*,
   614 F.2d 495 (5th Cir. 1980) .........................................................21, 22

*Wages & White Lion Invs., LLC v. FDA*,
   90 F.4th 357 (5th Cir. 2024) .............................................................25

**Statutes**

28 U.S.C. § 2462 ...................................................................................14

47 U.S.C. § 503 .....................................................................................20

47 U.S.C. § 504 .....................................................................................14

**Regulatory Authorities**

*AT&T, Inc.*,
   Forfeiture Order, FCC 24-40 (rel. Apr. 29, 2024)......................................*passim*

*Commission's Forfeiture Pol'y Statement & Amend. of Section 1.80 of
   the Rules to Incorporate the Forfeiture Guidelines*, Report and
   Order, 12 FCC Rcd 17087 (1997) .....................................................17

*Q Link Wireless LLC and Hello Mobile Telecom LLC*,
   Notice of Apparent Liability for Forfeiture, 38 FCC Rcd 7022
   (2023) ...........................................................................................24

*TerraCom, Inc. and YourTel America, Inc.*,
   Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325
   (2014) ......................................................................................19, 24

*TerraCom, Inc., and YourTel America, Inc.*,
   Order, 30 FCC Rcd 7075 (July 9, 2015)................................................20

**Other Authorities**

AT&T, Form 8-K (Apr. 24, 2024), tinyurl.com/mvh977wc ...................................21

U.S. Const. amend. VII ...............................................................................................7

## INTEREST OF *AMICUS CURIAE*

The U.S. Chamber of Commerce is the world's largest business federation.[1] It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The Chamber has been engaged for years in legislative, regulatory, and litigation matters involving the collection and use of data by American businesses, which is regulated by a patchwork of federal and state laws. The Chamber has championed federal legislation to provide predictability and uniformity for businesses and consumers, and it has resisted agency overreach and regulation that creates uncertainty and duplicative obligations for U.S. businesses in the digital economy. At the same time, the Chamber has consistently sought to ensure that

---

[1] No counsel for any party authored this brief in whole or in part. No entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

federal regulatory agencies operate within the structural limitations of the Constitution.

In a pair of landmark Supreme Court decisions issued this past term, in which the Chamber participated as amicus, the Supreme Court vindicated important limits on federal agency action, including the right of citizens to have access to Article III courts and juries to adjudicate claims for civil penalties, *see SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), and the proper role of courts in determining the meaning of statutes and the scope of agency authority, *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

This case implicates both Chamber priorities. In the agency proceeding giving rise to AT&T's petition for review, the Federal Communications Commission ("FCC") abused its investigative and enforcement authority to violate the company's Seventh Amendment right to a jury. And it announced and applied novel legal interpretations of the Communications Act to calculate and impose staggering forfeitures for activities that were not at the time of conduct a violation of any agency rule or law. The FCC's unpredictable and arbitrary enforcement procedure is inconsistent with orderly administrative process, the Communications Act, and the fundamental rights embodied in the Constitution.

## INTRODUCTION AND SUMMARY

The FCC's role in data privacy and security is limited to specific regulatory activities directed by Congress, such as the regulation of "customer propriety network information" ("CPNI")—a statutorily defined term. But the FCC has under different administrations attempted to expand its limited statutory mandate to encompass reams of additional data—including an ill-fated attempt to adopt broadband privacy rules that Congress abrogated under the Congressional Review Act. In the absence of statutory authority to adopt rules to assert a more muscular role on privacy, the agency has at times turned to its Enforcement Bureau to establish new policies outside the strictures of notice-and-comment rulemaking. This approach has resulted in threatening regulated entities with crushing liability for novel violations, and obtaining consent decrees where a company acquiesces.

The investigative and enforcement process at the FCC is hardly a model of fairness and due process. The agency shares many of the same enforcement processes as the Securities and Exchange Commission, which this Court and the Supreme Court have found inconsistent with the Seventh Amendment.

In this case, the FCC initiated an investigation in response to press reports about location data sales. Five years later, the Commission in a divided vote approved controversial new legal standards and imposed massive civil penalties on AT&T and other carriers on the same day. The FCC used its claimed enforcement

3

authorities to punish AT&T for violations of regulatory standards that were newly announced by the agency in the very same proceeding. AT&T has had no opportunity to test the agency's new legal theories, its methodology for assessing violations, or the calculation of the forfeitures before an Article III court. Nor has it had an opportunity to receive a jury trial on its liability or the amount of penalties.

