No. 24-60223

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AT&T INC.,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review from
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Jonathan S. Kanter
  *Assistant Attorney General*

Robert B. Nicholson
Matthew A. Waring
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Adam L. Sorensen
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60223, *AT&T Inc. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Petitioner**
AT&T Inc.

**Petitioner's Counsel**
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP

**Respondents**
Federal Communications Commission
United States of America

**Respondents' Counsel**
P. Michele Ellison
Jacob M. Lewis
Sarah E. Citrin
James Michael Carr
Adam L. Sorensen
FEDERAL COMMUNICATIONS COMMISSION

Merrick Garland
Jonathan S. Kanter
Robert J. Wiggers
Robert B. Nicholson
Matthew A. Waring
U.S. DEPARTMENT OF JUSTICE


Dated:  September 27, 2024          /s/  *Adam L. Sorensen*

                                   Adam L. Sorensen
                                   Counsel
                                   Federal Communications
                                   Commission
                                   Washington, D.C. 20554

## STATEMENT ON ORAL ARGUMENT

Respondents believe that the Court could find oral argument helpful in examining the claims raised by petitioner.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................i

STATEMENT ON ORAL ARGUMENT ...........................................iii

TABLE OF AUTHORITIES .................................................. vi

INTRODUCTION.......................................................... 1

STATEMENT OF THE ISSUES ............................................ 3

STATEMENT OF THE CASE............................................... 4

    A.    Statutory And Regulatory Background ................................ 4

        1.    Protection of customer proprietary information under the Communications Act .................................... 4

        2.    The Commission's privacy rules ................................. 5

        3.    The Commission's forfeiture authority......................... 6

    B.    Factual Background ................................................ 8

        1.    AT&T sells customer location data to third parties.......................................................... 8

        2.    Location-based service providers allow unauthorized access to AT&T customer location information................................................. 10

        3.    AT&T ends its location-based services program ......... 11

    C.    The Commission's Forfeiture Order ..................................... 11

    D.    AT&T Forgoes A Jury Trial ................................................ 15

STANDARD OF REVIEW ...................................................... 15

SUMMARY OF THE ARGUMENT...................................................... 16

ARGUMENT .................................................................. 19

I.    THE COMISSION'S STATUTORY FORFEITURE AUTHORITY DOES NOT VIOLATE THE CONSTITUTION ..... 19

    A.    The Commission's Forfeiture Procedures Did Not Violate AT&T's Seventh Amendment Jury Trial Right....... 19

# TABLE OF CONTENTS
## (continued)

**Page**

      1.    AT&T was not deprived of a de novo jury trial in federal court ................................................................. 19

      2.    The Seventh Amendment does not apply to Section 222, which has no common law analogue ....... 26

      3.    FCC enforcement of the Communications Act falls under the "public rights" exception ..................... 30

  B.    The Commission Did Not Violate Article III Or Due Process By Issuing A Notice Of Apparent Liability ............. 35

  C.    Congress Did Not Impermissibly Delegate Its Authority To The Commission .............................................. 39

II.    THE COMMISSION ACTED WITHIN ITS STATUTORY AUTHORITY IN ISSUING THE FORFEITURE ORDER ........... 44

  A.    Location Data Is CPNI ..................................................... 44

  B.    AT&T Had Adequate Notice Of The Statute's Meaning ...... 49

III.    THE COMMISSION REASONABLY FOUND THAT AT&T FAILED TO PROTECT CUSTOMER LOCATION DATA ........... 55

IV.    THE FORFEITURE AMOUNT IS REASONABLE AND APPROPRIATE .......................................................... 61

CONCLUSION ................................................................... 66

CERTIFICATE OF COMPLIANCE ..................................... 67

STATUTORY ADDENDUM ................................................ 68

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Master Maint. & Constr. Inc.*, 452 F.3d 373 (5th Cir. 2006) ................................................................................ 45

*Action for Children's Television v. FCC*, 59 F.3d 1249 (D.C. Cir. 1995) .............................................................................. 21

*Ala.-Tenn. Nat. Gas Co. v. Fed. Power Comm'n*, 359 F.2d 318 (5th Cir. 1966) ...................................................................... 51

*AT&T Corp. v. FCC*, 323 F.3d 1081 (D.C. Cir. 2003) ......................... 7, 20

*Bates & Guild Co. v. Payne*, 194 U.S. 106 (1904) ................................... 32

*Bowles v. Bennett*, 629 F.2d 1092 (5th Cir. 1980) .................................. 21

*BP Am., Inc. v. FERC*, 52 F.4th 204 (5th Cir. 2022) ........................ 50, 52

*Carter v. Sea Land Servs., Inc.*, 816 F.2d 1018 (5th Cir. 1987) ............. 20

*Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970) ................................................................ 38

*City of Arlington, Texas v. FCC*, 569 U.S. 290 (2013) ........................... 51

*Crowell v. Benson*, 285 U.S. 22 (1932) ................................................... 32

*Exec. Benefits Ins. Agency v. Arkinson*, 573 U.S. 25 (2014) .................. 35

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ......... 50, 51, 52

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940) ................................. 33

*Gibson v. FTC*, 682 F.2d 554 (5th Cir. 1982) ......................................... 36

*Grid Radio v. FCC*, 278 F.3d 1314 (D.C. Cir. 2002) ........................ 55, 62

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ......................... 41, 42, 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hersh v. United States ex rel. Mukasey*, 553 F.3d 743 (5th Cir. 2008)............................................................................26

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021)..............15

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018).......................47

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ............................36

*INS v. Chadha*, 462 U.S. 919 (1983).......................................................42

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928)............43

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ............................. 40, 42, 43

*Landry v. New Amsterdam Cas. Co.*, 279 F.2d 214 (5th Cir. 1960).......23

*Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282 (5th Cir. 2012)..............45

*Lockhart v. United States*, 577 U.S. 347 (2016)......................................46

*Loper Bright Enters. v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244 (2024)......................................................................................................15

*McCarthy v. Mukasey*, 555 F.3d 459 (5th Cir. 2009) .............................35

*Munn v. Illinois*, 94 U.S. 113 (1876) ......................................................31

*N.J. Steam Nav. Co. v. Merchants' Bank of Bos.*, 6 How. 382 (1848) ....31

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) .........................43

*NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ....................32

*Paul v. Davis*, 424 U.S. 693 (1976) ........................................................22

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1 (2019)...............................................................................................25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) ................................... 33

*Republic of Sudan v. Harrison*, 587 U.S. 1 (2019) ................................. 44

*San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697 (5th Cir. 1991) .......... 22

*SBC Commc'ns Inc. v. FCC*, 373 F.3d 140 (D.C. Cir. 2004) ................... 62

*Scripps-Howard Radio v. FCC*, 316 U.S. 4 (1942) ................................. 32

*SEC v. Jarkesy*, 144 S. Ct. 2117 (2024) ........................................ *passim*

*Sheldon v. Sill*, 49 U.S. (1 How.) 441 (1850) ......................................... 24

*Sierra Club v. EPA*, 939 F.3d 649 (5th Cir. 2019) ................................. 16

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) .......... 24

*United States v. Stevens*, 691 F.3d 620 (5th Cir. 2012) .................... 23, 25

*Virginian Ry. Co. v. United States*, 272 U.S. 658 (1926) ........................ 32

*Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ................... 41

*Wages & White Lion Invs. v. FDA*, 90 F.4th 357 (5th Cir.) .............. 51, 52

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................... 43

*Withrow v. Larkin*, 421 U.S. 35 (1975) ................................................ 36

*Yakus v. United States*, 321 U.S. 414 (1944) ........................................ 43

**Statutes**

18 U.S.C. § 3282 .................................................................................. 21

28 U.S.C. § 2342 ............................................................................. 20, 24

28 U.S.C. § 2344 .................................................................................. 25

# TABLE OF AUTHORITIES
## (continued)

Page(s)

28 U.S.C. § 2462 ...............................................................21

47 U.S.C. § 153 ..........................................................34, 49

47 U.S.C. § 154 ...............................................................43

47 U.S.C. § 222 ........................................................ *passim*

47 U.S.C. § 301 ...............................................................34

47 U.S.C. § 307 ...............................................................34

47 U.S.C. § 309 ...............................................................40

47 U.S.C. § 312 ...............................................................40

47 U.S.C. § 332 ...............................................................34

47 U.S.C. § 402 ...............................................................20

47 U.S.C. § 503 ........................................................ *passim*

47 U.S.C. § 504 ........................................................ *passim*

## Regulations

47 C.F.R. § 1.80 .........................................................7, 63

47 C.F.R. § 64.2001 *et seq*........................................................5

47 C.F.R. § 64.2007 ...........................................................6

47 C.F.R. § 64.2010 ..................................................29, 54, 55

## Administrative Materials

*AT&T Inc.*, 35 FCC Rcd 1743 (2020) .............................. *passim*

*Bellsouth Telecomms., LLC*, 35 FCC Rcd 8940 (2020) ...........................39

(ix)

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Implementation of the Telecommunications Act of 1996:
    Telecommunications Carriers' Use of Customer Proprietary
    Network Info. & Other Customer Info.*, 28 FCC Rcd 9609 (2013)......53

*Implementation of the Telecommunications Act of 1996:
    Telecommunications Carriers' Use of Customer Proprietary
    Network Information and Other Customer Information*, 14 FCC
    Rcd 14409 (1999)...............................................................................51

*Implementation of the Telecommunications Act of 1996:
    Telecommunications Carriers' Use of Customer Proprietary
    Network Information and Other Customer Information*, 22 FCC
    Rcd 6927 (2007)........................................................... 6, 54, 55

*Procedural Streamlining of Administrative Hearings*, 35 FCC Rcd
    10729 (2020) ............................................................................44

*Safeguarding & Securing the Open Internet*, FCC 24-52, 2024 WL
    2109860 (rel. May 7, 2024) ..................................................53

*TerraCom, Inc. & YourTel Am., Inc.*, 29 FCC Rcd 13325 (2014) ...........63

## Legislative Materials

H.R. Conf. Rep. No. 101-386 (1989) .......................................................62

## Treatise

Antonin Scalia & Bryan A. Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012) ....................................46

## Other Materials

AT&T, Form 10-K (Feb. 23, 2024) ..........................................................65

Letter from Lee Petro, FCC, WC Docket No. 17-126 (Aug. 5, 2017)......11

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Matthew Hale, *De Portibus Maris*, *A Collection of Tracts Relative To the Law of England* (Francis Hargrave ed., 1787).........................31

No. 24-60223

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

AT&T INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

## INTRODUCTION

For years, AT&T sold the location of its wireless customers to its business partners with no way of verifying that the information was being used for a legitimate purpose or that the customers had consented to sharing it.  This system-wide vulnerability endangered the privacy, and safety, of millions of the company's customers.  In one highly publicized incident, a rogue sheriff submitted thousands of illegitimate requests, enabling him to track the locations of his unwitting

acquaintances, including a judge.  This abuse went on for years, even though the sheriff, as supposed proof of authorization for access, routinely uploaded patently non-compliant documents, such as pages from his personal insurance policies and from office training manuals. Even after this alarming vulnerability became public, AT&T was slow to address the flaws in its program, leaving its customers' location information unprotected for nearly another full year.  In the order under review, the Federal Communications Commission properly determined that AT&T's dangerous failure to protect customers' location data warranted the imposition of a monetary forfeiture.

