No. 24-60223

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

AT&T Inc.,

*Petitioner*,

*v.*

Federal Communications Commission;
United States of America,

*Respondents.*

On Petition for Review from the Federal Communications
Commission

REPLY BRIEF OF PETITIONER AT&T INC.

Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T Inc.*

# AMENDED CERTIFICATE OF INTERESTED PERSONS

No. 24-60223, *AT&T Inc. v. Federal Communications Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Petitioner**
AT&T Inc.

**Counsel for Petitioner**
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP

**Respondents**
Federal Communications Commission
United States of America

**Counsel for Respondents**
James Michael Carr
Adam Sorensen
P. Michele Ellison
Jacob Matthew Lewis
FEDERAL COMMUNICATIONS COMMISSION

Merrick Garland, U.S. Attorney General
Robert J. Wiggers
Robert B. Nicholson
Matthew A. Waring
U.S. DEPARTMENT OF JUSTICE

*s/ Pratik A. Shah*
Pratik A. Shah

*Counsel for Petitioner AT&T Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..............................................i

INTRODUCTION ........................................................................1

ARGUMENT ............................................................................3

    I.    THE COMMISSION'S FORFEITURE SCHEME IS UNCONSTITUTIONAL AS APPLIED HERE ..................................3

        A.    The Forfeiture Scheme Violates The Seventh Amendment.......3

            1.    *The Commission relies on arguments* Jarkesy *forecloses.* ........................................................3

            2.    *The possibility of a government collection action does not satisfy AT&T's Seventh Amendment right.* .........7

        B.    The Forfeiture Scheme Violates Article III And Due Process....................................................................12

        C.    The Forfeiture Scheme Violates The Nondelegation Doctrine...................................................................14

    II.    THE COMMISSION EXCEEDED ITS STATUTORY AUTHORITY .......................................................................16

        A.    Section 222 Does Not Cover The Location Information At Issue..........................................................................16

        B.    The Commission Failed To Provide "Fair Notice" That Section 222 Applied .................................................19

    III.    THE COMMISSION'S LIABILITY DETERMINATION IS ARBITRARY AND CAPRICIOUS .....................................21

    IV.    THE COMMISSION'S ISSUANCE OF A $57 MILLION PENALTY IS LAWLESS...................................................26

CONCLUSION .........................................................................29

# TABLE OF AUTHORITIES

C<span>ASES</span>:

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996).................................................................6

*Action for Children's Television v. FCC,*
   59 F.3d 1249 (D.C. Cir. 1995).......................................9, 10

*Consumers' Rsch. v. FCC,*
   109 F.4th 743 (5th Cir. 2024) ......................................15, 16

*Davis v. Echo Valley Condo. Ass'n,*
   945 F.3d 483 (6th Cir. 2019) ............................................22

*Illumina, Inc. v. FTC,*
   88 F.4th 1036 (5th Cir. 2023) ..........................................12

*In re Nissan Motor Corp. Antitrust Litig.,*
   552 F.2d 1088 (5th Cir. 1977) ..........................................22

*In re Nobleman,*
   968 F.2d 483 (5th Cir. 1992) ............................................15

*In re Texas Gen. Petroleum Corp.,*
   52 F.3d 1330 (5th Cir. 1995) ............................................12

*Jarkesy v. SEC,*
   34 F.4th 446 (5th Cir. 2022) .............................14, 15, 16

*Kotch v. Board of River Port Pilot Comm'rs for Port of New Orleans,*
   330 U.S. 552 (1947)..........................................................28

*Maine Cmty. Health Options v. United States,*
   590 U.S. 296 (2020)..........................................................15

*National Ass'n of Regul. Util. Comm'rs v. FCC,*
   737 F.2d 1095 (D.C. Cir. 1984).......................................28

*NetChoice, L.L.C. v. Paxton,*
   49 F.4th 439 (5th Cir. 2022) ..............................................6

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
    588 U.S. 1 (2019)...............................................................11

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024)...............................................*passim*

*Tull v. United States*,
    481 U.S. 412 (1987)...............................................................4

*United States v. Herrera-Ochoa*,
    245 F.3d 495 (5th Cir. 2001) ...............................................10

*United States v. Stevens*,
    691 F.3d 620 (5th Cir. 2012) ........................................10, 11

*United States v. Wiese*,
    896 F.3d 720 (5th Cir. 2018) ...............................................11

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)...............................................................19

*Wages & White Lion Invs., L.L.C. v. FDA*,
    90 F.4th 357 (5th Cir. 2024) ...............................................19

*Williams v. Pennsylvania*,
    579 U.S. 1 (2016)...............................................................12

**COMMISSION PROCEEDINGS:**

*Amendment of Section 1.80(b) of the Comm'n's Rules*,
    34 FCC Rcd. 12824 (2019).............................................26

*Request by CTIA to Commence Rulemaking to Establish Fair
    Location Info. Practices*,
    Order, FCC 02-208 (July 24, 2002).............................................20

*Safeguarding & Securing the Open Internet*,
    Declaratory Ruling, Order, Report and Order, and Order on
    Reconsideration, WC Docket Nos. 23-320 & 17-108, FCC 24-52
    (May 7, 2024).............................................20

