**No. 24-60223**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

AT&T, INC.,

*Petitioner*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review from the
Federal Communications Commission

PETITIONER AT&T, INC.'S SUPPLEMENTAL OPENING BRIEF

Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T, Inc.*

# AMENDED CERTIFICATE OF INTERESTED PERSONS

No. 24-60223, *AT&T, Inc. v. Federal Communications Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Petitioner**
AT&T, Inc.

**Counsel for Petitioner**
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER &
  FELD LLP

**Amici**
Chamber of Commerce of the United
  States of America
CTIA – the Wireless Association

**Counsel for Amici**
Mariel A. Brookins
U.S. CHAMBER LITIGATION CENTER
Joshua Scott Turner
WILEY REIN, L.L.P.

**Respondents**
Federal Communications
  Commission
United States of America

**Counsel for Respondents**
D. Adam Candeub
Jacob M. Lewis
Sarah E. Citrin
James Michael Carr
Adam L. Sorensen
FEDERAL COMMUNICATIONS
  COMMISSION

Todd Blanche
Robert J. Wiggers
Robert B. Nicholson
Matthew A. Waring
U.S. DEPARTMENT OF JUSTICE

*/s Pratik A. Shah*
Pratik A. Shah

*Counsel for Petitioner AT&T, Inc.*

i

**TABLE OF CONTENTS**

AMENDED CERTIFICATE OF INTERESTED PERSONS ...................................i

INTRODUCTION ................................................................1

BACKGROUND .................................................................3

    A.    Legal Framework..................................................3

    B.    Factual Background ............................................5

    C.    Procedural History ..........................................9

ARGUMENT ..................................................................15

I.    PREVIOUSLY BRIEFED ISSUES INDEPENDENTLY REQUIRE VACATUR OF THE COMMISSION'S FORFEITURE ORDER................15

    A.    The Commission Lacked Statutory Authority To Issue The Forfeiture Order ..............................................16

        *1.    The customer information at issue falls outside the plain text of section 222.* ........................................16

        *2.    The Commission failed to provide "fair notice" that section 222 applied.* ..........................................21

    B.    The Commission's Liability Determination Is Arbitrary And Capricious ....................................................22

    C.    The Commission's $57 Million Forfeiture Is Unlawful.......................24

    D.    The Commission's Forfeiture Scheme Violates The Nondelegation Doctrine...........................................28

II.    THE SUPREME COURT IDENTIFIED AND LEFT OPEN AN ADDITIONAL BASIS FOR VACATUR ........................................30

    A.    The Commission's Forfeiture Order Misled AT&T Into Paying..........31

    B.    The Misleading Nature Of The Order Warrants Vacatur Or At Least A Refund .................................................34

CONCLUSION .................................................................37

# TABLE OF AUTHORITIES

CASES:

*ACA Connects v. Bonta*,
24 F.4th 1233 (9th Cir. 2022) ....................................................................3

*Anderson v. Yungkau*,
329 U.S. 482 (1947)....................................................................................32

*AT&T Corp. v. FCC*,
323 F.3d 1081 (D.C. Cir. 2003).................................................................5

*AT&T, Inc. v. FCC*,
149 F.4th 491 (5th Cir. 2025) .........................................................*passim*

*Brady v. United States*,
397 U.S. 742 (1970)....................................................................................35

*Bumper v. North Carolina*,
391 U.S. 543 (1968).....................................................................................36

*Commodity Futures Trading Comm'n v. EOX Holdings, L.L.C.*,
90 F.4th 439 (5th Cir. 2024)....................................................................21

*Davis v. Echo Valley Condo. Ass'n*,
945 F.3d 483 (6th Cir. 2019) ....................................................................22

*Dubin v. United States*,
599 U.S 110 (2023)......................................................................................17

*FCC v. AT&T, Inc.*,
146 S. Ct. 1418 (2026)........................................................................*passim*

*FTC v. AT&T Mobility LLC*,
883 F.3d 848 (9th Cir. 2018) ......................................................................3

*General Elec. Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002)....................................................................33

*Grand Trunk R.R. Co. v. Richardson*,
91 U.S. 454 (1875)......................................................................................23

iii

*Higgins v. United States*,
209 F.2d 819 (D.C. Cir. 1954) ...................................................36

*Honeycutt v. United States*,
581 U.S. 443 (2017) ....................................................................26

*In re MCP No. 185*,
124 F.4th 993 (6th Cir. 2025) ...............................................3, 20

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F.2d 1088 (5th Cir. 1977) ...................................................22

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) ......................................................29

*Jimenez v. United States Att'y Gen.*,
146 F.4th 972 (11th Cir. 2025) ..................................................25

*Johnson v. Zerbst*,
304 U.S. 458 (1938) ....................................................................35

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016) ....................................................................32

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ....................................................................27

*Luna-Garcia v. Barr*,
932 F.3d 285 (5th Cir. 2019) ......................................................29

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ....................................................................30

*National Ass'n of Regul. Util. Comm'rs v. FCC*,
737 F.2d 1095 (D.C. Cir. 1984) .................................................28

*SEC v. Jarkesy*,
603 U.S. 109 (2024) ..............................................................12, 29

*Southwestern Bell Tel. Co. v. FCC*,
19 F.3d 1475 (D.C. Cir. 1994) .....................................................3

*Sprint Corp. v. FCC,*
  151 F.4th 347 (D.C. Cir. 2025)........................................................................*passim*

*Texas v. United States,*
  126 F.4th 392 (5th Cir. 2025) ...................................................................35

*United States v. Lavergne,*
  785 F. App'x 213 (5th Cir. 2019) ..............................................................32

*United States v. Metcalf,*
  156 F.4th 871 (9th Cir. 2025) ....................................................................21

*United States v. Stevens,*
  691 F.3d 620 (5th Cir. 2012) .....................................................................33

*United States v. WIYN Radio, Inc.,*
  614 F.2d 495 (5th Cir. 1980) ................................................................25, 26

*Utility Solid Waste Activities Grp. v. EPA,*
  901 F.3d 414 (D.C. Cir. 2018)...................................................................24

*Verizon Commc'ns Inc. v. FCC,*
  156 F.4th 86 (2d Cir. 2025) .............................................................*passim*

*Wooden v. United States,*
  595 U.S. 360 (2022)..................................................................................27

## COMMISSION PROCEEDINGS:

*Amendment of Section 1.80(b) of the Comm'n's Rules,*
  34 FCC Rcd. 12,824 (2019)....................................................................5, 24

## STATUTES:

28 U.S.C.
  § 2342(1)...................................................................................................5

47 U.S.C.

   § 151 *et seq.* ...........................................................................................3

   § 153(11) .........................................................................................17, 20

   § 153(51) .....................................................................................3, 17, 20

   § 154(j) ..............................................................................................30

   § 222(a) ...............................................................................................4

   § 222(c)(1) ....................................................................................4, 17, 23

