**No. 24-60223**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

AT&T, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of the Federal Communications Commission

# SUPPLEMENTAL BRIEF FOR RESPONDENTS ON REMAND FROM THE U.S. SUPREME COURT


Christopher S. Santini
*Acting General Counsel*

Jacob M. Lewis
*Associate General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Scott M. Noveck
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

Robert B. Nicholson
Matthew A. Waring
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

## CERTIFICATE OF INTERESTED PERSONS

No. 24-60223, *AT&T, Inc. v. FCC*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Petitioner:**

AT&T, Inc.

**Counsel for Petitioner:**

AKIN GUMP STRAUSS HAUER & FELD LLP
Z.W. Julius Chen
Margaret O. Rusconi
Pratik A. Shah

**Respondents:**

Federal Communications Commission
United States of America

**Counsel for Respondents:**

FEDERAL COMMUNICATIONS COMMISSION
D. Adam Candeub
James M. Carr
Sarah E. Citrin
P. Michele Ellison
Jacob M. Lewis
Scott M. Noveck
Christopher S. Santini

U.S. DEPARTMENT OF JUSTICE
Todd Blanche
Merrick Garland
Jonathan S. Kanter
Robert B. Nicholson
Matthew A. Waring
Robert W. Wiggers

**Amici:**

Chamber of Commerce of the United States of America
CTIA—The Wireless Association

**Counsel for Amici:**

U.S. CHAMBER LITIGATION CENTER
Mariel A. Brookins
Maria C. Monaghan

WILEY REIN LLP
Sara M. Baxenberg
Stephen J. Conley
Boyd Garriott
Joshua S. Turner

*/s/ Scott M. Noveck*
Scott M. Noveck
*Counsel for Respondents*

## TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTERESTED PERSONS .......... i
TABLE OF AUTHORITIES .......... v
INTRODUCTION .......... 1
JURISDICTIONAL STATEMENT .......... 5
STATEMENT OF THE ISSUES .......... 5
STATEMENT OF THE CASE .......... 6
A. Statutory And Regulatory Background .......... 6
B. Factual Background .......... 10
C. The Commission's Forfeiture Order .......... 17
D. Judicial Proceedings .......... 21
STANDARD OF REVIEW .......... 23
SUMMARY OF THE ARGUMENT .......... 24
ARGUMENT .......... 28
I. THE COMMISSION'S FORFEITURE DETERMINATION IS REASONABLE AND SUPPORTED BY THE RECORD. .......... 28
A. The Commission Reasonably Found That AT&T Failed To Protect Customer Location Data. .......... 28
B. The Commission Reasonably Found That AT&T Committed 84 Continuing Violations By Continuing To Share Location Data With 84 Separate Entities. .......... 38
II. THE COMMISSION PROPERLY CONCLUDED THAT CUSTOMER LOCATION DATA IS CPNI PROTECTED BY SECTION 222. .......... 43
A. The Location Data Is "Information That Relates To The * * * Location" Of A Telecommunications Service. .......... 44
B. The Location Data Was "Made Available To The Carrier * * * Solely By Virtue Of The Carrier–Customer Relationship." .......... 47
C. AT&T Cannot Object That It Lacked Notice Of The Meaning Of The Statute. .......... 50

**TABLE OF CONTENTS**
**(continued)**

**Page**


III. THE COMMISSION'S CHOICE OF ADMINISTRATIVE FORFEITURE PROCEDURES IS A LAWFUL EXERCISE OF EXECUTIVE POWER. ... 53

IV. AT&T'S ARGUMENT THAT THE GOVERNMENT MISLED IT INTO PAYING THE FORFEITURE PRIOR TO A DISTRICT COURT ENFORCEMENT ACTION IS BOTH WAIVED AND MERITLESS. ....... 56

CONCLUSION ........................................................................................ 62

CERTIFICATE OF COMPLIANCE.......................................................... 63

STATUTORY ADDENDUM.................................................................... 64

**TABLE OF AUTHORITIES**


**Cases:** **Page(s)**

*AT&T Corp. v. FCC*,
323 F.3d 1081 (D.C. Cir. 2003) .................... 10, 21

*AT&T, Inc. v. FCC*,
149 F.4th 491 (5th Cir. 2025), *rev'd*, 608 U.S. 531 (2026) .................... 21

*BP Am., Inc. v. FERC*,
52 F.4th 204 (5th Cir. 2022) .................... 51

*CFTC v. EOX Holdings, LLC*,
90 F.4th 439 (2024) .................... 51

*Colo. Radio Corp. v. FCC*,
118 F.2d 24 (D.C. Cir. 1941) .................... 57

*FCC v. AT&T, Inc.*,
608 U.S. 531 (2026) .................... *passim*

*FCC v. Pottsville Broad. Co.*,
309 U.S. 134 (1940) .................... 55

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................... 23

*FCC v. Schreiber*,
381 U.S. 279 (1965) .................... 55

*Gundy v. United States*,
588 U.S. 128 (2019) .................... 53

*Hoyt v. Lane Constr. Corp.*,
927 F.3d 287 (5th Cir. 2019) .................... 46

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) .................... 24

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) .................... 54, 55

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) .... 45

*Lindh v. Murphy*,
521 U.S. 320 (1997) .... 46

*Lindquist v. City of Pasadena*,
669 F.3d 225 (5th Cir. 2012) .... 57

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .... 23, 41, 42

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) .... 56

*Peters v. Ashcroft*,
383 F.3d 302 (5th Cir. 2004) .... 45

*Qwest Corp. v. FCC*,
482 F.3d 471 (D.C. Cir. 2007) .... 34

*Rehaif v. United States*,
588 U.S. 225 (2019) .... 51

*Rivers v. Roadway Express, Inc.*,
511 U.S. 298 (1994) .... 51

*SBC Commc'ns Inc. v. FCC*,
373 F.3d 140 (D.C. Cir. 2004) .... 39

*Sierra Club v. EPA*,
939 F.3d 649 (5th Cir. 2019) .... 23, 39

*Sprint Corp. v. FCC*,
151 F.4th 347 (D.C. Cir. 2025) .... *passim*

*United States v. Metcalf*,
156 F.4th 871 (9th Cir. 2025) .... 51

**Page(s)**

*Verizon Commc'ns Inc. v. FCC*,
156 F.4th 86 (2d Cir. 2025) ........ *passim*

*Verizon Commc'ns Inc. v. FCC*,
2026 WL 2374102 (U.S. Aug. 17, 2026) ........ 5, 22

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........ 56

*Yakus v. United States*,
321 U.S. 414 (1944) ........ 56

**Administrative Materials:**

*2002 CPNI Order*:
*Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 17 FCC Rcd. 14860 (2002) ........ 7

*2007 CPNI Order*:
*Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 22 FCC Rcd. 6927 (2007), *pet. for rev. denied*, *Nat'l Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996 (D.C. Cir. 2009) ........ 8, 9, 37

*In re TerraCom, Inc.*,
29 FCC Rcd. 13325 (2014) ........ 40

**Consitution, Statutes, And Regulations:**

U.S. Const. art. II, § 3 ........ 55

U.S. Const. amend. VII ........ *passim*

5 U.S.C. § 706 ........ 54, 63

5 U.S.C. § 706(2) ........ 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

18 U.S.C. § 922(q)(2)(A) ... 53

28 U.S.C. § 2342(1) ... 6, 63

28 U.S.C. § 2344 ... 6

Communications Act of 1934, *as amended*,
47 U.S.C. §§ 151 *et seq.* ... *passim*

47 U.S.C. § 153(51) ... 52

47 U.S.C. § 154(j) ... 58

47 U.S.C. § 217 ... 8, 39

47 U.S.C. § 222 ... *passim*

47 U.S.C. § 222(a) ... 1, 7, 34

47 U.S.C. § 222(c)(1) ... *passim*

47 U.S.C. § 222(d)(4) ... 28, 48

47 U.S.C. § 222(f)(1) ... 28, 48

47 U.S.C. § 222(h)(1)(A) ... *passim*

47 U.S.C. § 312(f)(1) ... 11

47 U.S.C. § 402(a) ... 6, 12, 57

47 U.S.C. § 405(a) ... 36

47 U.S.C. § 503(b)(1)(B) ... 11, 44

47 U.S.C. § 503(b)(2)(B) ... 11

47 U.S.C. § 503(b)(2)(E) ... 11, 12, 43, 45

47 U.S.C. § 503(b)(3) ... 22, 55, 58

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


47 U.S.C. § 503(b)(3)(A) .......... 43, 57

47 U.S.C. § 503(b)(4) .......... *passim*

47 U.S.C. § 504(a) .......... *passim*

47 C.F.R. § 1.4(b)(2) .......... 6

47 C.F.R. § 1.80(b) .......... 11

47 C.F.R. § 1.80(b)(11) .......... 12

47 C.F.R. § 1.80(g) .......... 11

47 C.F.R. § 1.80(g)(5) .......... 12

47 C.F.R. Part 64, Subpart U,
47 C.F.R. §§ 64.2001 *et seq.* .......... 8

47 C.F.R. § 64.2003(e) .......... 51

47 C.F.R. § 64.2003(*i*) .......... 51

47 C.F.R. § 64.2003(k) .......... 9

47 C.F.R. § 64.2007(b) .......... 8

47 C.F.R. § 64.2008(b)–(c) .......... 9

47 C.F.R. § 64.2008(e) .......... 9

47 C.F.R. § 64.2010(a) .......... 10


**Other Authorities:**


Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* (2012) .......... 46

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Jennifer Valentino-DeVries, *Service Meant to Monitor Inmates' Calls Could Track You, Too*, N.Y. Times (May 10, 2018) .................. 14

Joseph Cox, *I Gave a Bounty Hunter $300, Then He Located Our Phone*, VICE: Motherboard (Jan. 8, 2019) ......................................... 16

**No. 24-60223**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

---

AT&T, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petition for Review of an Order of the Federal Communications Commission

---

**SUPPLEMENTAL BRIEF FOR RESPONDENTS ON REMAND FROM THE U.S. SUPREME COURT**

---

## INTRODUCTION

Section 222 of the Communications Act of 1934, as amended, requires telecommunications carriers—such as AT&T, which provides wireless telephone service to millions of customers—to protect their customers' confidential information. 47 U.S.C. § 222(a) & (c)(1). That duty encompasses "information that relates to the * * * location" of service. *Id.* § 222(h)(1)(A). Because wireless phones must continuously communicate with a carrier's cellular towers to ensure that users can

receive and make calls whenever their phones are on, AT&T knows every customer's approximate location at all times.

AT&T failed to safeguard this highly sensitive customer information. Until March 2019, AT&T sold access to customer location data to commercial "aggregators" and location-based service (LBS) providers that offered various location-related services. But AT&T did not meaningfully ensure that its partners upheld its obligation to protect this information. It instead relied on a series of contractual arrangements that sought to shift responsibility to the aggregators, and that those aggregators in turn delegated (sometimes through a chain of further intermediaries) to individual LBS providers. The contracts purported to require that each customer be given notice and provide affirmative consent before their location was disclosed, but AT&T had no means to know if its partners were complying with these policies. AT&T made only perfunctory efforts to compare location requests against LBS providers' self-reported consent records, without any ability to verify those consent records or to detect when LBS providers were falsely claiming to have obtained consent. AT&T likewise had no ability to detect if any given location request was for an LBS provider's approved "use case" or was instead for an unapproved use.

This reliance on bare contractual arrangements proved ineffective. In May 2018, the *New York Times* revealed that a rogue Missouri sheriff was able to track the locations of hundreds of people through LBS provider Securus Technologies, without legal authorization and without customers' knowledge or consent. The *Times* reported that the sheriff used this information to unlawfully track a local judge, multiple highway patrol officers, and his predecessor as sheriff, among others.

