**No. 24-60223**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

AT&T, INC.,

*Petitioner*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review from the
Federal Communications Commission

# PETITIONER AT&T, INC.'S SUPPLEMENTAL REPLY BRIEF

Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T, Inc.*

**AMENDED CERTIFICATE OF INTERESTED PERSONS**

No. 24-60223*, AT&T, Inc. v. Federal Communications Commission*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Petitioner**
AT&T, Inc.

**Counsel for Petitioner**
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP

**Amici**
Chamber of Commerce of the United States of America
CTIA – the Wireless Association

**Counsel for Amici**
Mariel A. Brookins
Maria C. Monaghan
U.S. CHAMBER LITIGATION CENTER
Joshua Scott Turner
Sara M. Baxenberg
Stephen J. Conley
Boyd Garriott
WILEY REIN, L.L.P.

**Respondents**
Federal Communications Commission
United States of America

**Counsel for Respondents**
D. Adam Candeub
James Michael Carr
Sarah E. Citrin
P. Michele Ellison
Jacob M. Lewis
Scott M. Noveck
Christopher S. Santini
FEDERAL COMMUNICATIONS COMMISSION

Todd Blanche
Merrick Garland
Jonathan S. Kanter
Robert J. Wiggers
Robert B. Nicholson
Matthew A. Waring
U.S. DEPARTMENT OF JUSTICE

*s/ Pratik A. Shah*
Pratik A. Shah

*Counsel for Petitioner AT&T, Inc.*

## TABLE OF CONTENTS


AMENDED CERTIFICATE OF INTERESTED PERSONS ..................................i

INTRODUCTION ....................................................................................1

ARGUMENT .........................................................................................4

I. THE COMMISSION'S ARGUMENTS ON THE PREVIOUSLY BRIEFED ISSUES REMAIN UNPERSUASIVE ........................................4

A. The Commission's Statutory Arguments Continue To Flout The Plain Text Of Section 222 And Basic Principles Of Fair Notice............4

B. The Commission's Defense Of Its Liability Determination Confirms The Commission Conducted The Wrong Inquiry ..................9

C. The Commission Cannot Justify Its Violation Of The Statutory Penalty Cap For Continuing Violations..............................................15

D. The Commission Has No Meaningful Response To AT&T's Nondelegation Claim.........................................................................19

II. THE ADDITIONAL BASIS IDENTIFIED BY THE SUPREME COURT INDEPENDENTLY COMPELS VACATUR .................................21

CONCLUSION......................................................................................25

# TABLE OF AUTHORITIES

**CASES:**

*Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*,
272 F.3d 276 (5th Cir. 2001) .......................................................... 22

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*,
663 F.3d 966 (8th Cir. 2011) .......................................................... 11

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......................................................... 24

*Chicago, R. I. & P. R. Co. v. Lint*,
217 F.2d 279 (8th Cir. 1954) .......................................................... 12

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .......................................................... 9

*Commodity Futures Trading Comm'n v. EOX Holdings, L.L.C.*,
90 F.4th 439 (5th Cir. 2024) .......................................................... 8

*E. I. duPont deNemours & Co. v. Christopher*,
431 F.2d 1012 (5th Cir. 1970) .......................................................... 11

*FCC v. AT&T, Inc.*,
608 U.S. 531 (2026) .......................................................... 21

*Fragosa v. Moore*,
17 F. Supp. 3d 985 (C.D. Cal. 2014) .......................................................... 24

*General Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) .......................................................... 9

*Grand Trunk R.R. Co. v. Richardson*,
91 U.S. 454 (1875) .......................................................... 10

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......................................................... 18

*In re MCP No. 185*,
124 F.4th 993 (6th Cir. 2025) .......................................................... 6

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F.2d 1088 (5th Cir. 1977) .......... 13

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) .......... 3, 19, 20

*Kuhns v. Scottrade, Inc.*,
868 F.3d 711 (8th Cir. 2017) .......... 11

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 17, 18

*National Ass'n of Regul. Util. Comm'rs v. FCC*,
737 F.2d 1095 (D.C. Cir. 1984) .......... 19

*National Horsemen's Benevolent & Protective Ass'n v. Black*,
178 F.4th 224 (5th Cir. 2026) .......... 7

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .......... 22

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 21

*Republican Nat'l Comm'n v. FEC*,
76 F.3d 400 (D.C. Cir. 1996) .......... 24

*Reyes-Mata v. IBP, Inc.*,
299 F.3d 504 (5th Cir. 2002) .......... 12

*United States v. WIYN Radio, Inc.*,
614 F.2d 495 (5th Cir. 1980) .......... 17, 18