The FCC's order flagrantly violated the Constitution by depriving AT&T of its rights to a neutral, Article III adjudicator and a jury. The Seventh Amendment provides that in "Suits at common law," "the right of trial by jury shall be preserved." As the Supreme Court recently explained in *SEC v. Jarkesy*, the text, history, and precedent of this provision emphatically dictate that before the federal government can impose a punitive fine like the one here, the defendant has a right to an Article III judge and jury. But the FCC imposed its gargantuan fine through an adjudication at the FCC in which the FCC gave itself the roles of judge, jury, and prosecutor.

In the order, the FCC defended its administrative adjudication mainly with the same arguments the United States made in *Jarkesy*, which was then pending before the U.S. Supreme Court. But the Supreme Court has since decided *Jarkesy* and rejected those arguments. So the FCC is now left to assert that its order is saved by Section 504(a) of the Communications Act, which allows the Department of Justice ("DOJ") to sue in federal district court to collect unpaid penalties. Because Section 504(a) provides that a DOJ collection action shall include a trial *de novo*, the FCC

says, AT&T could have received the Seventh Amendment's protections by refusing to pay the penalty.

That argument fails many times over. *First*, its premise is incorrect: under this Court's law, district-court review in a DOJ collection action is extremely limited and deferential. *Second*, AT&T could not be expected, nor should it have been forced, to refuse to pay what on its face is a binding government directive, nor does AT&T have any control over whether DOJ will bring a collection action with its attendant procedural protections. *Third*, regardless whether AT&T paid the penalty, the forfeiture order itself imposed legal, reputational, and economic harms on AT&T from the moment it was adopted.

Moreover, even assuming arguendo the FCC's view of this case, Congress may not convert federal agencies into *de facto* district courts by assigning initial adjudication to agencies with appellate review (even *de novo*) by the federal courts. *Jarkesy* forecloses that possibility: for common-law claims, it explains, "involvement by an Article III court *in the initial adjudication* is necessary." 144 S. Ct. 2117, 2132 (2024) (emphasis added). Straightforward application of *Jarkesy* resolves this dispute.

The forfeiture order also exceeded the FCC's statutory authority, as AT&T explains. For example, the FCC adopted an aggressive (to put it mildly) statutory reading that allowed it to circumvent a statutory damages cap. The Communications

Act caps damages at a particular amount for each "single act or failure to act," but the FCC determined that AT&T had 84 "single act[s] or failure to act[s]" because it had relationships with 84 location-based services ("LBS") providers or aggregators. The FCC further asserted that, because there was a violation with respect to each of AT&T's 114.5 million subscribers, there were actually 114.5 million "single act[s] or failure to act[s]," and therefore it could have imposed a fine of $234.6 trillion. The FCC supported its absurd reading by invoking *Chevron* deference in all but name, without any analysis of statutory text. Unsurprisingly, its policy-driven interpretive position does not reflect the statute's best reading.

This Court should vacate the FCC's forfeiture order.

## ARGUMENT

### I. THE CONSTITUTION PROHIBITS THE FCC'S PROCESS FOR IMPOSING PENALTIES

The FCC imposed a $57 million penalty on AT&T without any judicial process. Rather than making its case before an Article III judge and jury as the Constitution requires, the FCC made its case to itself, acting as the judge, jury, and prosecutor. As *Jarkesy* explains, that violates the Seventh Amendment because, when it comes to civil penalties like those at issue here, respondents have "the right to be tried by a jury of [their] peers before a neutral adjudicator." *Jarkesy*, 144 S. Ct. at 2139.

6

The FCC defended its framework with two arguments. First, the FCC argued that the public-rights exception permits its process. Second, the FCC argued that even if the public-rights exception does not apply, its process is constitutional because Section 504(a) allowed AT&T to receive a trial *de novo* in a DOJ collection action. Both arguments fail. The Supreme Court's decision in *SEC v. Jarkesy*, published after the FCC issued the forfeiture order in this case, directly repudiates the FCC's argument about the public-rights exception. And Section 504(a) does not eliminate the Seventh Amendment violation because AT&T's constitutional rights cannot be conditioned on its refusal to comply with a forfeiture order, and the DOJ's discretionary decision on whether and when to collect. The Constitution required the right to trial by jury at the outset, which AT&T never received.