AT&T challenges the Commission's order mainly on constitutional grounds—leading with the claim that the statutory forfeiture procedure deprived it of its right to a jury trial, in violation of the Seventh Amendment.  That procedure, however, gave AT&T the right to a de novo jury trial in district court.  AT&T simply chose to dispense with that opportunity and instead opted to pay the forfeiture at once and to seek relief in this Court rather than in district court.  Even apart from that waiver, the Seventh Amendment's jury trial right does not apply to the Commission's regulation of common carriers such as AT&T.  That

oversight falls within the heartland of matters historically assigned to the political branches.

AT&T's other arguments are likewise unpersuasive.  It points to no credible indication of bias in the administration of this case.  Congress gave sufficient guidance to inform the Commission's choice between administrative processes for enforcement.  The Commission's authority to penalize AT&T for failing to protect location data is plain on the face of the statute.  And AT&T points to no clear error of judgment in the Commission's finding of liability or its assessment of a $57 million penalty it deemed necessary to deter AT&T—a leading telecommunications carrier with some $122 billion in revenue last year—from engaging in similar misconduct in the future.

## STATEMENT OF THE ISSUES

1.    Whether the statutory process for imposing a forfeiture against AT&T, which included the availability of a de novo jury trial in federal court, is constitutional.

2.    Whether the Commission correctly interpreted the Communications Act's protections for "customer proprietary network information" to include wireless customers' location information.

3.    Whether the Commission's conclusion that AT&T did not adequately protect its customers' location information was arbitrary and capricious.

4.    Whether the Commission's assessment of a $57 million monetary penalty was appropriate.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

#### 1.    Protection of customer proprietary information under the Communications Act

Section 222 of the Communications Act imposes on every telecommunications carrier "a duty to protect the . . . proprietary information of" its "customers."    47 U.S.C. § 222(a).    One subset of customer data protected by the statute is "customer proprietary network information" or CPNI.    Section 222(c)(1) provides that, "[e]xcept as required by law or with the approval of the customer," a carrier that acquires customer proprietary network information "by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable [CPNI] in its provision of (A) the telecommunications service from which such information is

derived, or (B) services necessary to, or used in, the provision of such telecommunications service." *Id.* § 222(c)(1).

The Act defines "customer proprietary network information" to include "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *Id.* § 222(h)(1)(A).

### 2.    The Commission's privacy rules

The FCC "has issued regulations implementing the privacy requirements of section 222." *AT&T Inc.*, 35 FCC Rcd 1743, 1744 ¶4 (2020) ("Notice"); *see* 47 C.F.R. § 64.2001 *et seq.* Section 64.2010(a) of the Commission's rules provides that "[t]elecommunications carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI."

Before 2007, the Commission's rules "permitted telecommunications carriers to share customers' CPNI with joint venture partners and independent contractors for certain purposes based on a customer's 'opt-out approval.'" Notice, 35 FCC Rcd at 1745 ¶6;

*Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, 22 FCC Rcd 6927, 6932 ¶8 (2007) ("2007 CPNI Order").

In 2007, the agency amended its rules to, among other things, require carriers to "obtain the 'opt-in approval' of their customers before disclosing CPNI." Notice, 35 FCC Rcd at 1745 ¶5; *see* 47 C.F.R. § 64.2007(b).

### 3.    The Commission's forfeiture authority

Section 503 of the Communications Act provides that "any person" who the Commission determines has willfully or repeatedly failed to comply with any provision of the Act or of a rule, regulation, or order issued by the Commission "shall be liable to the United States for a [monetary] forfeiture penalty." 47 U.S.C. § 503(b)(1).

The statute provides two procedures for the assessment of such a forfeiture. First, under Section 503(b)(3), the Commission may assess a forfeiture after a formal hearing before the Commission or an administrative law judge. 47 U.S.C. § 503(b)(3).

Second, under Section 503(b)(4), the Commission may assess a penalty by issuing a written forfeiture order that has been preceded by a notice of apparent liability to which the alleged violator had an opportunity to respond in writing.  47 U.S.C. § 503(b)(4).  Under this procedure, the forfeiture may be recovered only in a trial de novo in federal district court, in a suit brought by the Department of Justice on the FCC's behalf.  47 U.S.C. § 504(a).  A carrier may waive its jury trial right by paying the forfeiture immediately and seeking review in a court of appeals.  *AT&T Corp. v. FCC*, 323 F.3d 1081, 1084 (D.C. Cir. 2003).

The Communications Act and the Commission's rules cap the amount of the forfeiture for a given violation, and set out factors that guide the Commission in assessing a penalty.  *See* 47 U.S.C. § 503(b)(2); 47 C.F.R. § 1.80(b) .  The Commission "shall take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."  47 U.S.C. § 503(b)(2)(E).

**B.    Factual Background**

**1.    AT&T sells customer location data to third parties**

"AT&T provides mobile voice and data services to consumers throughout the United States by enabling consumer mobile phones to make and receive calls or transmit data on AT&T's wireless network." Notice, 35 FCC Rcd at 1748 ¶11.   "The mobile phones of AT&T subscribers . . . periodically register with nearby network signal towers." *Id*.  "Because AT&T knows the location of [these] towers," it "is able to calculate the approximate geographic location of the mobile phones communicating with its towers."  *Ibid*.  This "location information—which is created even when the customer does not have an active established connection, such as a voice call or data usage," on the mobile phone—is used by AT&T "to ensure the proper functioning of its network and to provide the services to which its customers subscribe."  *Id*.

"AT&T ran a Location-Based Services . . . program until March 2019."  Order ¶8 (ER7).  Under this program, "AT&T sold access to its customers' location information to companies known as 'location information aggregators,'" which "then resold access to such information to third-party location-based service providers" or to other companies

that "resold access to such information to location-based service providers." *Id.* Such providers used customer location data to sell a variety of services, including roadside assistance, delivery tracking, mapping, navigation, and weather forecasting. Notice, 35 FCC Rcd at 1748 ¶11. In total, AT&T "sold access to its customers' location information, directly or indirectly," to 88 third-party entities "(including the two [a]ggregators)." *Id.* ¶13.

AT&T's contracts with location information aggregators "vested AT&T with oversight authority over the [a]ggregators." Order ¶ 9 (ER7–8). But the aggregators then proceeded to "enter[] into their own contracts" with various location-based service providers. *Id.* "This arrangement meant that it was the [location-based service] providers who were obligated 'to provide notice and obtain consent' from consumers—not the [a]ggregators or AT&T." *Id.* Despite its contractual right to do so, AT&T made no effort to verify customers' consent *before* providing location information to third parties. *Id.* Instead, it relied on location-based service providers' promises to use AT&T customer data for certain use cases AT&T approved in advance, and claimed to verify on a

daily basis that each request for information was tied to a consent record. *Id.*

### 2. Location-based service providers allow unauthorized access to AT&T customer location information

"On May 10, 2018, the *New York Times* reported on security breaches involving AT&T's (and other carriers') practice of selling access to customer location information." Notice, 35 FCC Rcd at 1752 ¶20. The article focused on Securus Technologies, which "operated a 'location-finding service' that enabled law enforcement and corrections officials to access the location of a mobile device belonging to customers of major wireless carriers, including AT&T, *without* the device owner's knowledge or consent." *Id.*

This deficiency allowed Cory Hutcheson, then a Missouri sheriff, to use "the Securus service, without legal authorization, to access location information about anyone he pleased." Notice, 35 FCC Rcd at 1753 ¶21. "Hutcheson submitted thousands of unauthorized location requests via the Securus service between 2014 and 2017, in some cases 'upload[ing] entirely irrelevant documents including his health insurance policy, his auto insurance policy, and pages selected from Sheriff training manuals'

in lieu of genuine legal process." *Id.* Among those tracked in this manner were a Missouri judge, Hutcheson's predecessor as Sheriff, "and at least five highway patrol officers." *Id.*

AT&T promptly terminated Securus's access to AT&T customer location information after the *New York Times* article.[1]

### 3.    AT&T ends its location-based services program

On January 10, 2019, AT&T announced that it had "decided to eliminate all location aggregator services." Order ¶14 (ER10). The announcement further stated, however, that AT&T would not end its location-based services program until March 2019—nearly a year after the *New York Times* article reported gross abuses of the program. *See id.* (ER10–11).

### C.    The Commission's Forfeiture Order

On February 28, 2020, the Commission issued a notice of apparent liability proposing a $57,265,625 fine against AT&T for its apparent

---

[1] AT&T asserts that "The Commission first became aware in 2017 that Securus had misused its access to location data." Br. 15. While the Commission was made aware of a criminal proceeding in which a Securus employee had been asked to testify, Letter from Lee Petro, FCC, WC Docket No. 17-126, at 2 (Aug. 5, 2017), it was not alerted to any systemic vulnerability in AT&T's location-based services program.

willful and repeated violations of Section 222 of the Communications Act and Section 64.2010 of the Commission's rules. *See generally* Notice, 35 FCC Rcd 1743. After considering AT&T's written responses to the notice, the Commission ultimately upheld the proposed forfeiture in the order under review. *See* Order (ER4–41).

As explained in the notice and subsequent forfeiture order, AT&T repeatedly "disclos[ed] its customers' location information, without their consent, to a third party who was not authorized to receive it," and "fail[ed] to take reasonable steps to protect its customers' location information." Order ¶1 (ER4).

*First*, the Commission explained that AT&T customers' location information is "customer proprietary network information" under the Communications Act. Order ¶¶18–30 (ER12–17). Relying on plain meaning and ordinary tools of statutory interpretation, the Commission reasoned that customer location data "relates to the location of a telecommunications service—i.e., AT&T's commercial mobile service." Order ¶19 (ER12). Likewise, "the location information at issue was obtained by AT&T solely by virtue of its customer-carrier relationship" because AT&T's customers provided their location to AT&T to obtain

telecommunications services, not for some unrelated reason.  Order ¶25 (ER14).

*Second*, the Commission rejected AT&T's argument that the company lacked fair notice that inadequately protecting location data could subject it to penalties under the Communications Act.  Order ¶¶31–37 (ER17–19).  The statute's plain language, as well as the Commission's prior enforcement guidance, gave AT&T adequate notice that it was responsible for protecting its customers' location data.  *Id.*

*Third*, the Commission found AT&T liable for "violat[ing] section 222 of the Act and section 64.2010 of [the Commission's] rules by failing to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information."  Order ¶¶38–53 (ER19–27).  AT&T's CPNI safeguards were inadequate, the Commission determined, both before and after the Securus breach.  Order ¶¶41–46 (ER21–24).  AT&T relied almost exclusively on its contractual agreements without any direct verification that consent was actually obtained from the customer.  Order ¶43 (ER22).  And even after the *New York Times* article revealed serious abuses, "AT&T continued to sell access to its customers' location information under (for all intents and

purposes) the *same system* that was exploited by Securus and Hutcheson"
for nearly a year before shutting down the program.  Order ¶44 (ER23).

*Fourth*, the Commission imposed a $57,265,625 penalty for the
above violations.  Order ¶¶54–67 (ER27–33).  The Communications Act
authorizes a penalty of "up to $204,892 for each day of a continuing
violation, up to a statutory maximum of $2,048,915 'for any single act or
failure to act.'"  Order ¶56 (ER28).  Because the Commission found that
AT&T had inadequately protected its customers' data across 84 separate
contracts with location data aggregators and service providers, it
calculated the penalty based on "84 separate continuing violations."  *Id.*
That calculation method was consistent with past agency practice and
statutory requirements.  Order ¶¶57–62 (ER28–31).  The Commission
further found that AT&T's violations were "willful[] or repeated[]," Order
¶¶63–65 (ER31–32), and that AT&T's failure to protect customers'
location data was uniformly deficient as to each entity that received the
data.  Order ¶67 (ER32).