## STATUTES:

28 U.S.C.
§ 2462................................................................................................7

47 U.S.C.
§ 153(51)..........................................................................................17
§ 154(j).............................................................................................15
§ 222(c)(1)........................................................................................24
§ 222(h)(1)(A)..................................................................2, 16, 17, 18
§ 503(b)(2)(B)...................................................................................26
§ 503(b)(3)(A)............................................................................14, 15
§ 504(a)...............................................................................................7

## OTHER AUTHORITIES:

47 C.F.R.
§ 64.2010(a) ..................................................................................5, 21

FCC, Wireless Telecomms. Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations* (May 2012)...................22

Kaczorowski, Robert J., *The Common-Law Background of Nineteenth-Century Tort Law*, 51 OHIO ST. L.J. 1127 (1990).............................6

Letter from Jessica Rosenworcel, Commission Chairwoman to John Stankey, Chief Executive Officer, AT&T Services, Inc. (July 19, 2022) ...............................................................................................13

Letter from Lee G. Petro, Counsel for the Wright Pet'rs to Marlene Dortch, Secretary, FCC, WC Docket No. 17-126 (Aug. 5, 2017)......................25

*Solely*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1118 (10th ed. 1997) ............................................................................................18

# INTRODUCTION

The Federal Communications Commission's brief distorts reality. First, the Commission paints Securus Technologies' misconduct as the basis of the Forfeiture Order. It is not. The Commission itself has acknowledged that Securus's misdeeds took place long before the statute-of-limitations period. And the Commission cites no evidence that Securus ever unlawfully accessed a single AT&T customer's location information.

The Commission next implies AT&T did nothing upon learning of Securus's misconduct. That too is wrong. AT&T immediately shut off Securus's access and launched an investigation into its location-based services ("LBS") program—through which companies like Life Alert and AAA provided critical and sometimes lifesaving services. AT&T eventually shuttered the program, following an orderly wind down that avoided harming AT&T customers who relied on LBS services.

The Commission also describes AT&T as "careless." But that could not be further from the truth. AT&T gave access only to providers with an approved use case; conducted daily audits of consent records and broader programmatic audits; and responded to Securus's misdeeds promptly and prudently, weighing the costs and benefits at every turn. That is far more than the Commission can say for itself, having taken no action (failing even to inform the major wireless carriers) after learning of Securus's malfeasance nearly a year before AT&T did.

Regardless, the Commission's (unfounded) attempts to paint AT&T as an indifferent steward of customer location information cannot mend the broken constitutional and statutory foundation upon which the Forfeiture Order rests. Although the Commission spends the bulk of its brief trying to head off Seventh Amendment, Article III/due process, and nondelegation violations, the Supreme Court and this Court have rejected virtually all the Commission's arguments in the *Jarkesy* decisions. Under those precedents, actions seeking a monetary penalty (like a forfeiture) require a jury trial before an Article III judge. The possibility that the Department of Justice years later might bring a district court collection action is no substitute. A forfeiture order carries immediate consequences, and a collection action would allow AT&T to exercise its jury-trial right only at the expense of its ability to challenge the order's legal validity—a catch the Supreme Court has called "intolerable."

Meanwhile, the Commission barely touches AT&T's main statutory authority argument: section 222 of the Communications Act does not cover the location information in question because the information was not obtained "*solely* by virtue of" AT&T's provision of voice services. 47 U.S.C. § 222(h)(1)(A) (emphasis added). The Commission does not (and cannot) deny that AT&T collected location information to provide *both* voice services *and* data services (and sometimes just the latter). The Commission instead simply reads "solely" out of the statute.

Finally, the Commission defends its liability determination and $57 million penalty as reasonable.  But the Commission's revisionist history focuses only on (unrealized) risks from AT&T's LBS program to the exclusion of its (undisputed) customer benefits.  And by premising that eye-popping penalty on each day any provider had access, the Commission punishes AT&T most severely for continuing to work with the most critical and reputable providers (*e.g.*, Life Alert, AAA, Allstate).  Worse still, the penalty far exceeds the Act's $2 million statutory cap for a "continuing" failure.

This Court should vacate the Commission's Forfeiture Order.

## ARGUMENT

## I.  THE COMMISSION'S FORFEITURE SCHEME IS UNCONSTITUTIONAL AS APPLIED HERE

### A.  The Forfeiture Scheme Violates The Seventh Amendment

#### 1.  *The Commission relies on arguments* Jarkesy *forecloses.*

The Commission's contention that it need not abide by the Seventh Amendment in issuing the Forfeiture Order defies *Jarkesy*'s crystal-clear holding. As the Supreme Court explained, "[t]he Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'"  *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024).  The Commission does not—and cannot—dispute that the imposition of a civil forfeiture order is "legal" in nature:  "civil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law."  *Id.* at 2129 (alteration

in original); *see* Comm'n Br. 29-30. Under *Jarkesy*, that remedial analysis "effectively decides" the matter. 144 S. Ct. at 2130. That is why the dissenting opinion specifically identified the Commission's forfeiture scheme as an administrative process that would be "upend[ed]" by *Jarkesy*. *Id.* at 2173-2175 (Sotomayor, J., dissenting).

The Commission nevertheless maintains that the Seventh Amendment does not apply to its enforcement action resulting in a $57 million fine against AT&T. It argues that there is no common-law analog and that the claim falls under the public-rights exception regardless. But those are the same two arguments that the federal government pressed and lost in *Jarkesy* itself.