   § 222(h)(1)(A) ...........................................................................*passim*

   § 402(a) ...............................................................................................5

   § 503(b)(1)(B) .....................................................................................33

   § 503(b)(2)(B) ...........................................................................*passim*

   § 503(b)(3)(A) ............................................................................4, 29, 30

   § 503(b)(4) ...........................................................................................5

   § 504(a) ...............................................................................................5

**OTHER AUTHORITIES:**

47 C.F.R.

   § 1.80(g)(4) ...................................................................................5, 11, 32

   §§ 1.311-1.325 .....................................................................................4

   § 1.351 ..................................................................................................4

   § 1.376 ..................................................................................................4

   § 64.2010(a) ...................................................................................4, 22

FCC, Wireless Telecomms. Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations* (May 2012) ...............6, 23

*Safeguarding & Securing the Open Internet*, 89 Fed. Reg. 45,404, 45,476 (May 7, 2024) .......................................................................21

*Solely*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1118 (10th ed. 1997) ........................................................................................17

## INTRODUCTION

Some agency decisions have one fatal flaw. Even after remand, the decision at issue here has five. In 2024, the Federal Communications Commission "**ORDERED**" AT&T, Inc. to pay a $57 million forfeiture within 30 days. AT&T complied—not by choice, but by obligation. Based on that long-held industry-wide understanding, the company had no real alternative. Still AT&T fought back, and it had no shortage of grounds to do so.

This Court ultimately reached only one of AT&T's arguments, holding that the Commission's forfeiture scheme violated the Seventh Amendment and Article III. *See AT&T, Inc. v. FCC*, 149 F.4th 491 (5th Cir. 2025) ("*AT&T I*"). And though the Supreme Court reversed that specific holding, its decision did not affirm the Commission's forfeiture order, approve of its reasoning, or otherwise resolve the other defects AT&T had identified throughout this litigation. To the contrary, the Supreme Court left most of this case untouched before remanding it back to this Court.

What is left now is not a close call. Four fully briefed grounds each independently doom the Commission's forfeiture order: (i) the Commission lacked statutory authority to issue the forfeiture order in the first place; (ii) the Commission's liability determination was arbitrary and capricious; (iii) the $57 million forfeiture was *28 times* the Communications Act's statutory cap; and (iv) the

Commission's forfeiture scheme violates the nondelegation doctrine. This Court can and should vacate the forfeiture order based on any one of those independent grounds.

There's also a new defect—one the Supreme Court itself flagged and the Commission's own litigation tactics introduced. That is, to win in the Supreme Court, the Commission abandoned the language of its own regulations and forfeiture orders and adopted a new defense: its forfeiture orders bind no one and do nothing except allow the Department of Justice ("DOJ") to bring a collection action in district court. In other words, according to the Commission now, its orders are effectively "right to sue" letters—nothing more.

The Supreme Court ultimately adopted the Commission's newfound understanding. But in apparent acknowledgment of the Commission's "switch" in positions, Tr. of Oral Arg. at 73 (Kavanaugh, J.), the Court expressly left open the question whether "the specific forfeiture order[] in this case misled [AT&T] into paying," *FCC v. AT&T, Inc.*, 146 S. Ct. 1418, 1432 n.5 (2026) ("*AT&T II*"). Of course it did. The order's plain text said pay immediately, as did the Commission's regulations. And the anticipated consequences of nonpayment left the company no other choice. So AT&T paid immediately.

For all or any one of these reasons, the Court should vacate the Commission's forfeiture order.

**BACKGROUND**

Because the Court is already familiar with the legal framework and factual background of this case, AT&T provides only a summary here.

**A. Legal Framework**

The Communications Act distinguishes between two categories of services: telecommunications services and information services. *See* 47 U.S.C. § 151 *et seq.* Companies providing telecommunications (*i.e.,* telephone or voice) services are deemed "common carriers," and thus subject to a "multitude of statutory restrictions and requirements" under Title II. *ACA Connects v. Bonta*, 24 F.4th 1233, 1238 (9th Cir. 2022). Meanwhile, companies providing information (*i.e.,* data or internet) services "may not be classified as a common carrier," *In re MCP No. 185*, 124 F.4th 993, 1002 (6th Cir. 2025), and are thus subject only to the Commission's "more limited 'ancillary authority'" under Title I, *Bonta*, 24 F.4th at 1238.

The Communications Act's "common carrier" label is not fixed, though. A company that provides telecommunications services is "treated as a common carrier *** *only to the extent that it is engaged in providing telecommunications services*." 47 U.S.C. § 153(51) (emphasis added). In other words, companies "can be a common carrier with regard to some activities but not others." *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 860 (9th Cir. 2018) (en banc). Many wireless carriers (AT&T included) wear two hats. *See Southwestern Bell Tel. Co. v. FCC*, 19 F.3d

1475, 1481 (D.C. Cir. 1994) ("Whether an entity in a given case is to be considered a common carrier or a private carrier turns on the particular practice under surveillance.").

This case concerns section 222 of Title II, which requires telecommunications carriers to protect the confidentiality of "customer proprietary network information" ("CPNI")—defined as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(a), (c)(1), (h)(1)(A). Relevant here, carriers "must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a).

The Commission enforces section 222 through forfeiture penalties. *See* 47 U.S.C. § 503(b)(3)(A). Specifically, the Communications Act gives the Commission "discretion" to pursue forfeitures for alleged violations of the Act in one of two ways: the Commission may assign a case to an administrative law judge ("ALJ") for a formal adjudicatory proceeding, with discovery and an opportunity for a hearing. *Id.*; 47 C.F.R. §§ 1.311-1.325, 1.351, 1.376. Or the Commission may issue a notice of apparent liability ("NAL"), in which case the alleged violator receives only an opportunity to submit a single written response before the Commission adjudicates

4

the case itself. 47 U.S.C. § 503(b)(4). Under either path, the forfeiture "assessed for any continuing violation" may not exceed $2 million "for any single act or failure to act." *Id.* § 503(b)(2)(B); *see Amendment of Section 1.80(b) of the Comm'n's Rules*, 34 FCC Rcd. 12,824, 12,828 (2019).

Until the Supreme Court's decision in this case, regulated entities widely understood Commission forfeiture orders to be obligatory. For years, Commission forfeiture orders have directed payment in mandatory terms, which was consistent with Commission regulations "requir[ing]" that a forfeiture order "be paid in full" by a date certain. 47 C.F.R. § 1.80(g)(4). And though the recipient of a forfeiture order could technically disobey and force the Department of Justice ("DOJ") to bring a collection action in district court, 47 U.S.C. § 504(a), forfeiture recipients feared significant consequences for refusing to pay, *see* AT&T Reply Br. 8-11. Thus, entities regularly doing business before the Commission saw only one viable option for challenging a forfeiture order—pay the penalty and pursue a direct appeal under the Hobbs Act. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *AT&T Corp. v. FCC*, 323 F.3d 1081, 1083-1085 (D.C. Cir. 2003).