Despite learning that its protections were ineffective, AT&T did not promptly act to fix the vulnerabilities, nor did it suspend its location data-sharing program until the vulnerabilities were addressed. Roughly a week after the *New York Times* article, AT&T terminated access for Securus and a related provider, and it terminated two other providers the following day. But AT&T took no immediate steps for the other 84 third-party entities to which it continued selling location data—not even for the aggregator that had the contractual obligation to monitor Securus. AT&T announced its intent to eventually phase out some LBS providers, but not others, and without specifying any timeline for such action.

Nine months later, the online publication *Motherboard* reported that another LBS provider with access to AT&T customer information was exploiting the same unaddressed vulnerabilities to sell location data

to "bounty hunters" in the bail bonds industry, without customer knowledge or consent. Two days later, AT&T announced that it would end its LBS program—but not for another two months. AT&T finally stopped sharing customer location data with LBS providers on March 29, 2019, nearly a full year after the *New York Times* alerted AT&T that its protections were inadequate and that it was not meaningfully in control of customer location data it sold to third parties.

In the *Order* under review, the Commission assessed a monetary forfeiture on AT&T for its failure to safeguard its customers' location information. *In re AT&T*, 39 FCC Rcd. 4216 (2024) (*Order*), *reprinted at* ER1–43. The Commission found that AT&T committed 84 continuing violations of the Act—one for each of the 84 entities that AT&T allowed to access customer location data after the *New York Times* article exposed that its purported safeguards were ineffective.

Since the original briefing in this case, the Supreme Court has squarely rejected AT&T's Seventh Amendment challenge to the Commission's forfeiture procedures. *FCC v. AT&T, Inc.*, 608 U.S. 531 (2026). In a companion case, the Court turned away Verizon's effort to argue in the alternative—as AT&T belatedly attempts to argue here—that the government misled the carriers into forgoing their opportunity

to seek a jury trial. *Id.* at 548 n.5; *Verizon Commc'ns Inc. v. FCC*, 2026 WL 2374102 (U.S. Aug. 17, 2026) (denying petition for rehearing on this issue). Meanwhile, in cases materially identical to this one, the Second and D.C. Circuits rejected the other arguments AT&T raises here. *Sprint Corp. v. FCC*, 151 F.4th 347 (D.C. Cir. 2025); *Verizon Commc'ns Inc. v. FCC*, 156 F.4th 86 (2d Cir. 2025). AT&T's petition for review should accordingly be denied.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction to review final orders of the Commission under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The forfeiture order challenged here was released on April 29, 2024. AT&T paid the forfeiture on May 6, 2024, and timely filed its petition for review the following day. *See* 28 U.S.C. § 2344; 47 C.F.R. § 1.4(b)(2).

## STATEMENT OF THE ISSUES

1. Whether the Commission's finding that AT&T failed to adequately protect its customers' location information and the resulting forfeiture penalty were supported by substantial evidence.

2. Whether the Commission correctly interpreted the Communications Act's protections for "customer proprietary network information" to include customers' location information.

3. Whether the Commission's choice between two procedural pathways for an administrative forfeiture proceeding rests within the agency's executive power.

4. Whether, notwithstanding the *Order*'s repeated statements that "AT&T is entitled to a trial *de novo* in federal district court before it can be required to pay the forfeiture," *see Order* ¶ 69 & n.223 (ER30), the government misled AT&T into paying the forfeiture prior to a district court enforcement action.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

**1.** Section 222 of the Communications Act imposes on every telecommunications carrier "a duty to protect the * * * proprietary information of" its "customers." 47 U.S.C. § 222(a). One form of customer data protected by the Act is "customer proprietary network information," or CPNI, which includes "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *Id.* § 222(h)(1)(A). Section 222(c)(1) provides that a carrier "shall only use,

disclose, or permit access to individually identifiable [CPNI]" to provide "the telecommunications service from which such information is derived" or "services necessary to[] or used in" that service, "[e]xcept as required by law or with the approval of the customer." *Id.* § 222(c)(1). When a carrier relies on "any officer, agent, or other person acting for [it]" to comply with its duties under the Act, that person's "act, omission, or failure * * * shall in every case be also deemed to be the act, omission, or failure of such carrier." *Id.* § 217.

**2.** The FCC has issued regulations implementing Section 222's requirements, codified at 47 C.F.R. Part 64, Subpart U (§§ 64.2001 *et seq.*). Since 2002, the Commission's rules have required telecommunications carriers to obtain "opt-in approval" before sharing a customer's CPNI with third parties, or with any of a carrier's affiliates not involved in communications services. 47 C.F.R. § 64.2007(b); *see Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 17 FCC Rcd. 14860, 14883–84 ¶¶ 50–52 (2002) (*2002 CPNI Order*). Opt-in approval "requires that the carrier obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request." 47 C.F.R. § 64.2003(k); *see id.* § 64.2008(b)–(c) & (e).

In 2007, the Commission extended the opt-in approval requirement to the use of CPNI by a carrier's joint venture partner to market communications services. *See Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 22 FCC Rcd. 6927, 6947–54 ¶¶ 37–50 (2007) (*2007 CPNI Order*), *pet. for rev. denied*, *Nat'l Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996 (D.C. Cir. 2009). That order cautioned that "a carrier that practices willful blindness" regarding the protection of CPNI likely "would not be able to demonstrate that it has taken sufficient measures" to comply with Section 222 and the Commission's rules. *Id.* at 6946 ¶ 35. The Commission further warned that a carrier does not satisfy its obligations when sharing CPNI with outside parties by simply adopting "contractual safeguards" that purport to make the outside parties responsible for protecting this information, given the heightened risk of unauthorized disclosures when information is shared with outside parties. *Id.* at 6952–53 ¶ 49.

The Commission's rules further require that telecommunications carriers "must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a). The Commission codified this requirement in response to a growing

"black market for CPNI" and "the actions of data brokers * * * to obtain private and personal information" from telecommunications carriers. *2007 CPNI Order*, 22 FCC Rcd. at 6928–29 ¶¶ 1–2, 6934 ¶ 12 & n.35, 6946 ¶ 39.

**3.** Any person who "willfully or repeatedly fail[s] to comply with any of the provisions of [the Communications Act] or of any rule, regulation, or order issued by the Commission * * * shall be liable to the United States for a forfeiture penalty." 47 U.S.C. § 503(b)(1)(B).[1] Under the procedure employed here, the Commission may "issue[] a notice of apparent liability" that "set[s] forth the nature of the act or omission charged * * * and the facts upon which such charge is based"; provide the alleged violator an opportunity to respond in writing; and then, after considering all relevant information, assess an appropriate forfeiture penalty. *Id.* § 503(b)(4); *see* 47 C.F.R. § 1.80(g).

The Act and the Commission's rules specify the maximum amount of the forfeiture penalty and set out factors that the Commission will consider in assessing a penalty. *See* 47 U.S.C. § 503(b)(2)(B) & (E); 47

[1] For obligations under the Communications Act, "willful" means "the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision." 47 U.S.C. § 312(f)(1); *see Order* ¶ 64 (ER28–29).

C.F.R. § 1.80(b). The Commission "shall take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E); 47 C.F.R. § 1.80(b)(11).

Any forfeiture penalty assessed under this procedure "shall be recoverable pursuant to section 504(a)," 47 U.S.C. § 503(b)(4); *see* 47 C.F.R. § 1.80(g)(5), which requires the government to bring "a civil suit in the name of the United States" in federal district court and provides that "any [such] suit * * * shall be a trial de novo," 47 U.S.C. § 504(a). Alternatively, a carrier may elect to waive its opportunity for trial by paying the forfeiture immediately and may then petition for review in a court of appeals under 47 U.S.C. § 402(a). *AT&T Corp. v. FCC*, 323 F.3d 1081, 1083–85 (D.C. Cir. 2003); *see FCC v. AT&T*, 608 U.S. at 539.

### B. Factual Background

**1.** AT&T provides mobile telephone service to millions of customers nationwide through its wireless network. *Order* ¶ 8 (ER4). Because wireless devices must continuously communicate with a carrier's cellular towers to enable users to receive and make calls, and

customers typically carry their phones on their person or keep them nearby, carriers like AT&T know a customer's approximate location whenever a phone has reception. *Id.* ¶ 19 (ER9).

Until March 2019, AT&T ran a "Location-Based Services (LBS) program" that "sold access to its customers' location information to companies known as 'location information aggregators,' who then resold access to such information to third-party location-based service providers" (sometimes through additional intermediary companies). *Id.* ¶ 8 (ER4). "In total, AT&T sold access to its customers' location information (directly or indirectly) to 88 third-party entities." *Ibid.* Each LBS provider was supposed to "use AT&T customer location information only for a specific purpose (known as a 'Use Case')." *Id.* ¶ 9 (ER5).

AT&T's LBS program "was largely governed via contractual provisions." *Id.* ¶ 9 (ER4). Those provisions "vested AT&T with oversight authority over the Aggregators," who "then entered into their own contracts with various LBS providers." *Ibid.* "This arrangement meant that it was the LBS providers who were obligated 'to provide notice and obtain consent' from consumers—not the Aggregators or AT&T." *Ibid.*

AT&T acknowledges that it "did not verify [its] customers' consent before providing access to the[ir] location information." *Id.* ¶ 9 (ER5). Instead, AT&T relied on LBS providers' self-reported "consent records" representing that consent was obtained. *See Notice of Apparent Liability* (*NAL*) ¶¶ 15–16 (A120–21).[2]

AT&T "claimed to verify on a daily basis that each [location] request" was "tied to a consent record" supplied by the requesting LBS provider. *Order* ¶ 9 (ER5). But AT&T "took [LBS providers] at [their] word that [they] had obtained opt-in consumer consent," *id.* ¶ 40 (ER17–18), without any apparent effort to verify providers' consent records or to detect if an LBS provider was supplying false or invalid consent data.[3] Indeed, AT&T now concedes that it was incapable of distinguishing "invalid consent records * * * from valid consent records." Supp. Br. 8.

---

[2] The confidential version of the *NAL* is available in the sealed appendix (Doc. 62) at A113–54. A redacted public version of the *NAL* is published at 35 FCC Rcd. 1743 (2020). All facts discussed in this brief are drawn from the public version of the *NAL* or from the *Order*.

[3] *See NAL* ¶ 56 (A132–33) (AT&T "relied almost entirely on the unverified assertions of the Aggregators and location-based service providers"); *id.* ¶ 59 (A133) (AT&T's review relied on "unverified vendor-created consent records"); *id.* ¶ 67 (A136) (AT&T "rel[ied] on the unverified representations of third-party location-based service providers that had financial incentives to access that information").

Similarly, while AT&T's contractual arrangements permitted each LBS provider to access customer location data only for a specific, pre-approved use case, AT&T "concede[s] that it was unable to distinguish location requests" made for an authorized use case from "location requests unrelated to the authorized Use Case." *Order* ¶ 39 (ER17); *accord id.* ¶ 11 & n.43 (ER6). There is no indication that AT&T "could effectively distinguish between valid and unauthorized requests," or that it "made any meaningful efforts" to do so. *Id.* ¶ 43 (ER19).

AT&T's contracts with aggregators and LBS providers reserved the "authority to conduct audits and other internal reviews." *Id.* ¶ 10 (ER5). AT&T states that it conducted five such reviews, but provided details for only two of them. *Ibid.* Those two reviews each identified serious deficiencies, including "numerous instances of non-compliance with security requirements by both Aggregators" and "issues related to the 'completeness of subscriber consents' and 'record retention practices regarding subscriber consents.'" *Ibid.* As to the other three reviews—two of which appear to pertain to data breaches at issue in this case—AT&T refused to reveal any information about its findings, asserting that those reviews are privileged. *Id.* (ER6); *see NAL* ¶ 19 (A122).