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 8

*Verizon Commc'ns Inc. v. FCC*,
156 F.4th 86 (2d Cir. 2025) .......... 6, 18

**COMMISSION PROCEEDINGS:**

*Amendment of Section 1.80(b) of the Comm'n's Rules*,
34 FCC Rcd. 12,824 (2019) .......... 15

**<u>STATUTES</u>:**

28 U.S.C.
§ 2342(1) .... 24

47 U.S.C.
§ 153(11) .... 6
§ 153(51) .... 4, 6
§ 153(53) .... 5
§ 154(j) .... 20, 21
§ 217 .... 12, 13
§ 222(h)(1)(A) .... 4, 5
§ 503(b)(2)(B) .... 15, 17, 18
§ 503(b)(3)(A) .... 19, 20

**<u>OTHER AUTHORITIES</u>:**

47 C.F.R.
§ 64.2003(e) .... 7
§ 64.2003(*i*) .... 7
§ 64.2010(a) .... 10, 11

## INTRODUCTION

The Federal Communications Commission's supplemental brief makes the same mistakes as before. Dwelling on the misdeeds of Securus Technologies and casting AT&T as "willfully blind," it opts for storytelling over analysis. And the Commission's version of events remains both factually incomplete and legally erroneous. Indeed, the Commission still lacks any coherent response to the central statutory defects underlying its forfeiture order.

Securus cannot be the basis of the Commission's action because its abuses occurred long before the statute-of-limitations period, and AT&T cannot be faulted for failing to prevent another's deception. The notion that AT&T was careless, moreover, is flat wrong. AT&T gave access only to location-based services ("LBS") providers with an approved use case; conducted daily audits of consent records and broader programmatic audits; and responded to Securus's misdeeds promptly and prudently, weighing the costs and benefits at every turn. The result: out of dozens of providers with access to AT&T customer information, only one abused it. And when the Securus incident came to light, AT&T immediately shut off Securus's access, launched an investigation into its LBS program, and undertook a systematic phase-out to minimize disruption to customers relying on critical services provided by companies like Life Alert and AAA.

In any event, the Commission's skewed portrait cannot deflect from the forfeiture order's broken legal foundation or the Commission's inability to offer any meaningful response regarding the same. First and foremost, the Commission's defense of its threshold statutory authority to act—when finally made late in its brief (page 47!)—would require the Court to read either "solely" or "carrier" out of the statute. After all, section 222 of the Communications Act limits the Commission's regulatory authority to information provided "*solely* by virtue of the *carrier*-customer relationship," and a company is a "carrier" only when it provides telecommunications (*i.e.*, voice, not data) services. Yet, under the Commission's reading, information obtained through *any* customer relationship (voice or data) is included, meaning either "solely" or "carrier" does no work at all. That is not how to read a statute. Because the Commission lacked the statutory authority to regulate the location information at issue, which AT&T obtained through its provision of *both* voice and data services (or, for certain customers, data services only), the Court need go no further.

To make matters worse, the Commission's discussion of the $57 million penalty ignores this Court's precedent interpreting the Communications Act's $2 million statutory cap as applying to one "continuing *** failure to act," which perfectly captures the forfeiture order's reasoning that AT&T "placed its customers' location information at continuing risk of unauthorized access." And the

Commission's nondelegation arguments still cannot be squared with *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022); at the end of the day, the text of the Act commits the choice of enforcement process entirely to the Commission's unguided discretion.

The Commission's response to the additional ground for vacatur the Supreme Court identified—that the terms of the forfeiture order "misled [AT&T] into paying"—fares no better. The Commission contends AT&T waived the argument by not raising it until its Supreme Court reply brief. But as several Justices took pains to note, the Commission first articulated its current position that the order lacked any legal effect in its Supreme Court response. So AT&T could not have waived its argument before then. On the merits, the Commission insists AT&T could not have been misled because one paragraph of a nearly 100-paragraph order mentioned the option for a trial *de novo*. That argument, however, ignores the order's operative command directing AT&T to pay $57 million within 30 days (period) and the Commission's own regulations reinforcing that directive. Put simply, AT&T did exactly what the Commission (a regulator with limitless leverage over AT&T's business) told it to do. The Commission cannot now disclaim the meaning of its own order and fault AT&T for having complied with it as written.

The Court should (again) vacate the Commission's unlawful order.

## ARGUMENT

### I. THE COMMISSION'S ARGUMENTS ON THE PREVIOUSLY BRIEFED ISSUES REMAIN UNPERSUASIVE

#### A. The Commission's Statutory Arguments Continue To Flout The Plain Text Of Section 222 And Basic Principles Of Fair Notice

It takes the Commission 40+ pages to work up to the threshold question in this case: whether it had statutory authority to act at all. *See* Comm'n Supp. Br. 43-50. That reluctance is understandable. The Commission still has no good arguments to make.