## A. The Seventh Amendment Entitled AT&T to A Jury Trial

The FCC cannot impose civil penalties on AT&T without the protections of a trial by jury before a neutral arbitrator. The Supreme Court in *Jarkesy* made that clear. The Court there evaluated a Seventh Amendment challenge brought by an investment advisor and his firm to the SEC's attempt to impose civil penalties for securities fraud in its own in-house administrative tribunals. Examining the text, history, and precedent underlying the Seventh Amendment, the Court concluded that the SEC could not impose its civil penalty remedy without the protections accorded by a federal court and jury. The same result applies here.

7

The Seventh Amendment provides that in "[s]uits at common law, … the right of trial by jury shall be preserved." U.S. Const. amend. VII. Statutory claims—like the ones the SEC pursued in *Jarkesy* and those the FCC seeks here—are "suits at common law" if the claim at issue is "legal in nature." 144 S. Ct. at 2128. While that inquiry can encompass both "the cause of action and the remedy it provides," "[s]ince some causes of action sound in both law and equity," the Supreme Court has historically "concluded that the remedy was the more important consideration." *Id.* at 2129 (cleaned up).

In this case, as in *Jarkesy*, "the remedy is all but dispositive," because the FCC (like the SEC) "seeks civil penalties" that are "designed to punish or deter the wrongdoer." They fall within the core of remedies that implicate the jury right and can "only be enforced in courts of law." *Id.*

There can be no doubt that the remedy at issue here is a civil penalty designed to punish or deter AT&T. Under this Court's case law, "[a]s opposed to restitution which is remedial, forfeiture is punitive." *United States v. Hoffman*, 901 F.3d 523, 560-61 (5th Cir. 2018). The government itself observed as much earlier this year, stating that an FCC forfeiture penalty "is a civil penalty" that is "plainly punitive in nature." United States Br. 12, *United States v. Rhodes*, No. 21-cv-0110 (D. Mont. Mar. 1, 2024), ECF No. 108. It involves a "per-violation maximum penalty," and "is designed to punish culpable individuals, rather than to extract compensation or

8

restore the status quo." *Id.* (cleaned up). That is game, set, and match—the government's acknowledgment that FCC forfeiture penalties are punitive "effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims." *Jarkesy*, 144 S. Ct. at 2130.

To be sure, the Supreme Court in *Jarkesy* "confirm[ed] that conclusion" by identifying a "close relationship" between the securities fraud claim at issue there and common-law fraud. *Id.* The same type of "close relationship" exists here. As AT&T has shown, common-law analogues that cover "the same basic conduct" (*id.*) as the FCC's forfeiture order abound—from negligence to eavesdropping to intrusion upon seclusion. *See* AT&T Br. 30-31, ECF No. 30. But even if these analogues bore less resemblance to the FCC's claims than the analogues at issue in *Jarkesy*, the result would be the same. After all, the Court's focus on remedy as "all but dispositive" establishes a strong presumption that a claim for civil penalties designed to punish or deter is legal in nature. As was true in *Jarkesy*, the mere fact that a statutory cause of action has no "identical" common-law equivalent cannot overcome that presumption. 144 S. Ct. at 2131.

To try to evade the Seventh Amendment, the FCC attempts to fit this case into a narrow exception that allows for administrative adjudication of "public rights." But that exception fails on its own terms. In *Jarkesy*, the Court noted that it had never "definitively explained" the line between public and private rights, and that

9

the public rights exception was an "area of frequently arcane distinctions and confusing precedents." *Id.* at 2133. But the Court noted that the exception "has no textual basis in the Constitution" and must be applied "with care," or else "the exception would swallow the rule." *Id.* at 2134. Accordingly, the Court has required significant historical warrant for the conclusion that the Constitution permits administrative adjudication in a specific area, like "an unbroken tradition—long predating the founding" of using summary proceedings to collect tax revenue. *Id.* at 2132. But none of the "historic categories of adjudications" the Court identified— like relations with Indian tribes, administration of public lands, or payments to veterans or pensions (*id.* at 2133)—remotely apply here. There are no "centuries-old rules" (*id.* at 2134) that would permit the FCC to adjudicate these claims, which are in the nature of an action at common law, and seek civil penalties in an administrative tribunal.