*Finally*, the Commission rejected AT&T's various arguments that
its enforcement procedures violated the Constitution.  Order ¶¶68–81
(ER33–39).  Among other things, AT&T's Seventh Amendment and
Article III objections failed because AT&T would be "entitled to a trial de

novo in federal district court before it [could] be required to pay the forfeiture."  Order ¶69 (ER33).

### D.    AT&T Forgoes A Jury Trial

Following the Commission's forfeiture order, AT&T did not wait for the government to seek to enforce the forfeiture order, which would have entitled the company to a jury trial, de novo, in federal district court, as well as continuing use of the $57 million.  *See* 47 U.S.C. § 504(a).  Instead, AT&T opted to forgo that statutory right and paid the assessed penalty so as to obtain direct review of the order in this Court.  *See* Dkt. 1-1 (May 9, 2024).

### STANDARD OF REVIEW

This Court reviews constitutional issues, as well as the best reading of relevant statutory provisions, de novo.  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021); *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024).  The Court otherwise reviews agency actions using the "narrow" arbitrary and capricious standard, under which courts defer to agency judgment unless it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Sierra Club v. EPA*, 939 F.3d 649, 663–64 (5th Cir. 2019) (citations omitted).

## SUMMARY OF THE ARGUMENT

I.  AT&T's constitutional challenges are unsound.

A.  AT&T was not deprived of any Seventh Amendment jury trial right because it could have contested the forfeiture in a de novo jury trial in district court but chose not to.  In any event, the Seventh Amendment's protections do not apply to enforcement actions under Section 222(c) of the Communications Act because they have no common law analogue. And even if they did, the Commission's regulation of telecommunications carriers falls within the historical "public rights" exception to the Seventh Amendment, under which Congress may assign a matter for decision by an agency without a jury trial.

B.  There is likewise no Article III or due process problem with the Commission's forfeiture procedures.  Again, AT&T had a right to de novo review in district court before paying any penalty.  And AT&T identifies no unconstitutional bias, either in the structure of the Commission's procedures or in the particular proceedings here.  The Commission does not prejudge liability before giving parties ample opportunity to respond, and statements by two Commissioners debating how to calculate the

proposed forfeiture amount did not evince bias on their part, let alone constitute sufficient evidence to overcome the presumption of honesty and integrity that courts afford to agency decisionmakers.

C. Congress did not unconstitutionally delegate legislative power to the Commission by creating two administrative paths for pursuing a forfeiture. The choice between issuing a written notice of apparent liability and holding a formal adjudication before the Commission or an administrative law judge is an exercise of executive, not legislative power. And even if that were not the case, Congress supplied an intelligible principle to guide the Commission's choice.

II. The Commission correctly interpreted the statutory definition of "customer proprietary network information" to include the customer location data at issue here. Section 222 of the Communications Act expressly covers "location" information, and AT&T customers share that information with AT&T for no reason other than their customer relationship. Section 222's plain text and the Commission's repeated warnings to wireless carriers not to be careless with contractual partners gave AT&T ample notice of the requirements at issue here.

III. The Commission's imposition of liability was neither arbitrary nor capricious. AT&T's entire defense of its location-based services

program was premised on the faulty notion that its contracts with aggregators and location service providers were sufficient to ensure against misuse of customer location data. AT&T sold access to customer location data without any means of verifying that customer consent to disclosure was actually obtained or that the data was not being misused. Indeed, none of the supposed consent documentation AT&T submitted during the Commission's investigation showed customer consent. And even after press reports revealed brazen abuses of this system, AT&T continued its location-based services program without meaningful changes for nearly a year.

IV. The $57 million penalty imposed was likewise appropriate. Consistent with the Communications Act and prior agency practice, the Commission calculated the penalty based on 84 continuing violations— one for each contractual relationship in which AT&T failed to adequately protect customer location data. AT&T points to nothing in the statute, the Commission's rules, or past practices that compels a contrary approach.

# ARGUMENT

## I.    THE COMISSION'S STATUTORY FORFEITURE AUTHORITY DOES NOT VIOLATE THE CONSTITUTION

### A.    The Commission's Forfeiture Procedures Did Not Violate AT&T's Seventh Amendment Jury Trial Right

AT&T's argument that it has been deprived of its Seventh Amendment right to a jury trial, Br. 29–36, has three fatal flaws.  First, under Section 504 of the Act, AT&T had the right to a jury trial before being legally compelled to pay any penalty.  Second, the Seventh Amendment provides no jury trial right for claims, like those here, that have no analogue at common law.  Third, even if the Seventh Amendment did apply, the Commission's enforcement of the Communications Act in this instance falls within the longstanding public rights exception to the jury trial right.

### 1.    AT&T was not deprived of a de novo jury trial in federal court

AT&T's Seventh Amendment challenge rests on the faulty premise that it was denied "a jury trial before an Article III judge."  Br. 29.  But any forfeiture under the Communications Act that follows a Commission notice of apparent liability is recoverable only "in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office or in any district through which the line

or system of the carrier runs," and such suit "shall be a trial de novo."  47 U.S.C. § 504(a).  Because Commission orders are ordinarily subject to direct review by a court of appeals under the Hobbs Act, *see* 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1), parties wishing to challenge a Commission forfeiture order following a notice of apparent liability have two options: they may decline to pay the forfeiture and avail themselves of their right to a de novo jury trial in district court under Section 504(a), or, as AT&T chose here, they may pay the forfeiture and seek review in a court of appeals under the Hobbs Act.  *See AT&T*, 323 F.3d at 1085 ("Such forum-controlling compliance choices . . . are common in statutes providing for judicial review of regulatory decisions").

Given this choice, the central constitutional injury AT&T complains of—the lack of a jury trial—is entirely self-inflicted.  AT&T's "statutory right to a trial de novo provided for by section 504 of the Act is itself sufficient grounds to reject" AT&T's Seventh Amendment arguments. Order ¶69 (ER33).  Indeed, AT&T knowingly and voluntarily waived whatever Seventh Amendment rights it had by choosing to forgo a de novo jury trial.  It is well established that "[p]arties may waive even fundamental rights, including . . . the right to a jury trial." *Carter v. Sea Land Servs., Inc.*, 816 F.2d 1018, 1021 (5th Cir. 1987) (citations omitted).

All that is required to effect such a waiver is "some express action by the party or his attorney which evidences his decision not to exercise the right." *Bowles v. Bennett*, 629 F.2d 1092, 1095 (5th Cir. 1980). A sophisticated actor well versed in Commission procedure and jurisdictional rules, AT&T chose to pursue this litigation, in this Court, under the Hobbs Act, fully aware that it was forgoing an otherwise available jury trial. AT&T cannot now complain that Congress or the Commission unconstitutionally forced its hand.

For its part, AT&T does not dispute that it could have sought a de novo jury trial in district court before paying the forfeiture. It complains, instead, that it "would have had to wait for the Department of Justice to sue in federal district court" first. Br. 35. But the five-year statute of limitations that applies to forfeiture recovery actions under Section 504, *see* 28 U.S.C. § 2462, is no more onerous than the standard limitations period used throughout the U.S. Code. *See, e.g.*, 18 U.S.C. § 3282. Moreover, the D.C. Circuit has suggested that AT&T could pursue a declaratory action if it were "suffering demonstrably adverse consequences from government delay in initiating [a] collection proceeding." *See Action for Children's Television v. FCC*, 59 F.3d 1249, 1262 (D.C. Cir. 1995). And if the Department of Justice declined to

pursue recovery of the penalty, AT&T would, of course, be under no obligation to pay.

Absent any monetary penalty, reputational harm alone could not give rise to a constitutional injury. *See Paul v. Davis*, 424 U.S. 693, 711 (1976) (reputational harm alone does not violate due process); *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991) ( "This circuit has consistently applied *Paul* by requiring that a [constitutional] claimant show a stigma *plus* an infringement of some other interest"). And in any event, the serious public concern over AT&T's "poor privacy practices," Br. 35, is not the Commission's doing. AT&T does not dispute that it repeatedly allowed access to customers' location data without their consent, or that public disclosure of its practices ultimately led it to terminate the entire location-based services program. AT&T's reputational harm, if any, stems from public disclosure of largely undisputed facts, not any delay in the Commission's forfeiture process.

AT&T also contends that "a four-year, jury-less administrative proceeding—culminating in a not just proposed but affirmed multimillion-dollar penalty—itself violated the Seventh Amendment." Br. 33. But as just explained, AT&T was not required to pay any penalty before seeking judicial review. *See* 47 U.S.C. § 504(a). Nor does AT&T

cite any authority for the proposition that the length of an administrative proceeding that later may be entirely set aside in a de novo jury trial somehow violates its Seventh Amendment rights.

Finally acknowledging that it could have challenged any attempt by the government to recover the penalty through a trial de novo in federal district court, AT&T argues that the choice between a de novo jury trial and Hobbs Act review is "no fair deal" because the former "would require AT&T to forgo any challenge to the 'legal validity' of the Forfeiture Order." Br. 33–34 (citing *United States v. Stevens*, 691 F.3d 620 (5th Cir. 2012)). There are several problems with this argument.

First, it is unclear how AT&T's objection relates to the Seventh Amendment, which preserves "the right of trial by jury." U.S. Const. Amend. VII. A jury would not decide "the 'legal validity' of the Forfeiture Order," Br. 34, because "[i]t is the province of the court to decide questions of law and the province of the jury to determine the facts from the evidence." *Landry v. New Amsterdam Cas. Co.*, 279 F.2d 214, 215 (5th Cir. 1960). Here, AT&T has not challenged the evidentiary basis for the forfeiture. And even if it had, it would not be denied "Article III's guarantee of a neutral adjudicator on questions of law," Br. 34: AT&T could have challenged both the Commission's legal conclusions and

factual findings in any federal courts of appeals, which routinely review both legal and factual issues in agency cases.

Second, to the extent that AT&T's complaint is with district courts' lack of jurisdiction to consider the legal validity of Commission orders, that is an argument regarding the scope of the Hobbs Act, not a constitutional defect in the Communications Act's forfeiture process. Under 28 U.S.C. § 2342(1), courts of appeals have "exclusive jurisdiction" to "determine the validity of" Commission orders.  AT&T has not challenged that statute here, nor offered any argument as to its proper scope, and it has forfeited any such challenge by failing to raise those issues in its opening brief.  *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 594 (5th Cir. 2006).  In any event, had it wished to assert both its jury trial right and its right to challenge the legal validity of Commission orders simultaneously, AT&T should have done so in district court.[2]

---

[2] Amicus CTIA is mistaken that this procedure "conditions AT&T's access to judicial review 'on the surrender of a constitutional right.'"  CTIA Br. 28.  AT&T would get Article III review either way, and Congress is free to channel jurisdiction issues to whatever lower court it wishes. *See Sheldon v. Sill*, 49 U.S. (1 How.) 441, 449 (1850).