*First*, in determining whether the Seventh Amendment applies, the Commission admits (as it must) that "the 'more important' consideration" is the nature of the remedy. Comm'n Br. 26 (quoting *Jarkesy*, 144 S. Ct. at 2129). For good reason: the Supreme Court has long "reject[ed]" the notion that "both the cause of action *and* the remedy must be legal in nature before the Seventh Amendment right to a jury trial attaches." *Tull v. United States*, 481 U.S. 412, 421 n.6 (1987) (emphasis added). Put another way, the remedy sought is "all but dispositive." *Jarkesy*, 144 S. Ct. at 2129.

In any event, there *are* several common-law analogs that "target the same basic conduct" as this action—*i.e.*, the unreasonable treatment of another's personal

information.  *Jarkesy*, 144 S. Ct. at 2130; *see* AT&T Br. 31-32.  Most notably, common-law negligence maps onto the Commission's claim almost perfectly.  *See Jarkesy*, 144 S. Ct. at 2131 (instructing that common-law analog need not be "identical").  The Commission rejoins that the statutory "'duty to protect the confidentiality of proprietary information' does not use the word 'reasonable' or any other 'common law terms of art.'"  Comm'n Br. 29.  But the Commission's own interpretation of that "duty," as codified in the "implementing regulations" applied against AT&T, requires "reasonable measures."  *Id.* (quoting 47 C.F.R. § 64.2010(a)).  The Commission ultimately provides no basis for distinguishing between the standard set forth in that regulation and the standard governing common-law negligence—aside from positing that "[t]he word 'reasonable' is ubiquitous," *including* in the "common law." *Id.*  That reinforces, rather than refutes, the common-law "link." *Id.*

*Second*, the Commission cannot rely on the public-rights exception here any more than the federal government did in *Jarkesy*.  As the Supreme Court underscored, only claims with "a serious and unbroken" history of "nonjudicial adjudication" qualify.  144 S. Ct. at 2146-2147 (Gorsuch, J., concurring); *see also id.* at 2133 (majority opinion).  Even then, there is a "presumption" against the exception's application.  *Id.* at 2134 (majority opinion).

The Commission asserts (Br. 31-32) that *any* claim brought against AT&T falls within the exception because AT&T is a "common carrier," and regulating common carriers is in the "public interest."  But there is no tradition of adjudicating claims against common carriers *outside* courts of law.  To the contrary, the "common carrier doctrine is a body of *common law*" that "dat[es] back long before our Founding."  *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 469 (5th Cir. 2022) (emphasis added); *see generally* Robert J. Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law*, 51 OHIO ST. L.J. 1127 (1990) (detailing "common-carrier liability" under common law).

Moreover, it cannot be that every matter affecting the "public interest" falls within the exception.  All laws and regulations are presumably enacted and promulgated in the public interest.  If that were enough to trigger the public-rights exception, "the exception would swallow the rule."  *Jarkesy*, 144 S. Ct. at 2134; *see also id.* at 2146 (Gorsuch, J., concurring) ("[D]espite its misleading name, the exception does not refer to *all* matters brought by the government against an individual to remedy public harms[.]").[1]

_____

[1] AT&T's status as "a licensee of federally managed radio spectrum" does not change the equation.  *Contra* Comm'n Br. 33.  True, the Supreme Court has applied the public-rights exception to "the granting of public benefits."  *Jarkesy*, 144 S. Ct. at 2133.  But that does not mean benefit recipients lose their jury-trial right in all matters, like this one, unrelated to their status as licensees.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996) (emphasizing that "conferral of [a] benefit" cannot "be conditioned on the surrender of a constitutional right").

At bottom, the Commission's claim against AT&T looks like a common-law claim, sounds like a common-law claim, and ("more important[ly]") has the same remedy as a common-law claim. *Jarkesy*, 144 S. Ct. at 2129. Suffice it to say the claim is one "at common law," to which the Seventh Amendment's jury-trial right applies.

   2.   *The possibility of a government collection action does not satisfy AT&T's Seventh Amendment right.*

Perhaps recognizing the futility of arguments against the Seventh Amendment's application, the Commission spends most of its time arguing (Br. 20) that AT&T "knowingly and voluntarily waived" its Seventh Amendment rights. According to the Commission, AT&T "could have sought a de novo jury trial in district court," but "cho[se] to forgo" one. *Id.* at 20-21.

The problems with that argument are legion. To start, AT&T could not itself have "sought" a de novo jury trial in district court. Had AT&T disobeyed the Forfeiture Order and refused to pay, the Department of Justice could have initiated a collection action in district court. *See* 47 U.S.C. § 504(a). But unless and until the Department did so (up to five years later), AT&T would have had no ability to demand a jury trial. *See* 28 U.S.C. § 2462 (five-year statute of limitations for collection proceedings); *see also* Chamber *Amicus* Br. 13 ("any jury trial right appears theoretical at best" given that "no Section 504(a) jury trial has occurred in at least fifty years").

Nor does a maybe-someday chance of a jury trial satisfy the Seventh Amendment. When a suit is one "at common law," a jury trial in federal court must be available *at the outset*. An agency may use administrative processes to decide whether to prosecute, but the "initial adjudication" must be before a neutral judge and jury. *Jarkesy*, 144 S. Ct. at 2131-2132 (Suits "in the nature of an action at common law" require "involvement by an Article III court," and "a jury if the Seventh Amendment applies[,] *** in the initial adjudication.").