### B. Factual Background

**1.** This case concerns AT&T's prior location-based services program. As a refresher, location-based services are "mobile services that combine information about a user's physical location with online connectivity," allowing users to "access

relevant and up-to-date information about their surroundings, inform others of their whereabouts, and get instant access to maps and traffic information." FCC, Wireless Telecomms. Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations* 1 (May 2012).[1] The Commission had long encouraged such services as "greatly increas[ing] the likelihood that someone in distress will receive life-saving assistance." *Id.* at 16.

To ensure customers had access to such services, AT&T (and the other major wireless companies) for years contracted with certain location-based services providers for access to AT&T customers' device-location data. AR4:2. Those providers included household names like Life Alert, which dispatched first responders to customers in urgent need of medical care; AAA, which sent roadside assistance to stranded customers; and major banks, which verified customers' identities to prevent fraud. *Id.* AT&T also contracted with "location aggregators"— specifically, LocationSmart and Zumigo—who served as the service providers' point of contact with all four major wireless carriers. *Id.* at 5.

Notably, the customer location information AT&T provided was not *call* location information, *i.e.*, information about where a customer was when making or receiving a voice call. AT&T instead provided customers' network-based location information—real-time location information all devices generated when they

---

[1] https://docs.fcc.gov/public/attachments/DOC-314283A1.pdf.

connected to the AT&T network, regardless of whether the services provided were voice or data (*i.e.*, telecommunications or information). AR4:3-4. In fact, an AT&T customer was not required to subscribe to voice services to use location-based services; AT&T's data-only customers could (and did) do so as well. AR3:9-10.

Given the sensitivity of customers' location information, AT&T implemented extensive safeguards and privacy protocols. Among other things, AT&T vetted all entities seeking access to customer location information, limited providers' access to specifically approved "use cases," and imposed encryption requirements for the data's transmission and storage. AR4:5-8. AT&T also required providers to obtain affirmative customer consent "in connection with every location request" and to provide a record evidencing that consent, which AT&T reviewed "daily." *Id.* at 7-8.

**2.** Employing those protocols (and others), AT&T's location-based services program proceeded for years without issue. Unbeknownst to AT&T, however, one location-based services provider, Securus Technologies, started misusing its access. Specifically, Securus—whose approved "use case" was limited to obtaining customer location information from *consenting* AT&T customers who received prison calls—created a tool that allowed law enforcement to access a suspect's location information, without that suspect's consent, by uploading a judicial warrant or other legal authorization. AR4:10. Even worse, Securus did not actually review the documents law enforcement uploaded, which allowed a Missouri sheriff to use

7

the tool at least eleven times without uploading any court order or other form of legal authorization (though not for any AT&T customer). *Id.* at 9.[2]

Perhaps aware that AT&T would have never approved its new program, Securus submitted location requests for the program "under the guise of its approved use case." AR1:17 (capitalization omitted). It even went so far as to provide LocationSmart (its aggregator) and AT&T with false records suggesting AT&T customers (*i.e.*, the subjects of warrants) had consented to the use of their location data. AR4:10-11. Those invalid consent records were indistinguishable in appearance from valid consent records. AR1:6.

The Commission first became aware of Securus's transgressions in 2017. Yet the Commission never investigated further or alerted the major wireless companies of the allegations. AR3:19. Thus, AT&T did not learn of Securus's misconduct until May 2018—two days before a *New York Times* article broke the story—at which point the company immediately launched an investigation and barred LocationSmart from providing location data for the unapproved program. AR4:9-10. Within days, AT&T shut off *all* of Securus's access to AT&T customer location data, including for the approved use case. *Id.* at 10-11.

---

[2] AT&T later confirmed that the number of requests for location data for the unauthorized program represented only 0.2% of Securus's requests for AT&T location data. Nothing in the record suggested those requested were unlawful, as opposed to inconsistent with Securus's contractual obligations. AR:4:10.

Although there was no evidence any other provider had misused its access to AT&T customer data, AT&T also undertook a broader review of its entire location-based services program. AT&T tried to scale the program down "as soon as practical in a way that preserve[d] important, potential lifesaving services like emergency roadside assistance," and simultaneously worked to develop additional mechanisms for obtaining customer consent. AR4:11, 15-17. By January 2019, the only remaining approved use cases comprised critical services like AAA's roadside assistance and major banks' fraud-prevention mechanism, and AT&T was ready to deploy an enhanced notice-and-consent system. *Id.* at 12-19.

That same month, though, after additional concerns emerged regarding the broader location-based-services ecosystem—specifically, an incident involving another wireless company—AT&T decided to discontinue its program altogether. It terminated the remaining arrangements through an orderly transition designed to minimize disruption to customers who relied on those services. By March 2019, AT&T no longer provided location information to any location aggregator for any location-based services provider. AR4:19-22.

## C.    Procedural History

**1.** Fast forward to 2024. After using the NAL process, the Commission "impose[d]" a forfeiture against AT&T and the other major wireless companies in final orders, concluding that the companies violated section 222 of the

9

Communications Act by failing to protect their customers' location data. In the Commission's view, AT&T should have terminated *every* provider's access to customer location information within 30 days of the *New York Times* article about Securus—no matter the essential (sometimes life-saving) services provided, the harm to customers such an abrupt termination would inflict, or the total lack of evidence that any of the remaining providers were misusing customer data in any way. *See AT&T I*, 149 F.4th at 495-497.

Despite never citing a single instance in which any remaining location-based services provider had abused its access to AT&T customer data, the Commission declared that AT&T had committed 84 separate "continuing violations"—one for each day a location-based service provider had access to the carrier's customer location data more than 30 days after the *New York Times* article was published—and imposed a separate penalty for each. AR1:24-28. In total, the penalty amounted to $57 million, more than *28 times* the Communication Act's $2 million statutory cap for any "continuing *** failure to act." 47 U.S.C. § 503(b)(2)(B).

Notably, the Commission never tried to anchor its methodology in the text of the Act. The Commission instead effectively admitted it plucked its inputs (the number of providers with access) out of thin air, even going so far as to claim that the *$57 million* penalty it arrived at was "eminently *conservative*" because the

Commission could have used "the total number of AT&T subscribers" as the input to reach a penalty in the *trillions* of dollars. AR1:26-27.

The final order ended with a section titled "**ORDERING CLAUSES**," which stated that "**IT IS ORDERED** that *** AT&T, Inc., **IS LIABLE FOR A MONETARY FORFEITURE** in the amount of [\$57,265,625]," and that "[p]ayment of the forfeiture shall be made in the manner provided for in section 1.80 of the Commission's rules within thirty (30) calendar days." AR1:36-37. The ordering clauses also provided that AT&T "shall send electronic notification of payment" to Commission staff "on the date said payment is made." *Id.* at 37.