**2.** On May 10, 2018, the *New York Times* reported that a Missouri sheriff named Cory Hutcheson used a location-finding service from LBS provider Securus Technologies to obtain unauthorized access to the location data of hundreds of people without legal authorization and without their consent. *Order* ¶¶ 11–12 (ER6–7); *see* Jennifer Valentino-DeVries, *Service Meant to Monitor Inmates' Calls Could Track You, Too*, N.Y. Times (May 10, 2018). Hutcheson reportedly used this service to track a local judge, multiple highway patrol officers, and his predecessor as sheriff, among others. *See*, *e.g.*, *Order* ¶¶ 12, 59 (ER7, 26).

Securus was authorized to use AT&T customer location data only to operate "an inmate collect-calling service," *id.* ¶¶ 11, 39 (ER6, 17), and only after providing notice and obtaining customer consent. But the *New York Times* article revealed that Securus "offered a location-finding service to law enforcement and corrections officials that allowed such officials to access customer mobile device location *without* that device owner's knowledge or consent." *Id.* ¶ 11 (ER6). That service simply required users to "input the telephone number of the device they wanted to locate" and "upload a document [and] check[] a box * * * certify[ing] the attached document is an official document giving permission to look up the location o[f] this phone number." *Id.* ¶ 12 (ER6) (internal

quotation marks omitted). Upon doing so, "the Securus LBS platform would *immediately* provide the requested location information (regardless of the adequacy of the uploaded document)." *Id.* (ER6–7); *see*, *e.g.*, *id.* ¶ 49 n.165 (ER22) (Hutcheson "'upload[ed] entirely irrelevant documents * * * in lieu of genuine legal process'").

Eight days after the *New York Times* article was published, AT&T terminated access to customer location data for Securus and a related intermediary, and it terminated two other providers the following day. *See id.* ¶ 13 (ER7); *NAL* ¶ 24 (A124). But AT&T took no immediate steps for the other 84 third-party entities to which it continued selling customer location data, including the aggregator that had provided location data to Securus without adequately overseeing it. The following month, AT&T "announced that it would phase out access" for "certain" LBS providers, but not others. *Order* ¶ 13 (ER7). Yet AT&T "did not specify how long the process would take." *NAL* ¶ 25 (A124). Six months later, AT&T had terminated only 36 out of 88 third-party entities. *Order* ¶ 13 (ER7). In November 2018, AT&T told the FCC that it "planned to implement 'enhanced' notice and consent measures for location information-sharing * * * for the remaining location-based service providers," but it never actually did so. *Ibid.*

**4.** In January 2019, the online publication *Motherboard* reported that MicroBilt, another LBS provider with access to AT&T customer location data, was selling location data to "bounty hunters" in the bail bonds industry in order to track customers without their knowledge or consent. *Order* ¶ 14 (ER7); *see* Joseph Cox, *I Gave a Bounty Hunter $300, Then He Located Our Phone*, VICE: Motherboard (Jan. 8, 2019), https://perma.cc/BT3S-675V. MicroBilt sought access to location data for "fraud prevention," then "s[old] phone geolocation services * * * to a spread of different private industries, ranging from car salesmen and property managers to bail bondsmen and bounty hunters," who then "resold [it] to others on the black market." *Ibid.*; *see NAL* ¶ 28 (A125). The *Motherboard* article reported how "customer location information was sold and resold, with little or no oversight." *Id.* ¶ 27 (A125).

Two days later, AT&T announced that it would end its LBS program in March 2019, after allowing another two months to pass. *Order* ¶ 14 (ER7–8). AT&T finally stopped providing customer location data to LBS providers on March 29, 2019, which was 323 days after the *New York Times* report exposed that AT&T's protections were ineffective and that it was not meaningfully in control of customer location data it sold to third parties. *Ibid.*

### C. The Commission's Forfeiture Order

**1.** On February 28, 2020, the Commission issued a Notice of Apparent Liability proposing a $57,265,625 penalty against AT&T for its apparent violations of Section 222 and the Commission's implementing rules by failing to protect its customers' location data. *See* A113–154 (*NAL*). "In particular," the Commission alleged that "for almost a year after AT&T became aware of Securus's unapproved location-finding service—and thereby had notice that the 'consent records' it received through indirect arrangements with location-based service providers were not reliable indicia of customer consent—the Company's continued reliance on such attenuated consent mechanisms and ineffective monitoring tools apparently did not meet" its obligation to protect customer location data. *Id.* ¶ 32 (A126).

The Notice of Apparent Liability tentatively found that AT&T committed 84 continuing violations of the Act—one for each aggregator or LBS provider that AT&T allowed to access its customers' location data after the *New York Times* article put it on notice that its safeguards were ineffective. *Id.* ¶¶ 75–76 (A138–39). For each violation, the Commission proposed "a base forfeiture of $40,000 for the first day of such a violation," beginning 30 days after the *New York Times* article, along with "a $2,500

forfeiture for * * * each successive day that the violation continued." *Ibid.* The Commission also proposed a 25% upward adjustment given the totality of the circumstances, including AT&T's "highly culpable" conduct, the seriousness of the potential harms, and the need to protect consumers and to provide a meaningful deterrent in view of AT&T's significant size and resources. *Id.* ¶¶ 79–80 (A140–41).

**2.** After considering AT&T's responses to the Notice of Apparent Liability and all the evidence in the record, the Commission issued a forfeiture order adopting the proposed forfeiture. *See* ER1–43 (*Order*).

The Commission first determined that customer location data "falls squarely within" the statutory definition of CPNI. *Id.* ¶¶ 18–20 (ER9–14); *see* 47 U.S.C. § 222(h)(1)A). Relying on plain meaning and ordinary tools of statutory interpretation, the Commission reasoned that customer location data "relates to the location of a telecommunications service—i.e., AT&T's commercial mobile service." *Order* ¶¶ 19–24 (ER9–11). Likewise, "the location information at issue was obtained by AT&T solely by virtue of its customer–carrier relationship" because AT&T's customers provided their location to AT&T solely to use the services they purchase from it, not for some unrelated reason. *Id.* ¶¶ 25–29 (ER11–14).

The Commission next found that AT&T violated section 222 "by failing to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information." *Id.* ¶ 38 (ER15); *see id.* ¶¶ 41–46 (ER18–21). "[T]he record not only shows that AT&T did not have reasonable protections in place prior to [the] 2018 *New York Times* article detailing the Securus/Hutcheson breaches, but also that AT&T failed to promptly address its demonstrably inadequate CPNI safeguards after [the] Securus/Hutcheson disclosure." *Id.* ¶ 41 (ER18–19). AT&T relied almost exclusively on contractual arrangements to govern the use of location data, without any reliable means to "assure that location-based service providers comply with [their] contractual obligation to access location information only after furnishing proper notice and receiving customer consent." *Id.* ¶ 43 (ER19). And even after the *New York Times* article revealed serious abuses, "rather than promptly implementing reasonable safeguards, AT&T continued to sell access to its customers' location information under (for all intents and purposes) the *same system* that was exploited by Securus and Hutcheson." *Id.* ¶ 44 (ER20).

The Commission rejected AT&T's arguments that its forfeiture procedures violated the Constitution. *Id.* ¶¶ 68–81 (ER30–36). In

response to AT&T's Seventh Amendment objection, the Commission advised AT&T that it would be "entitled to a trial *de novo* in federal district court before it can be required to pay the forfeiture." *Id.* ¶ 69 (ER30). And the Commission explained that Section 503(b)'s choice between two procedural pathways for an administrative forfeiture proceeding—an NAL-based agency adjudication under Section 503(b)(4), as used here, or a formal agency adjudication under Section 503(b)(3)—is not an impermissible delegation of legislative power because the choice of administrative enforcement processes "involves the exercise not of legislative power but of executive power." *Id.* ¶ 80 (ER35–36).

The Commission adopted the forfeiture calculation proposed in the Notice of Apparent Liability and ultimately assessed a total forfeiture of $57,265,625. *Id.* ¶ 54 (ER24). The Commission was not persuaded by AT&T's argument that the sale of sensitive customer data without adequate protections to 84 separate third-party entities—each separately reviewed and approved by AT&T—should have been treated as only a single violation. *Id.* ¶ 56–58 (ER25–26). And the Commission further explained why the 25% upward adjustment—"which is relatively modest compared to upward adjustments in other cases involving consumer harms"—was fully justified. *Id.* ¶ 59 (ER26–27).

### D. Judicial Proceedings

Although the *Order* expressly advised AT&T that it was not required to pay the forfeiture until the government prevailed in a civil enforcement action under Section 504(a), *see Order* ¶ 69 & n.223 (ER30), AT&T elected instead to pay the forfeiture penalty and pursue immediate appellate review in this Court. *See AT&T Corp.*, 323 F.3d at 1083–85.

After initial briefing, this Court ruled that the Commission's forfeiture procedures violated the Seventh Amendment because they did not entitle AT&T to a jury trial before the forfeiture order issued. 149 F.4th 491 (5th Cir. 2025), *rev'd*, 608 U.S. 531 (2026). The Court did not reach the other legal challenges AT&T raised. The government then sought review by the Supreme Court.

Meanwhile, in cases challenging materially identical forfeiture orders against Sprint and Verizon, the D.C. Circuit and the Second Circuit both rejected arguments that customer location data is not CPNI covered by Section 222 and that each carrier's misconduct should have been treated as only a single violation—arguments that AT&T now pursues here. *Sprint*, *supra*, 151 F.4th 347; *Verizon*, *supra*, 156 F.4th 86.

The Supreme Court granted review in both this case and *Verizon*, then proceeded to rule that the forfeiture procedures here comply with

the Seventh Amendment. *FCC v. AT&T*, *supra*, 608 U.S. 531. The Court explained that the Commission's forfeiture order in and of itself "d[oes] not create an obligation to pay" and that the *Order*'s "only legal effect is to enable the Department of Justice to file [an enforcement] suit" that would entitle AT&T to a trial de novo before it could be made to pay any penalty. *Id.* at 541, 543. Only Justice Thomas dissented, suggesting that the *Order* misled AT&T into paying the forfeiture prior to any jury trial. *Id.* at 554. The majority, however, found no occasion to address that argument, which the carriers failed to raise until their Supreme Court reply brief. *Id.* at 548 n.5.

The Supreme Court accordingly reversed and remanded this case to allow this Court to consider other arguments that AT&T previously raised but this Court did not reach. But in *Verizon*, where the Second Circuit had rejected all of the carrier's preserved challenges, the Court affirmed without remanding. *Id.* at 548. Verizon sought rehearing, requesting a remand to allow it to pursue the new argument raised in the reply brief and the dissent. Pet. for Reh'g, *Verizon Commc'ns Inc. v. FCC*, No. 25-567 (U.S. filed June 29, 2026). The Supreme Court summarily denied that request. *Verizon Commc'ns Inc. v. FCC*, 2026 WL 2374102 (U.S. Aug. 17, 2026).

## STANDARD OF REVIEW

Under the Administrative Procedure Act, a court may overturn agency action only if it is arbitrary, capricious, or otherwise contrary to law. *See* 5 U.S.C. § 706(2). The APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024); *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "[A]n agency's decision is arbitrary and capricious only if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Verizon*, 156 F.4th at 98 (internal quotation marks omitted); *accord Sierra Club v. EPA*, 939 F.3d 649, 664–65 (5th Cir. 2019).

On matters of statutory interpretation, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 412. "In exercising such judgment, though," courts may appropriately "seek aid from the interpretations of" the implementing agency. *Id.* at 394; *see also id.* at

412–13. Review of constitutional issues is de novo. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

## SUMMARY OF THE ARGUMENT

**I.** The Commission's finding that AT&T failed to protect its customers' location information is reasonable and well-supported. "[T]he record not only shows that AT&T did not have reasonable protections in place prior to [the] 2018 *New York Times* article detailing the Securus/Hutcheson breaches, but also that AT&T failed to promptly address its demonstrably inadequate CPNI safeguards after [the] Securus/Hutcheson disclosure." *Order* ¶ 41 (ER18); *see id.* ¶¶ 41–46 (ER18–21).