**1.** To impose the forfeiture order here, the Commission relied on its section 222 authority over customer proprietary network information ("CPNI"), which the Communications Act defines as "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." 47 U.S.C. § 222(h)(1)(A). All agree that the definition imposes two requirements: the information in question must (1) "relate[] to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service," and (2) be made available "solely by virtue of the carrier-customer relationship," meaning the relationship through which the carrier provides telecommunications (*i.e.*, voice) services. *Id.*; *see id.* § 153(51)

(a telecommunications carrier "shall be treated as a common carrier *** only to the extent that it is engaged in providing telecommunications services"). As AT&T has explained, the customer location information at issue here meets neither requirement.

In response, the Commission argues with respect to the first requirement that the statute covers any location information that "relates to" AT&T's wireless telecommunications service in any way. Comm'n Supp. Br. 44-45. But that interpretation reads "of use" out of the provision, thereby expanding the location information covered beyond what the text provides (*i.e.*, call location) and leaving several pieces of the provision without any clear or ordinary meaning. *See* Supp. Opening Br. 16-17. For example, without "of use," the provision would include information that relates to the "destination *** of a telecommunications service," 47 U.S.C. § 222(h)(1)(A), which is to say the "destination" of the "offering of telecommunications," *id.* § 153(53) (defining "telecommunications service"). What that means is anyone's guess. *See* CTIA Amicus Br. 13 ("'Destination' of an 'offering' is a mystery.").

The Commission's position on the second requirement—that the information be provided "solely by virtue of the carrier-customer relationship"—is even weaker. The Commission yet again argues that this requirement is met because the customer information in question was "requir[ed]" for customers' telecommunications

services. Comm'n Supp. Br. 47; *see also id.* (arguing that the relevant information qualified because it was "necessary" for customers' telecommunications services). The Commission, however, does not (and cannot) deny that information can be "required" without being the "sole[]" reason the information is provided. *See* Supp. Opening Br. 19 (citing Reply Br. 18). Indeed, data-only customers provide the same information, even though AT&T provides them no telecommunications (*i.e.*, voice) service at all.

Apparently recognizing the weakness of its "required" theory, the Commission adopts the Second Circuit's view that the carrier-customer relationship "'may encompass multiple services,' including information services," not just voice service. Comm'n Supp. Br. 48 (quoting *Verizon Commc'ns Inc. v. FCC*, 156 F.4th 86, 98 (2d Cir. 2025)). But like the Second Circuit, the Commission cannot square that view with the statutory text. *See* Supp. Opening Br. 19-20. The Communications Act makes clear that "carrier" means "common carrier." 47 U.S.C. § 153(11). And a "telecommunications carrier shall be treated as a common carrier *** only to the extent that it is engaged in providing telecommunications services." *Id.* § 153(51). There would be no point in limiting CPNI to information obtained "solely by virtue of the carrier-customer relationship" if the purpose was "not to cabin that relationship to common-carrier services." *Contra* Comm'n Supp. Br. 50 (quoting *Verizon*, 156 F.4th at 98); *see In re MCP No. 185*, 124 F.4th 993, 1002 (6th

Cir. 2025) (explaining that, under Title II of the Communications Act, "[a] provider that offers information service may not be classified as a common carrier").[1]

The Commission's suggestion that AT&T's reading would leave customer location information unprotected is just as wrong. Comm'n Supp. Br. 49. As then-Commissioner (now-Chairman) Carr's dissent from the forfeiture order explained, the Federal Trade Commission ("FTC") "would have been the right entity to take a final enforcement action, to the extent the FTC determined that one was warranted." AR1:40. Without addressing the substance of that statement, which Chairman Carr has never walked back, the most the Commission can offer in response is the *non sequitur* that the D.C. Circuit's and Second Circuit's decisions have since issued. Comm'n Supp. Br. 44 n.5. In any event, policy arguments about the proper scope of the Commission's statutory authority are a matter for Congress, not this Court,

---

[1] Meanwhile, the Commission barely references, much less embraces, the D.C. Circuit's off-point reasoning, citing that decision only for the undisputed proposition that customers often "get internet and text messaging from the same provider that supplies their voice service." Comm'n Supp. Br. 48. The Commission does invoke (for the first time) its own CPNI rule seeking to lump together "communications-related services" (such as voice calls) and "information services" (such as Internet access) for purposes of certain marketing limitations. *Id.* at 49 (quoting 47 C.F.R. § 64.2003(e), (*i*)). Even if that rule were relevant, though, it could not change the Communications Act's text, which plainly distinguishes between telecommunications services (*i.e.*, those provided "by virtue of the carrier-customer relationship") and information services (*i.e.*, data services necessarily provided in a non-carrier capacity). *See National Horsemen's Benevolent & Protective Ass'n v. Black*, 178 F.4th 224, 243 (5th Cir. 2026) ("agency cannot amend [a statute] by promulgating a rule").

which construes the terms as written. *See Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

**2.** At a minimum, applying the Commission's interpretation of CPNI here violated "basic principles of fair notice." AR1:41 (Comm'r Carr, dissenting). The Commission "has never held that location information other than 'call location information' constitutes CPNI. Nor has the [Commission] stated that a carrier might be liable under [its] CPNI rules for location information unrelated to a Title II [*i.e.*, telephone or voice] service and collected outside the Title II relationship." *Id.* AT&T thus had no fair notice that its customers' location information would be covered.