Resisting this conclusion, the FCC makes the same arguments that the SEC made in *Jarkesy* and the Supreme Court rejected. It leans heavily on *Atlas Roofing Co. v. OSHA*, 430 U.S. 442 (1977), a nearly 50-year-old case sustaining administrative adjudication under the OSH Act for certain workplace safety claims. *AT&T, Inc.*, Forfeiture Order, FCC 24-40 ¶ 77 (rel. Apr. 29, 2024) (citing *Atlas Roofing* six times in a single paragraph) ("Forfeiture Order"); *see generally* SEC Br., *SEC v. Jarkesy*, No. 22-859, 2023 WL 5655520 (U.S. Aug. 28, 2023). But the

Supreme Court in *Jarkesy* came less to praise *Atlas Roofing* than to bury it. Beyond asserting that the precedent did not control where, as here, the claim is in the nature of a common law suit, 144 S. Ct. at 2133, the Court went on to explain that *Atlas Roofing* "represents a departure from our legal traditions," that scholars have often either "simply ignored the case" or "offered nothing but a variety of criticisms," and that later precedent clarified the limits of *Atlas Roofing*'s holding and may indeed have overruled the case. 144 S. Ct. at 2138 n.4 (noting that "the author of *Atlas Roofing* certainly thought that" later Supreme Court precedent "may have" overruled the case). Needless to say, a case that represents a departure from our legal traditions, offered circular reasoning for its holding, and may already be overruled does not provide a sufficient basis to deprive AT&T of its Seventh Amendment right—especially after the Supreme Court cautioned that even in close cases, "the presumption is in favor of Article III courts." *Id.* at 2134 (cleaned up).

In any event, the Court explicitly rejected the broader readings of the case advanced by the FCC here. Like the SEC in *Jarkesy*, the FCC argues that the public-rights exception applies because Congress "created new statutory obligations" and assigned their enforcement to executive adjudication. Forfeiture Order ¶ 77; SEC Br., 2023 WL 5655520, at *13 (public-rights doctrine "permits Congress to create 'new statutory obligations,' impose civil penalties for their violation, and commit to an administrative agency the function of deciding whether a violation has in fact

occurred" (cleaned up)).  But the *Jarkesy* Court expressly rejected the argument that the public-rights exception applies merely because "Congress created 'new statutory obligations'" and "imposed civil penalties for their violation."  144 S. Ct. at 2136 (cleaned up).

### B.  Section 504(a) Does Not Save The FCC's Approach to Imposing Forfeitures.

With its public-rights argument rejected by *Jarkesy*, the FCC is left with only its argument from Section 504(a).  That provision allows DOJ to sue in federal district court to collect unpaid FCC forfeiture penalties.  The FCC argues that Section 504(a) makes its enforcement process constitutional.  That argument fails for multiple independent reasons.

### 1.  Section 504(a) Review Is Extremely Limited

The FCC's first problem is that its premise is incorrect.  In practice, Section 504(a) trials are often not *de novo*—instead, review is "extremely limited." *United States v. Olenick*, No. 18-CV-675-LY, 2019 WL 2565280, at *3 (W.D. Tex. Apr. 2, 2019), *adopted*, 2019 WL 3818041, at *1 (W.D. Tex. May 14, 2019).  Courts often review the FCC's factfinding, for example, deferentially for reasonableness. *See United States v. Sutton*, No. 2:23-CV-02100-SOH-MEF, 2024 WL 2926594, at *12 (W.D. Ark. Mar. 27, 2024) ("courts have held that an FCC forfeiture penalty should be upheld where the amount is reasonable and consistent with the relevant FCC guidelines").  That is not *de novo* review.  Legal challenges, moreover, are not

available in this Circuit at all. *See United States v. Stevens*, 691 F.3d 620, 622 (5th Cir. 2012) (affirming district court's "refus[al] to consider the Stevenses' legal arguments" because "its jurisdiction was limited to considering the factual basis for the agency action"). Under our Constitution, "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (judges must use "independent judgment"). But if Section 504(a) review is the judicial process an enforcement target receives, the executive—and the executive only—has said what the law is. AT&T should not have to abdicate its Article III right to have an impartial decisionmaker interpret the law to vindicate its Seventh Amendment right to a jury.