Third, AT&T's argument premised on *United States v. Stevens*, 691 F.3d 620 (5th Cir. 2012), does not account for the particulars of that case. *Stevens* involved the application of a long-settled FCC prohibition on operating an unlicensed radio station. *See* 691 F.3d at 621. The district court lacked jurisdiction to hear a challenge to that rule in part because doing so would have "enable[d]" the penalized party "to raise such challenges much later than they would have been required to had they followed the proper channels"—in other words, outside the 60-day window for seeking review of a new FCC rule under the Hobbs Act. *Id.* at 623; 28 U.S.C. § 2344. Here, AT&T challenges the application of Section 222 to customer location data, Br. 45—an issue as to which there was no prior opportunity to challenge the Commission's interpretation and therefore no 60-day clock under the Hobbs Act. *Stevens* does not hold that the Hobbs Act bars a district court from considering "as applied" challenges to an FCC order under any and all circumstances, irrespective of whether the subject of the forfeiture had any "'prior' and 'adequate' opportunity for judicial review" of the Commission's legal determinations. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 8 (2019). To the contrary, if such a jurisdictional bar created the constitutional problems that AT&T

suggests, a court would construe the Hobbs Act "to avoid such problems" if possible. *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008). In any event, AT&T elected not to argue to a district court that *Stevens* allows for jurisdiction to consider legal challenges to a forfeiture order in a case such as this. It must live with that choice.

### 2. The Seventh Amendment does not apply to Section 222, which has no common law analogue

Even if the statutory enforcement process used by the Commission had, in fact, denied AT&T a jury trial, there still would be no constitutional violation because the Seventh Amendment does not apply to Section 222, which has no analogue at common law.

The Seventh Amendment provides in relevant part that, in "[s]uits at common law, . . . the right of trial by jury shall be preserved." U.S. Const. Amend. VII. The Supreme Court has construed that language to extend the jury trial right to claims that are "legal in nature," and which bear a "close relationship" to a common law cause of action that existed at the Founding. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128–31 (2024). While the Supreme Court in *Jarkesy* considered the remedy in that case "the 'more important' consideration," it nonetheless instructed that courts should "consider the cause of action" as well. *Id.* at 2129.

The Seventh Amendment does not apply to Section 222 in the first instance because that provision does not bear a "close relationship" to any common law cause of action.  *Id.* at 2130.  In Section 222(c), Congress crafted a highly reticulated and technical scheme under which telecommunications carriers are restricted in how they "use, disclose, or permit access" to "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service," as well "information contained in the bills pertaining to telephone exchange service or telephone toll service."  47 U.S.C. § 222(c), (h)(1).  This provision does not describe "the same basic conduct" as any common law claim, nor does it borrow "common law terms of art" or "incorporate[] prohibitions from common law" into the Communications Act—unlike the securities fraud claim at issue in *Jarkesy*.  144 S. Ct. at 2130.  To the contrary, Section 222(c) imposes obligations, particular to the telecommunications context, on a limited set of highly regulated entities.[3]

---

[3] The lack of a common law analogue—and the troubling breadth of AT&T's arguments—becomes all the more apparent when considering the full range of Commission enforcement actions.  The Commission's Enforcement Bureau investigates not only data privacy matters, but
(cont'd)

AT&T's attempt to draw comparisons between Section 222 and various common law torts, Br. 31–32, falls flat. To start, eavesdropping and intrusion upon seclusion do not involve "the same basic conduct," *Jarkesy*, 144 S. Ct. at 2130, as a Section 222(c) violation. By AT&T's own account, Br. 31, eavesdropping involves improperly *obtaining* information, not "us[ing], disclos[ing], or permit[ting] access" to information that was legitimately obtained through a carrier-customer relationship. 47 U.S.C. § 222(c)(1). Nor does liability under Section 222(c) in any way involve using information to "frame slanderous and mischievous tales." Br. 31. AT&T's analogy to intrusion upon seclusion is likewise inapt. Section 222(c) liability does not turn on "giv[ing] publicity to a matter," or on the "offensive" character of the information, Br. 32—rather, the statute is violated when a telecommunications carrier, regardless of publicity or offense, insufficiently safeguards technical network information such as the location of a wireless communication device. 47 U.S.C. § 222(c)(1). The fact that two common law torts loosely involved "information" does not indicate the kind of "close relationship between the causes of action in this case and common

also national security, supply chain integrity, emergency services, and harmful interference violations.

law" necessary to make the Seventh Amendment applicable. *Jarkesy*, 144 S. Ct. at 2130.

Nor does Section 222 impose a duty "to exercise reasonable care" in the common law negligence sense, as AT&T suggests. Br. 31. Subsection (a), which imposes on carriers "a duty to protect the confidentiality of proprietary information" does not use the word "reasonable," or any other "common law terms of art." *Jarkesy*, 144 S. Ct. at 2130. The mere fact that the Commission's implementing regulations use the word "reasonable," 47 C.F.R. § 64.2010(a)— "[t]elecommunications carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI," *id.*—does not suggest otherwise. The word "reasonable" is ubiquitous in regulatory, statutory, and common law. Its use in 47 C.F.R. § 64.2010(a) to describe carriers' obligation under Section 222 does not evince an "enduring link" to a "common law 'ancestor'" sufficient to trigger the Seventh Amendment jury trial right. *Jarkesy*, 144 S. Ct. at 2130.

Given the lack of any persuasive common law analogue, AT&T relies heavily on the punitive nature of the Commission's forfeiture penalty, arguing that it is "'a type of remedy at common law that could

only be enforced in courts of law,' thereby 'implicat[ing] the Seventh Amendment right.'" Br. 29–30. But as explained above, a Commission penalty that follows a notice of apparent liability *is* only recoverable in a jury trial, unless a penalized party voluntarily chooses to pay it first, as AT&T did here. *See supra* Part I.A.1; 47 U.S.C. § 504(a). And, as explained below, *infra* Part I.A.3, the penalty here does not concern a "private right[]" as *Jarkesy* requires. 144 S. Ct. at 2132.

### 3. FCC enforcement of the Communications Act falls under the "public rights" exception

AT&T's Seventh Amendment challenge also fails because—even supposing the Seventh Amendment otherwise applied—regulation of common carriers, especially radio spectrum licensees, falls squarely within the "public rights" exception, under which "Congress may assign [a] matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Jarkesy*, 144 S. Ct. at 2131.

As the Supreme Court explained in *Jarkesy*, cases involving "public rights," as opposed to private rights, "'historically could have been determined exclusively by [the executive and legislative] branches,' even when they were 'presented in such form that the judicial power [wa]s capable of acting on them.'" *Id*. at 2132 (citations omitted). In such cases,

"no involvement by an Article III court in the initial adjudication is necessary." *Id.*

Regulation of common carriers is a paradigmatic "public rights" issue, and it thus falls in the "historic categories of adjudications" that "have been determined exclusively by [the executive and legislative] branches." *Id.* "Common carriers exercise a sort of public office, and have duties to perform in which the public is interested." *Munn v. Illinois*, 94 U.S. 113, 130 (1876) (citing *N.J. Steam Nav. Co. v. Merch.s' Bank of Bos.*, 47 U.S. (6 How.) 344, 382 (1848)). "Their business is, therefore, 'affected with a public interest,'" and "when private property is devoted to a public use, it is subject to public regulation." *Id.*

This understanding of common carrier regulation as implicating public, not private, rights long predates the Founding. As the Supreme Court explained in *Munn*, "when private property is 'affected with a public interest, it ceases to be *juris privati* [literally, of private right] only.'" *Id.* at 126 (quoting Matthew Hale, *De Portibus Maris, A Collection of Tracts Relative To the Law of England* 77–78 (Francis Hargrave ed., 1787)). This concept traces at least as far back as Lord Chief Justice Hale's legal treatises in the 17th Century, "and has been accepted without objection as an essential element in the law of property

ever since." *Id.*; *see also NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 469–73 (5th Cir. 2022) (discussing history of common carriage).

A straight line runs through the long-settled understanding of common carriage regulation as implicating public, not private, rights, and the regulation of telecommunication service providers under the Communications Act. In *Crowell v. Benson*—one of the seminal public rights decisions cited in *Jarkesy*, *see* 144 S. Ct. at 2133—the Supreme Court listed among the "[f]amiliar illustrations of administrative agencies created for the determination of [public rights]" agencies that "exercise . . . the congressional power as to interstate and foreign commerce," including the Interstate Commerce Commission's oversight of railroad carriers and the Postmaster General's regulation of mail facilities. 285 U.S. 22, 51 & n.13 (1932) (citing *Virginian Ry. Co. v. United States*, 272 U.S. 658 (1926); *Bates & Guild Co. v. Payne*, 194 U.S. 106 (1904)). The Communications Act and the powers given to the Commission to oversee interstate telecommunications grew directly out of these agencies and their regulation of common carriage. *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 6–7 (1942) (explaining that the Communications Act combined the Interstate Commerce Commission's "general regulatory authority over telephone and telegraph carriers" and

the Postmaster General's authority "to fix rates on government telegrams").

The Commission's oversight of AT&T is doubly affected with a public interest because AT&T, as a wireless telecommunications provider, is a licensee of federally managed radio spectrum. As *Jarkesy* instructs, the public rights exception extends to "matters concerning . . . the granting of public benefits." 144 S. Ct. at 2132-33. The Supreme Court has long understood spectrum allocation to be a uniquely public benefit. With the advent of radio, "[i]t quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the [federal g]overnment." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 376 (1969). Indeed, "[w]ithout government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard." *Id.* Since 1934, the Commission has been entrusted with managing this public good, "granting, denying modifying or revoking licenses" according to "public convenience, interest, or necessity." *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 137–38 (1940).

Thus, just as "the political branches ha[ve] traditionally held exclusive power over" fields such as "relations with Indian tribes," "the

administration of public lands," and "the granting of public benefits such as payments to veterans, pensions, and patent rights," *Jarkesy*, 144 S. Ct. at 2133 (collecting cases), so too do the political branches hold exclusive power over the enforcement of telecommunications carrier regulations like those at issue here. As AT&T readily acknowledges, Br. 6–7, the Communications Act—and Section 222 in particular—regulates telecommunications service providers such as AT&T as "common carriers." *See* 47 U.S.C. §§ 153(51) (providing that "[a] telecommunications carrier shall be treated as a common carrier . . . to the extent that it is engaged in providing telecommunications services"), 222 (applying CPNI protections to "telecommunications carrier[s]"). Likewise, AT&T's wireless telecommunications service is wholly contingent on federally managed radio spectrum licensed by the Commission consistent with the public interest, including compliance with Section 222. 47 U.S.C. §§ 301, 307(a), 332(c)(1). For these reasons, "Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Jarkesy*, 144 S. Ct. at 2131.

**B.    The Commission Did Not Violate Article III Or Due Process By Issuing A Notice Of Apparent Liability**

AT&T also contends that "the Commission's [notice of apparent liability] process violates Article III and the Fifth Amendment's Due Process Clause" by "allowing the Commission to act as both prosecutor and adjudicator." Br. 36.

This argument, too, falters because AT&T—like every other party subject to a Commission forfeiture following a notice of apparent liability—was entitled to a de novo jury trial in federal court before paying the assessed  penalty.  *See supra* Part I.A.1; 47 U.S.C. § 504. AT&T cannot voluntarily forgo a jury trial and then complain that Congress or the Commission has taken away its right to such a proceeding.  *Cf. McCarthy v. Mukasey*, 555 F.3d 459, 462 (5th Cir. 2009) (due process rights may be voluntarily waived).  And there is no Article III defect where de novo judicial review is readily available.  *Cf. Exec. Benefits Ins. Agency v. Arkinson*, 573 U.S. 25, 38–40 (2014) (rejecting argument that bankruptcy court adjudication violated Article III where litigant "was entitled to have an Article III court review de novo"). Indeed, because it is subject to a de novo jury trial in federal court, the Commission's notice of apparent liability and forfeiture order process is

far more like a prosecutor's charging decision than the soup-to-nuts adjudication that AT&T suggests. Br. 36.