The Commission suggests (Br. 22-23) that its adjudication of AT&T's liability was harmless and "could not give rise to a constitutional injury" because AT&T was "under no obligation to pay" the penalty until after a collection proceeding. The final Forfeiture Order, however, says no such thing: "**IT IS ORDERED**" that AT&T "**IS LIABLE FOR A MONETARY FORFEITURE** in the amount of *** $57,265,625[.] *** Payment of the forfeiture shall be made in the manner provided for in section 1.80 of the Commission's rules within thirty (30) calendar days[.]" AR1:36-37.

Payment obligations aside, the Forfeiture Order carried immediate consequences beyond even the significant reputational harm of being declared a "willful[] and repeated[]" violator. AR1:28 (emphasis and capitalization omitted). Indeed, the Commission does not deny that it would have been free to use its unreviewed (by judge or jury) factual findings "'as a basis for a higher forfeiture' in

future cases." Chamber *Amicus* Br. 17; *see also Action for Children's Television v. FCC*, 59 F.3d 1249, 1265 (D.C. Cir. 1995) (Tatel, J., dissenting) ("[T]he Commission relies on its unreviewed *** determinations to impose increased penalties," and in "several instances *** has doubled and tripled forfeitures[.]"). By the Commission's "own admission," the Order's findings could also "serve as a basis for denying a request to renew a license for broadcast, mobile voice or broadband, or satellite services," or for "prevent[ing] consummation of a merger that involved the transfer of [Commission] licenses." Chamber *Amicus* Br. 17. After all, the Commission itself has made "an official government determination that [AT&T] is a lawbreaker." *Id.* at 16.

Those consequences are also what sets apart the government's delay in bringing a collection action from other delay allowed under "standard limitations period[s] used throughout the U.S. Code." Comm'n Br. 21. Delay that *precedes* any "official determination" does not carry the same ramifications. Meanwhile, the Forfeiture Order and its collateral consequences would hang over AT&T's head indeterminately without a collection action. Moreover, there is no limit on how long the Commission can take to consider a notice of apparent liability ("NAL")— meaning a collection proceeding might not occur for 10-plus years after the conduct in question took place, when evidence has become stale and memories have faded.[2]

---

[2] Contrary to the Commission's passing assertion (Br. 21), a declaratory

Not even a hypothetical timely collection action would provide the "fair trial" the Constitution demands. *Jarkesy*, 144 S. Ct. at 2154 (Gorsuch, J., concurring). Although AT&T could have (belatedly) challenged the underlying facts before a jury, *United States v. Stevens* would have barred AT&T from challenging the "legal validity" of the Forfeiture Order. 691 F.3d 620, 622-624 (5th Cir. 2012) ("The district court correctly determined that it lacked jurisdiction to consider [defendants'] legal defenses in the government's action to enforce the forfeiture order."). In other words, AT&T would have been forced to defend itself with one arm tied behind its back.

The Commission's counter (Br. 23)—that this limitation does not present a Seventh Amendment issue because juries decide facts, not law—misses the point. There is no meaningful jury-trial right if, to exercise it, one must sacrifice the right to raise a legal challenge. "The Supreme Court has deemed such a choice, in which one constitutional right should have to be surrendered in order to assert another, intolerable." *United States v. Herrera-Ochoa*, 245 F.3d 495, 500 (5th Cir. 2001) (internal quotation marks omitted). Yet under *Stevens*, that is the choice AT&T faced: (1) challenge the "legal validity" of the Forfeiture Order, but forgo a (possible) jury trial and de novo review of the Commission's findings of fact; or (2)

---

judgment action would be no solution. Even if such an action were available, AT&T (not the government) "would then bear *** the burden of proof." *Action for Children's Television*, 59 F.3d at 1266 (Tatel, J., dissenting).

hope for a jury trial, but lose any opportunity to challenge the Order's "legal validity." 691 F.3d at 622-623. There was simply no way for AT&T to "challenge[] both the Commission's legal conclusions and factual findings" consistent with the Seventh Amendment. *Contra* Comm'n Br. 23-24. To the extent the Commission suggests AT&T could have raised a "legal challenge" on appeal of the district court's decision in a collection action, the Commission does not explain how. *See United States v. Wiese*, 896 F.3d 720, 723 (5th Cir. 2018) ("If the district court did not have jurisdiction to reach the merits, naturally, we cannot reach the merits on appeal.").

As a last resort, the Commission tries (Br. 25) to distinguish *Stevens* on the ground that it concerned a legal challenge the defendants had a "prior opportunity" to raise. *Stevens*, however, does not limit its holding in that way. To the contrary, the opinion broadly declares that "[p]ersons aggrieved by a final FCC forfeiture order must raise legal challenges to the validity of the order in a timely petition for review in the appropriate court of appeals." 691 F.3d at 623.[3] Thus, as a matter of binding Circuit precedent, AT&T was put to an unconstitutional choice that burdened its Seventh Amendment rights.

---

[3] Contrary to the Commission's suggestion (Br. 25), *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1 (2019), does not support its constricted reading of *Stevens*. The Supreme Court there, without mentioning *Stevens*, expressly declined to decide the import of a prior opportunity to raise a particular legal challenge. *Id.* at 8.