**2.** Faced with that order, the Commission regulation "requiring" that an order "be paid in full" by a date certain, 47 C.F.R. § 1.80(g)(4), and the potential consequences of nonpayment, "AT&T elected to timely pay the penalty [under protest] and seek review in [this] [C]ourt," *AT&T I*, 149 F.4th at 497. AT&T raised four categories of claims: that (i) "the Commission's enforcement regime is unconstitutional under Article III, the Seventh Amendment, and the nondelegation doctrine"; (ii) the Commission exceeded its authority because the customer location information at issue is not CPNI subject to section 222; (iii) the Commission forfeiture determination is arbitrary and capricious because AT&T acted reasonably in protecting customer information; and (iv) the forfeiture amount exceeded the \$2

11

million statutory penalty cap and was otherwise arbitrary and capricious. *Id.* at 496-497.

This Court vacated the Commission's order based on the first of AT&T's constitutional arguments. Applying *SEC v. Jarkesy*, 603 U.S. 109 (2024), the Court reasoned that, because the Commission's forfeiture orders "lev[y] fines" and "are not mere suggestions," the Commission's adjudication and imposition of those orders without an Article III judge or jury violates the Seventh Amendment. *AT&T I*, 149 F.4th at 503. The Court did not reach AT&T's remaining arguments. *Id.* at 497 ("[W]e need not reach the other issues AT&T raises.").[3]

The other carriers also paid their forfeitures under protest and sought appellate review under the Hobbs Act: Sprint and T-Mobile in the D.C. Circuit, and Verizon in the Second Circuit. Unlike in this case, those courts rejected the carriers' arguments that the Commission's forfeiture scheme violated the Seventh Amendment. The courts therefore reached the carriers' remaining claims but rejected them, holding that: (i) the location information at issue constituted CPNI; (ii) the Commission's liability determinations were not arbitrary and capricious; and (iii) the penalties assessed were not unlawfully excessive. *See generally Sprint*

---

[3] Judge Haynes concurred only in the judgment, but did not write separately. *See AT&T I*, 149 F.4th at 493 n.*.

12

*Corp. v. FCC*, 151 F.4th 347 (D.C. Cir. 2025); *Verizon Commc'ns Inc. v. FCC*, 156 F.4th 86 (2d Cir. 2025).[4]

**3.** The Supreme Court granted certiorari in this case and in *Verizon* to resolve the conflict over the Seventh Amendment question.

At the Supreme Court, the Commission took a different tack than it had taken in its forfeiture orders. Specifically, and seemingly in response to this Court's logic, the Commission claimed that its in-house adjudication of an alleged violation and proposed forfeiture "is not a distinct common-law suit for which the Seventh Amendment provides a right to trial by jury" because the resulting forfeiture order imposes no obligations and carries no "legal effect" other than allowing the DOJ to commence a collection action. Comm'n *AT&T II* Br. 20-21. In the Commission's words, it could not use a forfeiture order standing alone "to a person's prejudice" *at all*. *Id.* at 12. Thus, the Commission maintained, "[b]y choosing *** to pay the specified amounts and to seek review [under the Hobbs Act]," AT&T "waived [its] Seventh Amendment rights." *Id.* at 23. In response to AT&T's argument that the order issued here "compel[led] payment," the Commission largely deflected, pointing out that the question presented was about "whether the 'Communications

---

[4] Sprint and T-Mobile have asked the Supreme Court to review the D.C. Circuit's holdings regarding CPNI and the Commission's penalty assessment. *See* Pet. for Writ of Cert., *Sprint Corp. v. FCC*, No. 25-1422 (S. Ct. June 22, 2026) ("Sprint & T-Mobile Pet. for Writ of Cert."). Their petition remains pending, with the Commission's response currently due August 26, 2026.

Act' violates the Seventh Amendment," not "specific orders." *Id.* at 17. According to the Commission, "[i]f a particular order purports to compel payment, a court should hold that the order exceeds the [Commission]'s authority." *Id.*

At oral argument, several Justices noted the Commission's "switch [in] positions." Tr. of Oral Arg. at 73 (Kavanaugh, J.); *see id.* at 82 (Gorsuch, J.) (noting "government's retreat on how it's interpreting this statute"); *id.* at 6 (Thomas, J.) (observing that "government seems to have walked away from th[e] argument" it made "below"). One even asked the Commission to address the "concern" that the carriers "were misled into paying the money without getting the jury trial by what the government had said in the orders." *Id.* at 50-51, 73 (Kavanaugh, J.). The Commission responded that "the Court should rule for [the agency] on the question presented, which [wa]s just about the statute, and then leave for remand disputes about whether this particular waiver of the jury trial right was knowing and voluntary or whether AT&T was misled." *Id.* at 75.

That is exactly what the Supreme Court did. Accepting the Commission's position that the "forfeiture orders," standing alone, "do not obligate payment," "have no effect in a subsequent enforcement suit," and cannot be "h[e]ld *** against a regulated party," the Court held that "the Commission may issue [such] orders without the involvement of a jury." *AT&T II*, 146 S. Ct. at 1428-1429. But the Court left open whether "the specific forfeiture orders in this case misled [the carriers] into

14

paying, and [whether] a refund is therefore appropriate." *Id.* at 1432 n.5.  Justice Thomas dissented, explaining that he would have gone further and actually "grant[ed] *** relief"—*i.e.*, "give the [carriers] an opportunity to proceed under a correct understanding of the law." *Id.* at 1433.

The Court ultimately reversed and remanded AT&T's case to this Court "for further proceedings consistent with [its] opinion." *AT&T II*, 146 S. Ct. at 1432.

## ARGUMENT

What remains in this case is straightforward.  Four issues are already fully briefed before this Court.  And the Supreme Court itself identified and left open the fifth.  Pick any of the five, and the result is the same: the Commission's forfeiture order cannot stand.

## I.  PREVIOUSLY BRIEFED ISSUES INDEPENDENTLY REQUIRE VACATUR OF THE COMMISSION'S FORFEITURE ORDER

Take first the issues the parties previously briefed but the Court "[di]d not reach" given its Seventh Amendment decision: whether section 222 covers the location information at issue; whether AT&T acted reasonably; whether the forfeiture penalty amount was unlawful; and whether the Commission's forfeiture scheme violates the nondelegation doctrine. *AT&T I*, 149 F.4th at 497 & n.5.  AT&T incorporates its prior briefing as to those issues, and renews its arguments here in light of intervening developments.

15

**A. The Commission Lacked Statutory Authority To Issue The Forfeiture Order**

    *1. The customer information at issue falls outside the plain text of section 222.*

The Commission lacked statutory authority to issue the forfeiture order. As AT&T previously explained, the Commission here relied exclusively on its section 222 authority over CPNI, which the Communications Act defines as information that meets two conditions: it (1) "relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service," and (2) is obtained "solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A).