The Commission assessed a forfeiture penalty only for the period after AT&T was put on notice by the *New York Times* article that its protections were ineffective and that it was not meaningfully in control of its customers' location information that it sold to outside parties. The forfeiture is fully justified based on AT&T's failure to promptly address its known vulnerabilities or to stop sharing customer location information if it could not adopt reasonable safeguards. The Commission identified numerous steps that AT&T could have taken—but did not— to protect its customers. Instead, AT&T continued to put its customers'

location data at risk by persisting in selling access to that information for nearly a year under essentially the same system that was exploited by Securus.

AT&T's practices also were inadequate even before the Securus disclosures came to light. AT&T did not itself provide customer notice and obtain customer approval, but instead relied on an attenuated chain of contractual arrangements directing aggregators and LBS providers to do so. This reliance on contractual arrangements was not reasonable because AT&T had no reliable means to assure that location-based service providers complied with their contractual obligations and that the customer data was not being misused. Indeed, "nothing that AT&T has provided shows that it made any meaningful efforts or that it could effectively distinguish between valid and unauthorized requests"; instead, AT&T essentially relied on the honor system. *Order* ¶ 43 (ER19). Since at least 2007, the Commission has warned AT&T and other carriers about the risk that bad actors might try to obtain CPNI through false pretenses, and has admonished that carriers do not satisfy their obligations simply by adopting "contractual safeguards" that purport to assign their responsibility to others.

The Commission's calculation of the forfeiture amount was likewise appropriate. Consistent with the Communications Act and past agency practice, the Commission found that AT&T committed 84 continuing violations of the Act—one for each entity that AT&T allowed to continue accessing its customers' location data without effective safeguards. Each additional provider given access to location data without proper safeguards created a new risk of that provider misappropriating customer information.

**II.** AT&T fails to show any error in the Commission's conclusion that the statutory definition of CPNI includes the customer location data at issue here. Section 222 of the Communications Act expressly covers "location" information, and AT&T customers share that information with AT&T solely because they must do so to use the services they purchase from it, not for some unrelated reason. AT&T's effort to restrict CPNI to only "*call* location information" contravenes the statute, which defines CPNI to include all "location" information while using the narrower phrase "call location information" elsewhere. *Compare* 47 U.S.C. § 222(h)(1)(A) *with id.* § 222(d)(4) *and id.* § 222(f)(1).

**III.** The Commission's choice between two procedural pathways for an administrative forfeiture proceeding—a formal agency adjudication or an NAL-based agency adjudication—does not violate the nondelegation doctrine. That doctrine applies to delegations of legislative power, but the agency's choice of prosecutorial procedures is a paradigmatic exercise of *executive* power.

**IV.** AT&T's argument that the government affirmatively misled it into paying the forfeiture before any Section 504(a) enforcement suit has been waived and is in any event meritless. AT&T never made this argument until its Supreme Court reply brief, and so the argument has been waived—as the Supreme Court's treatment of the *Verizon* case confirms. The argument is also baseless. The Commission did not mislead AT&T; on the contrary, paragraph 69 of the *Order* specifically advised AT&T no fewer than four times that "AT&T is entitled to a trial *de novo* in federal district court before it can be required to pay the forfeiture." *Order* ¶ 69 (ER30). AT&T's attempt to rely instead on boilerplate language in the ordering clauses misreads that language, as the Supreme Court has already explained.

## ARGUMENT

### I. THE COMMISSION'S FORFEITURE DETERMINATION IS REASONABLE AND SUPPORTED BY THE RECORD.

#### A. The Commission Reasonably Found That AT&T Failed To Protect Customer Location Data.

The record amply supports the Commission's conclusion that AT&T violated Section 222 "by failing to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information." *Order* ¶ 38 (ER16). As the Commission explained, the record shows that "AT&T failed to promptly address its demonstrably inadequate CPNI safeguards after [the] Securus/ Hutcheson disclosure" was revealed by the *New York Times* in May 2018, and that it separately "did not have reasonable protections in place prior to [the] 2018 *New York Times* article." *Id.* ¶ 41 (ER18–19).

**1.** The Commission imposed a forfeiture penalty only for the period after AT&T was put on notice by the *New York Times* article that Securus and Hutcheson were able to obtain unauthorized access to its customers' location data (and only after an additional 30-day grace period to take appropriate action). *See Order* ¶¶ 54, 61 (ER24, 43); *NAL* ¶¶ 75–76 & tbl.1 (A138–39); *see also NAL* ¶ 60 (A133) ("[W]e focus on the actions that AT&T took, or failed to take, after discovery of that breach.").

AT&T points (Supp. Br. 7, 22) to "safeguards" and "consent procedures" it purported to require, but it largely ignores that the Securus disclosures revealed those measures to be ineffective. Even if AT&T could have thought its procedures adequate before the Securus disclosures, *but see infra* Part I.A.2, it could not reasonably have thought so afterward. *See NAL* ¶ 60 (A133) ("AT&T was on clear notice that its safeguards were inadequate after the disclosure" of the Securus breach).

"Continu[ing] to sell access to its customers' location information under (for all intents and purposes) the *same system* that was exploited by Securus and Hutcheson" was not reasonable when AT&T was on notice that its existing measures failed to prevent unauthorized access and disclosure. *Order* ¶ 44 (ER20). The Commission identified "numerous steps that could have been taken to squarely address the proven vulnerability, up to and including deploying enhanced measures to verify consumer consent (even directly verifying consumer consent) and shutting down the LBS program." *Id.* ¶ 46 (ER20); *see Verizon*, 156 F.4th at 100–01. But "[r]ather than tak[e] reasonable steps to safeguard its customers' location information after the Securus/Hutcheson disclosures were reported, AT&T placed its customers' location information at continuing risk of unauthorized access through its failure to terminate

its program or impose reasonable safeguards to protect its customers' location information." *Order* ¶ 53 (ER24).

AT&T states (Supp. Br. 8) that "[w]ithin days," it "shut off all of Securus's access to AT&T customer location data." But without addressing the underlying vulnerabilities that Securus exploited, terminating Securus's access did nothing to address the risk that customer location data could be misappropriated by the 84 other entities to which it "continued to sell access to its customers' location information under (for all intents and purposes) the *same system* that was exploited by Securus." *Order* ¶ 44 (ER20); *see Sprint*, 151 F.4th at 368 ("[The] decision to 'cut[] off' access for 'some' third parties 'did not improve the safeguards for consumers' * * * under the LBS program that otherwise remained in place."). AT&T "did not [even] suspend the access of LocationSmart, the Aggregator that had the contractual obligations to monitor Securus." *NAL* ¶ 61 (A134). AT&T took only "piecemeal steps" by gradually ending its relationship with a handful of providers while allowing most others to continue accessing location information under the same flawed system. *Order* ¶ 46 (ER21).

Indeed, nine months later, *Motherboard* reported that another LBS provider with continuing access to AT&T customer location data, MicroBilt, was exploiting the same vulnerabilities to sell customer location information to "bounty hunters" in the bail bonds industry, without seeking or obtaining customer consent. *Order* ¶ 14 (ER7); *NAL* ¶¶ 27–28 (A125). The *Motherboard* article shows that, nine months after AT&T was put on notice of the flaws in its system, AT&T still had not taken effective measures to address those vulnerabilities or to protect against other bad actors exploiting them. And although AT&T asserts here (Supp. Br. 9) that it "undertook a broader review" of its location-based services program after the Securus disclosures, it has refused to provide the results of that review to the Commission, *Order* ¶ 10 (ER5–6); *NAL* ¶ 19 (A122)—so the full extent of the flaws AT&T knew of, but chose not to address, remains unknown.

AT&T argues (Supp. Br. 23–24) that it was justified in continuing for nearly a year to operate a program it knew to be flawed by suggesting that the benefits of some location-based services outweigh the risk of harm. That approach is hard to square with the statute, which mandates that carriers "protect the confidentiality of proprietary information of * * * customers" in all circumstances and forbids unlawful access, use, or

disclosure of CPNI "[e]xcept * * * with the approval of the customer"—irrespective of any purported benefits of doing otherwise. 47 U.S.C. § 222(a) & (c)(1). Thus, "[i]f AT&T could not reasonably safeguard the customer location information that it sold access to," the statute itself appears to require that AT&T "cease[] to sell access to that information." *NAL* ¶ 69 (A136).

But even taking those benefits into account, the Commission found, AT&T's failure to take appropriate action to address the vulnerabilities revealed by the Securus disclosures was still unjustified. *See Order* ¶¶ 44–46 (ER20–21). AT&T's assertion that "at no point has the Commission meaningfully considered the benefits of continuing location-based services" (Supp. Br. 23) is false. The Commission specifically "considered AT&T's arguments" that "the benefits of LBS must be weighed against the risks." *Order* ¶ 45 (ER20). It determined, however, that "the risks were grave, particularly because AT&T did not have a reliable way of confirming customer consent," and found that the claimed benefits "are outweighed by these risks." *Ibid.* And while AT&T touts that some of its LBS providers were "household names" like AAA (Supp. Br. 6), the Commission explained that "[t]he reputation of any particular third party is no substitute for implementing reasonable safeguards" as

required by Section 222, especially since "even 'well known and highly reputable' companies * * * are not immune to security threats posed by insiders." *Order* ¶ 67 (ER29–30).

Contrary to AT&T's arguments, moreover, the Commission "n[ever] suggest[ed] that the only reasonable response would have been * * * to terminate the program." *Verizon*, 156 F.4th at 101. It "identified 'numerous steps that could have been taken' * * * short of terminating the program." *Id.* at 100. For example, the Commission explained that AT&T could have "deploy[ed] enhanced measures to verify consumer consent," such as by "directly verifying consumer consent" itself. *Order* ¶ 46 (ER20). Indeed, AT&T told the FCC after the Securus disclosures that it "planned to implement 'enhanced' notice and consent measures for location information-sharing," but it never actually did so. *Id.* ¶ 13 (ER7).

Nor is AT&T correct that, if it could not adopt effective safeguards, it would have had to terminate LBS services "immediately" (Supp. Br. 23) and leave customers in the lurch. On the contrary, the Commission afforded AT&T a 30-day "grace period" to take any appropriate measures, including any orderly wind-down. *Order* ¶¶ 54, 61 (ER24, 43). When the Commission proposed the 30-day grace period in the *NAL*, AT&T did not

argue that it needed a longer grace period, which would only have a marginal effect on the penalty amount. It thus waived any challenge to the length of the grace period or the corresponding penalty calculation. *See* 47 U.S.C. § 405(a); *Qwest Corp. v. FCC*, 482 F.3d 471, 474–77 (D.C. Cir. 2007); *cf. Verizon*, 156 F.4th at 104–05. Instead, AT&T's sole argument here is that it cannot be penalized *at all* for failing to take available steps to address known flaws in its statutorily mandated privacy measures. That position is untenable.

**2.** As an alternative and independent basis for the forfeiture, AT&T's practices also were inadequate even before the Securus abuses came to light. *See Order* ¶ 43 (ER19–20); *NAL* ¶¶ 54–59 (A132–33).

AT&T did not provide customer notice and obtain customer approval itself. Instead, it relied on an attenuated chain of contractual arrangements directing aggregators and LBS providers to supply notice and obtain customer consent before accessing location data, and to do so only for preapproved use cases. *Order* ¶ 9 (ER4–5). "This arrangement meant that it was typically the LBS providers who were obligated 'to provide notice and obtain consent' from consumers—not the Aggregators or AT&T." *Id.* (ER4).