The Commission's response rests on the notion that its reading is the "best," "most natural," and "most straightforward" one. Comm'n Supp. Br. 50-51. For the reasons explained above (pp. 4-8, *supra*), it is not. Regardless, the Commission does not dispute that, in this Court, the question is not whether an interpretation first applied in an enforcement proceeding is the best or most natural one. The question is whether that interpretation was "sufficiently clear" beforehand. Supp. Opening Br. 21 (quoting *Commodity Futures Trading Comm'n v. EOX Holdings, L.L.C.*, 90 F.4th 439, 444 (5th Cir. 2024)). The Commission cannot point to any authority demonstrating that was the case here.

Besides, the Commission's own conduct over the years muddied the waters. In the decades after Congress enacted section 222, the Commission never once treated location information other than call location information as CPNI—or suggested that a carrier could be liable for location information collected outside the Title II relationship. *See* AR1:41-42 (Comm'r Carr, dissenting). That "very lengthy period of conspicuous inaction" is precisely what made the "potential for unfair surprise *** acute." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012).

Grasping at straws, the Commission argues that any lack of fair notice was "harmless" because AT&T "chose at all relevant times to treat the data as if Section 222 applied." Comm'n Supp. Br. 52. That misses the point. AT&T's decision to take precautions amid regulatory uncertainty does not justify imposing a $57 million penalty without notice. "[W]here the regulation is not sufficiently clear to warn a party about what is expected of it[,] an agency may not deprive a party of property by imposing civil or criminal liability"—full stop. *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-1329 (D.C. Cir. 1995), *as corrected* (June 19, 1995).

### B. The Commission's Defense Of Its Liability Determination Confirms The Commission Conducted The Wrong Inquiry

The Commission's justification for its liability determination only proves its fatal flaw: the Commission replaced the reasonableness inquiry with strict liability. As the Commission itself has acknowledged, "companies cannot prevent all data

breaches." AR1:16 (¶ 38). And nothing in section 222 or the Commission's rules demands otherwise. The question is whether a company took "*reasonable* measures to discover and protect against attempts to gain unauthorized access to CPNI." 47 C.F.R. § 64.2010(a) (emphasis added).

The Commission's supplemental brief, like the forfeiture order, nevertheless rests on the fact that Securus abused its access to AT&T's customer location information. As the Commission sees it, AT&T's pre-Securus safeguards were unreasonable because Securus was able to thwart them, and because Securus was able to thwart those safeguards, AT&T's only options were to either immediately overhaul them or terminate its LBS program altogether. The problems with that reasoning are legion.

**1.** As an initial matter, the "Securus abuses" and AT&T's actions beforehand cannot serve as a "basis" for the forfeiture. Comm'n Supp. Br. 34. The Commission already (and correctly) disclaimed liability based on Securus in the NAL because the limitations period "ran out in April 2018," years before the NAL issued. AR5:28 (¶ 78). Put simply, any claims based on the Securus incident are time-barred.

In any event, the reasonableness inquiry required the Commission to consider more than the mere existence of the Securus incident. After all, the fact that safeguards were defeated does not, standing alone, mean those safeguards were unreasonable. *See, e.g.*, *Grand Trunk R.R. Co. v. Richardson*, 91 U.S. 454, 467

(1875) ("[I]t is not negligence *** to assume that he is not exposed to a danger which can only come to him through a disregard of the law on the part of some other person."); *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 717 (8th Cir. 2017) (rejecting as "inadequate" the "naked assertion" that "because data was hacked [the defendant's] protections must have been inadequate"); *cf. AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) ("The fact that a trade secret was successfully misappropriated does not defeat the fact that there were reasonable efforts to maintain its secrecy."). To hold otherwise would equate "reasonable" with "perfect" and "infallible," which is not the standard to which any carrier is held. *Compare* 47 C.F.R. § 64.2010(a) (requiring "reasonable" measures), *with E. I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1017 (5th Cir. 1970) ("[A]n impenetrable fortress is an unreasonable requirement.").