In any event, any jury trial right appears theoretical at best. By the FCC's own reckoning, no Section 504(a) jury trial has occurred in at least fifty years—the FCC has cited only one 1974 case from a different circuit in which a jury trial "was available" but was waived. Forfeiture Order ¶ 69 n.223. The FCC does not point to a single actual Section 504(a) jury trial ever.

### 2. The Forfeiture Order Compelled Payment

Even if Section 504(a) review did amount to *de novo* review, there was no way for AT&T to guarantee it could obtain it. The FCC argues that Section 504(a)

gave AT&T a "statutory right" to Section 504(a) review. *Id.*; *see also id.* ¶ 69 (AT&T was "entitled" to Section 504(a) review). That is wrong.

Section 504(a) does not grant any rights to regulated entities; rather, it empowers DOJ to institute a collection action in certain circumstances. Section 504(a) is titled "Recovery." It provides that FCC forfeitures "shall be recoverable … in a civil suit in the name of the United States brought in [federal district court]." 47 U.S.C. § 504(a). Nothing in Section 504(a) entitles an FCC defendant to refuse to pay penalties or demand an Article III court and jury in the event it fails to do so. Section 504(a) simply enables DOJ to sue for the funds when a defendant does not pay its debt. Should DOJ decide not to collect, AT&T would have no mechanism to assert its constitutional rights. And it certainly would have no control over how quickly it can vindicate itself before judge and jury, as the DOJ could take up to five years to bring a collection action under the applicable statute of limitations. *See* 28 U.S.C. § 2462.

Furthermore, nothing about the FCC's forfeiture order suggests that AT&T might be "entitled" to disregard it. The order was titled "Forfeiture Order," not "Forfeiture Suggestion." Forfeiture Order at 1. The order was "[b]y the Commission." *Id.* In the first paragraph, the Commission wrote that "we … impose a penalty of $57,265,625 against AT&T." *Id.* ¶ 1. The order states: "**IT IS ORDERED**" that AT&T "**IS LIABLE FOR A MONETARY FORFEITURE** in

14

the amount of … $57,265,625." *Id.* ¶ 83. The order states that "[p]ayment of the forfeiture shall be made … within thirty (30) calendar days." *Id.* ¶ 84. And AT&T "shall send electronic notification," the order continues, upon payment. *Id.*

Needless to say, that is language of coercion. It tells AT&T what it "shall" do. *See, e.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("shall" is "mandatory" and "creates an obligation"). And it requires AT&T to do it promptly. Despite all the order's emphatic commands, astoundingly, the FCC says that any payment by AT&T was made "voluntarily." Forfeiture Order ¶ 69 n.223. That is Orwellian nonsense. The forfeiture order's plain language leaves no doubt that payment was required.

To be sure, one consequence of AT&T's timely payment of the forfeiture is that it can avail itself of the Communications Act's ordinary processes for appeal to a federal court of appeals for final Commission orders. *See AT&T Corp. v. FCC*, 323 F.3d 1081, 1083-84 (citing 47 U.S.C. § 504(a)). But that is simply to say AT&T incurs no additional penalty for complying with the FCC's order. Had AT&T refused to pay, that judicial review mechanism would disappear, and AT&T would have been left at the mercy of DOJ to initiate process under the Communications Act's special provision for collection of "recoverable" debts. *See AT&T Corp. v. FCC*, 323 F.3d at 1084 (construing 47 U.S.C. § 504(a)). And of course, neither judicial review provision *entitles* AT&T to demand a trial by jury.

15

### 3. The Forfeiture Order Immediately Harmed AT&T

The difference between a trial initiated in an Article III court and a DOJ collection action (following an informal proceeding in an in-house tribunal and forfeiture order) is not merely semantic. It is embedded in the constitutional design, and for good reason, because it protects targets of enforcement actions from being unilaterally deemed a lawbreaker in an invalid and unfair procedure, and imposes legal, reputational, and economic harms that come from a finding of liability in that proceeding. The FCC's claim of "no harm, no foul" if the DOJ fails to pursue a forfeiture penalty imposed by the agency cannot withstand scrutiny.