In any event, the Commission's forfeiture procedures afforded AT&T due process. "[T]he Supreme Court has held that administrative agencies can, and often do, investigate, prosecute, and adjudicate rights without violating due process." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023); *see also Gibson v. FTC*, 682 F.2d 554, 560 (5th Cir. 1982) (rejecting due process challenge to combined investigative and adjudicatory functions of the Federal Trade Commission). A party arguing that "the combination of investigative and adjudicative functions . . . creates an unconstitutional risk of bias in administrative adjudication" must carry a "difficult burden of persuasion," showing sufficient evidence to "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 46, 47 (1975). AT&T fails to overcome that significant hurdle here.

AT&T's complaints of supposed systemic "bias" in Commission procedures are misplaced. "[C]ourts cannot 'presume bias' merely from the institutional structure of an agency." *Illumina*, 88 F.4th at 1047. A notice of apparent liability does not "prejudge[]" anything. Br. 37. It is "apparent" because it is merely tentative. Even before their right to

pursue a jury trial, anyone subject to such a notice "is granted an opportunity to show, in writing . . . why no such forfeiture penalty should be imposed." 47 U.S.C. § 503(b)(4)(C). That is precisely what AT&T sought to do here, and the Commission responded to each of its arguments at great length in the challenged forfeiture order. Order (ER4–46).

Nor was the process here "infused with bias" from individual Commissioners. Br. 37. AT&T complains about a statement of then-Chairman Ajit Pai, which characterized the notice of apparent liability as a "strong enforcement action." Br. 38 (quoting Notice, 35 FCC Rcd at 1175, Statement of Chairman Ajit Pai). But because Chairman Pai left the Commission in January 2021, the bias that AT&T (without basis) attributes to him cannot plausibly have affected the forfeiture order. As to AT&T's complaint that two other Commissioners' separate statements at the notice of apparent liability stage "criticized the Commission for not being punitive enough," Br. 37–38, the preference those Commissioners expressed for calculating the proposed forfeiture amount less conservatively than the Commission ultimately did is hardly evidence that the Commission was biased against AT&T or prejudged its liability.

These Commissioners' statements, moreover, are a far cry from the extreme conduct in the lone case on which AT&T relies.  In *Cinderella Career & Finishing School, Inc. v. FTC*, the D.C. Circuit vacated an agency decision where the Federal Trade Commission "completely ignore[ed] the testimony of many witnesses and the findings of the [hearing] examiner," and the chairman gave a public speech that "g[a]ve the appearance that the case ha[d] been prejudged."  425 F.2d 583, 589-90 (D.C. Cir. 1970).  The court in *Cinderella* noted a "marked difference" between that kind of flagrant bias, on the one hand, and the kind of written statements at issue here, which merely state that the agency "has 'reason to believe' . . . there have been violations."  *Id.*

Notably, AT&T's claims of prejudgment and bias ignore that one Commissioner who voted *against* the notice of apparent liability later voted *for* the forfeiture order, *see* Order, Statement of Chairwoman Jessica Rosenworcel (ER42), and another who voted *for* the notice of apparent liability *dissented* from the forfeiture order, *see id.*, Dissenting Statement of Commissioner Brendan Carr (ER43).  That dissent well illustrates how the Commission's enforcement process actually operates: The dissenting Commissioner explained that he "voted for the [notice] so [the Commission] could investigate the facts and determine whether or

not [AT&T] had violated any provisions of the Communications Act." *Id.* Ultimately, he concluded that AT&T should be subject to enforcement action by the Federal Trade Commission, rather than the FCC. *Id.* But having engaged in the same open-minded investigatory process, a majority of Commissioners determined that the Commission should impose a forfeiture.

Finally, AT&T's assertion that the Commission infrequently cancels or rescinds notices of apparent liability, Br. 38–39, does not establish any due process violation. To be sure, notices of apparent liability routinely lead to forfeiture orders. But that merely speaks to the thoroughness of the Commission's investigations, and the restraint shown by the agency before issuing a notice in the first place—not any prejudgment on the agency's part. And the Commission has shown no hesitation to cancel or settle notices of apparent liability issued to AT&T when circumstances warrant. *E.g.*, *Bellsouth Telecomms., LLC, d/b/a/ AT&T Southeast*, 35 FCC Rcd 8940 (2020).

## C. Congress Did Not Impermissibly Delegate Its Authority To The Commission

Section 503(b) provides the Commission with two procedural paths to pursue a forfeiture: (1) the more common notice of apparent liability

procedure, where the Commission explains its findings in writing before the penalized party may seek a jury trial in an Article III district court; or (2) by a formal adjudication in front of the Commission or an administrative law judge, which is then reviewable in an Article III court of appeals.  47 U.S.C. § 503(b)(3), (4).  The Commission rarely employs the latter procedure, and generally prioritizes those matters for which notice and opportunity for hearing are required by the Communications Act.  *See* 47 U.S.C. §§ 309(e), 312(c) (addressing licensing and revocation). In this case, consistent with usual practice, the Commission took the path set forth in Section 503(b)(4), allowing AT&T—had it elected to do so—to exercise its right to a jury trial in an Article III district court before paying the forfeiture.

The Commission's choice between two procedural paths does not violate the non-delegation doctrine for three independent reasons.

First, the agency procedure AT&T challenges here does not implicate this Court's nondelegation holding in *Jarkesy*.  The problem this Court identified in *Jarkesy* was that "Congress gave [the Securities and Exchange Commission (SEC)] the power to bring securities fraud actions for monetary penalties within the agency *instead of* an Article III court." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (emphasis

added).  Section 503(b)(4) does not do that—as explained above, the Commission determines whether a forfeiture should be assessed and a penalized party may obtain a trial de novo in an Article III court.  47 U.S.C. § 503(b)(4), 504(a).

To the extent that AT&T argues that the Commission's choice of decisional process in Section 503(b) is nonetheless unconstitutional because, even though the procedure employed here entitles subjects of enforcement to a jury trial de novo in federal district court, *see* 47 U.S.C. § 504(a), the other does not, *see id.* § 503(b)(3)(A), that issue is not properly before the Court.  AT&T was not subject to the Commission's decisional process under Section 503(b)(3)(A).  And to the extent it is attempting to mount a facial challenge to Section 503, AT&T would need to show that the statute is unconstitutional in *all* its applications, *see Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013), including those where, as here, a de novo jury trial was available.

Second, and in any event, the choice of prosecutorial procedure constitutes an exercise of executive, not legislative, power.  As the Supreme Court has emphasized, the non-delegation doctrine applies only to "powers which are strictly and exclusively legislative."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion).  In

choosing one purely administrative procedure over another, the Commission does not "alter[] the legal rights, duties and relations of persons . . . outside the legislative branch," *INS v. Chadha*, 462 U.S. 919, 952 (1983), because neither path requires the Commission to "establish general rules governing private conduct of the sort that might implicate potential concerns about unauthorized lawmaking." Order ¶80 (ER38–39). Nor does the Commission's choice of procedural path deny regulated parties the "legal processes . . . accompanying Article III proceedings." *Jarkesy*, 34 F.4th at 462. Under either procedural path, the Commission determines whether the forfeiture should be assessed and a penalized party may ultimately obtain judicial review of that determination in an Article III court. 47 U.S.C. § 503(b)(3), (4). Because the Commission's choice is purely executive, not legislative, non-delegation principles do not apply. *Gundy*, 139 S. Ct. at 2123.[4]

Third, even if the Commission's choice of procedures under Section 503 were legislative in character, it would nonetheless pass constitutional muster because Congress has supplied an "intelligible

---

[4] To the extent the Court concludes this argument is foreclosed by its decision in *Jarkesy*, 34 F.4th 446, Respondents seek to preserve the issue for further review.

principle" for the Commission to follow in making a choice between procedural paths. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). The Supreme Court has made clear that a delegation of legislative authority is unconstitutional only if "Congress had failed to articulate *any* policy or standard" whatsoever for exercising that authority. *Gundy*, 588 U.S. at 146 (emphasis in original); *see also Jarkesy*, 34 F.4th at 462 (invalidating SEC's choice of procedures where "Congress . . . said nothing at all" about its choice). That high bar is rarely met, and this case is no exception. In Section 4(j) of the Communications Act, Congress directed the Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j). While broadly worded, that statutory instruction is well in line with many other broad delegations the Supreme Court has upheld against constitutional challenge. *See, e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943); *Yakus v. United States*, 321 U.S. 414, 427 (1944); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). It is irrelevant that Congress's guidance does not appear in Section 503 itself—"the placement of such a statement within a statute makes no difference." *Gundy*, 588 U.S. at 142. And the Commission has relied on Section 4(j) in the past to guide it in

setting adjudicatory procedures. *E.g.*, *Procedural Streamlining of Administrative Hearings*, 35 FCC Rcd 10729, 10734–36 ¶¶14, 18 (2020).

## II. THE COMMISSION ACTED WITHIN ITS STATUTORY AUTHORITY IN ISSUING THE FORFEITURE ORDER

### A. Location Data Is CPNI

Statutory interpretation begins "with the language of the statute itself.'" *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019). The AT&T customer location information at issue here falls squarely within the statutory definition of CPNI.

CPNI is "information that relates to the quantity, technical configuration, type, destination, *location*, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A) (emphasis added).

1. To start, the customer location information here "relates to . . . the location . . . of a telecommunications service," 47 U.S.C. § 222(h)(1)(A)—specifically, "AT&T's commercial mobile service." Order ¶19 (ER12). A wireless carrier such as AT&T "must be aware of and use [a wireless mobile] device's location in order for it to enable customers to

send and receive calls." Notice, 35 FCC Rcd at 1757 ¶35. Functional wireless mobile devices are constantly connected to the closest cell tower, regardless of whether the devices are idle or in active use. Order ¶¶19–20 (ER12). Either way, the carrier is tracking the device's location, and that location data thus fits the statutory definition of CPNI in that it "relates to" AT&T's wireless telecommunications service. *See Acosta v. Master Maint. & Constr. Inc.*, 452 F.3d 373, 378 (5th Cir. 2006) ("'Relate' means 'to have connection, relation, or reference.'").

AT&T claims that the statutory definition of CPNI covers only "'*call* location information'—namely, the customer's location while making or receiving a voice call." Br. 42 (emphasis added). But this claim ignores the undisputed fact that a cellphone constantly shares its location with a carrier, even when it is idle. Order ¶¶19–20 (ER12).

What is more, Section 222 defines CPNI as including "location" information, not "call location" information. That distinction is notable because the precise phrase "call location" appears (twice) elsewhere in Section 222. *See* 47 U.S.C. § 222(d)(4), (f)(1).

It is axiomatic that "when Congress uses the same word in different parts of a statute, it intended each to carry the same meaning." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 286 (5th Cir. 2012). An important

corollary of this principle is that "a material variation in terms suggests a variation in meaning." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25 (2012). In Section 222, that "variation in meaning" is clear: "location" in (h)(1)(A) means *all* location information as opposed to only the "call location" expressly referenced in (d)(4) and (f)(1). Order ¶24 (ER14). Had Congress wished to limit CPNI to call location information as AT&T suggests, it would have said so.