**B.      The Forfeiture Scheme Violates Article III And Due Process**

The Commission's responses on Article III and due process are unavailing. Under Article III, Congress cannot "withdraw[] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Jarkesy*, 144 S. Ct. at 2131.  Yet the Commission's forfeiture scheme does just that:  it gives the Commission (an Executive Branch agency) the power to adjudicate a claim for civil penalties (a legal claim).  *See* pp. 3-4, *supra*.  Later truncated review in federal court is no solution.  *See In re Texas Gen. Petroleum Corp.*, 52 F.3d 1330, 1337 (5th Cir. 1995) (Article III court did not maintain sufficient "control over" bankruptcy court when Article III court affirmed bankruptcy court's judgment "utilizing clear error review" rather than "[d]e novo review").

That the Commission exercises judicial power while acting as the prosecutor only makes things worse.  An "unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case."  *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).  That is especially true when, like here, there are not even nominal safeguards against bias, like an evidentiary hearing or an ostensibly neutral administrative law judge ("ALJ").  *See, e.g.*, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1045 (5th Cir. 2023).

The far-from-"tentative" (Comm'n Br. 36) language in the Commissioners' individual statements confirms that the Commission prejudged the merits of the

Forfeiture Order in its NAL. Even Chairwoman Rosenworcel—whom the Commission touts (Br. 38) as proof of impartiality because she voted for the Forfeiture Order after dissenting from the NAL—dissented only because the penalty proposed was "too small." AR5:36. She still described AT&T's practices as "violations of [the Commission's] privacy laws." *Id.* Indeed, in a letter pre-dating the Forfeiture Order by nearly two years, she described the Commission as having "held [AT&T] responsible" for not "taking reasonable measures to protect against unauthorized access to [customer location] information." Letter from Jessica Rosenworcel, Commission Chairwoman to John Stankey, Chief Executive Officer, AT&T Services, Inc. 1 (July 19, 2022).[4]

That sort of prejudging is hardly the exception. Uncontested statistics show that less than 3% of 360 NALs issued in the last five years were cancelled or had their forfeiture amounts reduced based on information or arguments presented by the target. AT&T Br. 39 n.6. The Commission says these numbers "merely speak[] to the thoroughness of the Commission's investigations." Comm'n Br. 39. But that only highlights the specter of unconstitutional bias created by the Commission's process: the Commission so vigorously executes its role of prosecutor at the NAL stage that the accused's response is only an afterthought (if it is considered at all).

---

[4] https://docs.fcc.gov/public/attachments/DOC-385447A1.pdf.

## C.    The Forfeiture Scheme Violates The Nondelegation Doctrine

To top things off, the Commission's "unfettered authority" to choose whether to adjudicate Communications Act violations through an NAL or before an ALJ violates the nondelegation doctrine. *Jarkesy v. SEC*, 34 F.4th 446, 459 (5th Cir. 2022); *see* 47 U.S.C. § 503(b)(3)(A) ("At the discretion of the Commission, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative law judge.").

The Commission first argues (Br. 41) that its "prosecutorial procedure constitutes an exercise of executive, not legislative, power," so the nondelegation doctrine does not apply. The Commission seems to acknowledge (Br. 42 n.4) in a footnote, however, that this Court already rejected that exact argument. As this Court put it, "the power to decide which defendants should receive *certain legal processes* \*\*\* and which should not" is "a power that Congress uniquely possesses." *Jarkesy*, 34 F.4th at 462. To be sure, *Jarkesy* specifically concerned the power to bring actions "within the agency *instead of* an Article III court." Comm'n Br. 40. But the decision's logic is not limited to those facts. Just the opposite: this Court confirmed that "[g]overnment actions are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties and relations of persons \*\*\* outside the legislative

branch.'" *Jarkesy*, 34 F.4th at 461 (ellipsis in original).  Choosing between an NAL or ALJ does just that.

The Commission next argues that even if the nondelegation doctrine applies, Congress provided an "intelligible principle" by "direct[ing] the Commission" in a separate section of the Communications Act "to 'conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice.'" Comm'n Br. 42-43 (quoting 47 U.S.C. § 154(j)).  Section 154(j), however, does not actually cabin the Commission's discretion.  In full, that provision states that "[t]he Commission *may* conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice."  47 U.S.C. § 154(j) (emphasis added).  Such permissive language "implies discretion," *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020), and does not "meaningfully limit" the Commission, *Consumers' Rsch. v. FCC*, 109 F.4th 743, 761 (5th Cir. 2024).

Besides, reading section 154(j) to cabin the Commission's discretion conflicts with section 503(b)(3)(A)'s specific instruction that the choice between an NAL or ALJ be made "[a]t the discretion of the Commission."  47 U.S.C. § 503(b)(3)(A).  Between the two, the specific instruction prevails.  *See In re Nobleman*, 968 F.2d 483, 488 (5th Cir. 1992) ("If two statutes conflict, *** the general language of a statute does not 'prevail over matters specifically dealt with in another part of the

same enactment.'").  Thus, the Commission "may roam at will," *Consumers' Rsch.*, 109 F.4th at 761, exercising unfettered discretion that "is impermissible under the Constitution," *Jarkesy*, 34 F.4th at 462.

## II.   THE COMMISSION EXCEEDED ITS STATUTORY AUTHORITY

In any event, the Forfeiture Order must be set aside for an independent reason: the Commission plainly lacked statutory authority to seek it in the first place.  At a minimum, the Commission abdicated its responsibility to provide sufficient notice that it would enforce section 222 of the Communications Act in this context.