The customer location information at issue here does not meet either condition. As now-Chairman Carr explained in his dissent from the forfeiture order, the statutory requirement that the information "'relate' to" the "use of a telecommunications services" effectively limits CPNI location information to "'call location information'—namely the customer's location *while making or receiving a voice call.*" AR1:41. AT&T's customer location information was indisputably *not* call location information. *See* AR4:4. The Commission's only response—adopted by both the D.C. Circuit and Second Circuit—is to either read the phrase "use of" out of the statutory text or read it to include "passive" acts, contrary to its ordinary meaning. Comm'n Br. 44-47; *Sprint*, 151 F.4th at 364-365; *Verizon*, 156 F.4th at 95

16

& n.8.  That cannot be right.  *See* Sprint & T-Mobile Pet. for Writ of Cert. at 25-26 (quoting Supreme Court's recent interpretation of "use" in *Dubin v. United States*, 599 U.S. 110, 118-119 (2023)).

Even more clearly, the location information at issue here was not provided "*solely* by virtue of the *carrier*-customer relationship."  47 U.S.C. § 222(h)(1)(A) (emphases added).  As AT&T explained in its opening brief, "solely" means "to the exclusion of all else."  *Solely*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1118 (10th ed. 1997).  And a "carrier-customer relationship" is limited to the provision of "telecommunication [or voice] services."  47 U.S.C. § 153(51).  After all, the Communications Act uses "carrier" to refer to a "person engaged as a common carrier," and a "telecommunications carrier shall be treated as a common carrier *** only to the extent that it is engaged in providing telecommunications services."  *Id.* § 153(11), (51); *see also id.* § 222(c)(1) (referring to "the telecommunications service from which [CPNI] is derived").  Read together, then, CPNI must be information obtained by AT&T *only* because of AT&T's provision of *telecommunications* services.

That necessarily excludes the location information at issue here.  All AT&T customers provided their location information through their device's connection to the AT&T network regardless of whether they subscribed to voice services, data services, or both.  Customers subscribing to *both* services provided their location

information because of *both* of their relationships with AT&T—*i.e.*, their telecommunications/common carrier-customer relationship *and* their data service provider-customer relationship. And data-only customers, for whom AT&T did not provide any voice service (and thus lacked a carrier-customer relationship), also provided their location information. So AT&T's provision of telecommunications services could not be the "*sole*[]" reason AT&T had customer location information. 47 U.S.C. § 222(h)(1)(A) (emphasis added).

In nevertheless finding the "solely" requirement satisfied, the D.C. Circuit and Second Circuit adopted different, but equally flawed, components of the Commission's arguments before this Court.

For its part, the D.C. Circuit asked the wrong question. It focused on whether Sprint and T-Mobile's "provi[sion of] information service to customers *** t[ook] the resulting relationship outside the scope of the 'carrier-customer' relationship"— that is, whether a company can "stop being [a] carrier[] because [it] w[as] also [an] information-service provider[]." *Sprint*, 151 F.4th at 366; *see also* Comm'n Br. 48-49 (making same argument). But AT&T has never argued that one can. Nor does it matter. As AT&T explained in response to the Commission's brief in this Court, the point is that two separate and different "relationships" exist at the same time—a telecommunications/common carrier-customer relationship and a data provider-customer relationship. *See* Reply Br. 18-19. The definition of CPNI asks whether

18

the telecommunications/common carrier-customer relationship is the "*sole*[]" reason a carrier has a customer's information. 47 U.S.C. § 222(h)(1)(A) (emphasis added). The D.C. Circuit's analysis skirts that question entirely.

Meanwhile, the Second Circuit's analysis seemed to turn primarily on whether Verizon's "voice services *require* [customer location] information to operate"— apparently reading the word "solely" as akin to "necessary." *Verizon*, 156 F.4th at 98 (emphasis in original); Comm'n Br. 47-48 (making same argument). As AT&T explained to this Court, though, something can be "necessary" without being the "sole[]" cause. Reply Br. 18. If a person "requires" eggs both to make breakfast and bake a cake, they would not buy eggs "solely" to make breakfast. *See id*.

To avoid that "solely" problem, the Second Circuit also tried to make the case that "the scope of the 'carrier-customer relationship'" is not "limited to [a telecommunications carrier's] common-carrier services," and may in fact "encompass *** information services." *Verizon*, 156 F.4th at 98. But the court reached *that* interpretation only by focusing on the word "relationship," which it said may include "multiple services." *Id.* Of course, the text does not refer to information obtained by virtue of the "customer relationship" more broadly. It expressly limits CPNI to information obtained "solely by virtue of the *carrier*-customer relationship." 47 U.S.C. § 222(h)(1)(A) (emphasis added). And again, under the Communications Act, a company is a "common carrier" or "carrier" "*only* to the

19

extent that it is engaged in providing telecommunications services"; when providing information services, it is not a "carrier" at all. 47 U.S.C. § 153(11), (51) (emphasis added); *see In re MCP No. 185*, 124 F.4th at 1002. Thus, a customer relationship involving information services cannot be a "*carrier*-customer relationship."

The Second Circuit insisted otherwise. Although "the Communications Act treats regulated parties as common carriers only to the extent that they provide common-carrier services," it said, nothing in the Act "constrains the scope of the 'carrier-customer relationship' in [section] 222(h)(1)(A)." *Verizon*, 156 F.4th at 98. That section, the court claimed, "uses the terms 'carrier' and 'customer' to identify the relevant parties via their relationship to one another, not to cabin that relationship to common-carrier services." *Id.* It is no surprise the only support the court offered for that claim was its own *ipse dixit*. That makes no sense. The Act provides expressly that the term "carrier" refers to a "common carrier." 47 U.S.C. § 153(11). There would be no point in limiting CPNI to information obtained "solely by virtue of the *carrier*-customer relationship" if the purpose was "not to cabin that relationship to common-carrier services." That reading, at best, drains the word "carrier" of any limiting force. At worst, it stands the Act on its head, using the very services that place a company outside the Act's definition of "carrier" to bring a relationship within the "*carrier*-customer" relationship. That cannot be what Congress intended.

20

> ## 2. The Commission failed to provide "fair notice" that section 222 applied.

At a minimum, basic principles of due process and administrative law preclude the Commission from applying its interpretation of CPNI for the first time in AT&T's enforcement proceeding. The Commission cannot deny that, before that proceeding, it had never read section 222's definition of CPNI to cover data like AT&T's customer location information. In fact, the Commission has for years refused industry requests to clarify what constitutes CPNI, and has "never provided an exhaustive list of what constitutes CPNI." *Safeguarding & Securing the Open Internet*, 89 Fed. Reg. 45,404, 45,476 (May 7, 2024). AT&T (indeed, all carriers) thus lacked "fair notice" of how section 222 would be applied. *Commodity Futures Trading Comm'n v. EOX Holdings, L.L.C.*, 90 F.4th 439, 444-447 (5th Cir. 2024) (finding there was "no fair notice" where "enforcement action" was the "first time the [agency] advanced [its] interpretation of [a] Rule").