AT&T's contractual shifting of responsibility to others "w[as] not reasonable" because AT&T had no reliable means to "assure that location-based service providers comply with [their] contractual obligation to access location information only after furnishing proper notice and receiving customer consent." *Order* ¶ 43 (ER19). To rely on these contractual requirements, "AT&T would have needed to take steps to determine whether they were actually being followed" and to be able to "distinguish[] between a legitimate request for customer location information * * * and an illegitimate one." *Ibid.* Yet "nothing that AT&T has provided shows that it made any meaningful efforts or that it could effectively distinguish between valid and unauthorized requests." *Ibid.* Instead, AT&T "merely relied on the honor system." *Sprint*, 151 F.4th at 368.

AT&T nonetheless contends (Supp. Br. 22) that it "required location-services providers to provide records of customer consent that AT&T reviewed 'daily.'" But the record reveals that this "review" of consent records consisted essentially of comparing the location requests made by an LBS provider with that provider's *self-reported and unverified* "consent records"—a system that assumed that the claimed consent was properly obtained, and that could not detect if the provider

was supplying false or invalid consent data. AT&T concedes that it was incapable of distinguishing "invalid consent records * * * from valid consent records." Supp. Br. 8. And it has further "conceded that it was unable to distinguish location requests" for an authorized use case from "location requests unrelated to the authorized Use Case." *Order* ¶ 39 (ER17); *accord id.* ¶ 11 & n.43 (ER6).

With respect to Securus, for example, AT&T simply "took Securus at its word that Securus had obtained opt-in consumer consent." *Order* ¶ 40 (ER17–18). Indeed, Securus was apparently submitting invalid consent records "*for at least four years*" without AT&T having any effective means to detect it. *NAL* ¶ 56 (A133); *see Verizon*, 156 F.4th at 100 ("[I]t was appropriate for the FCC to consider * * * that the Securus/Hutcheson requests did not raise *any* red flags"). And the feebleness of AT&T's contractual arrangements is laid bare by AT&T's representation that it "was unable 'to compel Securus to cooperate'" with an audit of Securus's compliance. *Order* ¶ 43 (ER19).

Contrary to AT&T's contention that nothing "requires [it] to assume the falsity of such records and conduct a re-verification" (Supp. Br. 23), the Communications Act specifically provides that the "failure of any officer, agent, or other person acting for or employed by any common

carrier * * * shall in every case be also deemed to be the act, omission, or failure of such carrier." 47 U.S.C. § 217. "Since at least 2007," moreover, following a rash of incidents making it "foreseeable that entities seeking to gain unauthorized access to CPNI would use false pretenses—of one sort or another—to do so," *NAL* ¶ 7 n.27 (A116), the Commission has explicitly cautioned that a carrier does not satisfy its obligation to protect CPNI simply by adopting "contractual safeguards" that purport to assign its responsibility to others. *2007 CPNI Order*, 22 FCC Rcd. at 6952–53 ¶ 49. And the Commission has likewise warned that "a carrier that practices willful blindness" regarding the protection of CPNI likely "would not be able to demonstrate that it has taken sufficient measures" to comply with Section 222 and the Commission's rules. *Id.* at 6946 ¶ 35; *see Order* ¶ 36 (ER16).

Instead of contractually passing off CPNI protection to others, AT&T could have "deploy[ed] enhanced measures" to "directly verify[] consumer consent," such as by sending its customer a text message seeking affirmative consent to share the customer's location. *Order* ¶ 46 (ER20). This would have allowed AT&T to ensure proper notice and customer approval, and to verify location requests against its own records rather than provider-supplied records that could be falsified.

**3.** AT&T seeks to downplay its lapses by arguing (Supp. Br. 8 n.2, 23 n.6) that Securus was responsible for only a small percentage of all location requests. Yet because AT&T was unable to distinguish authorized from unauthorized location requests, the actual extent of unauthorized disclosures from other LBS providers cannot be known. AT&T's supplemental brief nowhere acknowledges, for example, that another of its LBS partners, MicroBilt, committed similar violations—nor does it appear to have even been aware of Securus's or MicroBilt's abuses until they was uncovered by the media. It is clear, however, that the risk posed by AT&T's failure to adequately protect its customers' location information "was not merely theoretical." *NAL* ¶ 79 (A140).

### B. The Commission Reasonably Found That AT&T Committed 84 Continuing Violations By Continuing To Share Location Data With 84 Separate Entities.

The Commission found that AT&T "engaged in 84 continuing violations—one for each ongoing relationship with a third-party LBS provider or aggregator that had access to AT&T customer location information more than 30 days after publication of the *New York Times* report—and that each violation continued until AT&T terminated the corresponding entity's access to customer location information." *Order* ¶ 54 (ER24); *see NAL* ¶¶ 75–76 (A138–39). Given the base forfeiture

amount and the upward adjustment for AT&T's "egregious" conduct, *Order* ¶ 59 (ER26), this resulted in a total forfeiture penalty of $57,265,625. That conclusion reflects no "clear error of judgment," *Sierra Club*, 939 F.3d at 664, and "the scale of the fine imposed" readily satisfies review, *see SBC Commc'ns Inc. v. FCC*, 373 F.3d 140, 151 (D.C. Cir. 2004).

AT&T maintains (Supp. Br. 24–28) that its heedless provision of access to 84 separate entities amounts to only "a single act or failure to act" rather than 84 separate violations. That position fails to engage with the facts. AT&T reviewed and approved each LBS provider separately—considering each provider's individual circumstances and proposed use case—and likewise decided to terminate different providers at different times based on individualized considerations. *Order* ¶¶ 9 & n.33, 58 (ER5, 24–25). Each decision whether and for how long to approve each relationship was a separate act. *See id.* ¶ 58 (ER25–26); *Verizon*, 156 F.4th at 103. And because each additional provider given access to location data without proper safeguards created a new risk that customer information might be misappropriated, each such relationship is properly treated as its own continuing violation. *Sprint*, 151 F.4th at 369 ("every * * * provider * * * posed an independent danger of CPNI misuse");

*Verizon*, 156 F.4th at 103 ("each of its ongoing relationships represented an additional risk of security breaches"). In short, "each unique relationship between AT&T and an LBS provider or aggregator represented a distinct failure to reasonably protect customer CPNI and therefore a separate violation of section 222." *Order* ¶ 58 (ER25).

That conclusion is consistent with the FCC's past practice, which a licensee like AT&T should be aware of. The Commission treats systemic privacy failings as "significantly more than a single violation." *Order* ¶ 57 (ER25) (citing *In re TerraCom, Inc.*, 29 FCC Rcd. 13325, 13343 ¶ 50 (2014)). The unit of analysis depends on the nature of the conduct that violated the law. In *TerraCom*, for example, because the offending parties had unreasonably exposed customers' documents by storing them on publicly accessible servers, each separate document disclosed was a distinct violation. *See ibid.*

Although AT&T attempts to frame this as a statutory issue, it identifies no statutory language that supports its approach. Findings as to what actions AT&T took in violation of its legal duties under Section 222, and hence how many violations AT&T committed, are more properly viewed as issues of fact. *Cf. Sprint*, 151 F.4th at 369 n.6. And though

courts generally must "decide legal questions by applying their own judgment," they owe deference to "agency policymaking and factfinding." *Loper Bright*, 603 U.S. at 392. Indeed, "because the agency is close to the facts, it is best positioned to determine what, under any given set of circumstances, qualifies as a single violation." *Verizon*, 156 F.4th at 102.

Even if the Commission's finding of 84 separate violations were viewed as a pure statutory issue, AT&T offers no sound basis to overturn it. For the reasons set forth above, the Commission's conclusion represents the best reading of how the statute applies to the facts of AT&T's misconduct. And even if the Court were uncertain, the Second Circuit has explained that this statutory scheme calls for deference to the Commission. Section 503(b) "gives the Commission 'the discretion' to determine when to issue a forfeiture penalty." *Verizon*, 156 F.4th at 102 (quoting 47 U.S.C. § 503(b)(3)(A)). It likewise "gives the Commission the discretion, within a statutory cap, to determine its amount," *ibid.*, including the sweeping and open-ended authority to weigh "such * * * matters as justice may require," 47 U.S.C. § 503(b)(2)(E). And because the statute authorizes forfeitures for violation "of any rule, regulation, or order issued by the Commission," its application necessarily turns on how

the Commission has defined the underlying obligation. *Id.* § 503(b)(1)(B). Since "the Communications Act explicitly grants the Commission the discretion to determine what qualifies as a violation of the Act, when to issue a forfeiture penalty for violations, and what the size of that forfeiture penalty would be," the best reading of the statute is therefore that "the FCC has the discretion to determine, within reasonable boundaries, when a carrier has engaged in a single violation of the Act." *Verizon*, 156 F.4th at 102 (citation and internal quotation marks omitted); *see Loper Bright*, 603 U.S. at 394 ("[O]f course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."). The statute thus "vests the agency with some discretion to select, from a reasonable range of possibilities, the unit of prosecution that can be considered a single violation of the Act under particular circumstances." *Verizon*, 156 F.4th at 102–03.

By contrast, AT&T's approach to the statute "makes little sense." *Verizon*, 156 F.4th at 103. If AT&T had its way, carriers would be free to maintain that they had a single "systemic" unreasonable practice that they simply applied in numerous instances, and could thereby be insulated from anything more than a single capped penalty. Even at the

statutory maximum of roughly $2 million, this would be insignificant for a carrier like AT&T, with its $122 billion in annual operating revenues. *See* AT&T Inc., Form 10-K, at 54 (Feb. 24, 2024).[4] Congress, which directed the Commission to take into account a violator's "ability to pay" in calculating the forfeiture amount, 47 U.S.C. § 503(b)(2)(E), could not have required such an ineffectual result. *See Verizon*, 156 F.4th at 104.

## II. THE COMMISSION PROPERLY CONCLUDED THAT CUSTOMER LOCATION DATA IS CPNI PROTECTED BY SECTION 222.

The customer location data at issue here also falls within the statutory definition of CPNI. *See Order* ¶¶ 18–30 (ER9–14). Section 222(h)(1)(A) defines CPNI to include information that (1) "relates to the quantity, technical configuration, type, destination, *location*, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier" and (2) "is made available to the carrier by the customer solely by virtue of the carrier–customer relationship." 47 U.S.C. § 222(h)(1)(A) (emphasis added). As the Commission, the D.C. Circuit and the Second Circuit have all concluded, both elements are satisfied here: the statute specifically protects "location" information, and

[4] Available at https://www.sec.gov/Archives/edgar/data/732717/000073271725000013/t-20241231.htm.

customers share their location with AT&T solely to use the services they purchase from it, not for some unrelated reason.[5]

### A. The Location Data Is "Information That Relates To The * * * Location" Of A Telecommunications Service.

To start, the Commission correctly found that the customer location data at issue is "information that relates to the * * * location * * * of a telecommunications service," 47 U.S.C. § 222(h)(1)(A)—here, "AT&T's commercial mobile service." *Order* ¶ 19 (ER9); *see Sprint*, 151 F.4th at 363–64. A wireless carrier "'must be aware of and use [a] device's location in order for it to enable customers to send and receive calls,'" and "AT&T does not dispute * * * that customers' devices and AT&T's network regularly exchange information" to "ensur[e] that they can receive incoming calls and place outgoing calls." *Order* ¶¶ 19, 22 (ER9–10). This is true "'regardless of whether the device is actively in use for a call'" or merely idle, since the device must continuously maintain a connection to the carrier's network for any incoming call to be received. *Id.* ¶ 19 (ER9);

5 Then-Commissioner Carr, who is now the FCC Chairman, dissented from the *Order* because, as he then read the statute, he did not believe the location information at issue to be CPNI covered by Section 222. *Order* at 40–41 (ER40–41). At that time, no court had yet spoken to this issue. Since then, however, two federal courts of appeals have authoritatively construed the statute to apply here. *See Sprint*, 151 F.4th at 363–67; *Verizon*, 156 F.4th at 94–98.