The Commission tries to broaden its rationale beyond the Securus incident by faulting AT&T more generally for relying on an "attenuated chain of contractual arrangements," *i.e.*, what the Commission derides as an "honor system." Comm'n Supp. Br. 34-35. As the Commission eventually acknowledges, though, AT&T did not just rely blindly on "contractual arrangements"; the company conducted regular audits and assessments, and reviewed "daily" the customer-consent records it required providers to submit. *Id.* at 35; AR4:2, 7-8. The Commission's real complaint is that those safeguards did not catch Securus's falsified records or

otherwise prevent Securus's misdeeds. But that logic just brings the Commission back to the same flawed premise: that safeguards cannot be reasonable if they do not prevent any and all misconduct. *Contra, e.g.*, *Reyes-Mata v. IBP, Inc.*, 299 F.3d 504, 506 (5th Cir. 2002) ("The mere occurrence of an event causing injury is not evidence of negligence."); *Chicago, R. I. & P. R. Co. v. Lint*, 217 F.2d 279, 284 (8th Cir. 1954) ("[D]uties *** measured by reasonable and ordinary care" do not require "insur[ance] against all mishaps that might occur.").

Nothing in section 217 of the Communications Act justifies that approach. The Commission suggests that, under that section, *anything* an LBS provider does is attributable to the carriers with which the provider has a relationship. Comm'n Supp. Br. 36-37. In doing so, however, the Commission omits critical language from the statutory text. While the Commission presents section 217 as "provid[ing] that the 'failure of any officer, agent, or other person acting for or employed by any common carrier *** shall in every case be also deemed to be the act, omission, or failure of such carrier," *id.* (ellipsis in original) (quoting 47 U.S.C. § 217), the Commission's ellipsis leaves out that such failures are attributed to the carrier only when the agent is "*acting within the scope of his employment*." 47 U.S.C. § 217 (emphasis added).[2] The Commission does not even try to argue that Securus was

[2] Section 217, in full, provides that "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, *acting within the scope of his employment*, shall in every case be also deemed to be the act,

acting within the scope of any employment (or agency relationship) with AT&T while engaging in misconduct. Nor could it. Securus's abuses were committed in furtherance of an "unauthorized" use case. Comm'n Supp. Br. 28.

**2.** The Commission's blinkered assessment of AT&T's response to the Securus incident fares no better. Notice of Securus's abuses obligated AT&T to respond; it did not dictate what response was "reasonable." That determination required a consideration of the broader context—whether any other providers had abused their access and what the cost-benefit consequences of any response would be for customers. *See, e.g.*, *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977) ("In every case, reasonableness is a function of anticipated results [versus] costs.").

The Commission never undertook that inquiry. If it had, it would have had to account for numerous facts—such as that when AT&T learned of Securus's misconduct, it cut off Securus's access within days and undertook a broader review of its entire LBS program; that AT&T's broad programmatic review revealed no evidence that any other provider had misused its access to AT&T customer information; and that any abrupt change to providers' access could have caused real

---

omission, or failure of such carrier or user as well as that of the person." 47 U.S.C. § 217 (emphasis added).

harms to AT&T customers, who relied on vital location-based services like roadside assistance and fraud prevention. *See* AR4:11-14, 21-22.[3]

The Commission waves away that crucial context because, it says, AT&T should have overhauled its safeguards or shut down its LBS program altogether *within 30 days*—no questions asked. Comm'n Supp. Br. 28-30, 33. But the Commission has never meaningfully weighed the costs and benefits of its proposed alternatives. It suggests that immediately adopting "enhanced measures to verify consumer consent" would have been reasonable because AT&T was in the process of doing so. *Id.* at 33. As AT&T explained, though, that system took months of work by more than 50 AT&T employees and engineers. *See* Opening Br. 18. Even if deploying such a system within 30 days had been possible, a rushed rollout would have risked introducing new and unknown vulnerabilities. As for shutting down the entire program, the Commission says only that its 30-day grace period allowed for an "orderly wind-down." Comm'n Supp. Br. 33. It never addresses the harm that would have befallen customers from ending services like Life Alert's emergency

[3] The Commission repeatedly references reporting that, after the Securus incident came to light, another LBS provider, Microbilt, had misused its access to customer location information. *See* Comm'n Supp. Br. 16, 31, 38. In an apparent attempt to tie that incident to AT&T, the Commission states that Microbilt was one of AT&T's LBS partners. To be clear, however, there was no evidence that Microbilt was ever able to exploit *AT&T*'s procedures to compromise the location data of any *AT&T* customer. *See* AR4:19-21. The *Motherboard* reporting the Commission references concerned misuse of *T-Mobile* data. *Id.* at 20-21.

response, AAA's roadside assistance, or other providers' bank-fraud protection on that truncated timeline.