*First*, the forfeiture order constitutes an official government determination that the enforcement target is a lawbreaker. But only the judiciary, not the executive, has the power to make such a determination with respect to claims for civil penalties. To be sure, the Executive Branch may use administrative adjudication to determine whether to *prosecute* a defendant. But with respect to "common law claims," as the Court explained in *Jarkesy*, "involvement by an Article III court *in the initial adjudication* is necessary." 144 S. Ct. at 2132 (emphasis added). That requirement was not satisfied here, where the initial adjudication was made by an in-house agency tribunal.

*Second*, the FCC's in-house determination carries significant legal consequences. Under FCC policy, the agency may "us[e] the underlying facts of a

16

prior violation that shows a pattern of non-compliant behavior against a licensee in a subsequent renewal, forfeiture, transfer, or other proceeding."[2]  That means the FCC could use the facts supporting an unpaid forfeiture "as a basis for a higher forfeiture" in future cases.  FCC Policy Statement ¶ 35; *see also FCC v. Fox Television Stations*, 567 U.S. 239, 255 (2012) (noting FCC's authority to take "history of prior offenses" into account when setting a future forfeiture penalty, even where agency declines to impose forfeiture initially) (citing 47 U.S.C. § 503(b)(2)(E)).  And by the FCC's own admission, such facts apparently could also serve as a basis for denying a request to renew a license for broadcast, mobile voice or broadband, or satellite services; to prevent consummation of a merger that involved the transfer of FCC licenses; or to inform the FCC's determination of whether a company possesses the requisite character to hold licenses at all—as the FCC's invocation of "other proceeding" appears limitless.  *See* FCC Policy Statement ¶ 34.  It is cold comfort to a licensee faced with such a legal cloud surrounding its operations that the facts adjudicated by the agency may someday be subject to review, at the executive branch's discretion, by an Article III court and jury.

---

[2] *See Commission's Forfeiture Pol'y Statement & Amend. of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087, ¶ 34 (1997) ("FCC Policy Statement").

*Third*, the pendency of a forfeiture order carries with it significant reputational and economic harms. As the Supreme Court has noted, FCC orders impose "reputational injury" in addition to "legal consequence." *Fox Television Stations*, 567 U.S. at 255. The agency's "findings of wrongdoing can result in harm to a broadcaster's reputation with viewers and advertisers," for example, given the "strongly disapproving terms" that "are contained in the permanent Commission record," and the fact that such findings are "widely publicized." *Id.* at 255-56. Meanwhile, enforcement targets must determine whether the existence of the forfeiture order or the findings contained therein must be further disclosed to investors as material in filings with the SEC; or in potential applications for new government contracts, grants, or similar programs or benefits; or in applications for new lines of credit or similar funding. These reputational and economic harms would exist even if (indeed, especially if) the DOJ makes no attempt to test the agency's allegations or conclusions in federal court.

*Fourth*, and finally, the procedures at play at the agency and in a DOJ collection action contribute to the costs imposed on enforcement targets throughout the process. Unlike in federal court, which has established timeframes for responding to a complaint, and where an Article III judge manages the timing and scope of the discovery process, there are no similar safeguards at the FCC. An FCC investigation and enforcement action can linger for years without resolution; indeed,

in the order under review, it took five years from the initiation of an investigation until the FCC issued its forfeiture order against AT&T.  And should a target eventually get to federal court, it has to start the process all over again—incurring unnecessarily duplicative costs and further drawing out resolution.  Even then, the target is branded with being a defendant in a "collection" action for a forfeiture already imposed, often, as noted above, with diminished procedural safeguards.

For all the above reasons, Section 504(a) review cannot bear the weight the FCC assigns to it.  Because of the significant legal and real-world consequences FCC forfeiture orders impose on parties like AT&T, the FCC cannot impose civil penalties without the protections of an Article III court and jury.