Amicus CTIA—but not AT&T—focuses on the words "of use" to argue that a customer must be actively engaged in making a call for the shared location to constitute CPNI under the statute. *See* CTIA Br. 10–15. The statutory phrase "of use," however, modifies the immediately preceding word "amount," not the entire preceding list. *See* Order ¶20 (ER31); *Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows"). Indeed, it would make little sense for Congress to say "technical configuration . . . of use." 47 U.S.C. § 222(h)(1). And even if "of use" did modify the word "location," it would not alter it to mean "call location." "When customers' devices are exchanging communications with AT&T's network, and thereby ensuring that they can receive incoming calls and place outgoing calls, . . . that is

a clear case of using the service to which they have subscribed, even outside the moments in time when they are engaged in calls." Order ¶22 & n.83 (ER13).

2. The location information at issue also fits the statutory definition of CPNI in that it was "made available to [AT&T] by the customer solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A).  As the Commission explained: "AT&T's customers provided their wireless location data to AT&T because of their customer-carrier relationship with AT&T."  Order ¶25 (ER14) (quoting Notice, 35 FCC Rcd at 1757–58 ¶36).  It is a necessary part of being a customer of a telecommunications carrier.  The carrier-customer relationship is the "sole[]" reason for providing this information because, were they not AT&T customers, they would not share their location with AT&T.  *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 768 (2018) ("'Solely' means 'alone.'").

AT&T, ignoring the words "customer" and "relationship," focuses only on the word "carrier" to suggest that, because AT&T tracks location in connection with non-telecommunications services, the definition of CPNI "inescapably excludes . . . location data." Br. 43.  That is incorrect.

To start, AT&T's strained interpretation is "belied by the technical and marketplace realities." Order ¶26 (ER14–15). AT&T "does not dispute that the carrier-customer relationship fully enables AT&T to obtain the location data at issue here." Order ¶27 (ER15). Its wireless subscribers have "no choice but to reveal [their] location to the carrier," regardless of the particular service to which they subscribe. Notice, 35 FCC Rcd at 1758 ¶40. Nor does AT&T contend that "a customer, having subscribed to its commercial mobile service, entered a[ny] separate agreement with AT&T for the provision of that location information—or that AT&T's voice customers had any way to avoid providing that information if they wanted to subscribe to AT&T's commercial mobile service." Order ¶27 (ER15). Thus, AT&T provides no account whatsoever for how or why its wireless voice customers would provide their location information to AT&T other than the "carrier-customer relationship." 47 U.S.C. § 222(h)(1).

Instead, AT&T argues that because customers share their location information with AT&T for non-voice services (such as data services), as to which AT&T may not be acting as a "carrier," *all* location information somehow falls outside CPNI's definition. That interpretation makes little sense in the context of Section 222. Just because AT&T provides

some customers with both telecommunications and non-telecommunications services does not "take[] the resulting *relationship* outside the scope of the 'carrier-customer' relationship.'" Order ¶28 (ER15). And AT&T points to no way of disaggregating location data particular to voice services from those relating to non-voice services, nor any distinguishing characteristic of such voice location data. Indeed, despite pointing to the "activity-based" definition of a telecommunications carrier, Br. 44 (citing 47 U.S.C. § 153(51)), AT&T made no attempt before the Commission to show that some particular portion of the location data at issue was unrelated to its provision of voice services. AT&T's overly narrow reading would also eviscerate Section 222's protections by effectively reading the word "location" out of the statute. Adopting AT&T's interpretation "would have the perverse effect of eliminating the statutory protections of the most sensitive types of CPNI." Notice, 35 FCC Rcd at 1758 ¶ 37. Congress did not intend for wireless carriers to negate the protections of Section 222 simply by offering non-carrier services through the same locatable device.

## B.    AT&T Had Adequate Notice Of The Statute's Meaning

AT&T contends that in any event it lacked fair notice of the Commission's reading of the statute. *See* Br. 45–48. That argument has

no traction where, as here, "the statute or regulation under which [an agency penalty] is obtained . . . provide[s] a person of ordinary intelligence fair notice of what is prohibited," and is not "so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

As discussed above, *supra* Part II.A, Section 222 unambiguously requires telecommunications carriers to safeguard "information that relates to the . . . location . . . of a telecommunications service" that their customers provide in the course of the customer-carrier relationship. 47 U.S.C. § 222(h)(1)(A). On its face, this statutory text provided AT&T adequate notice that it could be subject to penalty if it failed to protect its customers' location data. *See BP Am., Inc. v. FERC*, 52 F.4th 204, 219 n.11 (5th Cir. 2022).

Despite AT&T's assertion that the statutory text does not "suggest that the location data in question is CPNI," Br. 46, reading CPNI to include "location" is a straightforward application of the statute. As the Commission has long advised carriers, "implicit in section 222 is a rebuttable presumption that information that fits the definition of CPNI contained in section 222([h])(1) is in fact CPNI." *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of*

*Customer Proprietary Network Information and Other Customer Information*, 14 FCC Rcd 14409, 14495–96 ¶167 (1999).  Because AT&T customer location information comfortably "fits the definition of CPNI contained in section 222," AT&T had ample notice that is could be penalized for failing to reasonably protect such information.

AT&T nonetheless argues that it lacked fair notice that location data is CPNI because the Commission has not previously announced this interpretation in a formal rulemaking.  *See* Br. 45.  Not so.  The Commission was not required to proceed by rulemaking rather than adjudication, as AT&T contends.  "Congress has unambiguously vested the FCC with general authority to administer the Communications Act through [both] rulemaking and adjudication." *City of Arlington, Texas v. FCC*, 569 U.S. 290, 307 (2013).  And, as this Court has long recognized, "[t]he choice between proceeding by general rule or by individual, ad hoc litigation is one that lies in the informed discretion of the administrative agency." *Ala.-Tenn. Nat. Gas Co. v. Fed. Power Comm'n*, 359 F.2d 318, 343 (5th Cir. 1966).

AT&T relies on inapposite cases.  In both *Wages & White Lion Investments v. FDA*, 90 F.4th 357 (5th Cir.), and *Fox Television Stations*, 567 U.S. 239 (cited at Br. 46), regulated parties relied on specific,

affirmative agency guidance that the agencies later reversed. *See Wages*, 90 F.4th at 378; *Fox Television Stations*, 567 U.S. at 254. By contrast, the mere fact that the Commission "has never provided an exhaustive list of what constitutes CPNI," Br. 46, does not remove AT&T from the sweep of the statute. Like many statutes—especially those that impose a duty to take precautions—Section 222 may be violated in numerous ways. It is not incumbent on the Commission to spell out, in advance, each and every way a regulated entity may run afoul of such a rule. To the extent AT&T identifies any imprecision in the Commission's prior statements about CPNI, they "are not symptoms of a lack of notice or an inadequate decisional standard, but the natural consequence of the many ways in which [a violation] can manifest." *BP Am.*, 52 F.4th at 219 n.11. AT&T "cannot reasonably . . . assume[] that the fact a given scenario had not been expressly addressed by Commission rules and precedent meant it fell outside the scope of CPNI and the associated protections of section 222 and the Commission's implementing rules." Order ¶34 (ER18).

AT&T reads far too much into Commission statements discussing CPNI "in the voice service context." Br. 47. Nothing AT&T points to suggests that Section 222's definition of CPNI excludes location data. Contrary to AT&T's contention, the Commission's decision in the Open

Internet rulemaking to waive its privacy rules with respect to broadband internet service providers did not indicate that the rules are limited to entities that exclusively provide voice service. Rather, the Commission granted that waiver to "carefully evaluate appropriate rules" more specifically tailored to broadband providers and "to consider the effect of" a congressional resolution of disapproval on a previous rule adapting the Commission's privacy rules to the broadband context. *Safeguarding & Securing the Open Internet*, FCC 24-52 ¶359 (May 7, 2024) ("Open Internet Order") (currently under review, *see In re Open Internet Rule*, 6th Cir. No. 24-7000 and consolidated cases).

The past instances in which the Commission has actually addressed location data privacy do not support AT&T's fair-notice claim either. More than a decade ago, the Commission emphasized in the CPNI context that "location information in particular can be very sensitive customer information." *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 28 FCC Rcd 9609, 9617 ¶24 n.54 (2013). And AT&T itself has previously told the Commission that it treats customer location information as essentially equivalent to CPNI. *See* Notice, 35 FCC Rcd at 1758 ¶37 n.122 (explaining that AT&T

"collected and attempted to protect and treat location information in an essentially equivalent manner to CPNI").

The Commission has also previously warned carriers against careless maintenance of CPNI in their contractual relations with third parties like the aggregators and location-based service providers at issue here. Section 64.2010 of the Commission's rules makes clear that "[t]elecommunications carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a). The Commission has explained that beyond "requir[ing] carriers to implement the specific minimum requirements set forth in the Commission's rules," the Commission "further expect[s] carriers to take additional steps to protect the privacy of CPNI to the extent such additional measures are feasible for a particular carrier." 2007 CPNI Order, 22 FCC Rcd at 6959 ¶64. In particular, the Commission has cautioned that "a carrier that practices willful blindness" regarding unauthorized disclosure of CPNI likely "would not be able to demonstrate that it has taken sufficient measures" to discover and protect against such conduct. *Id.* at 6946 ¶35. And in the same order, the Commission specifically pointed to the dangers of relying

on "contractual safeguards" to address risks once CPNI has been disclosed to a third party. *Id.* at 6952–53 ¶49.

## III.  THE COMMISSION REASONABLY FOUND THAT AT&T FAILED TO PROTECT CUSTOMER LOCATION DATA

Courts review the Commission's forfeiture determinations using the deferential arbitrary and capricious standard, under which the Court must "'presume the validity' of the agency's action, . . . a presumption [that AT&T] can overcome only by demonstrating that the forfeiture constitutes a 'clear error of judgment.'" *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002) (citations omitted).  The Commission's forfeiture order clears that bar.

AT&T violated Section 222 of the Communications Act and Section 64.2010 of the Commission's rules by failing to take adequate measures to discover and protect against attempts to gain unauthorized access to its customers' location information.    47 U.S.C. § 222(c); 47 C.F.R. § 64.2010(a). "[T]he record not only shows that AT&T did not have reasonable protections in place prior to [the] 2018 *New York Times* article detailing the Securus/Hutcheson breaches, but also that AT&T failed to promptly address its demonstrably inadequate CPNI safeguards after [the] Securus/Hutcheson disclosure."  Order ¶41 (ER21–22).

To start, the Commission found that AT&T repeatedly disclosed customer location information to Securus without customer consent, in violation of Section 64.2007(b) of the Commission's rules. While the Hutcheson incident well illustrated the dangers of this problem, it did not reflect the full extent of AT&T's failings. "Securus's entire location-finding service . . . was predicated on unauthorized disclosures." Order ¶39 (ER20). As AT&T conceded before the Commission, "it was unable to distinguish location requests unrelated to the authorized [u]se [c]ase" it had approved—in Securus's case, collect calling by incarcerated people—such as Hutcheson's unauthorized requests. *Id.* (citing Notice, 35 FCC Rcd at 1753 ¶23). What is more, the Commission found that "none of the 'consent records' submitted in connection with the location-finding service evinced a consumer's actual opt-in." *Id.* Thus, *every time* AT&T provided Securus with location information under this program— not just when the information was passed on to Hutcheson—"a separate, unauthorized disclosure occurred." *Id.* And based on those violations, AT&T bore the burden "to offer evidence that it did have reasonable measures in place." Order ¶38 (ER20).