### A.   Section 222 Does Not Cover The Location Information At Issue

As explained in AT&T's opening brief (at 41-42), the Commission here relied exclusively on its section 222 authority over customer proprietary network information ("CPNI")—"information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship."  47 U.S.C. § 222(h)(1)(A).  Broken down, that statutory definition has two requirements:  information must (1) "relate[] to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service," and (2) be provided "solely by virtue of the [telecommunications] carrier-customer relationship"—*i.e.*, the provision of voice

services.  *Id.*; *see id.* § 153(51) ("The term 'telecommunications carrier' means any provider of telecommunications [or 'voice'] services[.]").

The location information at issue here does not meet either requirement.  The first effectively limits covered information to "call location data," which the information at issue here indisputably is not.  *See* AT&T Br. 42; CTIA *Amicus* Br. 10-15; AR1:41 (Comm'r Carr, dissenting).  To solve that problem, the Commission proffers (Br. 45) a much broader reading:  any location information that "'relates to' AT&T's wireless telecommunications service" in any way suffices.  But that interpretation misconstrues section 222 by reading "of use" out of the provision, thereby expanding the location information covered and leaving several pieces of the provision without any clear or ordinary meaning (*e.g.*, "destination *** of a telecommunications service").  47 U.S.C. § 222(h)(1)(A).

More importantly, the location information at issue here was not provided "*solely* by virtue of" AT&T voice services.  47 U.S.C. § 222(h)(1)(A) (emphasis added).  Rather, all AT&T customers provided their location information through their device's connection to the AT&T network whether they subscribed to voice services or data services or both (the vast majority).  Customers subscribing to *both* services provided their location information because of *both* relationships with AT&T—*i.e.*, the telecommunications carrier-customer relationship *and* the data service provider-customer relationship.  Data-only customers, for whom AT&T did

not provide any voice service (and thus lacked a carrier-customer relationship), also provided their location information.  It follows that the "[telecommunications] carrier-customer relationship" could not be the "*sole*[]" reason AT&T had the data. *Id*. (emphasis added); *Solely*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1118 (10th ed. 1997) ("to the exclusion of all else").

The Commission's response is hard to follow.  The Commission at first seems to argue (Br. 47-48) that section 222 requires only that information be "necessary" for the provision of voice services; and because location information is necessary for voice services, it constitutes CPNI.  But a "necessary" cause is different than a "sole[]" cause.  47 U.S.C. § 222(h)(1)(A).  Suppose, for example, someone needed eggs both to make breakfast *and* to bake a cake.  When that person bought a dozen eggs, no one would say he did so "solely" to make breakfast.  Yet that is the equivalent of the Commission's argument here.

The Commission further argues that providing "some customers with both telecommunications and non-telecommunications services does not 'take[] the resulting *relationship* outside the scope of the "carrier-customer" relationship,'" and that "AT&T points to no way of disaggregating location data particular to voice services from those relating to non-voice services."  Comm'n Br. 48-49 (alteration in original).  But as AT&T explained in its opening brief (at 44), two different "relationships" can exist at the same time—a telecommunications carrier-customer

relationship *and* a data provider-customer relationship—and there is no Commission rule requiring "disaggregat[ion]." Section 222 *does* require regulated location information to come "solely" from the telecommunications service. It was therefore *the Commission's* burden to "disaggregat[e]" the data arising from the carrier-customer relationship. The Commission never did, and all but admits that it cannot. *See* Comm'n Br. 49.

In the end, the Commission retreats to policy arguments, arguing that "AT&T's interpretation would have the perverse effect of eliminating the statutory protections of the most sensitive types of CPNI." Comm'n Br. 49 (internal quotation marks omitted). Not so. AT&T's interpretation simply confirms that authority over non-CPNI location data lies with other regulators. *See* AR1:40 (Comm'r Carr, dissenting). At any rate, if the Commission has a problem with the scope of its statutory authority, that is a matter for Congress, not this Court. *See Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

## B. The Commission Failed To Provide "Fair Notice" That Section 222 Applied

At the very least, principles of "fair notice" bar the Commission from applying its novel (and atextual) interpretation of CPNI for the first time in this enforcement proceeding. *See Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 374 (5th

Cir. 2024) (agency must give "fair notice of their rules before finding a violation of them").

The Commission contends that AT&T had "adequate notice" that its location information was covered by section 222 because "the Commission has long advised carriers, 'implicit in section 222 is a rebuttable presumption that information that fits the definition of CPNI contained in section 222([h])(1) is in fact CPNI.'" Comm'n Br. 50 (alteration in original). At best, the statement is a tautology somehow subject to a "rebuttable presumption." Needless to say, such "advice" provides little notice of anything.

To be clear, AT&T is *not* arguing that the Commission could provide fair notice of its CPNI interpretation only through "a formal rulemaking." *Contra* Comm'n Br. 51. Rather, as AT&T explained in its opening brief (at 46-47), before this case, there was obvious uncertainty as to what information constituted CPNI. Despite industry (and AT&T's own) calls for clarification, *Request by CTIA to Commence Rulemaking to Establish Fair Location Info. Practices*, Order, FCC 02-208 (July 24, 2002), the Commission has "never provided an exhaustive list of what constitutes CPNI," *Safeguarding & Securing the Open Internet* ¶ 351, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket Nos. 23-320 & 17-108, FCC 24-52 (May 7, 2024). When the Commission has addressed CPNI, it has "focused on addressing problems in the *voice service context*." *Id.* ¶ 359

(emphasis added). The Commission's decidedly piecemeal and nebulous approach to CPNI, while arguably not foreclosing the possibility of regulation of the location information at issue here, does not amount to notice of such regulation.