The D.C. Circuit's contrary conclusion rested entirely on the premise that the Commission's reading is the "most natural" one. *Sprint*, 151 F.4th 367.[5] This Court applies a different test—asking not what the "most natural" reading is, but whether the agency's reading is "sufficiently clear." *EOX Holdings*, 90 F.4th at 444; *cf. United States v. Metcalf*, 156 F.4th 871, 882-885 (9th Cir. 2025) (finding defendant

---

[5] The Second Circuit did not address any fair-notice arguments with respect to the Commission's interpretation of CPNI.

lacked "fair notice" even if the government's reading was "the more natural reading of the statute"). In any event, given the plain meaning of the word "solely," which the D.C. Circuit effectively reads out of the statutory text, that court's reading is hardly the "most natural."

**B. The Commission's Liability Determination Is Arbitrary And Capricious**

The Commission's liability finding is also arbitrary and capricious. The only question before the Commission was whether AT&T took "*reasonable* measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a) (emphasis added). That inquiry required the Commission to consider both the "costs" and "benefits" of AT&T's actions. *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491 (6th Cir. 2019); *see In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977) ("In every case, reasonableness is a function of anticipated results [versus] costs.").

But the Commission has never done that. In finding AT&T's response inadequate, the Commission brushed aside entirely the fact that AT&T had conducted regular audits and assessments, and that AT&T had required location-services providers to provide records of customer consent that AT&T reviewed "daily." AR4:2, 7-8. The Commission insists that AT&T's consent procedures were an "empty formality." Comm'n Br. 57. But its only support for that claim has been that Securus submitted *false* consent records. *See* AT&T Opening Br. 14-15; AT&T

22

Reply Br. 23.  No reasonableness standard requires AT&T to assume the falsity of such records and conduct a re-verification.  *See Grand Trunk R.R. Co. v. Richardson*, 91 U.S. 454, 467 (1875) ("[E]very person has a right to presume that every other person will perform his duty, and obey the law; and it is not negligence for him to assume that he is not exposed to a danger which can only come to him through a disregard of the law on the part of some other person.").  Nor is there any evidence that AT&T's reliance on customer consent records was inadequate with respect to other location-based services providers.[6]

On the flip side, at no point has the Commission meaningfully considered the benefits of continuing location-based services like Life Alert's emergency medical response and AAA's roadside assistance—benefits it touted for years.  *See generally* FCC, *Location-Based Services*.  And it has not even pretended to consider the harm that would befall AT&T customers had AT&T abruptly terminated such services.  AR1:20 (acknowledging AT&T's argument that the Commission erred in ignoring the social costs of immediately shutting down location-based services, but never

---

[6] The Securus incident itself falls outside the statute of limitations, as the Commission itself concedes.  *See* AR5:28.  In any event, the record shows that Securus's breach of its prisoner-use-case commitment was limited to 0.2% of AT&T lookup requests.  And the Commission has never shown that those lookups were *unlawful*, as opposed to inconsistent with Securus's contractual obligations.  AR4:10.  In fact, the actual investigative record suggests that most (if not all) of Securus's unauthorized AT&T lookups involved a legitimate search warrant or other legal processes authorizing the lookups.  AR3:20-21; *see* 47 U.S.C. § 222(c)(1) (authorizing disclosures "required by law").

actually addressing or considering those costs). The Commission's "failure to consider [those] important aspects" of the inquiry are reason alone to find the forfeiture order arbitrary and capricious. *Utility Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018) ("An agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning.").

That the D.C. Circuit and Second Circuit found the Commission's liability determinations for the other carriers "reasonable" should not alter this Court's analysis. *Verizon*, 156 F.4th 100; *see Sprint*, 151 F.4th at 367-368. Those courts faced different records about different safeguards different carriers had in place. And neither court ever considered whether the Commission had "fail[ed] to consider an important aspect of the problem"—specifically, the benefits of location-based services and the costs of early termination. *Utility Solid Waste*, 901 F.3d at 430.

### C. The Commission's $57 Million Forfeiture Is Unlawful

**1.** To make matters worse, the Commission's $57 million penalty exceeds the statutory cap. As explained above, the Communications Act limits the "amount assessed for any continuing violation" to $2 million "for any single act or failure to act." 47 U.S.C. § 503(b)(2)(B); *Amendment of Section 1.80(b) of the Comm'n's Rules*, 34 FCC Rcd. at 12,828. The meaning of that language is no mystery: this Court has already interpreted it, holding that there is a "continuing" failure to act when "there exists a continuing or persistent legal duty that the violator steadily fails

24

to fulfill," rather than separate and discrete failures. *United States v. WIYN Radio, Inc.*, 614 F.2d 495, 497 (5th Cir. 1980). A contrary interpretation, this Court explained, would vest the Commission with "ludicrous" and "draconian" authority, which could "not [have been what] Congress intended." *Id.* at 497-498; *cf. Jimenez v. United States Att'y Gen.*, 146 F.4th 972, 992 (11th Cir. 2025) (distinguishing for statute-of-limitations purposes between one "continuing violation," *i.e.*, "a single violation of an ongoing nature," and "separate and discrete acts that repeatedly violate the law").

This Court's interpretation makes this case easy. The Commission here "f[ound] that AT&T failed to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information." AR1:18. That does not describe separate and discrete "dut[ies], admitting of [individual] dereliction." *WIYN Radio*, 614 F.2d at 497. It describes one "continuing or persistent legal duty" that AT&T purportedly "steadily fail[ed] to fulfill"—*i.e.*, a single "continuing *** failure." *Id.*; *see also* AR1:25 (describing AT&T's purported violation as "a systemic failure"). Thus, the total forfeiture imposed against AT&T could not exceed $2 million. *See* 47 U.S.C. § 503(b)(2)(B).

Tellingly, the Commission has never tried to reconcile its one-violation-per-day-per-provider approach with the text of the Communications Act. It cannot do so. Nothing in the statute suggests the Commission can divide one continuing failure

25

to fulfill a duty into dozens of separate continuing violations simply because that one continuing failure persists for multiple days or concerns multiple third parties. To the contrary, that approach collapses the distinction between a "continuing violation" and a series of discrete violations. Indeed, under that logic, a single continuing failure could be recharacterized as any number of discrete violations, rendering the statutory cap Congress enacted "for any continuing *** failure to act" dead letter. 47 U.S.C. § 503(b)(2)(B); *see Honeycutt v. United States*, 581 U.S. 443, 454 n.2 (2017) ("[T]he Court cannot construe a statute in a way that negates its plain text[.]").