*Verizon*, 156 F.4th at 95.

AT&T nonetheless contends (Supp. Br. 16–17) that "location" information in Section 222 should be read to mean only "'call location information'"—*i.e.*, only information identifying "'the customer's location *while making or receiving a voice call*.'" But Section 222 covers any "information that relates to the * * * location * * * of a telecommunications service," 47 U.S.C. § 222(h)(1)(A), not just information that relates to the location of a call. *See Sprint*, 151 F.4th at 364; *Order* ¶ 24 (ER11) ("All *location* information is protected as CPNI under [Section 222](h)(1)(A)."). And even when not currently on a call, users must continuously share their location with a carrier to be notified of and to receive incoming calls—a key part of the telecommunications service AT&T offers. *Id.* ¶¶ 20–22 (ER9–10); *see Verizon*, 156 F.4th at 95. Section 222(h)(1)(A)'s use of the phrase "information that *relates to* * * * location" reinforces that it must be construed broadly, because "the Supreme Court has recognized [that] 'the ordinary meaning of the words "relating to" is a broad one.'" *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (brackets omitted); *accord Peters v. Ashcroft*, 383 F.3d 302, 307 (5th Cir. 2004) ("[T]he Supreme Court has traditionally afforded an expansive reading of 'related to.'").

Section 222(h)(1)(A)'s use of the bare term "location" also contrasts with use of the narrower phrase "call location" elsewhere in Section 222. *Compare* 47 U.S.C. § 222(h)(1)(A) *with id.* § 222(d)(4) (addressing "call location information") *and id.* § 222(f)(1) (same). Whereas "Congress used the broad term 'location' in the definition of CPNI," it "used the narrower term 'call location information' [only] to fashion a limited exception." *Sprint*, 151 F.4th at 365; *see also Verizon*, 156 F.4th at 96–97. Courts "presume that choice of different text carriers with it a choice of different meaning," *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 294 (5th Cir. 2019), and the "negative implications raised by disparate provisions are strongest when the [provisions] were being considered simultaneously," *Lindh v. Murphy*, 521 U.S. 320, 330 (1997); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 170 (2012) ("[A] material variation in terms suggests a variation in meaning."). Had Congress wished to limit protection to call location information, as AT&T contends, "it could have used a term like 'call location' in § 222(h)(1)(A)"—as it did elsewhere in the statute—"instead of affording protection more broadly to all 'information that relates to the * * * location' of a service." *Verizon*, 156 F.4th at 97.

### B. The Location Data Was "Made Available To The Carrier * * * Solely By Virtue Of The Carrier–Customer Relationship."

The Commission also correctly found that the location data here is information that was "made available to the carrier"—that is, to AT&T—by the customer "solely by virtue of the carrier–customer relationship." 47 U.S.C. § 222(h)(1)(A). As the Commission explained, "'AT&T's customers provided their wireless location data to AT&T because of their customer–carrier relationship with AT&T," *Order* ¶ 25 (ER11), since the wireless phone service they purchased from AT&T requires this information to operate, *id.* ¶¶ 19, 22, 27 (ER9–10, 12).

The carrier–customer relationship is the "sole[]" reason that customers provide this information to AT&T. *See Verizon*, 156 F.4th at 98. Customers share their location with AT&T solely to use the services they purchase from it, not for some unrelated reason. If they were not AT&T customers, they would not share their location with AT&T.

AT&T nonetheless contends (Supp. Br. 17–18) that it did not obtain customer location data "solely by virtue of the carrier–customer relationship" because many of the customers who provided their location by using wireless voice service, which is a "telecommunications service" covered by Section 222(c)(1), also provided the same location information

to use text messaging or wireless internet service, which are classified as "information services" rather than "telecommunications services." But the "solely by virtue of" language does not ask whether the carrier obtained the CPNI solely through *its telecommunications service*; instead, by its terms, it asks whether the carrier obtained the CPNI through "the carrier–customer *relationship*." 47 U.S.C. § 222(h)(1)(A) (emphasis added); *see Verizon*, 156 F.4th at 98.

That carrier–customer relationship "may encompass multiple services," including information services. *Verizon*, 156 F.4th at 98; *see Order* ¶ 28 (ER12) (a carrier's "inclusion of multiple services" does not "take[] the resulting *relationship* outside the scope of the 'carrier–customer' relationship"). As a practical matter, wireless customers don't have a separate customer relationship for each service—one carrier for voice service, another for internet, possibly a third for text messaging—but instead must get internet and text messaging from the same provider that supplies their voice service. *See Sprint*, 151 F.4th at 366.

It is thus unsurprising that voice and data service usually appear in a single bill, as part of a single carrier–customer relationship. If a carrier like AT&T leverages the wireless telephone service that it provides a customer to sell that customer additional services as part of a

bundle, "all those services are fairly encompassed within the carrier–customer relationship." *Verizon*, 156 F.4th at 98. Indeed, the Commission's CPNI rules specifically recognize that the "communications-related services" provided by carriers include "information services * * * that are typically provided by telecommunications carriers, such as Internet access or voice mail services." 47 C.F.R. § 64.2003(e) & (*i*).

AT&T's contrary approach would substantially undercut Section 222's protections. The duty to protect CPNI attaches under Section 222 when a customer's purchase of telecommunications service provides the carrier with protected information. Under AT&T's reading, however, carriers could negate that obligation simply by bundling additional information services like text messaging with their wireless voice service (as virtually all wireless carriers now do). Congress could hardly have intended for wireless carriers to be able to nullify the protections of Section 222 by simply bundling non-telecommunications services together with their telecommunications services.

Searching for support outside Section 222, AT&T cites (Supp. Br. 17, 19–20) the Act's definition of "telecommunications carrier"—which states that "[a] telecommunications carrier shall be treated as a common

carrier under [this Act] only to the extent that it is engaged in providing telecommunications services," 47 U.S.C. § 153(51)—to argue that "carrier–customer relationship" encompasses only its telecommunications services and not its information services. But the terms "carrier" and "customer" appear in Section 222(h)(1)(A) simply to identify the relationship at issue by reference to the parties involved—after all, the statute would be incomplete if it read "by virtue of the [] relationship"; the words "carrier" and "customer" specify *whose* relationship is at issue—rather than to obliquely distinguish among different services encompassed within that relationship. *Verizon*, 156 F.4th at 98 ("Section 222(h)(1)(A) uses the[se] terms * * * to identify the relevant parties * * *, not to cabin that relationship to common-carrier services.").

### C. AT&T Cannot Object That It Lacked Notice Of The Meaning Of The Statute.

AT&T contends (Supp. Br. 21–22) that it lacked notice that Section 222 applied to its location-based services program. But the forfeiture order simply tracks the best reading of the statute, as two other circuits have found, and that statute provides all the notice to which AT&T was entitled. *Cf. Order* ¶ 34 (ER15). Absent any contention that a statute is so standardless as to be unconstitutionally vague—which AT&T does not

argue here—courts must presume that the statute's "best," "most natural," and "most straightforward" interpretation supplies fair notice of what is prohibited. *Sprint*, 151 F.4th at 366–67; *see, e.g.*, *BP Am., Inc. v. FERC*, 52 F.4th 204, 219 n.11 (5th Cir. 2022).

To be sure, our system of "[j]udicial decisionmaking * * * necessarily involves some peril to individual expectations because it is often difficult to predict [the courts' interpretation of a statute] until it has been distilled in the crucible of litigation." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312 (1994). But that does not excuse regulated parties like AT&T from having to comply with the best reading of the statute, or from facing consequences if they fail to do so.[6]

---

[6] AT&T observes (Supp. Br. 21) that this Court, as a matter of administrative law, has required more particularized notice when an agency exercises rulemaking authority to create new obligations not directly imposed by statute. *CFTC v. EOX Holdings, LLC*, 90 F.4th 439, 443–48 (2024). But that is not the case here, where the statute itself creates the obligation to protect CPNI. Equally misplaced is AT&T's reliance (Supp. Br. 21–22) on *United States v. Metcalf*, 156 F.4th 871 (9th Cir. 2025). That decision rests on the scienter requirement of a criminal statute, 18 U.S.C. § 922(q)(2)(A), which requires proof beyond a reasonable doubt that the defendant was aware that his state firearms license was insufficient. *See Rehaif v. United States*, 588 U.S. 225 (2019) (construing the relevant scienter requirement). No such heightened scienter requirement applies in this case.

Even if AT&T was uncertain whether the statute applied, moreover, its representations to the Commission show that any such uncertainty was harmless. *Cf.* 5 U.S.C. § 706 (directing that courts take "due account * * * of the rule of prejudicial error"). AT&T told the Commission that although it disputed whether Section 222 applied to the location data at issue, it nonetheless chose at all relevant times to treat the data as if Section 222 applied. *Order* ¶ 34 & n.116 (ER15); *NAL* ¶ 37 n.122 (A128) (recounting AT&T's representations that it "collected and attempted to protect and treat location information in an essentially equivalent manner to CPNI").[7] AT&T's claimed injury thus stems not from any possible uncertainty about whether Section 222 applied, but instead from the inadequacy of the practices AT&T implemented to comply with Section 222.

[7] *See* LOI Resp. at 11 (A188) ("AT&T provides such information pursuant to protections that are equivalent to the protections required by Section 222 and the CPNI rules."); *id.* at 12 (A189) ("AT&T require[d] Location Aggregators and LBS Providers to provide notice and obtain customer consent in a manner that is consistent with the FCC's CPNI Rules."); Supp. LOI Resp. at 5–6 (details filed under seal)

## III. THE COMMISSION'S CHOICE OF ADMINISTRATIVE FORFEITURE PROCEDURES IS A LAWFUL EXERCISE OF EXECUTIVE POWER.

The Communications Act offers two procedural pathways for an administrative forfeiture proceeding. Under Section 503(b)(3), the Commission may initiate a formal adjudication before an administrative law judge or the Commission itself. 47 U.S.C. § 503(b)(3). Alternatively, under Section 503(b)(4), the Commission may "issue[] a notice of apparent liability" and provide the alleged violator an opportunity to respond in writing. *Id.* § 503(b)(4).

AT&T argues (Supp. Br. 28–30) that the Commission's discretion to choose between these two procedural routes violates the nondelegation doctrine because it delegates legislative authority without an intelligible principle to guide the Commission's choice. That argument fails because the agency's choice of prosecutorial procedures is a paradigmatic exercise of *executive*—not legislative—power. *Order* ¶ 80 (ER35–36). The nondelegation doctrine applies to "'powers which are strictly and exclusively legislative,'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion), but the Constitution assigns the power to "take Care that the Laws be faithfully executed" to the Executive Branch, U.S. Const. art. II, § 3. As the D.C. Circuit recognized in rejecting this same

argument, "the Executive Branch's Article II power to enforce the law encompasses the 'prerogative to choose where and how to enforce' a statute within the enforcement options created by Congress." *Sprint*, 151 F.4th at 363.

AT&T's reliance (Supp. Br. 29) on this Court's decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), is misplaced. *Jarkesy* held that Congress violated the nondelegation doctrine when it "gave the SEC the unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency," *id.* at 459—that is, to decide whether to proceed in a *judicial* forum or an *executive* forum.

Unlike in *Jarkesy*, the Communications Act does not empower the Commission to decide whether to proceed before a judicial or an administrative tribunal. Under either procedural pathway—a formal agency adjudication or an informal NAL-based agency adjudication—the determination of whether to assess a forfeiture is made by the agency through an administrative proceeding. While the particular administrative procedures may vary, the Supreme Court has long recognized the "established principle" that "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their

multitudinous duties.'" *FCC v. Schreiber*, 381 U.S. 279, 290 (1965) (quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 143 (1940)).