The Commission's contention that AT&T "failed to promptly address" the Securus incident rings particularly hollow given that the Commission knew of the incident nearly a year before AT&T and did zilch. Comm'n Supp. Br. 19. Indeed, despite learning of Securus's abuses in a 2017 regulatory proceeding, the Commission did not notify AT&T (or any other wireless provider) about apparent vulnerabilities, much less suggest that AT&T stop working with Securus. *See* Opening Br. 51-52; Reply Br. 25-26. Put simply, the Commission cannot fault AT&T for not engaging in an immediate across-the-board shutdown when the Commission itself sat on Securus's abuses for so long.

### C. The Commission Cannot Justify Its Violation Of The Statutory Penalty Cap For Continuing Violations

Liability aside, AT&T should not have been subject to a $57 million penalty—a figure more than *28 times* the $2 million statutory cap for any "continuing *** failure to act." 47 U.S.C. § 503(b)(2)(B); *Amendment of Section 1.80(b) of the Comm'n's Rules*, 34 FCC Rcd. 12,824, 12,828 (2019). Again, one "continuing *** failure" is all the Commission found here: that AT&T purportedly "placed its customers' location information at continuing risk of unauthorized access through its failure to terminate its program or impose reasonable safeguards." AR1:24; *see*

*id.* at 18 ("AT&T failed to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information.").

The Commission's supplemental brief maintains that AT&T "engaged in 84 continuing violations—one for each ongoing relationship with a third-party LBS provider or aggregator that had access to AT&T customer location information more than 30 days after publication of the *New York Times* report." Comm'n Supp. Br. 38. But its actual analysis—like the forfeiture order—tells a different story. Its defense of the Commission's liability determination is devoted entirely to AT&T's alleged broad failure to terminate its program or impose different safeguards. *See id.* at 28-38 (focusing on the general "risk" of the "*system*" AT&T used to protect customers' location information). Nowhere does the Commission even try to show that AT&T acted unreasonably with respect to each of the 84 LBS providers and aggregators for which it was separately penalized. In fact, the Commission brushes aside as irrelevant the identity and reputation of any individual provider, insisting instead that what matters is whether AT&T's "safeguards" were "reasonable" generally. *Id.* at 32-33. The Commission cannot transform its determination about that singular "system" into 84 separate violations to impose a larger penalty. *Id.* at 29 (emphasis omitted).

The statutory text only confirms the point. Congress anticipated that a single failure to act might persist over time, and it accounted for that possibility through

additional penalties for each day of a "continuing violation," subject to an overall cap. 47 U.S.C. § 503(b)(2)(B). As this Court explained when interpreting the very same provision, a "continuing *** failure to act" occurs when there is "a continuing or persistent legal duty that the violator steadily fails to fulfill." *United States v. WIYN Radio, Inc.*, 614 F.2d 495, 497 (5th Cir. 1980). That is precisely the conduct the Commission found here, meaning the $2 million statutory cap applies.

Notably, the Commission's supplemental brief does not mention *WIYN Radio*, much less grapple with its straightforward analysis of the statutory text. In fact, the Commission never even bothers to cite the relevant statutory text. Instead, the Commission brazenly claims that the penalty amount is not "a statutory issue" at all and that AT&T "identifies no statutory language that supports its approach." Comm'n Supp. Br. 39-40. That is obviously incorrect.

The Commission's fallback request for "deference" to its so-called "reading" of the statute is untenable from the get-go. Comm'n Supp. Br. 41. An agency cannot claim deference to a statutory analysis it has never actually conducted. Nor can its plea for deference be reconciled with the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The Commission's argument, borrowed from the Second Circuit, is that discretion to decide whether to pursue a forfeiture and how much to assess "within a statutory cap" includes discretion to decide what counts as a single continuing failure under that cap. Comm'n Supp. Br.

41-42 (quoting *Verizon*, 156 F.4th at 102). That argument works only if discretion authorized *within* a statutory cap includes discretion to *define* the statutory cap. It does not. As AT&T explained, the statutory cap on forfeitures is precisely the sort of "boundar[y] of *** delegated authority" courts are expected to both "fix[]" and "police." *Loper Bright*, 603 U.S. at 395, 404.

The Commission's attempt to defend its penalty calculation as an "issue[] of fact" only underscores the statutory problem. Comm'n Supp. Br. 40. The Commission reasons that it was free to focus on "each unique relationship between AT&T and an LBS provider or aggregator" because "[t]he unit of analysis depends on the nature of the conduct that violated the law" and the Commission should be the one to "determine *** under any given set of circumstances" how the "nature of the conduct" should be characterized. *Id.* at 40-42. But that logic cannot be squared with the statutory cap. It would mean that the Commission may define the relevant "conduct" however it wants (by carrier, relationship, transmission), and then divide any continuing failure to act into as many constituent violations as it likes. And if the Commission could do that, Congress's $2 million cap on "any single act or failure to act" would be an empty shell. 47 U.S.C. § 503(b)(2)(B); *Honeycutt v. United States*, 581 U.S. 443, 454 n.2 (2017) ("[T]he Court cannot construe a statute in a way that negates its plain text[.]"). That is just the sort of "ludicrous" result the *WIYN Radio* Court refused to read into the statute. 614 F.2d at 497-498.