## II.     THE FCC'S INTERPRETATION OF THE STATUTE TO PERMIT THE IMPOSITION OF UNPREDICTABLE AND MASSIVE CIVIL PENALTIES IS PLAINLY WRONG

The FCC has long exploited *Chevron* deference to create and apply unclear regulatory standards for assessing and calculating civil penalties.  The FCC has claimed for itself substantial discretion to determine virtually every element of a civil penalty: the number and type of violations that occurred in a given case, how to apply forfeitures to those claimed violations, whether to apply upward adjustments, and more.  This unpredictable and standardless exercise of authority has enabled the FCC's Enforcement Bureau to threaten regulated entities with exorbitant penalties to secure consent decrees and behavioral commitments it could not otherwise obtain.  *See, e.g.*, *TerraCom, Inc. and YourTel America, Inc.*, Notice

of Apparent Liability for Forfeiture, 29 FCC Rcd 13325, ¶ 52 (2014) (claiming, over two dissents, the ability to impose a $9 billion forfeiture) ("TerraCom NAL"); *TerraCom, Inc., and YourTel America, Inc.*, Order, 30 FCC Rcd 7075, ¶ 4 (July 9, 2015) ("To settle this matter, TerraCom and YourTel will pay a civil penalty of $3,500,000").

This case involving AT&T illustrates the problem.[3] Section 503(b) provides that a person may be liable for forfeiture for "willfully or repeatedly fail[ing] to comply with any of the provisions of" the Communications Act or rules promulgated by the FCC. 47 U.S.C. § 503(b)(1). The Act then caps the total per-violation amount at approximately $200,000 for "each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed" approximately $2 million, numbers adjusted for inflation, "for any single act or failure to act" that violates the statute or FCC rules. 47 U.S.C. § 503(b)(2)(B). The import of this provision is clear: while a "continuing violation" of FCC rules, based on a "single act or failure to act," may increase a violator's penalties beyond a single forfeiture, the penalties for a single "continuing violation" may not in the aggregate exceed $2 million.

---

[3] While the Chamber focuses discussion on the FCC's interpretation of Section 503(b)(2)(B), the Chamber supports AT&T's other statutory arguments as well.

As this Court has explained, the continuing violation provision "subjects to separate liability the recurring daily episodes of a delictual pattern that might otherwise be treated in the aggregate"—such as operating a broadcast station each day for 14 consecutive days without a license. *United States v. WIYN Radio, Inc.*, 614 F.2d 495, 497 (5th Cir. 1980). It does not penalize, by mere passage of time, the "fail[ure] to fulfill … a single, pointed duty, admitting of only a single dereliction," even if "the effect of [the] failure to act within the prescribed period persists." *Id.* at 497. Nor, by extension, does it permit the agency to identify tens, hundreds, or even millions of separate continuing violations based on a single failure to perform a legal duty.

Here, the Commission's findings in the forfeiture order could support at most a single "failure to act" warranting a forfeiture—that AT&T purportedly "failed to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information." Forfeiture Order ¶ 41. But the FCC found *84* separate violations—not grounded in additional "acts" or "failure[s] to act" committed by AT&T, but instead based on each LBS provider that AT&T did business with. And as the FCC saw it, that was conservative.

According to the Commission, it "could well have chosen to look to the total number of AT&T subscribers when determining the number of violations." *Id.* ¶ 60. As of March 2024, AT&T had 114.5 million wireless subscribers. AT&T, Form 8-

21

K (Apr. 24, 2024), tinyurl.com/mvh977wc. Taking the agency at its word, using that number and multiplying it by the approximately $2 million per-violation cap equals $234.6 trillion. That is not a typo, and it is the amount the FCC says it could have fined AT&T under Section 503. It is more than double the entire world's GDP. An interpretation that allows this "ludicrous … result[]" and that would permit the FCC to regulate in such "draconian fashion" cannot possibly be what Congress had in mind when enacting a *cap* on damages. *WIYN Radio*, 614 F.2d at 497-98.

Apart from the unbounded authority it would provide the FCC, under the agency's construction "willfulness would effectively be eliminated as a predicate for forfeiture." *Id.* at 498. Each day following a single failure to exercise due care—or in the Commission's reading, each separate LBS provider or subscriber implicated in that failure to act—would be converted automatically into a new rules violation, regardless of whether there was willfulness associated with each business partner or subscriber or "sheer inadvertence." *Id.*

In the Forfeiture Order, the FCC did not support its atextual and absurd position by invoking any tool of statutory interpretation that could shed light on Section 503(b)(2)(B)'s meaning. Rather, the FCC invoked *Chevron* deference. The FCC did not call it that, of course—the FCC knew well that *Chevron* was on life support. But the FCC's arguments unmistakably rely on that since-overruled doctrine.