AT&T did not take reasonable precautions to prevent such unauthorized disclosures. AT&T may well have followed "CTIA's

industry-standard guidelines." Br. 49. But those guidelines did "not include best practices recommendations for carriers that sell access to their customers' location information to location-based service providers." Order ¶43 (ER22). And the guidelines nowhere addressed the particular problem at issue here: "how to assure that location-based service providers comply with a contractual obligation to access location information only after furnishing proper notice and receiving customer consent." *Id.*

Nor is it sufficient that AT&T imposed certain contractual requirements on aggregators, such as "obtain[ing] evidence of customer consent from [location-based service] providers." Br. 49. "[T]hese safeguards relied almost entirely upon contractual agreement, passed on to location-based service providers through an attenuated chain of downstream contracts." Order ¶43 (ER22) (citing Notice, 35 FCC Rcd at 1762–63 ¶¶53–59). Yet AT&T failed to make "any meaningful efforts" to enforce these downstream contractual provisions. *Id.* The "daily audits of consent records" that AT&T repeatedly cites, Br. 49, 53, were, by all indications, an empty formality. AT&T could not even explain how its review process could "distinguish between valid and unauthorized requests for location information." *Id.* And this same review process

"allowed the Securus and Hutcheson breaches to continue *for at least four years* without AT&T's knowledge."  Notice, 35 FCC Rcd at 1763 ¶56.

AT&T plainly did not "vet[] all who had access to the data."  Br. 49.  To the contrary, the Commission found that AT&T made no attempt to verify that the recipients of customer location data had actually obtained authorization or customer consent.  Order ¶39 (ER20).  And while AT&T "conducted audits and assessments" of its location-based services program, Br. 49, those audits showed "numerous instances of non-compliance with security requirements" by aggregators, and problems with customer consent documentation.  Order ¶10 (ER8).  And the problems continued.

AT&T likewise failed to reasonably secure its customers' information after the Securus incident.  The Commission identified "numerous steps that could have been taken to squarely address the proven vulnerability, up to and including deploying enhanced measures to verify consumer consent."  Order ¶46 (ER23).  But "rather than promptly implementing reasonable safeguards, AT&T continued to sell access to its customers' location information under (for all intents and purposes) the *same system* that was exploited by Securus and Hutcheson."  Order ¶44 (ER23).  AT&T did not even immediately

"suspend the access of LocationSmart, the Aggregator that had the contractual obligations to monitor Securus." Notice, 35 FCC Rcd at 1764–65 ¶61. Nor could AT&T provide the Commission any evidence that similar abuses of customer location data "were not present for the other . . . entities to whom AT&T sold access." *Id.* at 1765 ¶64. It ultimately took AT&T nearly a year after the Hutcheson breach was reported in the *New York Times* to shut down its porous location-based services program.

As it did before the Commission, AT&T defends its prolonged inaction by pointing to the benefits that location-based services provide to customers, and arguing that it needed time to weigh those against the costs of terminating the program. Br. 50–51. But "[t]he issue here is not whether there are *any* beneficial services offered by [location-based service] providers." Order ¶45 (ER23) (emphasis added). The Commission recognized that there were. *See* Notice, 35 FCC Rcd at 1748 ¶11. But weighing those benefits against the harms to customers, the Commission found AT&T had "no excuse for its failure to promptly terminate every other non-critical [location-based service] provider." *Id.* All the benefits that AT&T touts were known before the breach—it did not take AT&T months to learn of them. Meanwhile, AT&T knew its

customers' locations were being continually disclosed to location-based service providers without AT&T's ability to verify whether any such request was authorized. *Id.* And in the end, AT&T took the same corrective action—shutting down the location-based service program altogether—that AT&T now decries as "the Commission's blunderbuss approach," proving that AT&T could have begun the same process much sooner. Order ¶ 13 (ER10); *accord* Br. 53.

AT&T is likewise mistaken that the Commission "overstates the privacy risks involved" simply because, on AT&T's telling, it was taking adequate precautions. Br. 53–54. That just assumes AT&T's conclusion. And it fails to grapple with the Commission's undisputed factual findings about the harm to consumers: AT&T was selling access to the location data of millions of its customers without *any* meaningful way of verifying that those customers consented to such access, or that its downstream contractual partners were not abusing the system. This scheme not only exposed location data to potential misuse—it was actually misused. Hutcheson exploited the vulnerabilities in AT&T's system to track the locations of a "Sheriff, a Missouri Circuit Judge, and at least five highway patrol officers." Notice, 35 FCC Rcd at 1753 ¶ 21. And AT&T was unable to present evidence that the same exploits were not possible across other

location-based service providers.  "[B]y making it possible for 'malicious actors to identify the exact locations of AT&T subscribers who belong[ed] to law enforcement, military, government, or other highly sensitive positions," AT&T even "threaten[ed] national security and public safety.'" Order ¶59 (ER29).

## IV.   THE FORFEITURE AMOUNT IS REASONABLE AND APPROPRIATE

The Commission found that AT&T "engaged in 84 continuing violations—one for each ongoing relationship with a third-party [location-based service] provider or aggregator that had access to AT&T customer location information more than 30 days after publication of the New York Times report—and that each violation continued until AT&T terminated the corresponding entity's access to customer location information."  Order ¶54 (ER27).  The Commission then applied "a base forfeiture of $40,000 for the first day each such violation and a $2,500 forfeiture for the second and each successive day the violations continued (excluding the 30-day grace period granted by the Commission)."  *Id.* Under that straightforward methodology, the Commission calculated a total base forfeiture of $45,812,500, which it then adjusted upward by

25% in light of "the nature of the violations and the risk of harm they posed to consumers," resulting in a total forfeiture of $57,265,625. *Id.*

That amount reflects no "clear error of judgment," *Grid Radio*, 278 F.3d at 1322, and readily satisfies arbitrary-and-capricious review, *see SBC Commc'ns Inc. v. FCC*, 373 F.3d 140, 151 (D.C. Cir. 2004). "AT&T's conduct was egregious." Order ¶59 (ER29). It failed "to adequately protect [customer data] for a protracted amount of time," even after the underlying problem was discovered. *Id.* AT&T's carelessness "caused substantial harm by making it possible for 'malicious actors to identify the exact locations of AT&T subscribers who belong to law enforcement, military, government, or other highly sensitive positions"—including a judge—"thereby threatening national security and public safety." *Id.* And the Commission reasonably considered "AT&T's status as a major telecommunications provider" in choosing a penalty that would "adequately provide AT&T with the necessary disincentive to engage in similar conduct again in the future." *Id.* As Congress has recognized, "penalties must be significant if they are expected to serve both as a meaningful sanction to the wrongdoer and a deterrent to others." H.R. Conf. Rep. No. 101-386 (1989), at 435. Consistent with Congress's instruction to "take into account the nature, circumstances, extent, and

gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require," 47 U.S.C. § 503(b)(2)(E), the Commission reasonably concluded that the forfeiture assessed here was necessary to deter future violations.

AT&T characterizes its violations as a single "systemic problem with AT&T's [location-based services] program," Br. 55, rather than 84 separate continuing violations. But nothing in the statute or the Commission's rules compels such an approach. Order ¶57 (ER28) (citing 47 U.S.C. § 503(b); 47 C.F.R. § 1.80(b)). Indeed, AT&T does not even attempt to point to any statutory or regulatory language indicating otherwise.

Consistent with prior practice, the Commission treats systemic privacy failings as "significantly more than a single violation." *Id.* (citing *TerraCom, Inc. & YourTel Am., Inc.*, 29 FCC Rcd 13325, 13343 ¶50 (2014)). The number of violations depends on the precise conduct that violated the law. For example, in *TerraCom*, because the penalized parties had unreasonably exposed customers' documents by storing them on publicly accessible servers, each separate document was a distinct violation. Under the particular facts of this case, the Commission

"reasonably exercised its authority to find that each unique relationship between AT&T and a [location-based services] provider or aggregator represented a distinct failure to reasonably protect customer CPNI," because "[e]ach such relationship relied upon a distinct and unique contractual chain," and "specific, individually-approved '[u]se [c]ase[s]' . . . had been reviewed and authorized by AT&T" without proper protections. Order ¶58 (ER28–19). In other words, each time AT&T contractually agreed to share customer data with third parties without ensuring adequate safeguards for that data, it violated Section 222. That was a reasonable approach to calculating AT&T's liability. And the fact that the Commission recognized that alternative approaches might also have been reasonable, *see* Br. 57 (citing Order ¶59 (ER29)), is hardly evidence of any error in judgment.

AT&T is likewise mistaken that the Commission was required to identify "84 distinct data-security inadequacies," or "84 breaches of AT&T customer data." Br. 55. 84 instances of conduct violating the law equals 84 violations, whether the facts of each violation are parallel or different. It was reasonable for the Commission to regard the same careless approach to protecting customer data repeated across 84 separate contractual relationships as not just a single violation of the

statute. And Section 222 gives carriers an affirmative duty to employ adequate safeguards to protect their customers' data, 47 U.S.C. § 222(a), (c)—violations are not limited to when there is a known misappropriation of customer data.

A contrary decision would make little sense. Under AT&T's proposed approach, it would often, if not always, be possible for a carrier to say that it had a "systemic" unreasonable practice that it simply applied over multiple instances. Br. 55. In such cases, a violator that "systemically" fails to protect the data of millions of customers would be insulated from anything more than a single capped penalty, which, even at the statutory maximum, would be insignificant in view of AT&T's $122 billion in annual revenue. *See* AT&T, Form 10-K (Feb. 23, 2024). Congress did not intend such an ineffectual result.

## CONCLUSION

The petition for review should be denied.

Dated:  September 27, 2024

Respectfully submitted,

/s/  *Adam L. Sorensen*

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Jonathan S. Kanter
  *Assistant Attorney General*

Robert B. Nicholson
Matthew A. Waring
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
  *United States of America*

Adam L. Sorensen
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
  *Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☒  this document contains <u>12,843</u> words, *or*

☐  this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

☐  this document has been prepared in a monospaced spaced typeface using _____ with _____.

*/s/  Adam L. Sorensen*

Adam L. Sorensen
*Counsel for Respondents*

**STATUTORY ADDENDUM**

## STATUTORY ADDENDUM CONTENTS

**Page**

47 U.S.C. § 222 ................................................................. Add. 2

47 U.S.C. § 503 ................................................................. Add. 7

47 U.S.C. § 504 ............................................................... Add. 13

47 U.S.C. § 222 provides:

## § 222. Privacy of customer information

## (a) In general

Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

## (b) Confidentiality of carrier information

A telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts.

## (c) Confidentiality of customer proprietary network information

### (1) Privacy requirements for telecommunications carriers

Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

### (2) Disclosure on request by customers

A telecommunications carrier shall disclose customer proprietary network information, upon affirmative written request by the customer, to any person designated by the customer.

### (3) Aggregate customer information

A telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service may use, disclose, or permit access to aggregate customer information other than for the purposes described in paragraph (1). A local exchange carrier may use, disclose, or permit access to aggregate customer information other than for purposes described in paragraph (1) only if it provides such aggregate information to other carriers or persons on reasonable and nondiscriminatory terms and conditions upon reasonable request therefor.