## III. THE COMMISSION'S LIABILITY DETERMINATION IS ARBITRARY AND CAPRICIOUS

The Commission's defense of its liability finding on the merits fares no better. The Forfeiture Order effectively faults AT&T for not shutting off access to *all* LBS providers *immediately* after learning about Securus's misdeeds. In doing so, however, the Order fails to consider both the costs and benefits of such a response. The Order focuses exclusively on Securus and attendant privacy concerns, while all but ignoring the countervailing benefits of continuing vital LBS services (like Life Alert's emergency medical care and AAA's roadside assistance) pending AT&T's orderly wind down. Indeed, the Order does not even pretend to consider the harm that would befall AT&T customers had AT&T abruptly terminated such services.

That one-sided approach—effectively applying a strict liability standard—cannot be squared with the regulatory regime or common sense. Neither section 222 nor the Commission's rules require AT&T to prevent every potential misuse of data or to react rashly in response to one criminal actor's abuses. *See* AR1:16. The touchstone, instead, is reasonableness—specifically, whether AT&T took "*reasonable* measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a) (emphasis added). That inquiry, like any

21

"reasonableness inquiry," necessitates "the balancing of costs and benefits." *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491 (6th Cir. 2019); *see In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977) ("In every case, reasonableness is a function of anticipated results [versus] costs.").

In defending the Forfeiture Order on appeal, the Commission again does not explain how it conducted the requisite balancing. Instead, the Commission discounts (Br. 59) the benefits of LBS services that it touted for years, insisting that "prompt[] terminat[ion]" of the LBS program was the only reasonable course. *See generally* FCC, Wireless Telecomms. Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations* (May 2012).[5] The Commission then completely ignores the costs of abruptly terminating important and sometimes lifesaving LBS services on which AT&T customers relied.

Ultimately, the Commission takes the position (Br. 55) that its liability finding is justified by AT&T's "inadequate" response. But the Commission both misstates and overstates the facts. The Commission repeatedly proclaims (Br. 9, 57, 59) that AT&T did nothing to verify that its LBS providers were obtaining consent or otherwise complying with privacy-related requirements. That is wrong. AT&T required providers to provide records of customer consent, which AT&T reviewed

---

[5] https://docs.fcc.gov/public/attachments/DOC-314283A1.pdf.

"daily." AR4:7-8. In addition, AT&T conducted regular audits and assessments to monitor and strengthen its contract-based controls over providers. *Id.* at 2, 8.

Although the Commission contends (Br. 57) that AT&T's efforts were nothing but "an empty formality" given Securus's conduct, what the Commission leaves out is that Securus gave AT&T *false* customer consent records. *See* AT&T Br. 14-15. The reasonableness standard does not require AT&T to assume the falsity of such records and conduct a re-verification. Indeed, there is no evidence that AT&T's reliance on customer consent records was inadequate with respect to scores of other LBS providers.

Even with respect to Securus, the record shows that Securus's breach of its prisoner-use-case commitment was limited to 0.2% of AT&T lookup requests. And the Commission has never shown that those lookups were *unlawful*, as opposed to inconsistent with Securus's contractual obligations. AR4:10. The Commission states otherwise for the first time on appeal, proclaiming that Sheriff Hutcheson "exploited the vulnerabilities in *AT&T's* system to track the locations of" certain individuals without legal process. Comm'n Br. 60 (emphasis added). But no evidence supports that claim. Indeed, the media report on which the Commission almost exclusively relies to support its distorted factual recitation does not link any of Securus's misdeeds to AT&T or its customers. By contrast, the actual investigative record suggests that most (if not all) of Securus's unauthorized AT&T

lookups involved a legitimate search warrant or other legal process authorizing the lookups.  AR3:20-21; *see* 47 U.S.C. § 222(c)(1) (authorizing disclosures "required by law").

The Commission's reliance on Securus here is all the more inappropriate given that the Forfeiture Order does *not* impose liability for Securus.  The Commission disclaimed any liability based on Securus in its NAL, noting that the statute of limitations on any Securus violations "ran out in April 2018."  AR5:28.  Yet much like the Forfeiture Order, the Commission makes Securus the centerpiece of its argument.  Indeed, the Commission's Securus fixation starts just three sentences into its brief and serves as the springboard for the Commission's merits discussion.  *See* Comm'n Br. 1-2 (using Securus to demonstrate AT&T's "system-wide vulnerability"); *id.* at 56-58 (describing Securus disclosures and AT&T's failure "to prevent such unauthorized disclosures").

When the Commission (finally) turns to AT&T's supposed delay in cutting off *other* longstanding LBS providers (with no record of misconduct) in response Securus—the actual basis of the Forfeiture Order—the Commission maintains that "AT&T knew its customers' locations were being continually disclosed."  Comm'n Br. 59-60.  But the Commission *still* has not identified any unlawful disclosure of an AT&T customer's information, or any misuse at all with respect to other LBS providers.

Moreover, the notion that AT&T did nothing besides cut off Securus's access, and could have undertaken its corrective action "much sooner" (Comm'n Br. 60), defies the record. When it learned about Securus's misconduct, AT&T immediately reviewed its entire LBS program from the ground up. AR4:11. Despite finding no evidence that any other provider had misused its access, or that AT&T customer location data was ever unlawfully accessed, AT&T started terminating providers' access. *Id.* at 12-14. Within months, the only providers left offered critical services, such as AAA's roadside assistance, Life Alert's emergency-response services, and major banks' fraud-prevention mechanisms. *Id.* When AT&T decided to end its LBS program entirely, it worked closely with those vital providers to ensure a safe transition for AT&T customers. *Id.* at 21-22.