The Commission's defense of its approach only proves the point. As the Commission tells it, instead of looking at the number of providers with access to AT&T customer information, "the Commission could well have chosen to look to the total number of AT&T subscribers when determining the number of violations." AR1:26-27. Put differently, under the Commission's reading, it "may arrive at forfeitures of any size simply by disaggregating an 'act' into its individual constituent parts, counting the members of whatever class of objects may be related to the alleged violation"—even "tens of millions"—"to arrive at whatever forfeiture amount suits a preordained outcome." *Id.* at 27, 43 (Comm'r Simington, dissenting). It is "simply not plausible" that the same Congress that expressly included a *cap* on forfeitures "intended that." *Id.* at 43; *see also WIYN Radio*, 614 F.2d at 497-498.

**2.** In rejecting the other carriers' challenges to the Commission's approach, the D.C. Circuit held that Sprint and T-Mobile "forfeited any statutory challenge," and so never grappled with the statutory text. *Sprint*, 151 F.4th at 369 n.6.

The Second Circuit, on the other hand, fundamentally misapplied *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). *See Verizon*, 156 F.4th at 102. The court reasoned that, because the Communications Act "does not specifically articulate what qualifies as a 'single act or failure to act,'" and Congress delegated to the Commission authority to enforce the Act through forfeitures, the Commission has "discretion to determine \*\*\* when a carrier has engaged in a single violation of the Act." *Id.* But *Loper Bright* itself says that an "ambiguity is \*\*\* not a delegation of law-interpreting power." 603 U.S. at 399. The statutory cap on forfeitures is precisely the sort of "boundar[y] of \*\*\* delegated authority" *courts* are supposed to both identify and effectuate. *Id.* at 395.

That the statutory cap's application turns on the appropriate "unit of prosecution" is of no matter, either. *Contra Verizon*, 156 F.4th at 102-103. The interpretative question is still well within a court's bailiwick. Indeed, applying a statute to determine the number of legally cognizable violations is something courts do all the time. *See, e.g.*, *Wooden v. United States*, 595 U.S. 360, 366 (2022) (deciding whether defendant who burglarized ten storage units in a single facility in the course of one evening committed his crimes on a "single occasion" or on ten

27

separate ones).  This Court is certainly able to decide without deferring to the agency whether one "systemic failure" constitutes a single "continuing *** failure to act," or anywhere from 84 to "tens of millions" "continuing violations."  AR1:25-27.

**3.**  Even setting aside the statutory text, the D.C. Circuit and Second Circuit were wrong to find the Commission's penalty calculation "reasonable."  Neither confronted the fact that Commission readily admits that its approach has no guiding principles or guardrails; it is effectively acting on nothing but "unbridled whim." *National Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1141 (D.C. Cir. 1984) (agency decisions can withstand review only when they are "neither patently unreasonable nor 'a dictate of unbridled whim'").  And at least for AT&T, the Commission's approach imposed the harshest penalties for the lowest-risk conduct: AT&T sensibly maintained access the longest for the most trusted, most reputable, and most critical providers.  Yet because the Commission's per-provider penalty formula increased with the number of days a provider remained within the program, the Commission levied the largest penalties against AT&T for those lowest-risk, highest-benefit providers. *See* AT&T Reply Br. 28.  That is the definition of arbitrary and capricious decisionmaking.

### D.  The Commission's Forfeiture Scheme Violates The Nondelegation Doctrine

Finally, the Commission's untrammeled "discretion" to choose whether to pursue a Communications Act violation through an NAL or before an ALJ violates

the nondelegation doctrine. *See* 47 U.S.C. § 503(b)(3)(A). This Court's decision in

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), is dispositive. *Jarkesy* holds that "the

power to decide which defendants should receive *certain legal processes* \*\*\* and

which should not" is "a power that Congress uniquely possesses" and cannot

delegate without an "intelligible principle." *Id.* at 462.[7] The Commission's choice

between the NAL process and ALJ process is exactly that power, yet the

Communications Act provides no "intelligible principle" to guide its exercise. The

Act gives the Commission no guidance at all.

The Commission has tried to avoid *Jarkesy*'s nondelegation holding by

claiming it was limited to "the power to bring \*\*\* actions for monetary penalties

within the agency *instead of* an Article III court." Comm'n Br. 40. But the decision's

logic is not limited to those facts: the Court confirmed that "[g]overnment actions

are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties

and relations of persons \*\*\* outside the legislative branch.'" *Jarkesy*, 34 F.4th at

461 (ellipsis in original). Choosing between an NAL and ALJ does just that.

The Commission's attempt to manufacture an "intelligible principle" guiding

its choice fares no better. The Commission has argued that the general provision

---

[7] The Supreme Court considered only the Seventh Amendment question when reviewing this Court's decision in *Jarkesy*, *see* 603 U.S. at 140-141, so this Court's alternative holding on nondelegation remains binding Circuit precedent, *see Luna-Garcia v. Barr*, 932 F.3d 285, 291 n.4 (5th Cir. 2019) ("In this circuit, 'alternative holdings are binding precedent and not *obiter dicta*.'").

29

instructing it to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice" provides sufficient guidance. Comm'n Br. 42-43 (quoting 47 U.S.C. § 154(j)). But that provision cannot override the Communications Act's specific command that the choice between an NAL and ALJ be made "[a]t the discretion of the Commission." 47 U.S.C. § 503(b)(3)(A). Besides, the provision the Commission points to actually says that "[t]he Commission *may* conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." *Id.* § 154(j) (emphasis added). Such language does not cabin discretion; it "implies" it. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020).[8]

## II. THE SUPREME COURT IDENTIFIED AND LEFT OPEN AN ADDITIONAL BASIS FOR VACATUR

The Court can and should vacate the Commission's forfeiture order based on any one of the above errors. Yet the Supreme Court identified, but did not resolve, an additional issue: whether "the specific forfeiture order[] in this case misled [AT&T] into paying" the $57 million penalty. *AT&T II*, 146 S. Ct. at 1432 n.5. If this Court rejects AT&T's other claims of error, this Court should hold that the

---

[8] Neither the D.C. Circuit nor the Second Circuit considered this issue on the merits. The D.C. Circuit "declined to [address]" the nondelegation argument (made only in a footnote there) because, it said, Sprint and T-Mobile did not "develop that argument" or "grapple with [the court's] prior statements that touch upon this issue." *Sprint*, 151 F.4th at 362 n.5, 363. And the Second Circuit did not address it at all.

Commission obtained AT&T's payment under false pretenses and vacate the Commission's order. At a minimum, the Court should hold that AT&T be refunded the penalty that it duly paid in accordance with the Commission's express payment directive that the Commission has since walked back, as reflected in the Supreme Court's decision.