Likewise, whereas *Jarkesy* was concerned that the SEC's choice between a judicial or in-house forum could deny regulated parties the "legal processes * * * accompanying Article III proceedings," 34 F.4th at 462 (emphasis omitted), in this case either procedural pathway provides for judicial review of any resulting forfeiture in an Article III court. *See* 47 U.S.C. § 503(b)(3)(A) ("Any person against whom a forfeiture penalty is determined under this paragraph may obtain [judicial] review thereof pursuant to" 47 U.S.C. § 402(a)); *id.* § 503(b)(4) ("Any forfeiture penalty determined under this paragraph shall be recoverable pursuant to" a judicial enforcement action under 47 U.S.C. § 504(a)).

Even if this case involved the same choice as in *Jarkesy*, moreover, that delegation would not be unconstitutional here because the Communications Act supplies appropriate guidance to govern the Commission's choice. *Jarkesy* stressed that the statute there "offered *no guidance* whatsoever" and "said nothing at all indicating how the SEC should make that call in any given case." 34 F.4th at 462. Here, by contrast, in deciding which procedural pathway to pursue, the Commission is guided by Congress's statutory directive to "conduct its

proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j). While that directive is broadly worded, it is well in line with many other broad delegations the Supreme Court has upheld against constitutional challenge. *See*, *e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943); *Yakus v. United States*, 321 U.S. 414, 427 (1944); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).[8]

## IV. AT&T'S ARGUMENT THAT THE GOVERNMENT MISLED IT INTO PAYING THE FORFEITURE PRIOR TO A DISTRICT COURT ENFORCEMENT ACTION IS BOTH WAIVED AND MERITLESS.

Lastly, AT&T seeks to advance a new argument (Supp. Br. 30–36) that the government affirmatively misled it into paying the forfeiture prior to a Section 504(a) enforcement action. Yet AT&T waived that

[8] AT&T also cannot fairly complain of the Commission's choice to employ the NAL-based route here because, if one accepts the other arguments that AT&T has advanced in this case, the Commission *could not* have chosen any other approach. AT&T argued in its opening brief (at 29–32) that the forfeiture order is a legal action involving the adjudication of private rights, thereby implicating the Seventh Amendment jury-trial right, and the Supreme Court decided the case on that basis. But a jury trial is available only for forfeitures assessed under Section 503(b)(4), not under Section 503(b)(3)—so on AT&T's own view, only the NAL-based pathway was available here. If the Commission had no constitutional choice but to pursue the NAL-based pathway, then any choice was illusory and could not give rise to any nondelegation problem.

argument by failing to raise it in its initial appeal, as the Supreme Court recognized in refusing to allow Verizon to belatedly raise the same argument. And even if the argument were preserved, the record here shows it to be entirely baseless.

**1.** As a threshold matter, AT&T waived this new argument by failing to timely raise it. AT&T did not argue in its initial appeal that, if the availability of a Section 504(a) enforcement action satisfies the Seventh Amendment, the *Order* unlawfully misled it into paying the penalty immediately and forgoing that opportunity. Nor did it raise that argument in the Supreme Court until its reply brief. AT&T's failure to raise this argument in its initial appeal waived its right to do so now. *See Lindquist v. City of Pasadena*, 669 F.3d 225, 239–40 (5th Cir. 2012) (the waiver doctrine precludes a party that failed to raise an argument on initial appeal from raising it after remand); *Colo. Radio Corp. v. FCC*, 118 F.2d 24, 26 (D.C. Cir. 1941) ("[N]o judging process * * * could operate efficiently" if a party could "sit back and hope that a decision will be in its favor, and then, when it isn't, to parry with an offer of more evidence.").

The Supreme Court's treatment of the *Verizon* case confirms that this argument is waived. When AT&T and Verizon sought to raise this argument for the first time in their Supreme Court reply brief, the Court responded that this belated effort provided no occasion to address "the merits of this argument [or] what relief may be available." 608 U.S. at 548 n.5. Verizon filed a petition for rehearing, asking the Court for a remand to allow it to advance this new argument. Pet. for Reh'g, *Verizon Commc'ns Inc. v. FCC*, No. 25-567 (U.S. filed June 29, 2026). The Court summarily denied that request, 2026 WL 2374102, reflecting that Verizon failed to preserve this argument and thus was not entitled to raise it on remand. AT&T is in no better position to assert that claim.

**2.** The record shows that AT&T's new argument is baseless in any event. The Commission did not mislead AT&T into paying the forfeiture; on the contrary, paragraph 69 of the *Order* specifically advised AT&T no fewer than four times that it was not required to pay the forfeiture until the government prevailed in a civil enforcement action under Section 504(a). "Pursuant to section 504 of the Act," the *Order* explained that "AT&T is entitled to a trial *de novo* in federal district court before it can be required to pay the forfeiture"; that AT&T has a "statutory

entitlement to a trial *de novo* in federal district court to ultimately adjudicate its obligation to pay a forfeiture"; and that AT&T has a "statutory right to a trial *de novo* before it can be required to pay the forfeiture. *Order* ¶ 69 (ER30). And after noting that AT&T could "elect to pay the forfeiture voluntarily," the *Order* stated that this "does not diminish [AT&T's] statutory right to a trial *de novo* in federal district court." *Id.* ¶ 69 n.223 (ER30).

The Commission thus specifically advised AT&T that it could decline to pay the penalty and wait for the government to bring an enforcement action in district court, which would have provided AT&T the opportunity to pursue a de novo jury trial in district court. Yet AT&T elected instead to forgo that opportunity and paid the forfeiture penalty in order to pursue immediate appellate review in this Court.

AT&T points (Supp. Br. 11, 31) to two sentences in the *Order*'s ordering clauses stating that (1) AT&T "is liable for a monetary forfeiture in the amount of" $57,265,625, and (2) "[p]ayment of the forfeiture shall be made * * * within thirty (30) calendar days." *Order* ¶¶ 83–84 (ER36–37) (capitalization and emphasis omitted). Contrary to AT&T's misimpression, that language does not itself impose a legal duty to pay,

but instead—consistent with the earlier statements in paragraph 69 of the *Order*—simply enables the government to bring a Section 504(a) judicial enforcement action if AT&T declines to pay. As the Supreme Court explained, by declaring AT&T "liable," the first sentence simply "authorizes a lawsuit—it 'creates a right of action.' It does not mean that an offender must immediately pay." *FCC v. AT&T*, 608 U.S. at 544 n.3 (brackets, alteration, and citation omitted).[9] And the second sentence, correctly understood, simply advised AT&T that if it wished to forestall a district court enforcement action by paying the penalty—perhaps to instead pursue direct review of the *Order*, as it chose here—then it had 30 days to do so.

That AT&T misreads this language is made unmistakably clear two sentences later, where the *Order* again states: "If the forfeiture is not paid within the period specified, the case may be referred to the U.S. Department of Justice for enforcement of the forfeiture pursuant to

[9] AT&T contends (Supp. Br. 31) that "no ordinary citizen * * * would read [this] language * * * as a friendly invitation to pay." But AT&T is not an ordinary citizen; it is a highly sophisticated corporation whose lawyers could understand that, as the Supreme Court explained, an agency declaring it "liable" is a legal term of art meaning that the government may file a judicial action seeking payment, not an immediate and self-enforcing obligation to pay.

section 504(a) of the Act." *Order* ¶ 84 (ER37). The *Order* did not compel AT&T to make immediate payment, but instead offered it a choice between paying the forfeiture or awaiting a district court enforcement action—in which it would have had the right to pursue a *de novo* jury trial. *Id.* ¶ 69 & n.223 (ER30). That AT&T claims to have misread the *Order* does not mean that the government misled it, nor does it entitle AT&T to relief against the government.[10]

[10] AT&T likewise identifies no legal authority permitting the Court to grant its alternative request (Supp. Br. 34–36) that the government be ordered to refund its forfeiture payment even if there is no basis to vacate the *Order*. Under the Hobbs Act, a reviewing court has "jurisdiction to enjoin, set aside, suspend, * * * or to determine the validity of" an FCC "order," 28 U.S.C. § 2342(1), but that statute supplies no basis for the court to order relief that operates on the government itself rather than on the challenged order. Likewise, the APA's waiver of sovereign immunity is limited to "relief other than money damages," 5 U.S.C. § 702, and thus does permit a court to directly order the government to make any monetary payment to AT&T.

## CONCLUSION

The petition for review should be denied.

Dated: September 23, 2026

Respectfully submitted,

/s/ *Scott M. Noveck*

Christopher S. Santini
*Acting General Counsel*

Jacob M. Lewis
*Associate General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Scott M. Noveck
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal Communications Commission*

Robert B. Nicholson
Matthew A. Waring
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United States of America*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   ☒ this document contains 12,724 words, *or*

   ☐ this document uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using __________________ with ______________________.

*/s/ Scott M. Noveck*
Scott M. Noveck
*Counsel for Respondents*

**STATUTORY ADDENDUM**

## STATUTORY ADDENDUM CONTENTS

**Page**

Communications Act of 1934, *as amended*, 47 U.S.C. §§ 151 *et seq*.:

47 U.S.C. § 217 .................... Add. 2

47 U.S.C. § 222 .................... Add. 2

47 U.S.C. § 503 .................... Add. 4

47 U.S.C. § 504 .................... Add. 6

47 C.F.R. § 1.80 .................... Add. 7

47 C.F.R. Part 64, Subpart U, 47 C.F.R. §§ 64.2001 *et seq*.:

47 C.F.R. § 64.2001 .................... Add. 10

47 C.F.R. § 64.2003 .................... Add. 10

47 C.F.R. § 64.2007 .................... Add. 11

47 C.F.R. § 64.2008 .................... Add. 12

47 C.F.R. § 64.2010 .................... Add. 13

Section 217 of the Communications Act, 47 U.S.C. § 217, provides:

**Sec. 217 [47 U.S.C. § 217]. Liability of carrier for acts and omissions of agents.**

In construing and enforcing the provisions of [this Act], the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

Section 222 of the Communications Act, 47 U.S.C. § 222, provides in pertinent part:

**Sec. 222 [47 U.S.C. § 222]. Privacy of customer information.**

(a) **In General.**—Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

* * *

(c) **Confidentiality of Customer Proprietary Network Information.**—

(1) **Privacy requirements for telecommunications carriers.**—Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

* * *

(d) **Exceptions.**—Nothing in this section prohibits a telecommunications carrier from using, disclosing, or permitting access to customer proprietary network information obtained from its customers, either directly or indirectly through its agents—

* * *

(4) to provide call location information concerning the user of a commercial mobile service * * * —

(A) to a public safety answering point, emergency medical service provider or emergency dispatch provider, public safety, fire service, or law enforcement official, or hospital emergency or trauma care facility, in order to respond to the user's call for emergency services;

(B) to inform the user's legal guardian or members of the user's immediate family of the user's location in an emergency situation that involves the risk of death or serious physical harm; or

(C) to providers of information or database management services solely for purposes of assisting in the delivery of emergency services in response to an emergency.

* * *

(f) **Authority to Use Location Information.**—For purposes of subsection (c)(1), without the express prior authorization of the customer, a customer shall not be considered to have approved the use or disclosure of or access to—

(1) call location information concerning the user of a commercial mobile service * * * other than in accordance with subsection (d)(4); or

(2) automatic crash notification information to any person other than for use in the operation of an automatic crash notification system.

* * *

(h) **Definitions.**—As used in this section:

(1) **Customer proprietary network information.**—The term "customer proprietary network information" means—

(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

(B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier;

except that such term does not include subscriber list information.