That logic also confirms the arbitrariness of the Commission's calculation. The Commission does not—indeed, cannot—dispute that its approach has no guiding principles or guardrails. Its decision here was nothing more than a "dictate of unbridled whim." *National Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1141 (D.C. Cir. 1984). Worse still, it levied the largest penalties against AT&T for its relationship with the lowest-risk, highest-benefit providers. *See* Supp. Opening Br. 28. That is the definition of arbitrary and capricious.

### D. The Commission Has No Meaningful Response To AT&T's Nondelegation Claim

The Commission's attempts to avoid a nondelegation problem are equally unavailing. As AT&T has explained, in both its original briefs and its supplemental brief, this Court's decision in *Jarkesy* is dispositive. The Court there held that "the power to decide which defendants should receive *certain legal processes* *** and which should not" is a "legislative" power Congress cannot delegate without an "intelligible principle." 34 F.4th at 462. Yet that is exactly what Congress did in the Communications Act: it gave the Commission complete "discretion" to choose between the NAL process and ALJ process, without any intelligible principle to guide the agency's decision. 47 U.S.C. § 503(b)(3)(A).

The Commission responds with the same arguments as before—claiming that *Jarkesy* is distinguishable because that case was limited to the power "to decide whether to proceed in a judicial forum or an executive forum." Comm'n Supp. Br.

54-55 (emphasis omitted). The problems with that argument remain. The logic of this Court's *Jarkesy* decision was not limited to the choice between an agency or Article III court. *See* Reply Br. 14-15; Supp. Opening Br. 28-29. The decision confirmed that "[g]overnment actions are 'legislative'"—and thus require an intelligible principle—so long as "they have 'the purpose and effect of altering the legal rights, duties and relations of persons *** outside the legislative branch.'" *Jarkesy*, 34 F.4th at 461 (ellipsis in original). The Commission barely even tries to suggest that the choice between the NAL process and ALJ process does not have such a purpose or effect.

At most, the Commission says that both processes ultimately "provide[] for judicial review *** in an Article III court." Comm'n Supp. Br. 55. As the Commission later acknowledges, though, there is a material difference (among others): the NAL route provides for a jury trial; the ALJ route does not. *Id.* at 56 n.8. So the Commission's choice between the two necessarily alters the "legal rights" of enforcement targets.

As for an intelligible principle, the Commission cannot rely on the general "directive" to "conduct its proceedings in such a manner as will best conduce to the proper dispatch of business and to the ends of justice," 47 U.S.C. § 154(j), when the Communications Act contains a specific instruction that the choice between processes be made "[a]t the discretion of the Commission," *id.* § 503(b)(3)(A).

"[T]he specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Nor does section 154(j) actually direct the Commission to do anything; it merely states that the Commission "*may* conduct its proceedings in [that] manner." 47 U.S.C. § 154(j) (emphasis added). As such, the Commission's discretion remains unconstrained.

## II. THE ADDITIONAL BASIS IDENTIFIED BY THE SUPREME COURT INDEPENDENTLY COMPELS VACATUR

Beyond the arguments previously briefed in this Court, the Commission cannot escape the alternative basis for vacatur the Supreme Court expressly left open for this Court to consider on remand—that "the specific forfeiture order[] in this case misled [AT&T] into paying." *FCC v. AT&T, Inc.* ("*AT&T II*"), 608 U.S. 531, 548 n.5 (2026).

**A.** As a threshold matter, the Commission argues that AT&T waived this argument by failing to raise it "in its initial appeal" and faults AT&T for doing so only in its Supreme Court reply. Comm'n Supp. Br. 57-58. That is a bold but losing assertion. After all, it is the Commission's own about-face during Supreme Court merits briefing that prompted that Court's observation in the first place.

To recap, when the Commission issued the forfeiture order, it maintained that such orders could be "imposed, from start to finish, without the involvement of Article III courts." *AT&T II*, 608 U.S. at 554 (Thomas, J., dissenting) (internal quotation marks omitted). And throughout the initial appeal in this Court, not to

mention the certiorari stage of Supreme Court review, the Commission never denied that nonpayment would amount to "disobey[ing]" the order. Supp. Opening Br. 33; *see* Comm'n Pet. for Writ of Cert., *FCC v. AT&T, Inc.*, No. 25-406 (U.S. Oct. 2, 2025). Only in its Supreme Court response brief on the merits did the Commission take the position that its orders have no "legal effect" beyond authorizing a collection suit. Comm'n Br. 21, *FCC v. AT&T, Inc.*, No. 25-406 (U.S. Mar. 20, 2026).