The FCC began by asserting that Section 503(b)(2)(B) does not "speak to" "the application of the phrase 'single act or failure to act.'" Forfeiture Order ¶ 57. That is *Chevron* language—the first step of *Chevron* was determining whether Congress has "spoken to" the question. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984). The FCC then asserted that its 84-violations determination was "reasonabl[e]." *Id.* ¶ 58 (determination was "rational and properly within the Commission's discretion"). That was *Chevron*'s second step— determining whether the agency's interpretation was "reasonable." *Chevron*, 467 U.S. at 844.

But "*Chevron* is overruled." *Loper Bright*, 144 S. Ct. at 2273. Now, a court's only job is to exercise its "independent judgment" to decide whether the agency "has acted within its statutory authority." *Id.* The FCC's days of stretching statutory language and falling back on deferential review are over.

The Commission did not have "discretion," Forfeiture Order ¶ 58, when determining the meaning of "single act or failure to act." This case does not implicate one of the narrow circumstances in which Congress might "expressly delegate" discretion to an agency, for example, by using broad language "such as 'appropriate' or 'reasonable.'" *See Loper Bright*, 144 S. Ct. at 2263. The phrase "single act or failure to act" contains plain English words subject to judicial review and interpretation—as this Court has done in the past.

This is not the only case in which the FCC has taken a freewheeling, policy-driven approach to determining what counts as a violation under Section 503, instead of interpreting the statute. The FCC's *TerraCom* NAL, for example, which the FCC cited in the Forfeiture Order here, took a different approach to finding violations and identified each unprotected *document* as a separate violation. *See* Forfeiture Order ¶ 58; TerraCom NAL at 13350 (threatening $9 billion in fines); *see also id.* (Commissioner Pai dissenting) ("It strains credulity to think that Congress intended such massive potential liability for 'telecommunications carriers' but not retailers or banks or insurance companies or tech companies or cable operators or any of the myriad other businesses that possess consumers' [personal identifying information]."). The FCC's other forays into data security and privacy reveal still different approaches, contributing to confusion and illustrating the arbitrariness of the FCC's approach. *See, e.g.*, *Q Link Wireless LLC and Hello Mobile Telecom LLC*, Notice of Apparent Liability for Forfeiture, 38 FCC Rcd 7022, ¶ 30 (2023) (concluding that "each time the Companies used readily available biographical information or account information either to authenticate a customer or carry out a password reset—whether on the Website or via the App—constitutes a separate violation of … the Commission's rules").

Aside from having no basis in the statute, the FCC's new theory of "single act or failure to act" also violates the requirement of fair notice. Regulated parties "need

fair notice of the circumstances" in which they "will and will not" be subject to adverse agency action. *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1046 (D.C. Cir. 2017); *see also, e.g.*, *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (fair notice of what the law "either forbids or requires" is "the first essential of due process of law"). While the fair-notice requirement has roots in constitutional due process, it "has now been thoroughly 'incorporated into administrative law.'" *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995); *Satellite Broad. Co., Inc. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987) (enforcing fair-notice requirement is form of arbitrary-and-capricious review). An agency must "give the public fair notice of their rules before finding a violation of them." *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 374 (5th Cir. 2024). But here AT&T had no notice that every relationship with an LBS provider or aggregator left in place thirty days after the *New York Times* article the FCC cites would be deemed a separate violation. That makes the forfeiture order arbitrary and capricious.

In sum, the FCC's policy-driven and atextual approach deprives targets of fair notice, and disregards the plain text of the statute. Congress enacted the Administrative Procedure Act "as a check upon administrators whose zeal" has "carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 144 S. Ct. at 2261. The FCC's approach in this case is exactly what Congress had in mind.

## CONCLUSION

This Court should vacate the forfeiture order.

Dated: August 5, 2024

Respectfully submitted,

*/s/* Mariel A. Brookins
  *Counsel of Record*
Maria C. Monaghan
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 659-6000
mbrookins@USChamber.com

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fifth Circuit Rule 29.3 and Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,064 words.

This brief also complies with the typeface requirements of Fifth Circuit Rule 32.1 and Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Fifth Circuit Rule 32.2 and Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced 14-point Times New Roman font.

 Dated: August 5, 2024                    */s/* Mariel A. Brookins

**CERTIFICATE OF SERVICE**

I certify that on August 5, 2024, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

Dated: August 5, 2024                      */s/* Mariel A. Brookins