## (d) Exceptions

Nothing in this section prohibits a telecommunications carrier from using, disclosing, or permitting access to customer proprietary network information obtained from its customers, either directly or indirectly through its agents--

(1) to initiate, render, bill, and collect for telecommunications services;

(2) to protect the rights or property of the carrier, or to protect users of those services and other carriers from fraudulent, abusive, or unlawful use of, or subscription to, such services;

(3) to provide any inbound telemarketing, referral, or administrative services to the customer for the duration of the call, if such call was initiated by the customer and the customer approves of the use of such information to provide such service; and

(4) to provide call location information concerning the user of a commercial mobile service (as such term is defined in section 332(d) of this title) or the user of an IP-enabled voice service (as such term is defined in section 615b of this title)--

(A) to a public safety answering point, emergency medical service provider or emergency dispatch provider, public safety, fire service, or law enforcement official, or hospital emergency or trauma care facility, in order to respond to the user's call for emergency services;

(B) to inform the user's legal guardian or members of the user's immediate family of the user's location in an emergency situation that involves the risk of death or serious physical harm; or

(C) to providers of information or database management services solely for purposes of assisting in the delivery of emergency services in response to an emergency.

## (e) Subscriber list information

Notwithstanding subsections (b), (c), and (d), a telecommunications carrier that provides telephone exchange service shall provide subscriber list information gathered in its capacity as a provider of such service on a timely and unbundled basis, under nondiscriminatory and reasonable rates, terms, and conditions, to any person upon request for the purpose of publishing directories in any format.

## (f) Authority to use location information

For purposes of subsection (c)(1), without the express prior authorization of the customer, a customer shall not be considered to have approved the use or disclosure of or access to--

(1) call location information concerning the user of a commercial mobile service (as such term is defined in section 332(d) of this title) or the user of an IP-enabled voice service (as such term is defined in section 615b of this title), other than in accordance with subsection (d)(4); or

(2) automatic crash notification information to any person other than for use in the operation of an automatic crash notification system.

## (g) Subscriber listed and unlisted information for emergency services

Notwithstanding subsections (b), (c), and (d), a telecommunications carrier that provides telephone exchange service or a provider of IP-enabled voice service (as such term is defined in section 615b of this title) shall provide information described in subsection (i)(3)(A)1 (including information pertaining to subscribers whose information is unlisted or unpublished) that is in its possession or control (including information pertaining to subscribers of other carriers) on a timely and unbundled basis, under nondiscriminatory and reasonable rates, terms, and conditions to providers of emergency services, and providers of emergency support services, solely for purposes of delivering or assisting in the delivery of emergency services.

**(h) Definitions**

As used in this section:

**(1) Customer proprietary network information**

The term "customer proprietary network information" means—

(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

(B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier;

except that such term does not include subscriber list information.

**(2) Aggregate information**

The term "aggregate customer information" means collective data that relates to a group or category of services or customers, from which individual customer identities and characteristics have been removed.

**(3) Subscriber list information**

The term "subscriber list information" means any information—

> (A) identifying the listed names of subscribers of a carrier and such subscribers' telephone numbers, addresses, or primary advertising classifications (as such classifications are assigned at the time of the establishment of such service), or any combination of such listed names, numbers, addresses, or classifications; and

> (B) that the carrier or an affiliate has published, caused to be published, or accepted for publication in any directory format.

**(4) Public safety answering point**

The term "public safety answering point" means a facility that has been designated to receive emergency calls and route them to emergency service personnel.

**(5) Emergency services**

The term "emergency services" means 9-1-1 emergency services and emergency notification services.

**(6) Emergency notification services**

The term "emergency notification services" means services that notify the public of an emergency.

**(7) Emergency support services**

The term "emergency support services" means information or data base management services used in support of emergency services.

47 U.S.C. § 503 provides:

## § 503. Forfeitures

### (a) Rebates and offsets

Any person who shall deliver messages for interstate or foreign transmission to any carrier, or for whom as sender or receiver, any such carrier shall transmit any interstate or foreign wire or radio communication, who shall knowingly by employee, agent, officer, or otherwise, directly or indirectly, by or through any means or device whatsoever, receive or accept from such common carrier any sum of money or any other valuable consideration as a rebate or offset against the regular charges for transmission of such messages as fixed by the schedules of charges provided for in this chapter, shall in addition to any other penalty provided by this chapter forfeit to the United States a sum of money three times the amount of money so received or accepted and three times the value of any other consideration so received or accepted, to be ascertained by the trial court; and in the trial of said action all such rebates or other considerations so received or accepted for a period of six years prior to the commencement of the action, may be included therein, and the amount recovered shall be three times the total amount of money, or three times the total value of such consideration, so received or accepted, or both, as the case may be.

### (b) Activities constituting violations authorizing imposition of forfeiture penalty; amount of penalty; procedures applicable; persons subject to penalty; liability exemption period

**(1)** Any person who is determined by the Commission, in accordance with paragraph (3) or (4) of this subsection, to have--

> **(A)** willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;

**(B)** willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter or under any treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;

**(C)** violated any provision of section 317(c) or 509(a) of this title; or

**(D)** violated any provision of section 1304, 1343, 1464, or 2252 of Title 18;

shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this subsection shall be in addition to any other penalty provided for by this chapter; except that this subsection shall not apply to any conduct which is subject to forfeiture under subchapter II, part II or III of subchapter III, or section 507 of this title.

**(2)(A)** If the violator is (i) a broadcast station licensee or permittee, (ii) a cable television operator, or (iii) an applicant for any broadcast or cable television operator license, permit, certificate, or other instrument or authorization issued by the Commission, the amount of any forfeiture penalty determined under this section shall not exceed $25,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $250,000 for any single act or failure to act described in paragraph (1) of this subsection.

**(B)** If the violator is a common carrier subject to the provisions of this chapter or an applicant for any common carrier license, permit, certificate, or other instrument of authorization issued by the Commission, the amount of any forfeiture penalty determined under this subsection shall not exceed $100,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act described in paragraph (1) of this subsection.

**(C)** Notwithstanding subparagraph (A), if the violator is—

**(i)(I)** a broadcast station licensee or permittee; or

**(II)** an applicant for any broadcast license, permit, certificate, or other instrument or authorization issued by the Commission; and

**(ii)** determined by the Commission under paragraph (1) to have broadcast obscene, indecent, or profane language,1 the amount of any forfeiture penalty determined under this subsection shall not exceed $325,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $3,000,000 for any single act or failure to act.

**(D)** In any case not covered in subparagraph (A), (B), or (C), the amount of any forfeiture penalty determined under this subsection shall not exceed $10,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $75,000 for any single act or failure to act described in paragraph (1) of this subsection.

**(E)** The amount of such forfeiture penalty shall be assessed by the Commission, or its designee, by written notice. In determining the amount of such a forfeiture penalty, the Commission or its designee shall take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.

**(F)** Subject to paragraph (5) of this section, if the violator is a manufacturer or service provider subject to the requirements of section 255, 617, or 619 of this title, and is determined by the Commission to have violated any such requirement, the manufacturer or provider shall be liable to the United States for a forfeiture penalty of not more than $100,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act.

**(3)(A)** At the discretion of the Commission, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative law judge thereof in accordance with section 554 of Title 5. Any person against whom a forfeiture penalty is determined under this paragraph may obtain review thereof pursuant to section 402(a) of this title.

**(B)** If any person fails to pay an assessment of a forfeiture penalty determined under subparagraph (A) of this paragraph, after it has become a final and unappealable order or after the appropriate court has entered final judgment in favor of the Commission, the Commission shall refer the matter to the Attorney General of the United States, who shall recover the amount assessed in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the forfeiture penalty shall not be subject to review.

**(4)** Except as provided in paragraph (3) of this subsection, no forfeiture penalty shall be imposed under this subsection against any person unless and until--

> **(A)** the Commission issues a notice of apparent liability, in writing, with respect to such person;

> **(B)** such notice has been received by such person, or until the Commission has sent such notice to the last known address of such person, by registered or certified mail; and

> **(C)** such person is granted an opportunity to show, in writing, within such reasonable period of time as the Commission prescribes by rule or regulation, why no such forfeiture penalty should be imposed.

Such a notice shall (i) identify each specific provision, term, and condition of any Act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, instrument, or authorization which such person apparently violated or with which such person apparently failed to comply; (ii) set forth the nature of the act or omission charged against such person and the facts upon which such charge is based; and (iii) state the date on which such conduct occurred. Any forfeiture penalty determined under this paragraph shall be recoverable pursuant to section 504(a) of this title.

**(5)** No forfeiture liability shall be determined under this subsection against any person, if such person does not hold a license, permit, certificate, or other authorization issued by the Commission, and if such person is not an applicant for a license, permit, certificate, or other authorization issued by the Commission, unless, prior to the notice required by paragraph (3) of this subsection or the notice of apparent liability required by paragraph (4) of this subsection, such person (A) is sent a citation of the violation charged; (B) is given a reasonable opportunity for a personal interview with an official of the Commission, at the field office of the Commission which is nearest to such person's place of residence; and (C) subsequently engages in conduct of the type described in such citation. The provisions of this paragraph shall not apply, however, if the person involved is engaging in activities for which a license, permit, certificate, or other authorization is required, or is a cable television system operator, if the person involved is transmitting on frequencies assigned for use in a service in which individual station operation is authorized by rule pursuant to section 307(e) of this title, or in the case of violations of section 303(q) of this title, if the person involved is a nonlicensee tower owner who has previously received notice of the obligations imposed by section 303(q) of this title from the Commission or the permittee or licensee who uses that tower. Whenever the requirements of this paragraph are satisfied with respect to a particular person, such person shall not be entitled to receive any additional citation of the violation charged, with respect to any conduct of the type described in the citation sent under this paragraph.

**(6)** No forfeiture penalty shall be determined or imposed against any person under this subsection if—

**(A)** such person holds a broadcast station license issued under subchapter III of this chapter and if the violation charged occurred—

> **(i)** more than 1 year prior to the date of issuance of the required notice or notice of apparent liability; or

> **(ii)** prior to the date of commencement of the current term of such license,

> whichever is earlier; or

**(B)** such person does not hold a broadcast station license issued under subchapter III of this chapter and if the violation charged occurred more than 1 year prior to the date of issuance of the required notice or notice of apparent liability.

For purposes of this paragraph, "date of commencement of the current term of such license" means the date of commencement of the last term of license for which the licensee has been granted a license by the Commission. A separate license term shall not be deemed to have commenced as a result of continuing a license in effect under section 307(c) of this title pending decision on an application for renewal of the license.

47 U.S.C. § 504 provides:

## § 504. Forfeitures

### (a) Recovery

The forfeitures provided for in this chapter shall be payable into the Treasury of the United States, and shall be recoverable, except as otherwise provided with respect to a forfeiture penalty determined under section 503(b)(3) of this title, in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office or in any district through which the line or system of the carrier runs: Provided, That any suit for the recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo: Provided further, That in the case of forfeiture by a ship, said forfeiture may also be recoverable by way of libel in any district in which such ship shall arrive or depart. Such forfeitures shall be in addition to any other general or specific penalties provided in this chapter. It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures under this chapter. The costs and expenses of such prosecutions shall be paid from the appropriation for the expenses of the courts of the United States.

### (b) Remission and mitigation

The forfeitures imposed by subchapter II, parts II and III of subchapter III, and sections 503(b) and 507 of this title shall be subject to remission or mitigation by the Commission under such regulations and methods of ascertaining the facts as may seem to it advisable, and, if suit has been instituted, the Attorney General, upon request of the Commission, shall direct the discontinuance of any prosecution to recover such forfeitures: Provided, however, That no forfeiture shall be remitted or mitigated after determination by a court of competent jurisdiction.

### (c) Use of notice of apparent liability

Add. 13

In any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final.