Proceeding in that considered fashion was reasonable by any measure. For all the Commission's effort to say otherwise, it has no answer to the fact that it knew about Securus's misdeeds nearly a year before AT&T and other carriers. Although the Commission claims (Br. 11 n.1) that it was not apprised of any vulnerabilities that would lead it to act, the very letter it cites declares that Securus had used its "Location Based Service to violate Section 222 of the Communication Act." Letter from Lee G. Petro, Counsel for the Wright Pet'rs to Marlene Dortch, Secretary, FCC, WC Docket No. 17-126, at 1 (Aug. 5, 2017).[6] If the Commission did not know that

---

[6] https://www.fcc.gov/ecfs/document/10805871110099/1.

AT&T specifically was affected, that is because the Commission chose to bury its head in the sand. Regardless, the Commission can hardly accuse AT&T of sitting on its hands in response to Securus when the Commission itself did far less for far longer—indeed, nothing at all (not even a warning to major wireless carriers) for nearly a year.

## IV.  THE COMMISSION'S ISSUANCE OF A $57 MILLION PENALTY IS LAWLESS

If the Commission's liability determination is correct (it is not), AT&T should have been subject to a maximum penalty of about $2 million. The Commission nevertheless issued a penalty *more than 28 times* that amount based on an unpredictable and standardless approach to forfeiture calculation. The penalty cannot stand.

Start with the text of the Communications Act, which is conspicuously absent from the Commission's brief. Section 503(b)(2)(B) allows the Commission to assess forfeitures "for each violation or each day of a continuing violation," but "the amount assessed for any continuing violation shall not exceed a total of $1,000,000 [with inflation, now $2,048,915] for any single act or failure to act." 47 U.S.C. § 503(b)(2)(B); *Amendment of Section 1.80(b) of the Comm'n's Rules*, 34 FCC Rcd. 12824, 12828 (2019). That language plainly caps the penalty for one "continuing" failure to $2 million.

One "continuing" failure is exactly what the Commission found here. With respect to liability, Commission never considered AT&T's actions on a provider-by-provider or customer-by-customer basis. Instead, the Commission considered "AT&T's safeguards after the Securus disclosure" as a whole, ultimately concluding that "AT&T placed its customers' location information at continuing risk of unauthorized access through its failure to terminate its program or impose reasonable safeguards." AR1:20-24. The Forfeiture Order thus "finds that AT&T failed to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information." AR1:18.

For penalty purposes, however, the Commission insists on "treat[ing] systemic privacy failings as 'significantly more than a single violation.'" Comm'n Br. 63. Here, it decided to treat AT&T's "failure to take reasonable measures" as "84 continuing violations—one for each ongoing relationship with a third-party [location-based service] provider or aggregator that had access to AT&T customer location information more than 30 days after publication of the New York Times report," multiplied by the number of days the provider had access to that information. *Id.* at 61 (alteration in original). As the Commission sees it, "nothing in the statute or the Commission's rules compels" another approach. *Id.* at 63.

The Communications Act, however, *does* compel a different approach. If the Commission could apportion a "continuing *** failure to act" into separate

violations the way it did here, the statutory cap would serve no purpose. As Commissioner Simington put it in his dissenting statement, it is "simply not plausible" that Congress meant to allow the Commission to "arrive at forfeitures of any size simply by disaggregating an 'act' into its individual constituent parts." AR1:43. It does not matter that, in the Commission's view, "a single capped penalty *** would be insignificant." *Contra* Comm'n Br. 65. That was Congress's decision to make.

What's more, the Commission's approach has no guiding principles or guardrails. According to the Commission, "[t]he number of violations" it will find in any given "privacy failing[] *** depends on the precise conduct that violated the law." Comm'n Br. 63. What that means in practice is that the Commission will "count[] the members of whatever class of object may be related to the alleged violation to arrive at whatever forfeiture amount suits a preordained outcome." AR1:43 (Comm'r Simington, dissenting). "That is not a [reasonable approach]; it is a wholly arbitrary exercise of power." *Kotch v. Board of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 566 (1947) (Rutledge, J., dissenting); *see also National Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1141 (D.C. Cir. 1984) (agency decisions can withstand review only when they are "neither patently unreasonable nor 'a dictate of unbridled whim'").

Worse still, the Commission's chosen inputs here are nonsensical. The Forfeiture Order bases AT&T's penalty on the number of days any given LBS provider had access to customer data. But the LBS providers AT&T gave access to the longest were the most reputable, most critical providers—companies like Life Alert, AAA, and Allstate. In other words, AT&T is being punished most severely for maintaining access for providers that meant the most to AT&T customers and posed the lowest risk. AR6:2. That is the definition of unreasonable.

## CONCLUSION

For the foregoing reasons, this Court should hold unlawful, vacate, enjoin, and set aside the Forfeiture Order.

Respectfully submitted,

November 1, 2024

*s/Pratik A. Shah*
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Pratik A. Shah*
Pratik A. Shah

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,494 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*s/Pratik A. Shah*
Pratik A. Shah

November 1, 2024