### A. The Commission's Forfeiture Order Misled AT&T Into Paying

The Commission's every action culminating in its final forfeiture order and leading to AT&T's petition for review indicated that AT&T was obligated to pay the $57 million forfeiture immediately. Above all, the order's plain text compelled payment. The very first paragraph said the Commission was "impos[ing] a penalty." AR1:2. The "ordering clauses" then declared that "[p]ayment of the [$57,265,625] forfeiture *shall be made* in the manner provided for in section 1.80 of the Commission's rules *within thirty (30) calendar days*." *Id.* at 37 (emphases added). The order further instructed that AT&T "shall send electronic notification of [the] payment" and specified how and where to send the money. *Id.* Nothing in that language—or any other part of the "ordering clauses"—suggested that payment was optional. And no ordinary citizen (or responsible company) would read the express language in the Commission's forfeiture order as a friendly invitation to pay. Responsible companies pay, every time, when ordered to do so.

To be sure, the Commission referenced in one paragraph of its nearly-100-paragraph order AT&T's "statutory right to a trial *de novo* before it can be required to pay." AR1:30. In context, however, that isolated statement cannot plausibly be read to suggest the Commission did not mean what it said when it "ordered" that AT&T "shall" pay the $57 million forfeiture within 30 days of the issuance of the order—time in which a trial *de novo* obviously would not be completed. *Id.* at 1, 36-37. After all, "[t]he word 'shall' is ordinarily 'the language of command.'" *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (similar). And a reasonable person would understand the "ordering clauses"—like a court's "decretal language" or "judgment"—to be what "really matters." *United States v. Lavergne*, 785 F. App'x 213, 216 (5th Cir. 2019) (Oldham, J., concurring in part and dissenting in part); *see also* Chamber Amicus Br. 15 ("The forfeiture order's plain language leaves no doubt that payment was required.").

There were other reasons that AT&T should not "have known that [this] order[] w[as] nonbinding." *AT&T II*, 146 S. Ct. at 1435 (Thomas, J., dissenting). The ordering clauses' language tracked the Commission's regulations, which "requir[e] that [the forfeiture] be paid in full and stat[e] the date by which the forfeiture must be paid." 47 C.F.R. § 1.80(g)(4). When the Commission issued the order, moreover, it affirmatively "took the position that *** such orders could be

imposed, from start to finish, without the involvement of Article III courts." *AT&T II*, 146 S. Ct. at 1435 (Thomas, J., dissenting) (internal quotation marks omitted).

At a minimum, the "adverse consequences" AT&T reasonably believed would follow nonpayment gave the order "practical binding effect." *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). Under precedent in effect at the time, "[i]f AT&T *** ignored the order[] and the Government brought an enforcement action," it would have been unable to challenge the order's legal validity. *AT&T II*, 146 S. Ct. at 1434 (Thomas, J., dissenting); *see United States v. Stevens*, 691 F.3d 620, 622-624 (5th Cir. 2012). AT&T likewise understood that the Commission's factual determinations could have consequences in later proceedings such as transaction approvals for spectrum (the lifeblood of the company), AT&T Reply Br. 8-11, and that refusing to pay could mean it would be "subject to immediate statutory penalties for defying Commission forfeiture orders," *AT&T II*, 146 S. Ct. at 1435 (Thomas, J., dissenting) (citing 47 U.S.C. § 503(b)(1)(B)). No reasonable company would gamble on Commission grace and risk defying a Commission order, legitimate or not, to pay tens of millions of dollars in penalties.

Until the Commission switched tacks in the Supreme Court, it conspicuously had not denied that AT&T's nonpayment would amount to "disobey[ing]" the order and the Commission's rules. AT&T Reply Br. 7. And AT&T had no option but to avoid that position given the Commission's regulatory purview over AT&T's

licenses, operations, and businesses. *Id.* at 8-9 (noting Commission did not dispute various consequences of nonpayment AT&T had outlined). True, the Commission has since taken the position—now memorialized in the Supreme Court's decision—that AT&T would have suffered no consequences for nonpayment. But that simply proves AT&T's point, as several Justices raised at oral argument: the Commission "switch[ed] positions." Tr. of Oral Arg. at 73 (Kavanaugh, J.); *id.* ("[Y]ou've retreated in multiple ways from the original position that the government had."); *id.* at 82 (Gorsuch, J.) (noting "government's retreat on how it's interpreting" its forfeiture authority). That the Supreme Court accepted the Commission's new position simply means that, at the time the forfeiture order issued, the Commission's statements regarding AT&T's payment obligations were inaccurate—not that AT&T, in fact, had a legitimate "choice."

## B. The Misleading Nature Of The Order Warrants Vacatur Or At Least A Refund

The Commission's own litigation position compels vacatur in these circumstances. Before the Supreme Court, the Commission expressly conceded that "[i]f a particular order purports to compel payment, a court should hold that the order exceeds the [Commission]'s authority under the Act." Comm'n *AT&T II* Br. 17; *see* Tr. of Oral Arg. at 75 ("[I]f you do have concerns about whether AT&T was misled, *** the Court should *** leave for remand disputes about whether this particular waiver of the jury trial right was knowing and voluntary or whether AT&T was

misled."). The forfeiture order here did exactly that: it declared AT&T "liable" and commanded payment within 30 days. Under the Commission's own standard, then, the order is *ultra vires* and must be set aside. *See Texas v. United States*, 126 F.4th 392, 418 (5th Cir. 2025) ("[T]he APA empowers and commands courts to 'set aside' unlawful agency actions, allowing a district court's vacatur to render a challenged agency action 'void.'") (alteration in original).

At the very least, the Court should order the Commission to issue AT&T a refund. As the Commission acknowledged before the Supreme Court, agencies may not "mislead someone into waiving [their] jury trial rights." *AT&T II*, 146 S. Ct. at 1432 n.5 (quoting Tr. of Oral Arg. at 75). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). Indeed, "courts [must] indulge every reasonable presumption *against* waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (emphasis added) (internal quotation marks omitted).

As discussed, the record here shows AT&T reasonably believed it had no real choice: the forfeiture order unambiguously compelled payment; the regulations required payment; and AT&T had reason to think it would face significant consequences without payment. *See* pp. 5, 33, *supra*. Put simply, payment was done

35

"in submission to authority"—not "as an understanding and intentional waiver of a constitutional right." *Higgins v. United States*, 209 F.2d 819, 820 (D.C. Cir. 1954); *see Bumper v. North Carolina*, 391 U.S. 543, 548-549 (1968) ("[T]he burden of proving *** consent was, in fact, freely and voluntarily given *** cannot be discharged by showing no more than acquiescence to a claim of lawful authority."). Accordingly, even if the Commission's unlawful directive to pay the $57 million penalty does not require vacatur of the order altogether, AT&T should be restored to the position that it would have been in if, as the Commission has now made clear, the order had essentially no legal effect.

## CONCLUSION

For the foregoing reasons and those included in AT&T's prior briefing, this Court should hold unlawful, vacate, enjoin, and set aside the Commission's forfeiture order.

Respectfully submitted,

August 6, 2026

*s/Pratik A. Shah*
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2026, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Pratik A. Shah*
Pratik A. Shah

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 8,305 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*s/Pratik A. Shah*
Pratik A. Shah

August 6, 2026