* * *

Section 503 of the Communications Act, 47 U.S.C. § 503, provides in pertinent part:

**Sec. 503 [47 U.S.C. § 503]. Forfeitures.**

* * *

(b)(1) Any person who is determined by the Commission, in accordance with paragraph (3) or (4) of this subsection, to have—

(A) willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;

(B) willfully or repeatedly failed to comply with any of the provisions of [this Act] or of any rule, regulation, or order issued by the Commission under [this Act] or under any treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;

(C) violated any provision of section 317(c) or 509(a) of [this Act]; or

(D) violated any provision of section 1304, 1343, 1464, or 2252 of title 18;

shall be liable to the United States for a forfeiture penalty. * * *

(2) * * * (B) If the violator is a common carrier subject to the provisions of [this Act] or an applicant for any common carrier license, permit, certificate, or other instrument of authorization issued by the Commission, the amount of any forfeiture penalty determined under this subsection shall not exceed $100,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act described in paragraph (1) of this subsection.

* * *

(E) The amount of such forfeiture penalty shall be assessed by the Commission, or its designee, by written notice. In determining the amount of such a forfeiture penalty, the Commission or its designee shall take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.

* * *

(3)(A) At the discretion of the Commission, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative law judge thereof in accordance with section 554 of title 5. Any person against whom a forfeiture penalty is determined under this paragraph may obtain review thereof pursuant to section 402(a) of this title.

(B) If any person fails to pay an assessment of a forfeiture penalty determined under subparagraph (A) of this paragraph, after it has become a final and unappealable order or after the appropriate court has entered final judgment in favor of the Commission, the Commission shall refer the matter to the Attorney General of the United States, who shall recover the amount assessed in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the forfeiture penalty shall not be subject to review.

(4) Except as provided in paragraph (3) of this subsection, no forfeiture penalty shall be imposed under this subsection against any person unless and until—

(A) the Commission issues a notice of apparent liability, in writing, with respect to such person;

(B) such notice has been received by such person, or until the Commission has sent such notice to the last known address of such person, by registered or certified mail; and

(C) such person is granted an opportunity to show, in writing, within such reasonable period of time as the Commission prescribes by rule or regulation, why no such forfeiture penalty should be imposed.

Such a notice shall (i) identify each specific provision, term, and condition of any Act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, instrument, or authorization which such person apparently violated or with which such person apparently failed to comply; (ii) set forth the nature of the act or omission charged against such person and the facts upon which such charge is based; and (iii) state the date on which such conduct occurred. Any forfeiture penalty determined under this paragraph shall be recoverable pursuant to section 504(a) of [this Act].

* * *

Section 504 of the Communications Act, 47 U.S.C. § 504, provides in pertinent part:

**Sec. 504 [47 U.S.C. § 504]. Provisions Relating to Forfeitures.**

(a) The forfeitures provided for in [this Act] shall be payable into the Treasury of the United States, and shall be recoverable, except as otherwise provided with respect to a forfeiture penalty determined under section 503(b)(3) of [this Act], in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office or in any district through which the line or system of the carrier runs: *Provided*, That any suit for the recovery of a forfeiture imposed pursuant to the provisions of [this Act] shall be a trial de novo: *Provided further*,

That in the case of forfeiture by a ship, said forfeiture may also be recoverable by way of libel in any district in which such ship shall arrive or depart. Such forfeitures shall be in addition to any other general or specific penalties provided in [this Act]. It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures under [this Act]. The costs and expenses of such prosecutions shall be paid from the appropriation for the expenses of the courts of the United States.

* * *

(c) In any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under [this Act], that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final.

47 C.F.R. § 1.80 provides in pertinent part:

**§ 1.80 Forfeiture Proceedings.**

* * *

(b) *Limits on the amount of forfeiture assessed—*

* * *

(11) *Factors considered in determining the amount of the forfeiture penalty.* In determining the amount of the forfeiture penalty, the Commission or its designee will take into account the nature, circumstances, extent and gravity of the violations and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.

* * *

TABLE 3 TO PARAGRAPH (b)(11)—ADJUSTMENT CRITERIA FOR SECTION 503 FORFEITURES

*Upward Adjustment Criteria:*

(1) Egregious misconduct.

(2) Ability to pay/relative disincentive.

(3) Intentional violation.

(4) Substantial harm.

(5) Prior violations of any FCC requirements.

(6) Substantial economic gain.

(7) Repeated or continuous violation.

*Downward Adjustment Criteria:*

(1) Minor violation.

(2) Good faith or voluntary disclosure.

(3) History of overall compliance.

(4) Inability to pay.

NOTE 2 TO PARAGRAPH (b)(11): *Guidelines for Assessing Forfeitures.* The Commission and its staff may use the guidelines in tables 1 through 4 of this paragraph (b)(11) in particular cases. The Commission and its staff retain the discretion to issue a higher or lower forfeiture than provided in the guidelines, to issue no forfeiture at all, or to apply alternative or additional sanctions as permitted by the statute. The forfeiture ceilings per violation or per day for a continuing violation stated in section 503 of the Communications Act and the Commission's rules are described in paragraph (b)(12) of this section. These statutory maxima became effective September 13, 2013. Forfeitures issued under other sections of the Act are dealt with separately in table 4 to this paragraph (b)(11).

* * *

(f) *Alternative procedures.* In the discretion of the Commission, a forfeiture proceeding may be initiated either: (1) By issuing a notice of apparent liability, in accordance with paragraph [(g)] of this section, or (2) a notice of opportunity for hearing, in accordance with paragraph [(h)].

(g) *Notice of apparent liability*. Before imposing a forfeiture penalty under the provisions of this paragraph, the Commission or its designee will issue a written notice of apparent liability.

(1) *Content of notice.* The notice of apparent liability will:

(i) Identify each specific provision, term, or condition of any act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, or instrument of authorization which the respondent has apparently violated or with which he has failed to comply,

(ii) Set forth the nature of the act or omission charged against the respondent and the facts upon which such charge is based,

(iii) State the date(s) on which such conduct occurred, and

(iv) Specify the amount of the apparent forfeiture penalty.

(2) *Delivery*. The notice of apparent liability will be sent to the respondent, by certified mail, at his last known address (see § 1.5).

(3) *Response.* The respondent will be afforded a reasonable period of time (usually 30 days from the date of the notice) to show, in writing, why a forfeiture penalty should not be imposed or should be reduced, or to pay the forfeiture. Any showing as to why the forfeiture should not be imposed or should be reduced shall include a detailed factual statement and such documentation and affidavits as may be pertinent.

(4) *Forfeiture order*. If the proposed forfeiture penalty is not paid in full in response to the notice of apparent liability, the Commission, upon considering all relevant information available to it, will issue an order canceling or reducing the proposed forfeiture or requiring that it be paid in full and stating the date by which the forfeiture must be paid.

(5) *Judicial enforcement of forfeiture order*. If the forfeiture is not paid, the case will be referred to the Department of Justice for collection under section 504(a) of the Communications Act.

* * *

47 C.F.R. § 64.2001 provides in pertinent part:

**§ 64.2001 Basis and purpose.**

(a) *Basis.* The rules in this subpart are issued pursuant to the Communications Act of 1934, as amended.

(b) *Purpose.* The purpose of the rules in this subpart is to implement section 222 of the Communications Act of 1934, as amended, 47 U.S.C. 222.

47 C.F.R. § 64.2003 provides in pertinent part:

**§ 64.2003 Definitions.**

* * *

(e) *Communications-related services.* The term "communications-related services" means telecommunications services, information services typically provided by telecommunications carriers, and services related to the provision or maintenance of customer premises equipment.

* * *

(g) *Customer proprietary network information (CPNI).* The term "customer proprietary network information (CPNI)" has the same meaning given to such term in section 222(h)(1) of the Communications Act of 1934, as amended, 47 U.S.C. 222(h)(1).

* * *

(i) *Information services typically provided by telecommunications carriers.* The phrase "information services typically provided by telecommunications carriers" means only those information services (as defined in section 3(20) of the Communication Act of 1934, as amended, 47 U.S.C. 153(20)) that are typically provided by telecommunications carriers, such as Internet access or voice mail services. Such phrase "information services typically provided by telecommunications carriers," as used in this subpart, shall not include retail consumer services provided using Internet Web sites (such as travel reservation services or mortgage lending services), whether or not such services may otherwise be considered to be information services.

*   *   *

(k) *Opt-in approval.* The term "opt-in approval" refers to a method for obtaining customer consent to use, disclose, or permit access to the customer's CPNI. This approval method requires that the carrier obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request consistent with the requirements set forth in this subpart.

*   *   *

47 C.F.R. § 64.2007 provides in pertinent part:

**§ 64.2007 Approval required for use of customer proprietary network information.**

*   *   *

(b) *Use of opt-out and opt-in approval processes.* A telecommunications carrier may, subject to opt-out approval or opt-in approval, use its customer's individually identifiable CPNI for the purpose of marketing communications-related services to that customer. A telecommunications carrier may, subject to opt-out approval or opt-in approval, disclose its customer's individually identifiable CPNI, for the purpose of marketing communications-related services to that customer, to its agents and its affiliates that provide communications-related services. A telecommunications carrier may also permit such persons or entities to obtain access to such CPNI for such purposes. Except for use and disclosure of CPNI that is permitted without customer approval under § 64.2005, or that is described in this paragraph, or as otherwise provided in section 222 of the Communications Act of 1934, as amended, a telecommunications carrier may only use, disclose, or permit access to its customer's individually identifiable CPNI subject to opt-in approval.

47 C.F.R. § 64.2008 provides in pertinent part:

**§ 64.2008 Notice required for use of customer proprietary network information.**

* * *

(b) Individual notice to customers must be provided when soliciting approval to use, disclose, or permit access to customers' CPNI.

(c) *Content of notice.* Customer notification must provide sufficient information to enable the customer to make an informed decision as to whether to permit a carrier to use, disclose, or permit access to, the customer's CPNI.

(1) The notification must state that the customer has a right, and the carrier has a duty, under federal law, to protect the confidentiality of CPNI.

(2) The notification must specify the types of information that constitute CPNI and the specific entities that will receive the CPNI, describe the purposes for which CPNI will be used, and inform the customer of his or her right to disapprove those uses, and deny or withdraw access to CPNI at any time.

(3) The notification must advise the customer of the precise steps the customer must take in order to grant or deny access to CPNI, and must clearly state that a denial of approval will not affect the provision of any services to which the customer subscribes. However, carriers may provide a brief statement, in clear and neutral language, describing consequences directly resulting from the lack of access to CPNI.

(4) The notification must be comprehensible and must not be misleading.

(5) If written notification is provided, the notice must be clearly legible, use sufficiently large type, and be placed in an area so as to be readily apparent to a customer.

(6) If any portion of a notification is translated into another language, then all portions of the notification must be translated into that language.

(7) A carrier may state in the notification that the customer's approval to use CPNI may enhance the carrier's ability to offer products and services tailored to the customer's needs. A carrier also may state in the notification that it may be compelled to disclose CPNI to any person upon affirmative written request by the customer.

(8) A carrier may not include in the notification any statement attempting to encourage a customer to freeze third-party access to CPNI.

(9) The notification must state that any approval, or denial of approval for the use of CPNI outside of the service to which the customer already subscribes from that carrier is valid until the customer affirmatively revokes or limits such approval or denial.

(10) A telecommunications carrier's solicitation for approval must be proximate to the notification of a customer's CPNI rights.

* * *

(e) *Notice requirements specific to opt-in.* A telecommunications carrier may provide notification to obtain opt-in approval through oral, written, or electronic methods. The contents of any such notification must comply with the requirements of paragraph (c) of this section.

* * *

47 C.F.R. § 64.2010 provides in pertinent part:

**§ 64.2010 Notice required for use of customer proprietary network information.**

(a) *Safeguarding CPNI.* Telecommunications carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI. Telecommunications carriers must properly authenticate a customer prior to disclosing CPNI based on customer-initiated telephone contact, online account access, or an in-store visit.

* * *