The Justices plainly noticed. At oral argument, Justice Kavanaugh repeatedly referred to the Commission's "switch [in] positions." Tr. of Oral Arg. 73. Justice Gorsuch noted frequently the "government's retreat." *Id.* at 82. Justice Thomas remarked that the government "seems to have walked away from th[e] argument" it had made below. *Id.* at 6. In fact, when pressed on the issue, the Commission specifically asked the Court to "leave for remand disputes about * * * whether AT&T was misled." *Id.* at 50-51, 75. The Commission cannot turn around now and claim AT&T waived the issue by not raising it in its "initial appeal." Comm'n Supp. Br. 57; *cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel[] 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'").

The Supreme Court's denial of Verizon's petition for rehearing does not suggest otherwise. *Contra* Comm'n Supp. Br. 58. A denial of rehearing "does not amount to a decision on the merits." *Alpha/Omega Ins. Servs., Inc. v. Prudential

*Ins. Co. of Am.*, 272 F.3d 276, 281 (5th Cir. 2001). And it certainly is not a holding about what a different party preserved in a different case where the Supreme Court expressly remanded the case for further proceedings.

**B.** On the merits, the Commission argues that AT&T could not have been misled because one paragraph in a nearly 100-paragraph order mentioned AT&T's "statutory right to a trial *de novo* before it can be required to pay." Comm'n Supp. Br. 58-59 (quoting AR1:30 (¶ 69)). That contention blinks reality. No reasonable company—particularly one that appears regularly before the Commission as a regulated party—would rely on a reference buried in a long order before deciding whether to comply with a $57 million agency payment directive. The company would look to the order's operative "ordering clauses," as well as the agency's regulations, industry understanding, and the consequences of noncompliance. Here, as explained above and in AT&T's supplemental opening brief, the order and surrounding context (including agency regulations) underscored the Commission's clear-cut directive to pay immediately: "**ORDERED**" that "[p]ayment of the forfeiture *shall be made* in the manner provided for in section 1.80 of the Commission's rules *within thirty (30) calendar days*." AR1:36-37 (italics added); *see* Supp. Opening Br. 31-34.

Citing the Supreme Court's decision, the Commission maintains that the ordering clauses did not "impose a legal duty to pay." Comm'n Supp. Br. 59.

Fair enough; that is what the Supreme Court clarified years after the forfeiture order issued. But that clarification does not change the fact that, in full context at the time, a reasonable company would have read those clauses to require payment. The order was thus misleading. And even the Commission cannot dispute that a misleading order must be vacated as arbitrary and capricious. *See Republican Nat'l Comm'n v. FEC*, 76 F.3d 400, 412 (D.C. Cir. 1996) (Sentelle, J., concurring in part and dissenting in part) ("The unreasonably misleading nature of the prescribed statement, coupled with the Commission's prohibition of additional explanation, provides sufficient grounds for us to hold the regulation arbitrary.") (citing cases).[4]

[4] The Commission objects to AT&T's alternative argument that the Court should, at a minimum, order the Commission to refund AT&T—*i.e.*, restore AT&T to the position it would have occupied had the Commission's forfeiture order been as inconsequential as the Commission told the Supreme Court. According to the Commission, neither the Hobbs Act nor the Administrative Procedure Act ("APA") authorizes a refund absent a vacatur. Comm'n Supp. Br. 61 n.10. But the Hobbs Act authorizes this Court to "set aside" or "enjoin" a Commission order "in part." 28 U.S.C. § 2342(1). And "[t]he APA allows the remedy of 'specific relief,' an equitable remedy, which includes the entitlement of funds or a refund from a government agency." *Fragosa v. Moore*, 17 F. Supp. 3d 985, 988 (C.D. Cal. 2014) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 900-901 (1988)). Together, those provisions allow this Court to remedy the unlawful monetary consequence of the Commission's order without setting aside the order wholesale.

## CONCLUSION

For the foregoing reasons and those included in AT&T's prior briefing, this Court should hold unlawful, vacate, enjoin, and set aside the Commission's forfeiture order.

Respectfully submitted,

October 28, 2026

*s/ Pratik A. Shah*
Pratik A. Shah
Z.W. Julius Chen
Margaret O. Rusconi
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
pshah@akingump.com

*Counsel for Petitioner AT&T, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2026, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Pratik A. Shah*
Pratik A. Shah

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 5,817 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

*s/ Pratik A. Shah*
Pratik A. Shah

October 28, 2026